COPY

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEWEY R. BOZELLA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE COUNTY OF DUTCHESS; THE | ) |
| CITY OF POUGHKEEPSIE; WILLIAM J. | ) |
| O'NEILL; AND ROBERT J. DEMATTIO | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

10 CIV 4917

No. 10 Civ._____
COMPLAINT AND
JURY DEMAND



WILMER CUTLER PICKERING
HALE AND DORR LLP
Peter J. Macdonald
Ross E. Firsenbaum
Somil Trivedi
Margaux J. Hall
399 Park Avenue
New York, New York 10022
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiff Dewey R. Bozella*

Plaintiff Dewey R. Bozella, by and through his attorneys, alleges as follows:

## I.  **INTRODUCTION**

1.     This civil action seeks monetary damages for the extraordinary injuries and damages suffered by Dewey R. Bozella, who was wrongfully convicted and incarcerated for more than 26 years for a murder that he did not commit.

2.     On October 14, 2009, after Mr. Bozella spent more than 26 years incarcerated for the June 14, 1977 murder of J. Emma Crapser in Poughkeepsie, New York ("Crapser Murder"), the Dutchess County Court vacated Mr. Bozella's murder conviction based upon the Defendants' multiple violations of Mr. Bozella's constitutional rights. *People v. Bozella*, 25 Misc. 3d 1215(A), 2009 WL 3364575 (Dutchess Co. Ct. Oct. 14, 2009) (attached hereto as Exhibit A). Specifically, the Dutchess County Court found that there was "overwhelming" evidence demonstrating that the Dutchess County District Attorney's office ("District Attorney") and City of Poughkeepsie Police Department ("Police") violated Mr. Bozella's constitutional rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to Mr. Bozella's defense counsel at or before trial (or anytime between 1977 and 2008) various *Brady* materials – including eyewitness statements, police reports, and even another man's confession to having committed the Crapser Murder.

3.     The egregious misconduct perpetrated against Mr. Bozella spanned the course of 32 years – Mr. Bozella's entire adult life – and included the malicious and relentless prosecution of his case by an assistant district attorney, Defendant William J. O'Neill, who was determined to prosecute and convict Mr. Bozella for the highly-publicized murder at whatever cost. Specifically, Defendant O'Neill, among other things, suppressed exculpatory and impeachment evidence, failed to investigate known and exculpatory leads that pointed to another person as the

actual perpetrator of the crime, and maliciously abused the legal process by coercing a witness to testify falsely before a Grand Jury to indict Mr. Bozella.

4.     Defendant O'Neill also conspired with Defendant Robert J. DeMattio and Officer William Grey to suppress and conceal exculpatory and impeachment evidence that implicated a young man named Donald Wise as the actual perpetrator of the Crapser Murder in violation of Mr. Bozella's constitutional rights.

5.     Instead of prohibiting or discouraging these contemptible violations, the District Attorney and Police permitted, encouraged, and in certain instances *required* such conduct as part of their policies, customs, and/or practices. Among other things, in response to training from the District Attorney, the Police adopted an official policy, custom, and/or practice of destroying detectives' and police officers' interview notebooks after reducing their notes into official reports for the express purpose of ensuring that the notebooks would not have to be produced to defense counsel in connection with criminal trials of individuals such as Mr. Bozella – a policy, custom and/or practice that the Second Department subsequently deemed constitutionally improper. *See People v. Roberts*, 178 A.D.2d 622, 622-23 (N.Y. App. Div. 1991).

6.     Moreover, assistant district attorneys, including Defendant O'Neill, routinely failed to disclose police reports and grand jury testimony to defense counsel, even when such documentation contained exculpatory or impeachment evidence.

7.     These and other policies, customs, and/or practices demonstrated a deliberate indifference towards the constitutional rights of individuals, and in the case of the Crapser Murder, directly and proximately caused violations of Mr. Bozella's constitutional rights.

8.     If not for the misdeeds of Defendants, Mr. Bozella would not have been prosecuted, convicted, and incarcerated in violation of his constitutional rights, and would not have spent 32 years asserting his innocence and fighting for his liberty in connection with a crime that he did not commit.

## II.   PARTIES

9.     Plaintiff Dewey R. Bozella is a 51-year old man residing in Beacon, New York.

10.    Defendant Dutchess County is a body politic and corporate empowered to exercise home rule. The Dutchess County Legislature, the County's policymaker, has delegated final policymaking authority for the supervision and control of the Dutchess County District Attorney's office to the duly elected Dutchess County District Attorney, currently William Grady, and for the relevant time period, John King and William Grady. Messrs. King and Grady further delegated authority to Defendant O'Neill as a final policymaker responsible for his own actions and the actions of subordinate employees. Defendant Dutchess County is sued for the constitutional harm Mr. Bozella has suffered as a direct result of the County's policies, customs, and/or practices with respect to *Brady* and federal law; acts of a County policy-maker in violation of *Brady* and federal law, such that the policies, customs, and/or practices and implementation were one; and a County policy-maker's failure to act in training and supervising assistant district attorneys with regard to *Brady* and federal law when the need was so obvious that the failure to act demonstrated deliberate indifference to criminal suspects' constitutional rights.

11.    Defendant City of Poughkeepsie is a home-rule city located in this judicial district. The City was the employer of Defendant DeMattio and other police officers and detectives (collectively "Officers") at all relevant times, and is and was at all times before and during the investigation and prosecution of the Crapser Murder responsible for the policies,

customs, and/or practices of the Police. Defendant City of Poughkeepsie is sued for the constitutional harm Mr. Bozella suffered as a result of the City's policies, customs, and/or practices with respect to *Brady* and federal law, and a City policy-maker's failure to act in training and supervising Officers with regard to *Brady* and federal law when the need was so obvious that the failure to act demonstrated deliberate indifference to criminal suspects' constitutional rights.

12.     Defendant William O'Neill was employed by the District Attorney at all times relevant to this Complaint. Defendant O'Neill is being sued in his individual capacity, as well as in his official capacity because at relevant times he was a delegated final policymaker responsible for his own actions and the actions of his subordinate employees in the Dutchess County District Attorney's office, and was acting in an administrative capacity in connection with certain matters alleged herein. Defendant O'Neill was acting within the scope of his employment and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York and County of Dutchess when he conducted all activities alleged in this Complaint. Defendant O'Neill resides in Red Hook, New York, which is located in Dutchess County.

13.     Defendant Robert DeMattio was employed by the Police at all times relevant to this Complaint. Defendant DeMattio was acting in his individual capacity, within the scope of his employment, and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York and City of Poughkeepsie when he conducted all activities alleged in this Complaint. Defendant DeMattio resides in Poughkeepsie, New York, which is located in Dutchess County.

## III.  RELEVANT NON-PARTIES

14.     Officer William Grey was employed by the Police at all times relevant to this Complaint.  Officer Grey was acting in his individual capacity, within the scope of his employment, and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York and City of Poughkeepsie when he conducted all activities alleged in this Complaint.  Officer Grey resides in Punta Gorda, Florida.  On May 20, 2010, Officer Grey initiated a Chapter 7 bankruptcy proceeding in the United States Bankruptcy Court for the Middle District of Florida, naming himself, among others, as the debtor in those proceedings.  Accordingly, pursuant to 11 U.S.C. § 362, Officer Grey has not been named as a defendant in this action.

## IV.  JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims arising under 42 U.S.C. § 1983.

16.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because that is the judicial district in which the claims arose.

17.     This action is properly designated for assignment in White Plains under Rule 21 of the Rules For the Division of Business Among District Judges of this Court because the claims arose in whole or in major part in Dutchess County.

## V.  JURY DEMAND

18.     Pursuant to the Seventh Amendment of the United States Constitution, Mr. Bozella requests a jury trial on all issues and claims set forth in this Complaint.

## VI.   FACTUAL ALLEGATIONS

### A.   THE MURDER OF EMMA CRAPSER

19.   Ninety-two year old J. Emma Crapser was brutally murdered in her home at 15 North Hamilton Street in Poughkeepsie, New York at approximately 11:00 p.m. on June 14, 1977.

20.   Ms. Crapser was beaten, bound, and murdered in an unusual and gruesome manner. She was "asphyxiated by suffocation" as her assailants stuffed five pieces of material down her throat – including a chisel-like instrument, cloth, and lace measuring more than 7 feet in length.

21.   The Crapser Murder sparked an outcry in the community. The July 31, 1977 *Poughkeepsie Journal* reported that "[t]he Crapser murder heightened public resentment of a growing number of crimes against the elderly and put pressure on the law enforcement establishment to come up with some answers." Accordingly, the Defendants were under tremendous public pressure to arrest and convict *someone* for the Crapser Murder.

### B.   FROM THE OUTSET, THE DISTRICT ATTORNEY PLAYED AN ACTIVE ROLE IN THE INVESTIGATION OF THE CRAPSER MURDER

22.   The District Attorney and Defendant O'Neill played an active role in the investigation of the Crapser Murder from its earliest stages. Defendant O'Neill conducted investigatory activities at the crime scene on June 15, 1977, directing Officers to take photographs of the scene and to collect fingerprints.

23.   Defendant O'Neill directed Officers to take photographs of all doors and windows in the apartment, including the rear windows facing an alley next to Ms. Crapser's residence, one of which had a missing screw as part of its locking mechanism.

24.     In the ensuing weeks and months, the District Attorney and Defendant O'Neill continued to investigate the Crapser Murder, working alongside Officers during witness interviews and other fact investigation.

### C.     THE POLICE FAILED TO RECORD AND PRESERVE EXCULPATORY AND IMPEACHMENT EVIDENCE

25.     Approximately one day after the Crapser Murder, Officer Pete Murphy interviewed a female neighbor of Ms. Crapser about whether she had heard anything unusual on the night of the murder. The neighbor informed Officer Murphy that she had heard loud noises in the alley at the side of Ms. Crapser's home that sounded like garbage cans being moved.

26.     Officer Murphy did not record in writing the neighbor's statement. Officer Murphy informed his partner, Officer Art Regula, of the sum and substance of the statement, but Officer Regula failed to record in writing the statement as well.

27.     Thus, the Police did not record in writing the neighbor's exculpatory statement – a statement that would have bolstered Mr. Bozella's asserted defense at his criminal trials that the point of entry into Ms. Crapser's home was through a window in the side alley rather than through the front door. On October 14, 2009, the Dutchess County Court concluded that such misconduct constituted a *Brady* violation.

### D.     THE POLICE AND DISTRICT ATTORNEY STRUCK A DEAL WITH LAMAR SMITH TO OBTAIN A FALSE STATEMENT IMPLICATING MR. BOZELLA

28.     On June 25, 1977, Officers Regula and Enno Groth questioned a young man named Lamar Smith and his brother Stanley Smith regarding the Crapser Murder. Lamar Smith and Stanley Smith informed the Officers that they were not at the scene of the murder. The questioning took place in the back of a police car and was tape-recorded.

29. This cassette tape was subsequently destroyed prior to Mr. Bozella's indictment (which took place six years after the Crapser Murder) and would never be made available to Mr. Bozella or his defense counsel.

30. Four days later, on June 29, 1977, Officers Regula and Groth arrested Lamar Smith for a separate burglary. In exchange for his release for the burglary, Lamar Smith changed his story regarding the Crapser Murder and informed the Officers that he had seen Mr. Bozella and Wayne Moseley on Ms. Crapser's porch on the evening of June 14, 1977 while a third individual, Elbert Pittman, served as a lookout. Lamar Smith informed the Officers that he was an observer situated across the street from Ms. Crapser's residence – thus, he claimed to have a vantage point where he could be of value to the Police without implicating himself as a wrongdoer.

31. The Police tape-recorded this second conversation and, in contrast to the exculpatory June 25, 1977 tape, preserved the tape of Lamar Smith's coerced, fabricated, and incriminating account.

32. Officers Regula and Groth also questioned Stanley Smith on June 29, 1977. Stanley Smith echoed his brother's revised story.

33. On or around June 25, 1977, the very same day that Lamar Smith and Stanley Smith informed Officers Regula and Groth that they had nothing to do with the Crapser Murder, the Police interviewed several of Ms. Crapser's neighbors (who lived in the second-floor apartment above Ms. Crapser's first-floor apartment in the same two-family house) and others regarding their observations from the night of the murder. These four witnesses had either (a) entered and exited the second-floor apartment between 10:00 p.m. and 11:00 p.m. on the night of

the murder, or (b) approached the house next door to Ms. Crapser's apartment during the same time frame.

34.     The four witnesses all provided the Police with voluntary statements that they did not see or hear anything unusual in front of Ms. Crapser's home on the night of the murder. One witness told the Police that she loitered on a bench on the street adjacent to Ms. Crapser's home from 7:00 p.m. until 11:00 p.m. on the night of the Crapser Murder and did not observe anything unusual. She further told the Police that she did not observe Lamar Smith, Stanley Smith, or Pittman (whom she knew) at any point that evening.

35.     The neighbors' statements contradicted Lamar Smith's June 29, 1977 story to the Officers. Specifically, the statements undermined Lamar Smith's account that he, Stanley Smith, and Pittman were outside the house just before 11:00 p.m. while Mr. Bozella and Wayne Moseley were entering the house.

36.     The neighbors' statements were recorded in a police report but never produced to Mr. Bozella's defense counsel at any time between 1977 and 2008. As the Dutchess County Court concluded in 2009, the neighbors' statements constituted *Brady* material because they contradicted, among other things, Lamar Smith's June 29, 1977 statement to the Police.

## E.     THE DEFENDANTS ARRESTED MR. BOZELLA BASED ON LAMAR SMITH'S BARGAINED-FOR STATEMENT AND UNLAWFULLY HELD MR. BOZELLA IN CUSTODY FOR ALMOST A MONTH WITHOUT A HEARING

37.     Notwithstanding the neighbors' statements contradicting Lamar Smith's story, on or about June 29, 1977, the Chief of Police, Defendant O'Neill, and other Officers met and decided to file warrants charging Mr. Bozella, Moseley, and Pittman with the Crapser Murder, based solely on the statements of Lamar Smith and Stanley Smith. On or about June 30, 1977, Defendant DeMattio and Officer Siegel arrested Mr. Bozella.

38.     Although a state law prohibited the detention of prisoners beyond 72 hours without bringing their case to a preliminary hearing or the Grand Jury, the Defendants held Mr. Bozella in county jail without bail for *27 days* without granting him a hearing, and without probable cause to indict.  Eventually, on July 28, 1977, Mr. Bozella was released after the District Attorney acknowledged that it had "insufficient" evidence to convene a preliminary hearing.

39.     While Mr. Bozella was in custody, the District Attorney and Police sent latent fingerprints lifted from the crime scene to the FBI to be compared to the fingerprints of Mr. Bozella, Moseley, and Pittman.  The FBI's results revealed that none of the suspects' fingerprints matched any of the latent fingerprints.

**F.     DESPITE HAVING NO CREDIBLE EVIDENCE IMPLICATING MR. BOZELLA, THE DISTRICT ATTORNEY NONETHELESS ATTEMPTED TO INDICT MR. BOZELLA AND FAILED**

40.     Two days after Mr. Bozella's release, the District Attorney deemed its case against Mr. Bozella "insufficient."  According to a *Poughkeepsie Journal* article dated July 31, 1977, the District Attorney understood that Lamar Smith and Stanley Smith's statements were "low priority" evidence that "would not stand up to a Grand Jury or preliminary hearing test." Specifically, Defendant O'Neill told a reporter, "[w]e just need more evidence" to support a finding of probable cause against Mr. Bozella.

41.     In response to public pressure, and with full knowledge that probable cause was lacking given the "low priority" evidence, the District Attorney nevertheless convened a Grand Jury and sought an indictment against Mr. Bozella for the charges of Intentional Murder and Felony-Murder.

42.     Moseley testified before the Grand Jury with immunity and said that he knew nothing about the Crapser Murder.  Moseley informed the Grand Jury that he last saw Mr.

Bozella at approximately 8:00 p.m. on the night of the Crapser Murder. Moseley further testified that he went to McDonald's that evening with Christopher Whitaker, and then went home.

43.     Whitaker gave Officer Regula a statement on July 5, 1977 that corroborated Moseley's Grand Jury testimony.

44.     After considering Lamar Smith and Stanley Smith's testimony, the Grand Jury "no-billed" the case against Mr. Bozella. In other words, the Grand Jury concluded that Lamar Smith and Stanley Smith's stories did not constitute sufficient evidence to support a finding of probable cause to indict Mr. Bozella for the Crapser Murder.

G.     **DONALD WISE COMMITTED A STRIKINGLY SIMILAR ASSAULT IN AUGUST 1977, BUT THE DEFENDANTS FAILED TO INVESTIGATE LEADS CONNECTING DONALD WISE TO THE CRAPSER MURDER**

45.     According to a July 31, 1977 *Poughkeepsie Journal* article, Chief of Police Stuart Bowles maintained that the Police's investigation of the Crapser Murder was "complete" and credited Officers with an "outstanding job," even though the case built by the Police "rest[ed] uneasily on the statements of two unidentified informants [Lamar Smith and Stanley Smith] placing the defendants at the murder scene."

46.     Two days later, on August 2, 1977, the Police found 82-year old Estelle Dobler in her bedroom, located at 210 Main Street in Poughkeepsie, approximately six blocks away from Ms. Crapser's residence. The Police found Ms. Dobler in a strikingly similar position as Ms. Crapser: "laying on the floor and her hands, legs, and mouth were bound with black electrical tape" and with "a stocking [] stuffed in her mouth and then covered with tape."

47.     Ms. Dobler, who survived her attack (the "Dobler Assault"), informed the Police that she observed two black males enter her apartment, one of whom matched the description of the 5 foot, 1 inch-tall Donald Wise.

48.     Within one month of the Dobler Assault, a man named Christopher Gill informed Officers Regula and Groth – the same Officers working on the Crapser Murder investigation – that Donald Wise was Ms. Dobler's attacker.  Specifically, police reports authored by Officer Groth (the "Dobler Reports") indicated that Gill "had a conversation with Donald Wise in which the latter made reference to Mrs. Dobler" and "stated that Donald Wise had carried a rag and that he used this rag to wipe areas that he had touched."  According to Officer Groth's reports, both Officer Regula and Officer Groth believed Gill's statement that Donald Wise was one of Ms. Dobler's attackers.

49.     The District Attorney was aware of Gill's identification of Donald Wise as Ms. Dobler's attacker.  The Dobler Reports state that the interview of Mr. Gill was conducted "with the knowledge of Assistant District Attorney Otto Williams."

50.     The District Attorney kept a copy of the Dobler Reports in its file for a subsequent February 1978 murder in the same neighborhood ("King Murder"), a murder for which Defendant O'Neill prosecuted Donald Wise and for which Donald Wise was convicted and sentenced to 20 years to life in prison.  Thus, during the prosecution of Donald Wise for the King Murder in 1978, Defendant O'Neill was aware of the Dobler Assault.  However, the District Attorney *did not* place a record of the Dobler Reports in its files for the Crapser Murder. In short, the District Attorney took no steps to ensure that Defendant O'Neill or any other assistant district attorney preserved this exculpatory and impeachment evidence in connection with the Crapser Murder to ensure that it would be produced to Mr. Bozella in accordance with Mr. Bozella's constitutional rights.

51.     The Defendants never produced the Dobler Reports to Mr. Bozella's defense counsel between 1977 and 2008.  As the Dutchess County Court concluded in 2009, the Dobler

Reports constituted *Brady* material because they implicated Donald Wise as Ms. Crapser's assailant.

### H. DONALD WISE COMMITTED A STRIKINGLY SIMILAR MURDER IN FEBRUARY 1978, BUT THE DEFENDANTS FAILED TO INVESTIGATE LEADS CONNECTING DONALD WISE TO THE CRAPSER MURDER

52.     Approximately six months after the Dobler Assault, the Police arrested Donald Wise and his brother Anthony Wise for the February 20, 1978 murder of 80-year old Mary King in Ms. King's home (the "King Murder"), just blocks away from Ms. Crapser's and Ms. Dobler's homes.

53.     Defendant O'Neill visited the scene of the King Murder approximately thirty minutes after the Police were informed of the King Murder. As he did at the scene of the Crapser Murder, Defendant O'Neill "assisted in the coordination of the [King Murder crime scene] investigation." Defendant O'Neill observed that Ms. King, like Ms. Crapser, had been "strangled and hit with blunt objects."

54.     Officer Grey and Defendant DeMattio also assisted with the criminal investigation for the King Murder.

55.     The Defendants and the community at large were aware of the similarities between the King Murder and the Crapser Murder, which both involved elderly women who were assaulted and murdered in their homes late at night within a close time frame and geographic proximity.

56.     The King Murder was similar to the Crapser Murder in at least three ways. First, the perpetrators used the same modus operandi – asphyxiating their victim by stuffing objects down her throat. Second, both crimes evidenced wanton violence, far beyond what young men in their late teens would need to do to steal from elderly women. Third, the assailants in both murders canvassed the scene prior to burglarizing the victim's home.

57.     Defendant O'Neill served as the lead prosecutor of Donald Wise for the King

Murder in 1978.

58.     The District Attorney publicly acknowledged the similarity between the Crapser

Murder and the King Murder.  On February 22, 1978, District Attorney King stated, "We have

had the thought that the age alone (of the victims) is enough to make the parallel."

### I.     THE DEFENDANTS LEARNED THAT DONALD WISE CONFESSED TO COMMITTING THE CRAPSER MURDER, BUT THEY SUPPRESSED AND CONCEALED THE CONFESSION AND FAILED TO INVESTIGATE THE EXCULPATORY LEAD

59.     On February 22, 1978, Defendant O'Neill participated in an interrogation of

Anthony Wise in connection with the King Murder.  During the interrogation, Anthony Wise

confessed that he, Donald Wise, and a young man named Saul Holland had committed the King

Murder.

60.     On February 22, 1978, Defendant O'Neill participated in an interview of Shirley

Wise, Carmen Wise, and Tina Wise in connection with the King Murder.  During the interview,

the three women (who were Donald Wise and Anthony Wise's sisters) informed Defendant

O'Neill that Anthony Wise, Donald Wise, and Saul Holland had committed the King Murder.

61.     On February 22, 1978, Defendant O'Neill participated in an interview of

Madeline Dixon South, Anthony Wise's girlfriend, in connection with the King Murder.  During

the interview, South informed Defendant O'Neill that Anthony Wise, Donald Wise, and Saul

Holland had committed the King Murder.

62.     On February 23, 1978, just one day after District Attorney King's statement that

the King Murder and the Crapser Murder were similar based upon the age of the victims, Officer

Grey, Defendant DeMattio (the same Officer who arrested Mr. Bozella for the Crapser Murder

months earlier), and Defendant O'Neill questioned Saul Holland about his involvement in the King Murder.

63. During the interrogation, Holland informed Defendant O'Neill, Defendant DeMattio, and Officer Grey that Donald Wise had convinced him to participate in the King Murder because Donald Wise said he had previously committed a similar crime and gotten away with it:

> Oh, they had did – *they had did one of these jobs here before.* [Donald Wise] said, you ain't got nothing to be scared of or nervous about.

Holland proceeded to describe the specifics of Donald Wise's previous crime:

> He said the way they did it, they, you know, *when they got to the house, there wasn't nobody there*, you know, and they just found all this money and stuff and then around, you know – *they said around 9 or 10 or 11, that's when the lady came home. She must have come home.*

64. Holland's description of Donald Wise's previous crime to Defendant O'Neill, Defendant DeMattio, and Officer Grey matched the description of the Crapser Murder – Ms. Crapser's assailants were inside her apartment and attacked her when she arrived home at approximately 11:00 p.m.

65. But the Defendants took no further steps to investigate this lead despite the fact that there was no unsolved crime other than the Crapser Murder which could fit the description conveyed by Holland.

66. Holland had just informed the Defendants that his accomplice Donald Wise had confessed to the Crapser Murder. But rather than ask Holland additional questions about Donald Wise's previous crime, Officer Grey steered the conversation away from this previous crime, responding:

> *Well, I don't want to get into that because we're liable to get confused.*

67. The Defendants suppressed this favorable evidence from ever coming to light. The Defendants did not follow up on Holland's statement about Donald Wise's previous crime at any point during the interrogation or afterwards. For example, although the District Attorney and Police had by this time previously attempted to match the fingerprints of Mr. Bozella to those recovered from Ms. Crapser's home, none of the Defendants attempted to match Donald Wise's fingerprints to the latent fingerprints at any time between 1977 and 1982, despite knowing of the striking similarities between the Crapser Murder, King Murder, and Dobler Assault, and despite Holland's statement that Donald Wise had committed a crime that matched the description of the Crapser Murder. In suppressing and failing to further investigate this highly exculpatory evidence, the Defendants violated Mr. Bozella's constitutional rights.

68. The Police recorded the Holland interrogation on a cassette tape. The District Attorney kept a copy of the cassette in its files for the prosecution of Donald Wise, Anthony Wise, and Holland in connection with the King Murder.

69. However, the District Attorney *did not* keep a copy of the cassette in its files for the Crapser Murder. Nor did the District Attorney or Defendant O'Neill place a record of the Holland interrogation or Donald Wise's confession in its files for the Crapser Murder. In short, the District Attorney took no steps to ensure that Defendant O'Neill or another assistant district attorney preserved this exculpatory and impeachment evidence in connection with the Crapser

- 17 -

Murder to ensure that it would be produced to Mr. Bozella in accordance with Mr. Bozella's constitutional rights.

70.     The Defendants never produced the Holland tape to Mr. Bozella's defense counsel between 1977 and 2008. As the Dutchess County Court concluded in 2009, the Holland tape constituted *Brady* material because it implicated Donald Wise as Ms. Crapser's assailant.

**J.     THE DISTRICT ATTORNEY CONTINUED TO MALICIOUSLY PROSECUTE MR. BOZELLA BY STRIKING A DEAL WITH MOSELEY TO TESTIFY FALSELY AGAINST MR. BOZELLA**

71.     The District Attorney secured convictions of Donald Wise and Anthony Wise for the King Murder in 1978.

72.     Upon information and belief, there were no brutal attacks of elderly women in their homes in Poughkeepsie, New York between the date of the arrests of Anthony Wise, Donald Wise, and Holland in 1978 and the arrest of Mr. Bozella for the Crapser Murder in 1983.

73.     The investigation of the Crapser Murder reached an apparent dead-end in 1978. For approximately *five years*, the Defendants failed to procure any evidence to corroborate Lamar Smith's story that he had seen Moseley and Mr. Bozella outside Ms. Crapser's residence on the night of the Crapser Murder and that he had seen them enter through the front door.

74.     In October 1981, the District Attorney saw an opportunity to obtain the so-called "evidence" it needed to indict Mr. Bozella. Specifically, the District Attorney learned that Moseley had been arrested for a separate crime and was serving a sentence for a felony with a maximum expiration date of December 16, 1986. The District Attorney sent a young assistant district attorney – Thomas Whelan – to visit Moseley at Arthur Kill Correctional Facility to suggest that if Moseley would change his account to implicate Mr. Bozella in the Crapser Murder, he could thereby secure his own release from state prison.

75.    During his very first meeting with Moseley, Whelan told Moseley that "based on the review of the file, it was *totally obvious* that he [Moseley] was involved and that we could talk frankly because there was no chance of his being prosecuted," even though there was no credible evidence suggesting that Moseley or Mr. Bozella had any connection with the crime.

76.    Whelan "proposed . . . in exchange for his truthful testimony concerning what happened in connection with the burglary and homicide of Ms. Crapser, that perhaps a favorable recommendation could be made concerning his parole status." Whelan's offer focused specifically on Mr. Bozella:

> Q.    Mr. Whalen, did you tell ... Mr. Moseley, we want your cooperation about Dewey Bozella's involvement, or did you ask him for his truthful testimony in general, his truthful information?
>
> A.    *I was specific as to Dewey Bozella being the target* . . ..

77.    Whelan's supervisor, Assistant District Attorney D. James O'Neil, authorized Whelan's deal with Moseley because, according to O'Neil, the Crapser Murder was one that the People remained "very, very interested in."

78.    Whelan informed Moseley that Moseley had immunity with regard to the Crapser Murder. Yet even with that reassurance, Moseley reiterated what he said in 1977 – that he did not have any information concerning the Crapser Murder.

79.    According to Whelan's testimony, over the next *18 months* of negotiations with Moseley, Whelan "never remember[ed] getting any phone calls from him [Moseley] or any letters written directly to me. *I sought him out.*"

80.    During this time, after several unfruitful meetings between Whelan and Moseley, Assistant District Attorney D. James O'Neil paid a visit to Moseley. Moseley again denied knowledge of the Crapser Murder. But, understanding the favorable offer that was on the table,

Moseley soon realized that he could gain his freedom if he told the assistant district attorneys the information that they wanted to hear. Moseley offered D. James O'Neil fabricated tidbits of details about a murder to "entice" him for a deal. Moseley lacked credibility but nonetheless proceeded to "negotiate" his freedom with the District Attorney.

81.     Despite knowing that Moseley had previously testified before the Grand Jury in 1977 that he had no knowledge about the Crapser Murder, and possessing ample evidence corroborating Moseley's Grand Jury testimony, the District Attorney nonetheless was determined to coerce Moseley to "flip" to implicate Mr. Bozella.

82.     Moseley threatened that he would not provide additional information unless the District Attorney promised him, in writing, complete immunity for any involvement with the Crapser Murder. Moseley also demanded that the District Attorney release him from state prison as a condition of his providing further information.

83.     The District Attorney asked the New York State Division of Parole to release Moseley early as part of an effort to secure false testimony from Moseley against Mr. Bozella. The New York State Division of Parole refused.

84.     The District Attorney was in a logjam – it had arranged for Moseley to testify against Mr. Bozella before the Grand Jury in March 1983, but Moseley was unwilling to do so unless the District Attorney had secured his release from prison by then. Ultimately, with deliberate disregard for Mr. Bozella's constitutional rights, the District Attorney crafted a creative solution to obtain the false testimony that it had sought for six years.

85.     Assistant District Attorney D. James O'Neil described Moseley's deal as follows:

> So I told him if we could not get him released through the parole
> process, we would use the process in the Criminal Procedure law
> called a 440 motion to go back and have the court review his prior
> conviction and sentence and to find a way, not that there was a

- 20 -

problem with the case, but to find a way to change the sentence, reduce it to a misdemeanor, which would allow him to be released from prison. *It was more or less a maneuver mechanism to give him something for his help.*

86.     The District Attorney's offer to Moseley was extremely generous, particularly given that there was no legal infirmity with Moseley's existing felony conviction. According to Moseley's court-appointed attorney:

> [The deal] was extraordinarily good, that here he was in prison on a felony, and he was then going to be released on a misdemeanor conviction with a vacating of the felony. I was very pleased, even though it had nothing to do with my abilities. If it had something to do with my abilities, I would have been even more pleased.

87.     The District Attorney suggested to Moseley's attorney what arguments to make in the 440 motion and played an active role in preparing and organizing this unprecedented procedural move to secure Moseley's testimony against Mr. Bozella. Not surprisingly, the District Attorney did not oppose the 440 motion that it had helped to prepare and organize.

88.     Moseley was released from prison in April 1983, after testifying against Mr. Bozella before the Grand Jury with complete immunity for the Crapser Murder and for perjury.

89.     The District Attorney also struck a deal with Lamar Smith, who was incarcerated for a separate crime in 1983, to obtain his testimony against Mr. Bozella.

K.     **MADELINE DIXON SOUTH INFORMED THE POLICE, DISTRICT ATTORNEY, AND DEFENDANT O'NEILL THAT DONALD WISE CONFESSED TO THE CRAPSER MURDER**

90.     At approximately the same time that the District Attorney struck a deal with Moseley, Madeline Dixon South informed the Police, District Attorney, and Defendant O'Neill that Donald Wise and Anthony Wise – not Mr. Bozella – had committed the Crapser Murder.

91.     South, who was Anthony Wise's girlfriend at the time of the Crapser Murder,

informed the Police, District Attorney, and Defendant O'Neill that on the morning of June 15,

1977, Donald and Anthony Wise boasted to her about killing Ms. Crapser the previous evening.

92.     South informed the Police, District Attorney, and Defendant O'Neill:

> That at her apartment she was then living with Anthony Wise and
> that Donald Wise and Sonia Williams was there, and Wayne Wise
> and Carol Valle, and they planned to do a burglary, and that
> Anthony, Donald, Wayne, Sonia Williams, and Carol Valle left the
> apartment, and that they later came back saying they had done a
> burglary. And Donald told her that she would read about it in the
> paper. I'm not sure she specified it was on June 14th. I think the
> nearest she could recall was that it was in June of 1977.

93.     South also told the Police, District Attorney, and Defendant O'Neill:

> [T]he following day Donald Wise came back to her apartment and
> that he brought a paper with him in which the story was. She said
> that they then left her apartment, walked to the Main Mall, going
> by the house where the murder occurred, and that they went on to
> the Mall to a jewelry store to sell some jewelry they had gotten
> from the burglary.

94.     South further informed the Police, District Attorney, and Defendant O'Neill that

Donald Wise and Anthony Wise indicated to her on June 15, 1977 that they had committed a

"movie" (i.e., a robbery "hurting someone") at Ms. Crapser's residence the previous evening.

95.     According to South, Donald Wise told her that "he went through the window, the

side window, through the little alley and went into the room and he gagged and tied [Ms.

Crapser] up and laid her on the floor and he went through the drawers." In short, South informed

the Police, District Attorney, and Defendant O'Neill that Donald Wise had confessed to her that

he had murdered Ms. Crapser.

**L.     THE DISTRICT ATTORNEY SECURED AN INDICTMENT AGAINST MR. BOZELLA BY COERCING MADELINE DIXON SOUTH TO LIE TO THE GRAND JURY**

96.     South also testified before the Grand Jury in 1983; but, remarkably, despite having just informed the Police, District Attorney, and Defendant O'Neill that Donald Wise had confessed to her that he committed the crime in Ms. Crapser's home, her story changed.

97.     South did not relay to the Grand Jury what she had told the Police, District Attorney, and Defendant O'Neill. Instead, South withheld from the Grand Jury evidence that Donald Wise had committed the Crapser Murder.

98.     South told the Grand Jury that she had made up her earlier story that Donald Wise had confessed to the Crapser Murder. Months later, when asked why she had told the Grand Jury that she made up her earlier story, South testified under oath, *"[b]ecause I was pressured"* by Defendant O'Neill to do so.

99.     Defendant O'Neill's coercion of South was in an investigatory rather than judicial capacity. Defendant O'Neill did not prosecute the Indictment of Mr. Bozella in 1983.

100.    Using the combination of South's coerced, false testimony and Moseley's negotiated, false testimony, the District Attorney secured an indictment against Mr. Bozella for the murder of Ms. Crapser.

101.    Yet the District Attorney and Defendant O'Neill knew that there was no probable cause to secure such an indictment – an indictment that was the product of malice, bad faith, and fabricated, coerced, and suppressed evidence.

102.    Specifically, the District Attorney itself had acknowledged in 1977 (and the 1977 Grand Jury had confirmed) that Lamar Smith and Stanley Smith's statements were "insufficient" to constitute probable cause. Even with Moseley's testimony, there was still no probable cause because Moseley's testimony was (a) inconsistent with Moseley's prior statements that he lacked

personal knowledge of the Crapser Murder, (b) inconsistent with Lamar Smith's account of the timeline and events on the evening of the Crapser Murder, (c) inconsistent with the statements of Christopher Whitaker as to Moseley's whereabouts on the evening of the Crapser Murder, and (d) obtained only through prolonged, coercive negotiations and an unusually favorable deal with the District Attorney that resulted in Moseley's early release from prison.

103.　Defendant O'Neill also had coerced South to lie to the Grand Jury.  Thus, South's testimony, combined with that of Lamar Smith, Stanley Smith, and Moseley, did not constitute probable cause.

104.　On or about April 3, 1983, days after the Indictment, District Attorney King made a statement to the press that demonstrated the relentless pursuit of Mr. Bozella: "[t]his arrest indicates that neither my office or Chief [Stuart] Bowles and the city police give up on a case."

**M.　THE DEFENDANTS LEARNED THAT A FINGERPRINT FOUND ON THE INSIDE OF MS. CRAPSER'S BATHROOM WINDOW MATCHED DONALD WISE'S FINGERPRINT**

105.　Revealing their own doubts about their "case" against Mr. Bozella, and their own belief that South's statement implicating Donald Wise was accurate, the Police and District Attorney sent Donald Wise's fingerprints to the FBI to determine whether Donald Wise's fingerprints matched any of the latent fingerprints recovered from Ms. Crapser's residence.

106.　Rather than wait for the results of the fingerprint analysis to return, the District Attorney pleaded its case to the Grand Jury.  By pushing forward relentlessly with its prosecution six years after the Crapser Murder, the District Attorney ensured that the Grand Jury would never get to consider exculpatory and impeachment evidence from the fingerprint analysis.

107.　When the Police and District Attorney received the results from the FBI on June 17, 1983, they learned that Donald Wise's fingerprint matched a fingerprint found on the *inside* of Ms. Crapser's bathroom window.

108. This window was the same window facing the alley where a neighbor informed Officer Murphy that she had heard noises on the night of the murder, a statement that Officer Murphy never wrote down and that was never disclosed to Mr. Bozella's defense counsel at or before either of his trials.

109. Thus, in June 1983, after Moseley was released from prison, and after Mr. Bozella was indicted and incarcerated, the Police and District Attorney learned of the first, and only, piece of physical evidence suggesting the identity of Ms. Crapser's murderer. That evidence implicated Donald Wise – not Mr. Bozella – as the murderer of Ms. Crapser.

110. The District Attorney and Defendant O'Neill were aware of, but nonetheless ignored, this evidence and proceeded to trial against Mr. Bozella. They had no reasonable explanation for pursuing Mr. Bozella rather than Donald Wise for the Crapser Murder.

111. In a November 29, 1983 news article, Assistant District Attorney D. James O'Neil informed a *Poughkeepsie Journal* reporter "that a witness provided information that the Wise brothers had been involved in the Crapser killing" and that "[w]e investigated that story: as part of it we sent the prints of the Wise brothers to the FBI to check against the print on the window." Assistant District Attorney D. James O'Neil did not explain why the District Attorney and Defendant O'Neill did not pursue a case against Donald Wise after discovering physical evidence suggesting Donald Wise was the perpetrator.

112. The District Attorney and Defendant O'Neill knew that Donald Wise had been convicted of the King Murder, had confessed to the Dobler Assault, and had confessed to Holland and South that he had committed a burglary matching the one at Ms. Crapser's residence. Yet, without any evidence to support his theory, Assistant District Attorney D. James

O'Neil suggested that "the Wise fingerprint was most likely left on the window prior to the night of the slaying, possibly during another burglary."

113.    In short, on the intractable theory that Mr. Bozella had committed the Crapser Murder, the District Attorney and Defendant O'Neill arranged for the release of two convicted felons – Moseley and Lamar Smith.  Having arranged the release of both, and having based the Indictment against Mr. Bozella on these convicted felons' coerced testimony, the District Attorney and Defendant O'Neill refused to dismiss the Indictment, despite physical evidence implicating Donald Wise (who was already incarcerated for the King Murder).  Instead, the District Attorney and Defendant O'Neill failed to pursue exculpatory leads pointing to Donald Wise as the perpetrator and continued to suppress exculpatory and impeachment evidence (i.e. the Dobler Reports and the Holland tape) from defense counsel and the Grand Jury.  The District Attorney and Defendant O'Neill continued their malicious prosecution of Mr. Bozella in violation of his constitutional rights.

N.    **THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL TRIED MR. BOZELLA WITHOUT PROBABLE CAUSE AND THEN VIOLATED MR. BOZELLA'S *BATSON* RIGHTS DURING HIS 1983 TRIAL**

114.    Defendant O'Neill served as the lead prosecutor for the District Attorney during the 1983 trial of Mr. Bozella.

115.    Defendant O'Neill lacked probable cause to justify the existing Indictment against Mr. Bozella since he had procured the Indictment through false testimony, the coercion of a key witness, and the incomplete presentation of exculpatory and impeachment evidence to the Grand Jury.

116.    Just as the statements of Lamar Smith and Stanley Smith had been "insufficient" to constitute probable cause in 1977, Lamar Smith and Stanley Smith's testimony, combined

- 26 -

with Moseley's testimony and South's coerced testimony, also was insufficient to constitute probable cause to support an indictment.

117.    In addition, on the eve of trial, Defendant O'Neill knew that Donald Wise's fingerprint had been found inside Ms. Crapser's bathroom window. Without probable cause, with malice, and in deliberate disregard of Mr. Bozella's constitutional rights, Defendant O'Neill nonetheless proceeded to trial against Mr. Bozella.

118.    Prior to Mr. Bozella's trial, Mr. Bozella's trial counsel requested that the District Attorney and Defendant O'Neill produce to them all *Brady* material. The District Attorney and Defendant O'Neill failed to produce the four categories of *Brady* material (discussed in Section R below) to Mr. Bozella or his counsel.

119.    Prior to Mr. Bozella's trial, during voir dire, Defendant O'Neill excluded all six African-Americans available in the venire without having race-neutral reasons for doing so.

120.    Following a three week trial, on December 3, 1983, a jury without a single African-American individual found Mr. Bozella (who is African-American) guilty of second-degree murder.

121.    Mr. Bozella appealed his conviction on the grounds that Defendant O'Neill's exclusion of all African-American individuals from the venire violated Mr. Bozella's constitutional rights. The Second Department remitted the matter to the trial court to conduct a hearing to determine whether Defendant O'Neill's use of peremptory challenges to remove potential jurors violated Mr. Bozella's constitutional rights.

122.    In reviewing the hearing, the Second Department concluded that Defendant O'Neill's testimony at the hearing "amounted to little more than a denial of discriminatory purpose and a general assertion of good faith, [which] failed to satisfy the[] [People's] burden of

establishing racially neutral explanations for the challenges." Thus, the Second Department vacated Mr. Bozella's conviction, holding that Defendant O'Neill's use of preemptory challenges violated Mr. Bozella's constitutional rights, and ordered a new trial.

## O.    STANLEY SMITH RECANTED HIS TESTIMONY IMMEDIATELY AFTER THE JURY CONVICTED MR. BOZELLA

123.     On the Monday morning following the jury's verdict, Stanley Smith recanted his trial testimony implicating Mr. Bozella. Stanley Smith told the District Attorney that he had lied under oath during the trial in order to corroborate his brother's testimony: "I looked up to my brother, so there wasn't nothing I wouldn't do for my brother."

124.     Instead of encouraging Stanley Smith to provide a truthful account, or exploring the merits of Stanley Smith's account, Defendant O'Neill threatened Stanley Smith with a perjury charge if Smith pursued his recantation.

## P.    THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL RE-TRIED MR. BOZELLA IN 1990, AGAIN VIOLATING HIS CONSTITUTIONAL RIGHTS

125.     The District Attorney and Defendant O'Neill re-tried Mr. Bozella in 1990 (the "1990 Trial"). Defendant O'Neill served as the lead prosecutor for the District Attorney during the 1990 Trial.

126.     Defendant O'Neill lacked probable cause to pursue his prosecution for the same reasons that he lacked probable cause on the eve of the 1983 trial. In addition, on the eve of the 1990 Trial, Stanley Smith had recanted his testimony from the 1983 trial and had informed the Dutchess County Court that neither he nor Lamar Smith was present at or near Ms. Crapser's residence at the time of the Crapser Murder. Yet, without probable cause, with malice, and in deliberate disregard of Mr. Bozella's constitutional rights, Defendant O'Neill nonetheless

proceeded to re-try Mr. Bozella based on false testimony, the coercion of a key witness, and suppressed exculpatory and impeachment evidence.

127.    In preparation for the 1990 Trial, Mr. Bozella's counsel filed a pre-trial motion to obtain *Brady* materials from the District Attorney and obtained a judicial subpoena duces tecum ordering District Attorney William V. Grady to appear before the court on November 16, 1990 and to bring with him, among other items, "any and all records, investigative reports, statements of witnesses concerning the murder of Emma Crapser in the custody of the Dutchess County District Attorney's office." Despite such a request, the District Attorney and Defendant O'Neill failed to produce the *Brady* evidence (discussed in Section R below) to Mr. Bozella or his counsel.

128.    The District Attorney and Defendant O'Neill's evidence against Mr. Bozella in the 1990 Trial was insubstantial. No physical evidence placed Mr. Bozella at or near the scene of the crime. The District Attorney and Defendant O'Neill did not prove that Mr. Bozella had a unique motive for the crime. The District Attorney and Defendant O'Neill failed to present the testimony of a single unbiased witness who could identify Mr. Bozella as the perpetrator. Instead, the case hinged exclusively on the testimony of Lamar Smith and Moseley, two convicted felons who had received highly favorable deals in exchange for their testimony against Mr. Bozella.

129.    Lamar Smith testified at the 1990 Trial that he was smoking marijuana and drinking beer in Mansion Square Park with his brother Stanley Smith, Moseley, Pittman, and Mr. Bozella on the evening in question.

130.  Lamar Smith also testified that Pittman served as the lookout, but never entered Ms. Crapser's house. This testimony contradicted Lamar Smith's initial statement to the Police on June 25, 1977.

131.  Lamar Smith testified that Moseley and Mr. Bozella were inside the house for between 5-10 minutes. This testimony contradicted Lamar Smith's June 29, 1977 statement to the Police, in which he informed the Police that he remained across the street from Ms. Crapser's residence for forty-five minutes while Pittman "was walking up and down the street in the vicinity of the house" serving as a lookout for Moseley and Mr. Bozella.

132.  Moseley testified at the 1990 Trial that he had drunk "anywhere in between from eight to fourteen quarts" of beer on June 14, 1977, and was "pretty high" and "pretty drunk."

133.  Lamar Smith and Moseley's collective testimony had significant holes. They testified that they broke two doors to gain entry to Ms. Crapser's residence. Yet neither Ms. Crapser's niece Evelyn Petterson nor Officer Sauter – both of whom arrived at Ms. Crapser's apartment after Moseley and Mr. Bozella supposedly broke in her front door – observed anything unusual about the front door.

134.  The Grand Jury testimony of Joan Moseley, Moseley's mother, was read into the record during the 1990 Trial, revealing that Moseley was with his mother in their home at the time of the Crapser Murder.

135.  Stanley Smith testified as a defense witness without immunity and offered additional testimony contradicting his brother Lamar Smith's testimony. Stanley Smith testified that he and his brother Lamar Smith were at Lamar Smith's girlfriend's house on the evening of June 14, 1977, and he never saw Mr. Bozella or Moseley that night.