# EXHIBIT A



Page 1

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

**H**NOTE: THIS OPINION WILL NOT APPEAR IN A PRINTED VOLUME. THE DISPOSITION WILL APPEAR IN A REPORTER TABLE.

County Court, Dutchess County, New York.
The PEOPLE of the State of New York,
v.
Dewey BOZELLA, Defendant.
No. 102/83.

Oct. 14, 2009.

MAJORITY OPINION

JAMES T. ROONEY, J.

### INTRODUCTION

*1 In December 1990, a jury convicted Dewey Bozella of the brutal murder of an elderly woman thirteen years earlier on the evening of June 14, 1977 in the City of Poughkeepsie. This was the Defendant's second trial for this offense as a previous conviction in 1983 was reversed by the Appellate Division, Second Department, on the basis of a *Batson* violation ( 161 A.D.2d 775 [2d Dep't 1990] ).

Now, almost twenty years after his second conviction, Mr. Bozella moves pursuant to CPL 440.10(1)(g)and(h) to set aside the judgment of conviction claiming (1) his conviction was obtained in violation of his constitutional right to due process; (2) newly discovered evidence; and (3) actual innocence. The gravamen of the defendant's motion is that the People violated his constitutional right to due process by withholding certain *Brady* material. It is alleged that the non-disclosed material not only supports Bozella's theory of the case at trial, but also contradicts the testimony of the People's key trial witnesses who repeatedly changed their stories over the course of the thirteen years leading up to the second trial and who testified against Dewey Bozella only after securing beneficial deals with the District Attorney. Bozella maintains that this newly discovered *Brady* material-which the People had a obligation to produce during pre-trial discovery-warrants a new trial.

### PROCEDURAL AND FACTUAL HISTORY

Before reaching the merits of defendant's post-judgment motion, a review of the extensive procedural and factual history of this case is necessary.[FN1]

> FN1. The facts are taken from the papers and exhibits submitted in support of and in opposition to defendant's 440 motion, which include the trial transcript of the second trial, as well as the records from the County Clerk's office.

### THE POLICE INVESTIGATION

On June 14, 1977, ninety-two year old Emma Crapser spent the last evening of her life playing bingo at St. Joseph's Church. At about 11:00 p.m. she returned to her modest apartment on 15 North Hamilton Street in the City of Poughkeepsie where she apparently interrupted a burglary. The perpetrators had ransacked the apartment. Emma Crapser sustained blunt force injuries, was bound with cord and eventually suffocated as a result of the several pieces of material stuffed down her throat, including a lady's handkerchief, two cloth collars, and a thin 88 inch length of crocheted lace. A chisel-like instrument was protruding from the victim's mouth. A t-shirt and a lady's slip were wrapped around her head and tied with knots.

The police received a tip from an informant that Lamar Smith was involved in the murder. Interestingly, Detective Groth of the City of Poughkeepsie Police Department, had spotted Lamar at about 7:00 p.m. on the night in question in front of the victim's home with his brother Stanley, Elbert Pittman, and another unidentified person.[FN2] The police interviewed Lamar, his brother Stanley, and Pittman, and they all told conflicting stories about being in the vicinity of the victim's apartment building that evening. On June 25,1977, Lamar Smith told the police that he had no knowledge of the murder and denied any involvement. He told police he had been with Wanda Elting that evening. Wanda said that Lamar had been with her from 6:15 p.m. to 11:00 p.m. but

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

later recanted, claiming Lamar had threatened her.

> FN2. At trial, Detective Groth testified that he did not recognize Dewey Bozella in this group.

*2 On June 29, 1977, the police arrested Lamar for an unrelated attempted burglary, whereupon he told the police a different story. This time, Lamar told the police that he had seen Wayne Moseley and Dewey Bozella on the victim's porch after 8:00 p.m. on the evening of the murder. It further appeared that Dewey was forcing the lock, and Elbert was walking up and down the block. Lamar watched them for about forty-five minutes until a blue car pulled up.

Wayne Moseley was interviewed by the police on June 24, 1977. He claimed that on the night of the murder, he and Dewey went to New York City. He then changed his story and claimed he played basketball with Dewey from 6:00 p.m. to 9:30 p.m. and then went home.

Around the end of June, the police arrested Bozella, age eighteen, Moseley, age fifteen, and Pittman, age eighteen, for the murder of Emma Crapser.

*THE FIRST GRAND JURY PROCEEDING*

In September, 1977, a grand jury was convened. After two months of hearings, during which Wayne Moseley testified with immunity from prosecution for the murder, the grand jury issued a "no bill" against Bozella and Pittman.

*SIMILAR ASSAULTS ON ELDERLY WOMEN*

Several weeks after Emma Crapser's murder, on August 2, 1977, another elderly woman was similarly assaulted in her apartment in the City of Poughkeepsie, several blocks from Emma Crapser's residence. According to the City of Poughkeepsie Police Department reports, Estelle Dobler, eighty-two years of age, was knocked down, bound and had something stuffed inside her mouth. The police interviewed Christopher Gill, a friend of Donald Wise. Gill told the police that Wise was Estelle Dobler's attacker and the victim's description of her assailant matched that of Donald Wise (*see* Steiman Affirmation, Ex. E). The District Attorney failed to produce the police reports of the Dobler attack in response to Bozella's pre-trial discovery request for *Brady* material.

A few months later, on February 20, 1978, Donald Wise, his brother Anthony, and Saul Holland burglarized the home of three elderly sisters at 30 Balding Avenue in the City of Poughkeepsie. The attack on the King sisters occurred within several blocks of the Crapser and Dobler residences. The King house was ransacked; the elderly women were severely beaten and tied up. One sister died. The Wise brothers were arrested and tried for her murder. At their trial, one of the sisters testified that her assailant threw something over her face and tried to stuff something down her throat.

Two days after the attack on the King sisters, a newspaper article published in the *Poughkeepsie Journal* reported that law enforcement officials were considering a possible link between the Crapser murder and the attack on the King sisters (Firsenbaum Affirmation, Ex. 15).

The very next day, the police and an Assistant District Attorney interviewed Saul Holland, a suspect in the King murder. During this taped interview, Holland informed the police and the Assistant District Attorney that Anthony Wise had told him not to be nervous about the planned attack because he and his brother "had did one of these jobs here before" and had "gotten away" with it (Steiman Affirmation, Ex. F, pp. 47-48). Specifically, Holland stated (id.):

*3 He said the way they did it, ..., when they got to the house, there wasn't nobody there, you know, and they just found all this money and stuff and then around, you know-they said around 9 or 10 or 11, that's when the lady came home. She must have come home.

The Detective responded: "Okay. Well, I don't want to get into that because we're liable to get confused" (*id.* at p. 48). Again, the People failed to produce this tape in response to Bozella's pre-trial discovery request for *Brady* material.

*THE PROSECUTION'S DEAL WITH WAYNE MOSELEY*

In late 1980 and early 1981, four years after the grand

Page 3

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

jury issued a "no bill" against Dewey Bozella, two assistant district attorneys separately visited Wayne Moseley in prison on numerous occasions with the sole purpose of convincing Moseley to testify against Bozella. Despite an offer of a favorable recommendation to parole, Moseley repeatedly denied any knowledge of the crime, even though he was told "there was no chance of his being prosecuted" for the murder (862).[FN3] Moseley insisted upon an absolute guarantee in exchange for his testimony. Finally, the District Attorney's office acquiesced to Moseley's demands in exchange for his testimony. The District Attorney agreed, in writing, that (1) Moseley would not be prosecuted for the murder of Emma Crapser; (2) Moseley would not be prosecuted for committing perjury at the 1977 grand jury proceeding; and (3) the District Attorney's office would work with parole for an early release from jail.

> FN3. Numbers in parentheses refer to the transcript of the second trial of Dewey Bozella contained in Appendix I (two volumes), submitted in support of the 440 motion.

Alternatively, the Assistant District Attorney who eventually brokered the deal suggested that Bozella prepare a motion pursuant to CPL 440 requesting that the felony conviction for which he was currently incarcerated be reduced to a misdemeanor and a lower sentence imposed. Although there was no legal infirmity with Moseley's conviction, the motion "was more or less a maneuver mechanism to give him something for his help" (931). The agreement was prepared and signed by both the District Attorney and the Assistant District Attorney.

The court appointed a local criminal defense attorney to prepare Moseley's 440 motion. Appointed counsel testified at Bozella's trial that it was the only time in his long legal career that a court had ever assigned him to prepare a 440 motion. The Assistant District Attorney suggested to him what arguments were to be made. It was clear that the motion was designed to effectuate an agreement that had already been reached with District Attorney's office. The Assistant District Attorney also testified that in his twelve years as a prosecutor with the Dutchess County District Attorney's office he had never participated in or consented to the release of anyone from jail where that person had been an accomplice and had testified against another.

Moseley was released from prison during the third week of April 1983, approximately the same time the second grand jury convened, and a full three years before his maximum release date.

### TWO KEY WITNESSES ARE RELEASED FROM PRISON UPON TESTIFYING AT THE SECOND GRAND JURY PROCEEDING

*4 Having secured Wayne Moseley's testimony in exchange for his early release from prison and immunity from prosecution for murder and perjury, a second grand jury was convened in early 1983. This time, Wayne Moseley implicated Dewey Bozella in the murder of Emma Crapser. Lamar Smith also testified before the second grand jury in April 1983. The next month, Smith was released from jail on parole as a result of the District Attorney's favorable recommendation.

The second grand jury indicted Dewey Bozella on two counts of Murder in the Second Degree. Moseley received immunity, and Pittman was indicted for burglary only. However, that charge was dismissed on statute of limitations grounds.

### THE ONLY FINGERPRINT IDENTIFIED FROM THE SCENE BELONGS TO A LOCAL CRIMINAL IMPLICATED IN TWO SIMILAR ASSAULTS

In May 1983, the police requested that the FBI compare Donald Wise's fingerprints to those lifted from the scene of the Crapser murder.[FN4] It was determined that one of Donald Wise's fingerprints matched a latent print lifted on June 15, 1977 from the inside of Emma Crapser's bathroom window by Police Officer Eugene Rooney, a crime scene technician who was assigned the duty of evidence collection in this case.

> FN4. Fingerprint analysis had previously been requested in 1977, but there had been no initial comparison made against Donald Wise's prints.

Notably, an analysis of the time line indicates that Mosely's cooperation was secured and the second grand jury presentation underway before the District

Page 4

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

Attorney received the identification of the Donald Wise fingerprint.

## THE FIRST TRIAL

In late 1983, six years after Emma Crapser's death, Bozella was tried and convicted of Murder in the Second Degree. The Defendant appealed the conviction, and the appeal was held in abeyance and the matter remitted for the Supreme Court to hear and report on the *Batson* issue ( 150 A.D.2d 471 [2d Dep't 1989] ). The Supreme Court concluded that the People had failed to rebut the defendant's *prima facie* case of racial discrimination, and on May 29, 1990, the judgment of conviction was reversed, and a new trial ordered ( 161 A.D.2d 775 [2d Dep't 1990] ).

## THE SECOND TRIAL

Prior to the second trial, in August 1990, the defendant made an omnibus motion which included a request for exculpatory evidence pursuant to *Brady v. Maryland* (373 U.S. 83 [1963] ).

In November 1990, thirteen years after Emma Crapser's murder, the second trial of Dewey Bozella commenced.

At trial, it was established that Emma Crapser was brutally attacked, tied up and gagged when she apparently interrupted a burglary in her apartment after returning home from playing bingo. Witnesses established that she was escorted to her door at approximately 11:00 p.m. on the night of June 14, 1977. Furthermore, the victim's watch was stopped at 10:58 p.m. Her body, discovered the following morning, was still dressed in the outer coat worn the previous evening.

Upon arriving at the scene the next morning, the police noticed nothing remarkable about the front outer door and the door to the victim's apartment. Similarly, the victim's niece saw nothing amiss when she went to check on her aunt the morning after the murder. Apparently, there was no discernible evidence that either door had been tampered with. Indeed, Lieutenant Arthur Regula testified that the inner door did not appear to have been forced. In addition, at a police meeting concerning the case, none of the officers remembered examining the outer door on the morning following the murder. Lieutenant Regula further testified that inside the apartment "a rear kitchen window was found to be open and a lock broken" (91-98).[FN5] Yet, the police ultimately concluded that entry was through the apartment door, which they believed could be pushed open with a minimum amount of force. The police finally examined the outer door later in June and noticed some pry marks on the door and the frame.

> FN5. Although not received into evidence at trial, a portion of the police report indicated that "[i]t is the general feeling of the investigators at the scene that this [the kitchen window] is the most likely place of entrance into the apartment, but not excluding the front door of the apartment itself which is a very old lock and could have been opened with a skeleton key" (Police Report annexed to Whitesell Affirmation in Opposition, pp. 3-4). At trial, Lieutenant Regula testified that he had discounted the kitchen window as the point of entry (284).

*5 Many items, including fingerprints and palm prints, were recovered from the apartment. In 1977, the fingerprint evidence was forwarded to the FBI lab. The recovered fingerprints were compared to the known prints of Lamar Smith, Elbert Pittman, Dewey Bozella and Wayne Moseley. None matched. The palm prints could not be analyzed as there were no palm prints available for comparison purposes. The fingerprints, palm prints and thirty-four separate items recovered from the apartment were again sent to the FBI lab in 1983.[FN6] The recovered prints were compared with the known fingerprints and palm prints of Lamar Smith, Elbert Pittman, Dewey Bozella, Wayne Moseley, Anthony Wise, Donald Wise and Wayne Wise. The fingerprint recovered from the inside of Emma Crapser's bathroom window matched that of Donald Wise.

> FN6. These items included a flashlight, wooden handled metal chisel, white cord, door lock, wood frame, pocketbook, pair of woman's shoes, drinking glass, photograph, hearing aid assembly, piece of cardboard, bottle, tin can, cardboard box, plastic box, metal strong box, bankbook, pair of cutting pliers, and a window frame with glass.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

Lamar Smith was a career criminal whose extensive record dating back to 1975 was admitted into evidence. Lamar testified that on the evening of the murder, the police picked up his brother and him on suspicion of Emma Crapser's murder. In response to initial questioning, Lamar denied any involvement in or knowledge of the murder. Several days later, on June 29, 1977, Lamar Smith was arrested for another crime. Again the police advised him that he was a suspect in the Crapser murder. He testified that at that time he did not tell the police who murdered Emma Crapser and that "I still, to this day, I don't know who killed her" (431).

The trial testimony indicated that Lamar Smith eventually told the police that he had seen Bozella and Moseley on the front porch of Emma Crapser's house, but only after the police had told Smith that Bozella and Moseley had related to the police that he and his brother were involved in the murder.

Lamar claimed he was in Mansion Square Park, near the victim's home, around 7:00 p.m. on the night of the murder. He had smoked two joints on that day. He claimed he overheard a conversation between Wayne Moseley, Dewey Bozella and Elbert Pittman about committing a robbery. They asked Lamar if he knew someone who would be interested in buying stereo equipment from a burglary. Lamar offered his father as a potential buyer for the stolen property.

After about fifteen to twenty minutes, the three men left, and Lamar followed a few minutes later in the same direction. Lamar testified that he left the park about 7:45 p.m. He then claimed the three were at the Crapser home, and Pittman was walking up and down the street acting as a lookout for fifteen to twenty minutes. Moseley was "messing" with the door. Lamar claimed Moseley and Bozella were on the front porch for approximately five to ten minutes and then they went into the building. A car drove by, and Lamar was going to leave, but the car did not stop. Not more than five minutes later, another car pulled up and an old lady got out, was escorted to her door and then the car left. Lamar claimed that Pittman departed as soon as the car pulled up and that he also left at that time.[FN7] His brother had left the area before the woman arrived home. Lamar did not see what happened after Emma Crapser entered the building. Wayne Moseley was also a career criminal by the time he was arrested at age fifteen for the murder of Emma Crapser. His extensive criminal history was introduced at trial. At the time of the second trial, Moseley was incarcerated in the New York State prison system.

> FN7. Wayne Moseley contradicted Lamar Smith's testimony. Moseley claimed that after Bozella tied up the victim, he came outside and started yelling at Pittman. But, according to Lamar, Pittman would have already left the scene.

*6 Moseley testified to the details of his visits in prison from the two Assistant District Attorneys and the very favorable written agreement upon which he insisted before he would testify against Bozella, the details of which are set forth *supra*. Both Assistant District Attorneys also testified at trial as to the visits, the cooperation agreement, and Moseley's release from prison three years early.

Wayne Moseley, appearing before the first grand jury with immunity from prosecution for the murder of Emma Crapser, testified that he knew nothing about the murder and, further, that he was nowhere near her home between 9:00 p.m. the evening of the murder and the next day. He had been with Dewey Bozella that evening at about 8:00 p.m. Dewey got on a bike and left the park. Moseley went to McDonald's, then went home and did not see Bozella again that night. Moseley testified before the grand jury that he had never been inside the victim's apartment and had no personal knowledge of the burglary or her death. He testified: "I don't know what the doors look like or nothing cause I made this story up ... I took some [facts] out of the newspaper" (494).

Moseley testified before the second grand jury with immunity from prosecution for committing perjury at the first grand jury proceeding and with immunity from prosecution for Emma Crapser's murder. With this grant of immunity, he testified against Bozella.

At the second trial, Moseley testified that he had lied before the first grand jury on two separate occasions. He also admitted to lying to the parole board about the murder on three separate occasions. Moseley further testified that he participated in the murder of Emma Crapser with Dewey Bozella while Pittman was acting as lookout. He testified he was pretty high and drunk at the time, admitting to drinking between

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

eight and fourteen quarts of beer that day. He further admitted that his vision would have been blurry, his thinking would have been slow, and he would have been wobbly and forgetful.

Moseley claimed that on the night of the murder, Lamar and Stanley Smith, Elbert Pittman and Dewey Bozella were in the park talking between 6:00 p.m and 8:00 p.m. They left the park and went to the victim's house. He further claimed that he was on the front porch when it was dark out, but could not fix the time with any specificity or certainty. While on the porch, he claimed that he and Bozella jiggled the outer door open with a screwdriver and that he kicked in the door to the victim's apartment. Moseley could not recall how long they were in the apartment before he heard a car door slam upon the victim's return home.

Interestingly, and quite to the contrary, Moseley's mother had given previous testimony that her son was at home with her at the time of the murder.

Another witness, Madeline Dixon South, was deceased by the time of the second trial and, therefore, her testimony from the first trial was read into the record. She had testified that in 1977 she dated Anthony Wise. In June 1977, Donald Wise showed her a house on North Hamilton Street and told her that "he went through the window, the side window, through the little alley and went into the room and he gagged and tied that lady up and laid her on the floor and he went through the drawers" (1214). He told the witness not to ask any questions, and she would find out about it in the newspaper. South also testified that she had told a different story before the grand jury because she had been pressured by the prosecutor to change her story and not to implicate Wise (1217-23).

*7 Lamar Smith's brother, Stanley, was produced by the Florida State prison system and testified at the second trial. Stanley completely contradicted his brother's and, also, Moseley's testimony. Stanley testified that he and his brother Lamar were with Wanda Etling from 6:30 to 9:30 or 10:00 p.m. on the night of the murder. He did not see Dewey Bozella or Wayne Moseley that evening.

Upon cross-examination, Stanley acknowledged that he had told the police and had previously testified under oath that he had been in the park with his brother the evening of the murder and that Bozella, Moseley and Pittman were also in the park planning to commit a robbery. Further, Stanley also acknowledged that he had previously testified that he had seen Bozella and Moseley trying to open the door to someone's house, but did not see them go in. Pittman was acting as a look out.[FN8]

FN8. Two days after the verdict was rendered in the first trial, Stanley Smith recanted his testimony implicating Bozella and, instead, averred that he did not recall seeing either Bozella or Moseley in the park at all that day at any time. The court held a recantation hearing at which Stanley testified that he and his brother were at Wanda's the night of the murder, and neither had first-hand knowledge of the murder. Stanley admitted to testifying falsely before the first grand jury to help his brother and had lied before the second grand jury to help his brother and to avoid prosecution for lying before the first grand jury. To complicate matters further, after recanting to Bozella's attorney, Stanley told the Assistant District Attorney there were people looking for him and that is why he told Bozella's lawyer he lied during the first trial, but he had in fact told the truth. At the recantation hearing, Stanley insisted he was never at Emma Crapser's home the night of the murder, and he knew nothing about the murder. The court found Stanley Smith's hearing testimony "incredible and reject[ed] it in its entirety" (Minutes of Recantation Hearing and Decision, January 9, 1994).

Donald and Anthony Wise were called as witnesses. Both refused to testify, each brother invoking his Fifth Amendment right against self-incrimination.

*JUDGMENT OF CONVICTION AND POST-TRIAL PROCEEDINGS*

On December 13, 1990, the jury convicted Dewey Bozella of Murder in the Second Degree (Penal Law § 125.25[3][Felony Murder]. In April 1991, the court denied the defendant's motions to set aside the verdict and to reargue. On May 9, 1991, the court sentenced him to an indeterminate period of twenty years to life

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

in prison.

On June 27, 1994, the Appellate Division, Second Department, affirmed the judgment of conviction (205 A.D.2d 1994). In part, the appellate court found the evidence legally sufficient in that the testimony of the accomplice Wayne Moseley was corroborated as required by law, but the testimony regarding Lamar Smith "raised differing inferences" as to whether he was also an accomplice, requiring corroboration. The issue of whether the verdict was against the weight of the evidence was not raised. The Court of Appeals denied leave to appeal (84 N.Y.2d 1029 [1995]).

Bozella's post-verdict motion, first post-trial motion and federal writ were all denied.

## DEFENDANT'S INSTANT MOTION PURSUANT TO CPL 440.10(1)

The Innocence Project became involved in Bozella's case and in 2007 conducted an investigation (*see* Firsenbaum Affirmation, Ex. 3). Because DNA did not exonerate Bozella, his case fell outside the scope of the Innocence Project. At the Project's request, the firm of Wilmer Cutler Pickerin Hale and Dorr (WilmerHale) continued to represent Bozella pro bono.[FN9]

> FN9. These "facts" are improperly recited in the memorandum of law, with no reference to sworn or affirmed statements in the supporting affidavits or affirmations. However, since this information is not germane to the ultimate outcome of defendant's motion and because the information fills in a procedural gap, the court has included it in its factual and procedural recitation.

In the course of its investigation, in late 2008 and early 2009, WilmerHale discovered that certain material had not been turned over to trial counsel in 1983 (*see* Firsenbaum Affirmation ¶¶ 3, 12, 32-36, 41; Steiman Affirmation ¶¶ 32-61). Specifically, counsel first discovered (1) a portion of the Police Complaint Report containing statements of several neighbors of Emma Crapser which contradict key testimony of Lamar Smith and Wayne Moseley and the transcribed interviews of these neighbors; (2) two police reports prepared in connection with the Dobler assault in which the victim describes her assailant as a person fitting the description of Donald Wise and a statement by Christopher Gill that Donald Wise was the perpetrator in the Dobler assault; (3) a tape of a police interview of Saul Holland about the King murder in which Holland implicates the Wise brothers in a murder, the description of which fits the Crapser murder; and (4) a neighbor's oral statement to police which lends support to the defendant's theory that the mode of entry was through an alley window.

*8 Upon learning of the existence of this newly discovered information which current counsel maintains the People never provided to Bozella's trial counsel, the defendant now moves for the instant relief. Specifically, Bozella claims the People violated their obligation under *Brady v. Maryland* and, therefore, he is entitled to release or a new trial. In support of Bozella's request for post-judgment relief, retired Lieutenant Arthur Regula submits an affidavit stating that he believes Donald Wise, not Dewey Bozella, murdered Emma Crapser. When Regula first met with Bozella's current attorneys, he told them "the murder of Ms. Crapser was the one case that stood out to me over the course of my entire twenty-two year service with the Poughkeepsie Police Department." He informed them that "[he] had held onto a copy of [his] entire case file, now for over eighteen years, because [he] suspected that someone would one day ask [him] to see it." It was the only case file that Lieutenant Regula retained when he retired (Regula Affidavit ¶¶ 2, 8). In addition, Lieutenant Regula attested to an oral statement of a neighbor that she heard noises in the alley adjacent to the victim's home on the night of the murder (*id.* at ¶¶ 3-5).

The People oppose the motion. Specifically, the People do not concede that the Police Complaint Report was withheld from the defense. Further, the People claim that the neighbors' statements do not constitute *Brady* material. With respect to the "alleyway" witness, the People argue that this is not *Brady* material. The People further contend that "the small similarities" between the Dobler assault and the Crapser murder "do not give rise to a necessary finding that the existence of the admission to Christopher Gill regarding the Dobler assault constitutes *Brady* material" (Whitesell Affirmation in Opposition, p. 7). The People also maintain that the Saul Holland tape does not connect Donald Wise to the Crapser murder. Finally, the People claim that disclosure of any of this information would not have yielded a more favorable result for the defendant.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

*LEGAL ANALYSIS*

The court begins its analysis with a basic tenant of our legal system that "[i]t is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit" ( *People v. Tankleff,* 49 AD3d 160, 177 [2d Dep't 2007] ). Indeed, "[t]he greatest crime of all in a civilized society is an unjust conviction ..." (*People v. Ramos,* 201 A.D.2d 85, 90 [1st Dep't 1994], quoting motion court). The post-judgment motion pursuant to CPL 440.10 affords a defendant an opportunity to fully vindicate his or her rights in the event of an alleged wrongful conviction.

*POST-JUDGMENT RELIEF*

Dewey Bozella moves for post-judgment relief pursuant to CPL 440.10(1)(g) and (h) based upon (1) the People's failure to provide *Brady* material in response to defense counsel's specific pre-trial discovery demand; (2) newly discovered evidence; and (3) actual innocence.[FN10]

> FN10. A court's legal analysis of a post-judgment motion based on a *Brady* violation is wholly distinct from a motion based on newly discovered evidence. While the motion and opposition papers treat these two bases for relief interchangeably, they warrant separate consideration.

*9 Bozella's claim that his conviction was procured in violation of his constitutional right to due process by the People's failure to disclose *Brady* material is cognizable under CPL 440.10(1)(h) (*see People v. Baxley,* 84 N.Y.2d 208, 212-13 [1994]; *see also People v. Wright,* 86 N.Y.2d 591 [1995] ).

A defendant may move for post-judgment relief pursuant to CPL 440 .10(1)(g) at any time after entry of judgment based upon new evidence which has been discovered since the entry of a judgment based upon a guilty verdict after trial provided such evidence "could not have been produced by the defendant at the trial even with due diligence on his part" and must be "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant." Moreover, the motion must be made with due diligence after discovery of the new evidence (CPL 440.10[1][g] ).

Bozella also moves for post-judgment relief based upon actual innocence, relying upon CPL 440.10(1)(h).[FN11]

> FN11. CPL 440.10(1)(h) states that a judgement of conviction may be vacated at any time upon the ground that "the judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States."

*ALLEGED BRADY VIOLATIONS*

Bozella alleges that certain recently and newly discovered evidence is *Brady* material, which the People failed to produce in response to a pre-trial discovery demand. In 1963, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" ( *Brady v. Maryland,* 373 U.S. 83, 87 [1963] ). Indeed, New York has long recognized that "the prosecution has an affirmative duty to disclose to the defense evidence in its possession that is both favorable to the defense and material to guilt or punishment" ( *People v. Wright, supra,* 86 N.Y.2d at 595). The People's failure to comply with this affirmative duty violates a defendant's constitutional right to due process (*id.*). Further, "defense efforts, or lack thereof, are irrelevant on the issue of the prosecutor's affirmative obligation to hand over *Brady* ... materials" (*People v. Ramos,* 201 A.D.2d 85, 86 [1st Dep't 1994]; relying on *People v. Ranghelle,* 69 N.Y.2d 56, 64 [1986] ). Moreover, in the context of a 440 motion after a defendant's appeal has long been concluded, the People's failure to comply with *Brady* after a specific defense request "requires a showing of a reasonable possibility that defendant would not have been convicted" (*People v. Ramos, supra,* 201 A.D.2d at 89; *accord People v. Vilardi,* 76 N.Y.2d 67, 77 [1990] ).

*A. THE NEIGHBORS' STATEMENTS*

Bozella's current counsel maintains that on June 27,

Page 9

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

2008, in the course of WilmerHale's recent investigation, he first obtained from retired police Lieutenant Arthur Regula a copy of seven pages of a City of Poughkeepsie Complaint Report dated June 25, 1977 containing interviews with Emma Crapser's neighbors (see Firsenbaum Affirmation ¶ 3). In addition, on or about December 15, 2008, current counsel first obtained from the City of Poughkeepsie Police Department, in response to a Freedom of Information Law request, transcripts of the voluntary statements of Cecil Carpenter, Curtis Carpenter, Shirley Ellerbee and Linda Miller, which were taken within two days of the murder (id. ¶¶ at 32-35).

*10 In the face of trial counsel's positive averment that the People did not produce this portion of the Police Complaint Report or the transcripts of the neighbors' voluntary statements in response to defense counsel's request for all Brady material (see Steiman Affirmation ¶¶ 31-34), the People do not concede that there was a failure to disclose the entirety of the report to defense counsel. Rather, the Assistant District Attorney answering the defendant's motion, who admittedly had no involvement with the original prosecutions, states that (Whitesell Affirmation, p. 3):

Based upon conversations with former Assistant District Attorney William J. O'Neill, who was the prosecutor on both trials, the People believe that the entirety of Lieutenant Regula's report was previously submitted to the defense.

In support, the People note that certain portions of the report were admitted at the second trial (311-313). The People also argue that the neighbors' statements do not constitute Brady material because the information was not exculpatory, and, in any event, had this information been admitted at trial it "would not have rendered it probable that an outcome more favorable to the defendant would have resulted" (Whitesell Affirmation, pp. 4-5).[FN12] Finally, the People claim that the defendant could have discovered this information with due diligence (id. at p. 5).

FN12. The correct standard is "reasonable possibility."

The People's speculation, in the absence of any supporting affidavit by a party with first hand knowledge, is insufficient to controvert trial counsel's affirmative statement that the portion of the report containing the neighbors' statements had not been produced. Indeed, had it been produced, trial counsel most certainly would have questioned the police about these interviews and would have sought to introduce these statements into evidence to support the defense theory of the case, i.e., that Donald Wise committed the murder and gained access to the victim's apartment through a window. Moreover, the mere fact that other portions of the report may have been marked for identification at trial does not support the People's speculative conclusion that, a fortiori, the entire report must have been produced.

Clearly, the evidence against Dewey Bozella was far from overwhelming. The heart of the People's case consisted of the testimony of two career criminals, who repeatedly changed their stories during the long history of this case, who admittedly were under the influence of mind-altering substances the day of the murder and who finally testified for the prosecution only after receiving favorable deals in exchange for their testimony, years after Emma Crapser was murdered. Lamar Smith and Wayne Moseley were the only witnesses who placed the defendant at the scene, and only Moseley placed the defendant inside the victim's apartment. Their testimony was contradicted by Lamar's brother, Stanley Smith, Wayne Moseley's mother and Madeline Dixon South and, moreover, was wholly unsupported by any forensic evidence. Indeed, the only forensic evidence tending to connect anyone to this crime is the fingerprint of Donald Wise, who allegedly confessed to Madeline Dixon South that he was involved in Emma Crapser's murder and who was convicted of murdering another elderly woman in an alarmingly similar incident.

*11 Given the prosecution's evidence adduced at trial, it cannot be said that any evidence, no matter how slight, supporting the defendant's theory of the case, would not have led to a "reasonably possibility" of a different verdict. Indeed, in a close case, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt" ( US v. Agurs, 427 U.S. 97, 113 [1976]; accord Jones v. Stinson, 229 F3d 112, 120 [2d Cir.2000] ).

The narrative of events created by Lamar Smith and Wayne Moseley left significant gaping holes in the time line for the evening of June 14, 1977. The testimony was that Lamar, Moseley, Pittman and Bozella

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

close known, favorable evidence rising to a material level of importance is inescapable]; *see also* People v. Frantz, 57 AD3d 692 [2d Dep't 2008] [duty of disclosing exculpatory evidence extends to disclosure of evidence impeaching the credibility of a prosecution witness whose testimony may be determinative of guilt or innocence]; People v. Grant, 13 AD3d 204 [1st Dep't 2004], lv denied 4 NY3d 798 [2005] [undisclosed statement of witness who was a career criminal, who waited six years to come forward and had motive to give false testimony was not cumulative to impeachment material already brought to jury's attention, but, rather called into doubt the witness's specific claim that he was present when the victim was shot] ).

In view of the court's finding that the non-disclosed Police Complaint Report and witnesses' statements are *Brady* material, the question as to whether the defense exercised due diligence in obtaining this information is irrelevant (*see Ramos, supra* ).

### B. SAUL HOLLAND'S STATEMENT

During the recent investigation, current defense counsel located a tape of a City of Poughkeepsie Police Department interview of Saul Holland taken February 23, 1978. The tape was in the Dutchess County District Attorney's file for the criminal case involving the King murder captioned *People v. Donald Wise,* Docket No. 1978/1093. Counsel first learned of the contents of the taped interview on or about March 7, 2009 (*see* Firsenbaum Affirmation ¶ 41, Ex. 38). Prior to March 2009, trial counsel had not seen a copy of the transcript, nor was he aware of its existence (*see* Steinman's Affirmation ¶ 50).

Although the People concede that this tape was not turned over to trial counsel, the People, nevertheless, maintain that the tape is insufficient to connect Wise to the Crapser murder. The People claim that there is insufficient specificity to indicate the time of the burglary or that it related specifically to the murder of Emma Crapser. The People argue that "the transcript might also apply to any other burglary, including the Dobler case." Therefore, the prosecution asserts, had the tape been disclosed it would not have yielded a more favorable result. Finally, the People contend that the tape would be inadmissible at any subsequent trial (*see* Whitesell Affirmation, pp. 8-9).

*13 Initially, evidence need not be admissible to constitute *Brady* material (*see U.S. v. Rodriguez, 496 F3d 221 n. 4* [2d Cir2007] [*Brady* obligation to disclose material information favorable to the accused does not depend on whether the information to be disclosed is admissible as evidence in its present form; the objectives of fairness as well as the legal system's objective of convicting the guilty rather than the innocent, require the prosecution to make the defense aware of material information potentially leading to admissible evidence favorable to the defense] ).

While admissibility is not the threshold question here,[FN15] the court finds that the information contained on the tape constitutes *Brady* material. This interview was conducted by the police on the day immediately following the publication of a *Poughkeepsie Journal* report that law enforcement officials were considering the possibility of a link between the King and Crapser murders.

> FN15. Although not germane to the inquiry before the court, Bozella's attorney submits arguments for the tape's admissibility at a subsequent trial. While the People claim Saul Holland is available to discuss the contents of the tape, defendant argues that Holland is unavailable due to mental incapacity and, furthermore, the People's failure to disclose the tape for more than 25 years contributed to his unavailability (*see* Benvie Reply Affidavit ¶¶ 5-8; Reply Memorandum of Law, pp. 3-4).

During this interview, Holland told the police that the Wise brothers had told him not to be worried about participating in the King robbery because they had done "one of these jobs before" where they "got to the house, there wasn't nobody there, you know, and they found all this money and stuff and then around, you know-they said around 9 or 10 or 11, that's when the lady came home" after which the police officer responded "Well, I don't want to get into that because we're liable to get confused" (*id.; see also* Steiman Affirmation Exhibits C-F).

The record is barren of any other crime which could fit the description conveyed by Saul Holland to the police. Moreover, contrary to the People's contention, Holland could not have been referring to the Dobler

Page 12

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

assault because that victim was home at the time the perpetrators entered her home. The People allege that there is not enough specificity in Holland's statement to connect the Wise brothers to Crapser's murder. However, the police cut short the questioning because, as excerpted above, they did not want to become confused.

In any event, the court finds that there was enough information conveyed during this interview, especially given the timing of the interview in relation to law enforcement officials' reported contemporaneous belief that the King and Crapser crimes could be related, to constitute information "favorable to the defense and material to guilt" (*People v. Wright, supra, 86 N.Y.2d at 595*), thus triggering the People's obligation to "make defense aware of material information potentially leading to admissible evidence favorable to the defense" (*Rodriguez, supra* 496 F3d 221 at n. 4; see also *People v. Vilardi, supra* 76 N.Y.2d at 75 [proceedings cannot be fair if evidence is withheld which casts doubt upon the guilt of the defendant]).

Indeed, the defendant's main theory of the case was that Donald Wise had murdered Emma Crapser after having gained access to her apartment through an alley window.[FN16] Surely, had the defendant been aware of this information at the time, regardless of its admissibility at trial, the defense would have further investigated the source of the statement (see Steiman Affirmation ¶ 53 [absolutely no doubt that had trial counsel known of the information contained on the Holland tape in 1983 and 1990, they would have attempted to locate Saul Holland, and the police and Assistant District Attorney who were present during the questioning and interviewed them as potential defense witnesses and, further, the Assistant District Attorney's presence during the interview would have subjected him to cross-examination]). Again, the point of *Brady* is disclosure of material information which potentially leads to admissible evidence. This potential evidence would have also corroborated other evidence adduced at trial which supported the defendant's theory of the case, i.e., Donald Wise's fingerprint was recovered from the crime scene; evidence of Donald Wise having committed a similar murder and attack on three elderly sisters; and Madeline Dixon South's testimony that Donald Wise had confessed to her that he killed Crapser.

FN16. Defendant's other theories were that the police had bungled the investigation and that the People's key witnesses were utterly incredible as they both had changed their stories repeatedly, admitted lying to police, admitted lying under oath, and both had received a benefit in exchange for their testimony.

### C. THE DOBLER POLICE REPORT

*14 On August 30, 1977, about six weeks after the Crapser murder, the police interviewed Christopher Gill, a friend of Donald Wise, in connection with a similar attack on Estelle Dobler. The police believed that Gill, who lived in the same building as the elderly victim, had let Wise into the apartment building. Gill told the police that Wise was Estelle Dobler's attacker, and, in addition, the victim's description of her assailant matched that of Donald Wise (see Steiman Affirmation, Ex. E). Apparently, no one was every prosecuted for this crime.

Bozella's current counsel located two complaint reports of the City of Poughkeepsie Police Department (collectively "the Dobler Report") in the Dutchess County District Attorney's file for the King murder captioned *People v. Donald Wise*, Docket No 1978/1093 on or about January 23, 2009 (see Firsenbaum Affirmation ¶¶ 12, 41). Trial counsel had not seen a copy of the Dobler Report prior to January 2009 (see Steiman Affirmation ¶ 44).

The People concede that this Report was never disclosed to trial counsel. However, the People argue that although the fact that Wise's fingerprint was located inside Emma Crapser's apartment was brought out at trial, along with Wise's involvement in the King murder, the jury, nevertheless, rejected Wise as the killer. The People further claim that the similarities of the King, Dobler and Crapser attacks are so "small" that they "do not give rise to a necessary finding that the existence of the admission to Christopher Gill constitutes *Brady* material" and, further, that disclosure would not have yielded a more favorable result (Whitesell Affirmation, pp. 7-8).

Given that the Dobler Report was located inside the King file and the People and police reportedly considered a link between the King and the Crapser murders, the court finds that this information would have been "favorable to the defense and material to guilt" (

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

*People v. Wright, supra*, 86 N.Y.2d at 595). Therefore, the People were obligated to disclose the report. Merely because the defendant had introduced evidence of a prior similar crime, which the jury apparently did not find to be determinative, does not, contrary to the People's contention, necessarily mean that had this new information been before the jury, a different verdict would not have resulted. Indeed, it appears that had the jury before it evidence that Donald Wise was involved in two other alarmingly similar attacks on elderly women, there would have been a "reasonable possibility" that the jury would have reached a different conclusion.

Although the People attempt to minimize the similarities among the three assaults, the record reveals otherwise. Indeed, the similarities are striking. In addition to the advanced age of the victims, the proximity of the crimes in time and location and information connecting Donald Wise to all three assaults, the perpetrators tried to or did stuff material down the victims' throats. Further, in the King and Crapser murders, the perpetrators had apparently gained entry to their victims' apartments earlier in the day to "case" the location.[FN17]

> FN17. Specifically, before the King murder, the Wise brothers volunteered to shovel the sisters' walkway. They asked to go inside for a while to escape the cold. While inside, they obtained a key to the residence. Similarly, a man came to Emma Crapser's apartment the day of the murder claiming to be a plumber who stated he would return later. Suspicious, Ms. Crapser called her plumber and was informed that the office had not dispatched anyone to her home.

### D. THE NEIGHBOR'S ORAL STATEMENT

*15 In support of Bozella's motion, Lieutenant Regula averred that on either the evening following the murder or the next night, Detective Pete Murphy questioned a female neighbor about whether she had heard anything unusual on the night of the murder. The neighbor told Detective Murphy that she had heard loud noises in an alley adjacent to the victim's home on the night of the murder and, more specifically, that the noises sounded like garbage pails being moved. Detective Murphy informed Lieutenant Regula of this conversation, and they investigated whether the bathroom window could have been the point of entry. Neither Detective memorialized this interview in writing (*see* Regula Affidavit ¶¶ 3-5). This neighbor was identified in the *Poughkeepsie Journal* two days after the murder (*see* Firsenbaum Affirmation, Ex. 6).

The People maintain that this statement does not constitute *Brady* material. Specifically, Detective Regula does not recall the name of the witness, nor do the files contain any reference to this neighbor. In addition, the People claim that this witness could have been discovered with due diligence as part of defense counsel's investigation of the crime; that, in the absence of her identity this information would be inadmissible; and, in any event, her testimony would not have resulted in a more favorable outcome.

The People have a duty to disclose oral statements (*see People v. Demand*, 268 A.D.2d 901, 902 [3d Dep't], *lv denied* 95 N.Y.2d 795 [2000] ). Further, the fact that the statement was made to the police and not the prosecution is immaterial (*see People v. Jackson*, 237 A.D.2d 179, 180 [1st Dep't], *lv denied* 89 N.Y.2d 1095 [1997] ). Indeed, the admissibility of this statement is not determinative in assessing a *Brady* violation,[FN18] nor is due diligence relevant when *Brady* material has been withheld. Moreover, should this testimony be secured directly or through other means at a new trial, the statement clearly supports the defendant's theory that Donald Wise gained access through a window and corroborates Madeline Dixon South's testimony that Donald Wise claimed to have gained access to Emma Crapser's apartment through an alley window and was involved in the murder.

> FN18. In any event, Detective Regula's affidavit coupled with the newspaper article sufficiently identifies this neighbor.

Finally, while the court finds that each piece of information individually may be sufficient to tip the balance in a case such as this in which the evidence against the defendant was far from overwhelming and in which the only evidence connecting him to the crime was the testimony of two extremely interested witnesses with serious credibility problems, who were admittedly on mind altering substances, the court cannot ignore the overall cumulative effect of the neighbors' statements, the Saul Holland tape, the Dobler Report, and the neighbor's oral statement and

Page 14

Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)
(Table, Text in WESTLAW), Unreported Disposition
(Cite as: 2009 WL 3364575 (N.Y.Co.Ct.))

how this information collectively impacts and supports the defendant's theory of the case (*see People v. Tankleff, supra,* 49 AD3d at 181 [error not to consider cumulative effect of new evidence] ).

## *NEWLY DISCOVERED EVIDENCE*

*16 Bozella's *Brady* claim is dispositive of that branch of his 440 motion seeking a new trial. Therefore, the court need not address his alternate claim for relief based on newly discovered evidence.

## *ACTUAL INNOCENCE*

The Appellate Division recently declined to address a defendant's contention "that New York recognizes a free-standing claim of actual innocence that is cognizable by, or which may be addressed within the parameters of, CPL 440.10(1)(h). Instead, the Appellate Division determined that the defendant had not established entitlement to relief based on this claim (*see People v. Tankleff, supra,* 46 AD3d at 182). Similarly, in this case, although there was absolutely no forensic evidence connecting Dewey Bozella to the murder of Emma Crapser, there was no evidence exonerating him either. Therefore, assuming *arguendo* that the defendant's claim of actual innocence and entitlement to immediate release is cognizable under CPL 440.10(1)(h), this claim must fail.

## *CONCLUSION*

This court does not lightly disturb a conviction in such a serious case as this in which the defendant was twice convicted by jury verdicts of the cruel and cowardly murder of a ninety-two year old woman within the sanctuary of her own home. Criminal conduct simply does not get more repugnant nor abhorrent than this.

However, upon a thorough and careful review of the record, the court, without reservation, is firmly and soundly convinced of the meritorious nature of the defendant's application. The legal and factual arguments advanced in support of the motion are compelling, indeed overwhelming.

This court, while granting the defendant's application on the basis of non-disclosure of *Brady* material, does not ascribe intentional misconduct or bad faith to the police or the prosecution.

Finally, it is not the function of the court to speculate as to the guilt or non-guilt of the defendant, and nothing contained in this decision should be interpreted as any such finding or opinion.

Accordingly, it is hereby

ORDERED that the motion is granted to the extent that the judgment of conviction of the defendant for Murder in the Second Degree (Penal Law section 125.25[3] ) is vacated and a new trial is ordered; and it is further

ORDERED that the matter is scheduled for further proceedings on the indictment on *October 28, 2009 at 11:00 a.m.* and the prior securing order in this matter is reinstated.

This constitutes this Court's Decision and Order in this matter.

N.Y.Co.Ct.,2009.
People v. Bozella
Slip Copy, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y.Co.Ct.), 2009 N.Y. Slip Op. 52099(U)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.