108.    This window was the same window facing the alley where a neighbor informed Officer Murphy that she had heard noises on the night of the murder, a statement that Officer Murphy never wrote down and that was never disclosed to Mr. Bozella's defense counsel at or before either of his trials.

109.    Thus, in June 1983, after Moseley was released from prison, and after Mr. Bozella was indicted and incarcerated, the Police and District Attorney learned of the first, and only, piece of physical evidence suggesting the identity of Ms. Crapser's murderer. That evidence implicated Donald Wise – not Mr. Bozella – as the murderer of Ms. Crapser.

110.    The District Attorney and Defendant O'Neill were aware of, but nonetheless ignored, this evidence and proceeded to trial against Mr. Bozella. They had no reasonable explanation for pursuing Mr. Bozella rather than Donald Wise for the Crapser Murder.

111.    In a November 29, 1983 news article, Assistant District Attorney D. James O'Neil informed a *Poughkeepsie Journal* reporter "that a witness provided information that the Wise brothers had been involved in the Crapser killing" and that "[w]e investigated that story: as part of it we sent the prints of the Wise brothers to the FBI to check against the print on the window." Assistant District Attorney D. James O'Neil did not explain why the District Attorney and Defendant O'Neill did not pursue a case against Donald Wise after discovering physical evidence suggesting Donald Wise was the perpetrator.

112.    The District Attorney and Defendant O'Neill knew that Donald Wise had been convicted of the King Murder, had confessed to the Dobler Assault, and had confessed to Holland and South that he had committed a burglary matching the one at Ms. Crapser's residence. Yet, without any evidence to support his theory, Assistant District Attorney D. James

O'Neil suggested that "the Wise fingerprint was most likely left on the window prior to the night of the slaying, possibly during another burglary."

113.    In short, on the intractable theory that Mr. Bozella had committed the Crapser Murder, the District Attorney and Defendant O'Neill arranged for the release of two convicted felons – Moseley and Lamar Smith. Having arranged the release of both, and having based the Indictment against Mr. Bozella on these convicted felons' coerced testimony, the District Attorney and Defendant O'Neill refused to dismiss the Indictment, despite physical evidence implicating Donald Wise (who was already incarcerated for the King Murder). Instead, the District Attorney and Defendant O'Neill failed to pursue exculpatory leads pointing to Donald Wise as the perpetrator and continued to suppress exculpatory and impeachment evidence (i.e. the Dobler Reports and the Holland tape) from defense counsel and the Grand Jury. The District Attorney and Defendant O'Neill continued their malicious prosecution of Mr. Bozella in violation of his constitutional rights.

**N.    THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL TRIED MR. BOZELLA WITHOUT PROBABLE CAUSE AND THEN VIOLATED MR. BOZELLA'S *BATSON* RIGHTS DURING HIS 1983 TRIAL**

114.    Defendant O'Neill served as the lead prosecutor for the District Attorney during the 1983 trial of Mr. Bozella.

115.    Defendant O'Neill lacked probable cause to justify the existing Indictment against Mr. Bozella since he had procured the Indictment through false testimony, the coercion of a key witness, and the incomplete presentation of exculpatory and impeachment evidence to the Grand Jury.

116.    Just as the statements of Lamar Smith and Stanley Smith had been "insufficient" to constitute probable cause in 1977, Lamar Smith and Stanley Smith's testimony, combined

with Moseley's testimony and South's coerced testimony, also was insufficient to constitute probable cause to support an indictment.

117.    In addition, on the eve of trial, Defendant O'Neill knew that Donald Wise's fingerprint had been found inside Ms. Crapser's bathroom window.  Without probable cause, with malice, and in deliberate disregard of Mr. Bozella's constitutional rights, Defendant O'Neill nonetheless proceeded to trial against Mr. Bozella.

118.    Prior to Mr. Bozella's trial, Mr. Bozella's trial counsel requested that the District Attorney and Defendant O'Neill produce to them all *Brady* material.  The District Attorney and Defendant O'Neill failed to produce the four categories of *Brady* material (discussed in Section R below) to Mr. Bozella or his counsel.

119.    Prior to Mr. Bozella's trial, during voir dire, Defendant O'Neill excluded all six African-Americans available in the venire without having race-neutral reasons for doing so.

120.    Following a three week trial, on December 3, 1983, a jury without a single African-American individual found Mr. Bozella (who is African-American) guilty of second-degree murder.

121.    Mr. Bozella appealed his conviction on the grounds that Defendant O'Neill's exclusion of all African-American individuals from the venire violated Mr. Bozella's constitutional rights.  The Second Department remitted the matter to the trial court to conduct a hearing to determine whether Defendant O'Neill's use of peremptory challenges to remove potential jurors violated Mr. Bozella's constitutional rights.

122.    In reviewing the hearing, the Second Department concluded that Defendant O'Neill's testimony at the hearing "amounted to little more than a denial of discriminatory purpose and a general assertion of good faith, [which] failed to satisfy the[] [People's] burden of

establishing racially neutral explanations for the challenges." Thus, the Second Department

vacated Mr. Bozella's conviction, holding that Defendant O'Neill's use of preemptory

challenges violated Mr. Bozella's constitutional rights, and ordered a new trial.

**O.     STANLEY SMITH RECANTED HIS TESTIMONY IMMEDIATELY
        AFTER THE JURY CONVICTED MR. BOZELLA**

123.    On the Monday morning following the jury's verdict, Stanley Smith recanted his

trial testimony implicating Mr. Bozella.  Stanley Smith told the District Attorney that he had lied

under oath during the trial in order to corroborate his brother's testimony:  "I looked up to my

brother, so there wasn't nothing I wouldn't do for my brother."

124.    Instead of encouraging Stanley Smith to provide a truthful account, or exploring

the merits of Stanley Smith's account, Defendant O'Neill threatened Stanley Smith with a

perjury charge if Smith pursued his recantation.

**P.     THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL RE-TRIED
        MR. BOZELLA IN 1990, AGAIN VIOLATING HIS CONSTITUTIONAL
        RIGHTS**

125.    The District Attorney and Defendant O'Neill re-tried Mr. Bozella in 1990 (the

"1990 Trial").  Defendant O'Neill served as the lead prosecutor for the District Attorney during

the 1990 Trial.

126.    Defendant O'Neill lacked probable cause to pursue his prosecution for the same

reasons that he lacked probable cause on the eve of the 1983 trial.  In addition, on the eve of the

1990 Trial, Stanley Smith had recanted his testimony from the 1983 trial and had informed the

Dutchess County Court that neither he nor Lamar Smith was present at or near Ms. Crapser's

residence at the time of the Crapser Murder.  Yet, without probable cause, with malice, and in

deliberate disregard of Mr. Bozella's constitutional rights, Defendant O'Neill nonetheless

proceeded to re-try Mr. Bozella based on false testimony, the coercion of a key witness, and suppressed exculpatory and impeachment evidence.

127. In preparation for the 1990 Trial, Mr. Bozella's counsel filed a pre-trial motion to obtain *Brady* materials from the District Attorney and obtained a judicial subpoena duces tecum ordering District Attorney William V. Grady to appear before the court on November 16, 1990 and to bring with him, among other items, "any and all records, investigative reports, statements of witnesses concerning the murder of Emma Crapser in the custody of the Dutchess County District Attorney's office." Despite such a request, the District Attorney and Defendant O'Neill failed to produce the *Brady* evidence (discussed in Section R below) to Mr. Bozella or his counsel.

128. The District Attorney and Defendant O'Neill's evidence against Mr. Bozella in the 1990 Trial was insubstantial. No physical evidence placed Mr. Bozella at or near the scene of the crime. The District Attorney and Defendant O'Neill did not prove that Mr. Bozella had a unique motive for the crime. The District Attorney and Defendant O'Neill failed to present the testimony of a single unbiased witness who could identify Mr. Bozella as the perpetrator. Instead, the case hinged exclusively on the testimony of Lamar Smith and Moseley, two convicted felons who had received highly favorable deals in exchange for their testimony against Mr. Bozella.

129. Lamar Smith testified at the 1990 Trial that he was smoking marijuana and drinking beer in Mansion Square Park with his brother Stanley Smith, Moseley, Pittman, and Mr. Bozella on the evening in question.

130.   Lamar Smith also testified that Pittman served as the lookout, but never entered Ms. Crapser's house.  This testimony contradicted Lamar Smith's initial statement to the Police on June 29, 1977.

131.   Lamar Smith testified that Moseley and Mr. Bozella were inside the house for between 5-10 minutes.  This testimony contradicted Lamar Smith's June 29, 1977 statement to the Police, in which he informed the Police that he remained across the street from Ms. Crapser's residence for forty-five minutes while Pittman "was walking up and down the street in the vicinity of the house" serving as a lookout for Moseley and Mr. Bozella.

132.   Moseley testified at the 1990 Trial that he had drunk "anywhere in between from eight to fourteen quarts" of beer on June 14, 1977, and was "pretty high" and "pretty drunk."

133.   Lamar Smith and Moseley's collective testimony had significant holes.  They testified that they broke two doors to gain entry to Ms. Crapser's residence.  Yet neither Ms. Crapser's niece Evelyn Petterson nor Officer Sauter – both of whom arrived at Ms. Crapser's apartment after Moseley and Mr. Bozella supposedly broke in her front door – observed anything unusual about the front door.

134.   The Grand Jury testimony of Joan Moseley, Moseley's mother, was read into the record during the 1990 Trial, revealing that Moseley was with his mother in their home at the time of the Crapser Murder.

135.   Stanley Smith testified as a defense witness without immunity and offered additional testimony contradicting his brother Lamar Smith's testimony.  Stanley Smith testified that he and his brother Lamar Smith were at Lamar Smith's girlfriend's house on the evening of June 14, 1977, and he never saw Mr. Bozella or Moseley that night.

136.   Accordingly, there was evidence presented suggesting that neither Lamar Smith nor Moseley were involved in any way with the murder of Ms. Crapser, thereby casting doubt on the entire story, and thus Mr. Bozella's alleged involvement in the murder.

137.   Despite the Defendants' concealment and suppression of exculpatory and impeachment evidence from Mr. Bozella implicating Donald Wise, Mr. Bozella's counsel presented the evidence it had assembled indicating that Donald Wise was the murderer.  Defense counsel presented evidence showing that Donald Wise's fingerprint was found on the inside of Ms. Crapser's bathroom window and was the only matching fingerprint or matching forensic evidence found in the entire investigation:

Q.   Do you know the name of the individual for whom a match was sought for those fingerprints in 1983?

* * *

A.   They were compared to Dewey Bozella, Lamar Smith, Wayne Moseley, Elbert Pittman,

* * *

Q.   And do you know whether the fingerprints that were sent down to the FBI matched any of the individuals that you just named?

A.   *One print matched Donald Wise.*

138.   Officer Regula confirmed that Donald Wise's fingerprint was found on the inside of Ms. Crapser's bathroom window, indicating that Wise had been inside her house:

Q.   And was that on the inside of the bathroom window, the side inside the victim's apartment?

A.   It was on the pane of the glass on the interior of the glass."

139.   When called to testify at trial, Donald Wise invoked the Fifth Amendment outside the jury's presence.  Donald Wise's brother Anthony Wise also invoked the Fifth Amendment.

140.   The Defense read into the record South's 1983 testimony.  South testified that Donald Wise and Anthony Wise showed her a stolen brown leather pocketbook with old coins, silver dollars, and rings and then led her to Ms. Crapser's house on North Hamilton Street and indicated that they had committed a "movie" in that house on the night of her murder.  South testified that Donald Wise told her that "he went through the side window, through the little alley and went into the room and he gagged and tied [Ms. Crapser] up and laid her on the floor and he went through the drawers."

141.   During the 1990 Trial, Defendant O'Neill failed to adhere to the trial judge's rulings regarding appropriate trial conduct.  Specifically, Defendant O'Neill spoke with Officer Paul Slater, a prosecution witness, in between the first and second days of trial about his prior testimony "[r]egarding who may have directed me, as to who may have directed me to take photographs of a window," despite being admonished by the trial judge not to do so.  Notably, Defendant O'Neill had been present at the Crapser Murder crime scene and had directed Officers to take photographs of all windows and doors, including a window in the rear of the house that was observed to have a broken latch.

142.   Despite the paucity of evidence against Mr. Bozella, and wealth of evidence pointing to an alternate suspect, a jury convicted Mr. Bozella of second-degree murder and the trial judge sentenced Mr. Bozella to twenty years to life.

143.   In ruling on Mr. Bozella's appeal of his 1991 conviction, the Second Department concluded that "[t]he prosecutor [Defendant O'Neill] exceeded the court's evidentiary ruling with respect to a tape-recorded conversation, in which the defendant's accomplice had initially implicated himself and the defendant in the homicide, during both his cross-examination of the accomplice and his summary." *People v. Dewey Bozella*, 205 A.D.2d 790 (N.Y. App. Div.

1994). Although the Second Department concluded that Defendant O'Neill's misconduct

amounted to harmless error, the Second Department was not privy to the substantial *Brady*

material that Defendant O'Neill had concealed from the defense, the trial court, and the jury.

**Q.   THE NEW YORK STATE PAROLE BOARD REPEATEDLY DENIED MR. BOZELLA'S APPLICATIONS FOR PAROLE BECAUSE MR. BOZELLA WOULD NOT ADMIT TO A MURDER HE DID NOT COMMIT**

144.    Mr. Bozella first became eligible for parole in 2003, and the New York State

Board of Parole ("Board") rejected his application for parole four times. The Board denied Mr.

Bozella parole because of Mr. Bozella's apparent failure to appreciate the nature and seriousness

of "his" crime (i.e. the Crapser Murder). Of course, Mr. Bozella was unable to do so because he

has always maintained his innocence.

**R.   THE DUTCHESS COUNTY COURT CONCLUDED THAT MR. BOZELLA HAD BEEN WRONGFULLY CONVICTED AND INCARCERATED FOR MORE THAN 26 YEARS**

145.    Approximately seventeen years after Mr. Bozella's 1991 conviction, Mr. Bozella

discovered four categories of new evidence (the "*Brady* Evidence") establishing that the

Defendants violated his constitutional rights in connection with the investigation and prosecution

of the Crapser Murder.

146.    The first category of *Brady* Evidence was a report authored by Officer Regula,

which included statements of four unbiased neighbors on or around June 25, 1977, contradicting

Moseley and Lamar Smith's testimony. Despite Mr. Bozella's *Brady* requests, the District

Attorney and Defendant O'Neill never provided Mr. Bozella's trial counsel with these

statements.

147.    In granting Mr. Bozella's motion to vacate his conviction, the Dutchess County

Court found that "the potential testimony of the neighbors" whose statements were in Officer

Regula's report, "at best, wholly contradicts the People's eyewitnesses [Lamar Smith and Moseley] and, at least, seriously calls their version of the events into question. Significantly, these witnesses are, in contrast to the People's only eyewitnesses, uninterested parties." Thus, the Dutchess County Court held that the statements found in Officer Regula's report, "would have seriously called into question the testimony of the People's key witnesses, testimony which was already rife with credibility problems" and "that this information would have been favorable to the defense and is therefore *Brady* material which should have been produced."

148.   The second category of *Brady* Evidence was presented to the Dutchess County Court through an affidavit by Officer Regula in support of Mr. Bozella's motion to vacate his conviction, in which Officer Regula averred that a witness informed Officer Murphy that "she heard loud noises in an alley adjacent to Ms. Crapser's home at 15 North Hamilton Street in Poughkeepsie on the night of Ms. Crapser's murder" and "that the noises sounded like one or more garbage cans were being moved." Officer Murphy relayed the neighbor's statement to Officer Regula. As discussed above in paragraphs 25-27, although both Officers found the statement credible, neither Officer wrote it down or relayed the statement to the District Attorney. The Dutchess County Court concluded that the statement was *Brady* material because it "clearly support[ed] the defendant's theory that Donald Wise gained access through a window and corroborate[d] Madeline Dixon South's testimony that Donald Wise claimed to have gained access to Emma Crapser's apartment through an alley window and was involved in the murder."

149.   The third category of *Brady* Evidence was the Holland tape, which Mr. Bozella's counsel collected in 2009 during an inspection of the District Attorney's files from the King Murder. The Dutchess County Court concluded that the tape was *Brady* material because it contained "enough information . . ., especially given the timing of the interview in relation to law

enforcement officials' reported contemporaneous belief that the King and Crapser crimes could be related, to constitute information "favorable to the defense and material to guilt.'"

150.    The fourth category of *Brady* Evidence was the Dobler Reports — police reports evidencing that Donald Wise was the perpetrator in an attack similar to the Crapser Murder insofar as the attack: (1) victimized an elderly woman in her own home, (2) was located approximately six blocks from Ms. Crapser's residence, (3) took place less than two months after the Crapser Murder, (4) entailed stuffing cloth down the victim's throat, and (5) broke several of the victim's bones. The Dutchess County Court concluded that the reports were *Brady* material because they were "located inside the King file and the People and police reportedly considered a link between the King and the Crapser murders."

151.    In granting Mr. Bozella's motion to vacate his conviction, the Dutchess County Court concluded that the case against Mr. Bozella was weak:

> Clearly, the evidence against Dewey Bozella was far from overwhelming. The heart of the People's case consisted of the testimony of two career criminals, who repeatedly changed their stories during the long history of this case, who admittedly were under the influence of mind-altering substances the day of the murder and who finally testified for the prosecution only after receiving favorable deals in exchange for their testimony, years after Emma Crapser was murdered. Lamar Smith and Wayne Moseley were the only witnesses who placed the defendant at the scene, and, only Moseley placed the defendant inside the victim's apartment. Their testimony was contradicted by Lamar's brother, Stanley Smith, Wayne Moseley's mother and Madeline Dixon South and, moreover, was wholly unsupported by any forensic evidence. Indeed, the only forensic evidence tending to connect anyone to this crime is the fingerprint of Donald Wise, who allegedly confessed to Madeline Dixon South that he was involved in Emma Crapsers' murder and who was convicted of murdering another elderly woman in an alarmingly similar incident.

152.    Accordingly, the Dutchess County Court concluded:

> [U]pon a thorough and careful review of the record, the court, without reservation, is firmly and soundly convinced of the meritorious nature of the defendant's application. The legal and factual arguments advanced in support of the motion are compelling, indeed overwhelming.

153.    On October 28, 2009, the Dutchess County Court held a hearing in Mr. Bozella's criminal case to determine what course of action the District Attorney would take given the court's October 14 order vacating Mr. Bozella's conviction.  During the hearing, Assistant District Attorney Edward Whitesell informed the court that the District Attorney found no "sound legal basis for the People to appeal the Court's decision" and that the District Attorney "c[ould] not go forward with a third trial" of Mr. Bozella.  Accordingly, Assistant District Attorney Whitesell moved the Dutchess County Court to dismiss the Indictment against Mr. Bozella.

154.    The District Attorney's decision to move the court to dismiss the indictment was not the result of a compromise with Mr. Bozella.  Nor was the decision a result of any misconduct by Mr. Bozella.

155.    The Dutchess County Court granted Assistant District Attorney Whitesell's motion and ordered the immediate release of Mr. Bozella from custody.  The court's dismissal of the Indictment constituted a favorable termination of the criminal case against Mr. Bozella.

156.    On October 28, 2009, Mr. Bozella was released from custody after serving more than 26 years in prison for the Crapser Murder, a crime he did not commit.

**S.      THE DISTRICT ATTORNEY'S POLICIES, CUSTOMS, AND/OR PRACTICES PROXIMATELY AND DIRECTLY CAUSED THE VIOLATIONS OF MR. BOZELLA'S CONSTITUTIONAL RIGHTS**

157.    Prior to and during the investigation and prosecution of the Crapser Murder, the County, by and through its final policymakers, maintained policies, customs, and/or practices of

promoting, facilitating, or condoning improper, illegal, and unconstitutional practices, including but not limited to disregarding criminal defendants' *Brady* rights.

158.    Prior to and during the investigation and prosecution of the Crapser Murder, District Attorneys John King and William Grady knew that there was significant "grey-area" under *Brady*, and that assistant district attorneys would be confronted with choices implicating criminal suspects' constitutional rights.

159.    Prior to and during the investigation and prosecution of the Crapser Murder, District Attorneys John King and William Grady knew that there was an obvious need to act – by training, supervising, monitoring, and/or disciplining assistant district attorneys – to prevent violations of criminal defendants' constitutional rights.

160.    Upon information and belief, neither District Attorney John King, District Attorney William Grady, nor any County policy-maker promulgated a written policy regarding *Brady*, or offered any formal training to assistant district attorneys regarding *Brady*. Each assistant district attorney applied *Brady* as he or she understood it. The District Attorney thus delegated policymaking authority to assistant district attorneys, including but not limited to Defendant O'Neill, by allowing assistant district attorneys to decide for themselves what constituted *Brady* material.

161.    In furtherance of the District Attorney's policies, customs, and/or practices, Defendant O'Neill, as a matter of custom and practice, withheld police reports and grand jury testimony from defense counsel in response to *Brady* requests, despite the fact that such documentation likely contained exculpatory and impeachment evidence. Defendant O'Neill, thus, as a matter of custom and practice, violated *Brady*.

162.   Defendant O'Neill's practices regarding the disclosure of *Rosario* materials were equally reprehensible. Defendant O'Neill would provide defense counsel with the *Rosario* material only *after* a witness had testified on direct examination at trial for the District Attorney and immediately before cross-examination. Thus, Defendant O'Neill's practices deprived defense counsel of a sufficient and meaningful opportunity to use this evidence and violated the text, or at minimum the spirit, of *Rosario*.

163.   The County's policies, customs, and/or practices, as evidenced by Defendant O'Neill's well-known practices described above, directly caused the violation of Mr. Bozella's constitutional rights. Specifically, Defendant O'Neill's practices prevented the disclosure of the exculpatory statements of Ms. Crapser's neighbors found in Officer Regula's police report to Mr. Bozella's defense counsel at or before trial, in violation of *Brady*.

164.   District Attorneys John King and William Grady knew of Defendant O'Neill's practices described above. But neither Mr. King, Mr. Grady, nor any County policymaker initiated training or supervision to ensure that Defendant O'Neill altered his practices to comply with *Brady*. This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

165.   Upon information and belief, in furtherance of the District Attorney's policies, customs, and/or practices, Defendant O'Neill and other assistant district attorneys employed by the District Attorney trained Officers in the City of Poughkeepsie Police Department to *destroy* interview notebooks after the Officers reduced their notes into official reports for the express purpose of ensuring that the District Attorney would not have to produce the notebooks to defense counsel as *Brady* material in connection with criminal trials of individuals such as Mr. Bozella.

166.   The Second Department addressed this policy, custom, or procedure in a 1991 ruling in which it stated: "Pursuant to a procedure established within the Poughkeepsie Police Department, the detectives destroyed these notes after they had been transcribed into a formal report. Such a procedure is [constitutionally] improper. . . ." *People v. Roberts*, 178 A.D.2d 622, 622-23 (N.Y. App. Div. 1991).

167.   Upon information and belief, in furtherance of the District Attorney's policies, customs, and/or practices, Defendant O'Neill and the District Attorney knew that Officers in the City of Poughkeepsie Police Department did not record in writing all statements taken from eyewitnesses in connection with criminal investigations.

168.   Defendant O'Neill's training of the Officers, and knowledge of the Officers' failure to record in writing all statements taken from eyewitnesses in connection with criminal investigations, directly caused the violation of Mr. Bozella's constitutional rights. Specifically, Defendant O'Neill's instruction to destroy notebooks and his deliberate indifference to the risk of constitutional violations resulting from Officers' failure to record eyewitness statements directly caused both Officer Murphy and Officer Regula to fail to record the exculpatory statement of Ms. Crapser's neighbor.

169.   District Attorneys John King and William Grady knew of Defendant O'Neill's training of the Officers described above, as well as the Officers' practice of failing to record eyewitness statements. But neither Mr. King, Mr. Grady nor any County policymaker initiated training or discipline to ensure that Defendant O'Neill altered his training of Officers to ensure that the District Attorney and Police complied with *Brady*. This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

170. Prior to and during the investigation and prosecution of the Crapser Murder, the District Attorney's policymakers did not implement any mechanism to ensure that evidence collected in connection with an open criminal investigation was cross-checked with other pending similar criminal investigations to make sure that exculpatory or impeachment evidence would be disclosed to defense counsel pursuant to *Brady*.

171. The County's failure to implement such a mechanism directly caused the violation of Mr. Bozella's constitutional rights. Specifically, the lack of an appropriate mechanism ensured that the Holland tape and Dobler Reports – inculpatory evidence used in connection with the King Murder – would never be disclosed to defense counsel in connection with the Crapser Murder as required under *Brady*.

172. District Attorneys John King and William Grady knew of the lack of such a mechanism, and the resulting risk of constitutional violations. But neither Mr. King, Mr. Grady, nor any County policymaker initiated training or supervision, or otherwise addressed this fundamental flaw to ensure that assistant district attorneys would cross-check evidence across related investigations to ensure compliance with *Brady*. This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

**T.   THE CITY OF POUGHKEEPSIE POLICE DEPARTMENT'S POLICIES, CUSTOMS, AND/OR PRACTICES PROXIMATELY AND DIRECTLY CAUSED THE VIOLATIONS OF MR. BOZELLA'S CONSTITUTIONAL RIGHTS**

173.   Prior to and during the investigation and prosecution of the Crapser Murder, the City, by and through its final policymakers, maintained policies, customs, and/or practices of promoting, facilitating, or condoning improper, illegal, and unconstitutional practices, including but not limited to disregarding criminal defendants' *Brady* rights.

174.   Prior to and during the investigation and prosecution of the Crapser Murder, Police Chief Stuart Bowles knew that there was significant "grey-area" under *Brady*, and that Officers would be confronted with choices implicating criminal suspects' constitutional rights.

175.   Prior to and during the investigation and prosecution of the Crapser Murder, Police Chief Stuart Bowles knew that there was an obvious need to act – by training, supervising, monitoring, and/or disciplining Officers – to prevent a violation of criminal defendants' constitutional rights.

176.   Upon information and belief, the City did not promulgate any written policies and did not offer any formal training to ensure Officers' compliance with *Brady*.

177.   Prior to and during the investigation and prosecution of the Crapser Murder, the City promulgated an official policy which instructed Officers to *destroy* their notebooks after the Officers had translated their notes into formal police reports. The purpose of such a policy was to prevent defense counsel from obtaining access to information recorded in the Officers' notebooks.

178.   The Second Department addressed this policy, custom, or procedure in a 1991 ruling in which it stated: "Pursuant to a procedure established within the Poughkeepsie Police

Department, the detectives destroyed these notes after they had been transcribed into a formal report. Such a procedure is [constitutionally] improper. . . ." *Roberts*, 178 A.D.2d at 622-23.

179.   In furtherance of the City's policies, customs, and/or practices, Officers in the City of Poughkeepsie Police Department did not record in writing all statements taken from eyewitnesses in connection with felony investigations.

180.   Upon information and belief, Police Chief Stuart Bowles knew of Defendant O'Neill's training of the Officers described above, as well as the Officers' practice of failing to record eyewitness statements. But, neither Chief Bowles nor any City policymaker initiated training or discipline to ensure that Officers complied with *Brady*. This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

181.   The Officers' destruction of notebooks and failure to record in writing all statements taken from eyewitnesses in connection with felony investigations directly caused the violation of Mr. Bozella's constitutional rights. Specifically, these practices proximately and directly caused both Officer Murphy and Officer Regula to fail to record the exculpatory statement of Ms. Crapser's neighbor.

## U.   DAMAGES

182.   The actions of the Defendants deprived Mr. Bozella of his civil rights under the Fifth, Sixth, and/or Fourteenth Amendments of the Constitution of the United States.

183.   The unlawful, intentional, willful, deliberately indifferent, and/or reckless acts and omissions of the Defendants caused Mr. Bozella to be maliciously prosecuted, wrongfully convicted and incarcerated, and forced to spend more than 26 years in prison for a crime he did not commit.

184.   The Defendants' acts and omissions caused Mr. Bozella injuries and damages including, but not limited to, the following, which continue to date and will continue into the future: pain and suffering; severe mental anguish; emotional distress; loss of family relationships; several psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, for which he is entitled to monetary relief.

185.   All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, and/or recklessly, and the acts meet all of the standards for the imposition of punitive damages.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 *Monell* Claim Against Dutchess County

186.   Mr. Bozella incorporates by reference the allegations set forth above.

187.   Dutchess County is and was at all times before and during the investigation and prosecution of the Crapser Murder responsible for the policies, customs, and practices of the District Attorney and its policy-makers.

188.   Dutchess County was the employer of District Attorney John King before and during the investigation and prosecution of the Crapser Murder.

189.   Dutchess County was the employer of District Attorney William Grady during the investigation and prosecution of the Crapser Murder.

190.   Dutchess County was the employer of Defendant O'Neill before and during the investigation and prosecution of the Crapser Murder.

191.   Prior to and during the investigation and prosecution of the Crapser Murder, the

County maintained policies, customs, and/or practices of concealing, suppressing, and/or

withholding exculpatory and impeachment evidence and conducting constitutionally inadequate

investigations and prosecutions. This general practice, even if not authorized by officially

adopted or promulgated policy, was so common and well-settled as to constitute an official

policy that fairly represented the District Attorney's official policies, customs, and/or practices.

192. The District Attorney delegated policymaking authority to assistant district

attorneys by allowing assistant district attorneys to decide for themselves what constituted *Brady*

material. In the absence of an official policy regarding *Brady*, Defendant O'Neill acted as an

official policymaker when he violated *Brady*.

193. The County's policymakers, including District Attorneys John King and William

Grady, knew of the misconduct of Defendant O'Neill and other assistant district attorneys

through, among other things, their direct involvement in the investigation and prosecution of the

Crapser Murder, their awareness of Defendant O'Neill's practices of engaging in, encouraging,

and condoning unconstitutional conduct, and their awareness of the unconstitutional policies,

customs, and/or practices described above. Thus, the County's policymakers knew of the risk of

constitutional violations by assistant district attorneys such as Defendant O'Neill.

194. In this context, the need for the County's policymakers to act was obvious and the

failure to act so likely to result in constitutional violations that County's policymakers' failure to

act rose to deliberate indifference.

195. But the County failed to act. The County failed to adequately train and/or

discipline assistant district attorneys regarding concealing, suppressing, and/or withholding

exculpatory and impeachment evidence and conducting constitutionally inadequate

investigations and prosecutions.

196. The County's official policies, customs, and/or practices of concealing, suppressing, and/or withholding exculpatory and impeachment evidence, conducting constitutionally inadequate investigations, and maliciously prosecuting individuals, without regard to guilt and in disregard of their constitutional rights, were a moving force behind the denial of Mr. Bozella's rights to due process and a fair trial under the Fifth, Sixth, and/or Fourteenth Amendments of the Constitution of the United States. These official policies, customs, and/or practices proximately and directly caused the violations of Mr. Bozella's constitutional rights described above.

197. As a direct and proximate result of the County's policies, customs, and/or practices, Mr. Bozella was wrongfully prosecuted, convicted, and imprisoned for more than 26 years, and suffered grievous and continuing injuries, including those set forth above.

### COUNT II
### 42 U.S.C. § 1983 *Monell* Claim Against the City of Poughkeepsie

198. Mr. Bozella incorporates by reference the allegations set forth above.

199. The City of Poughkeepsie is and was at all times before and during the investigation and prosecution of the Crapser Murder responsible for the policies, customs, and/or practices of the Police and its policy-makers.

200. The City of Poughkeepsie was the employer of Police Chief Stuart Bowles before and during the investigation and prosecution of the Crapser Murder.

201. The City of Poughkeepsie was the employer of Defendant DeMattio, Officer Grey, Officer Murphy, Officer Regula and other Officers employed by the Police before and during the investigation and prosecution of the Crapser Murder.

202. Prior to and during the investigation and prosecution of the Crapser Murder, the City of Poughkeepsie maintained policies, customs, and/or practices of instructing Officers to

destroy exculpatory and impeachment evidence in violation of the duties imposed by *Brady* and fail to memorialize, preserve, and disclose exculpatory and impeachment evidence. This general policy, custom, or practice, even if not authorized by officially adopted or promulgated policy, was so common and well-settled as to constitute an official policy that fairly represented the Police's official policies, customs, and/or practices.

203.   The City's policymakers, including the Chief of the Police, Stuart Bowles, knew of the misconduct of Defendant DeMattio, Officer Grey, Officer Murphy, Officer Regula and other Officers, through, among other things, their direct involvement in the investigation and prosecution of the Crapser Murder, and their awareness of the unconstitutional policies, customs, and/or practices described above. Thus, the City's policymakers knew of the risk of constitutional violations by Officers such as Defendant DeMattio, Officer Grey, Officer Murphy, Officer Regula and other Officers.

204.   In this context, the need for the City's policymakers to act was obvious and the failure to act so likely to result in constitutional violations that City's policymakers' failure to act rose to deliberate indifference.

205.   But the City failed to act. The City failed to adequately discipline Officers for destroying exculpatory and impeachment evidence in violation of the duties imposed by *Brady*. And, the City failed to adequately train its Officers to memorialize, preserve, and disclose exculpatory and impeachment evidence, and to conduct adequate investigations.

206.   The City's official policies, customs, and/or practices of instructing Officers to destroy exculpatory and impeachment evidence in violation of the duties imposed by *Brady* and failing to memorialize, preserve, and disclose exculpatory and impeachment evidence were a moving force behind the denial of Mr. Bozella's rights to due process and a fair trial under the

Fifth, Sixth, and/or Fourteenth Amendments of the Constitution of the United States. These official policies, customs, and/or practices proximately and directly caused the violations of Mr. Bozella's constitutional rights described above.

207.   As a direct and proximate result of the City's policies, customs, and/or practices, Mr. Bozella was wrongfully prosecuted, convicted, and imprisoned for more than 26 years, and suffered grievous and continuing injuries, including those set forth above.

<u>COUNT III</u>
<u>42 U.S.C. § 1983 Claim Against Defendant O'Neill for Violating Mr. Bozella's Constitutional Rights Under the Fifth and/or Fourteenth Amendments Based Upon Malicious Prosecution, Suppression of Exculpatory and Impeachment Evidence, Failure to Investigate Known and Exculpatory Leads, and Malicious Abuse of Process</u>

208.   Mr. Bozella incorporates by reference the allegations set forth above.

209.   Defendant O'Neill, acting deliberately and with malice, initiated and continued the criminal prosecution of Mr. Bozella without probable cause or other legal justification, suppressed exculpatory and impeachment evidence exculpating Mr. Bozella and incriminating Donald Wise, failed to investigate known and exculpatory leads, and maliciously abused legal process.

210.   Defendant O'Neill played an active role in investigating the Crapser Murder. Defendant O'Neill's investigatory role included examining the scene of the Crapser Murder, directing Officers to take photographs of the scene and to collect fingerprints, working alongside Officers during witness interviews and other fact investigation, participating in conversations with Officers resulting in Mr. Bozella's arrest and unlawful detention in 1977, and participating in witness interviews and other fact investigation in connection with the King Murder, including the interrogation of Saul Holland. All of these activities occurred more than four years before a Grand Jury indicted Mr. Bozella. In addition, Defendant O'Neill coerced South to provide false

testimony to the Grand Jury to secure the indictment of Mr. Bozella. Defendant O'Neill engaged in all of this conduct in an investigatory capacity.

211.    Defendant O'Neill initiated a criminal prosecution of Mr. Bozella in 1977. The malicious prosecution began with Mr. Bozella's arrest and nearly month-long incarceration without cause, without a hearing, and in violation of applicable New York law.

212.    Defendant O'Neill continued the malicious prosecution of Mr. Bozella by seeking an indictment based solely on Lamar Smith and Stanley Smith's statements, knowing that such statements were "low priority" evidence that "would not stand up to a Grand Jury or preliminary hearing test."

213.    Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to record Donald Wise's involvement in the Dobler Assault as exculpatory evidence in the Crapser Murder.

214.    Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to pursue Donald Wise as a suspect in the Crapser Murder following the discovery of evidence identifying Donald Wise as the assailant in the Dobler Assault.

215.    Defendant O'Neill continued the malicious prosecution of Mr. Bozella by instructing Holland during the February 23, 1978 interrogation not to discuss Donald Wise's role in the Crapser Murder.

216.    Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to pursue Donald Wise as a suspect in the Crapser Murder following Holland's statement that Donald Wise had committed the Crapser Murder.

217.    Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to record Holland's statement that Donald Wise had committed the Crapser Murder as exculpatory evidence in the Crapser Murder.

218.    Defendant O'Neill continued the malicious prosecution of Mr. Bozella in 1983 by coercing South to testify falsely before the Grand Jury.

219.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill refused to present evidence to a Grand Jury that Donald Wise's fingerprint was found on the inside of Ms. Crapser's bathroom window, and instead, initiated a trial against Mr. Bozella in 1983.

220.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill tried Mr. Bozella in 1983 based on the same evidence he knew was insufficient to constitute probable cause in 1977, together with the fabricated testimony of Moseley and coerced testimony of South. Defendant O'Neill was aware that the only physical evidence connecting an individual to the Crapser Murder implicated not Mr. Bozella, but rather Donald Wise, for the Crapser Murder.

221.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill failed to disclose the *Brady* Evidence to Mr. Bozella at or before the 1983 trial.

222.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill excluded all potential African-American jurors from the venire during the jury selection process of the 1983 trial, in violation of Mr. Bozella's constitutional rights under *Batson*.

223.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill re-tried Mr. Bozella in 1990 based on Lamar Smith's story and the fabricated testimony of Moseley, despite the fact that he was aware of physical evidence implicating Donald Wise for the Crapser Murder, Holland's statement implicating Donald Wise for the Crapser Murder, evidence implicating Donald Wise for the Dobler Assault, Stanley Smith's recanted testimony, and South's 1983 trial

testimony. No reasonable person would have believed that such evidence constituted probable cause.

224.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill failed to disclose the *Brady* Evidence to Mr. Bozella at or before the 1990 Trial.

225.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill engaged in misconduct during the 1990 Trial by speaking to prosecutorial witness Officer Slater outside the courtroom, in direct violation of the trial judge's explicit instruction not to do so.

226.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill engaged in misconduct during the 1990 Trial by referring to a tape-recorded conversation in direct violation of the trial judge's explicit instruction not to do so.

227.    Defendant O'Neill's malicious prosecution of Mr. Bozella terminated in Mr. Bozella's favor on October 28, 2009 when Mr. Bozella's conviction was vacated, and the District Attorney moved the Dutchess County Court to dismiss the Indictment because the District Attorney lacked sufficient evidence to convince a jury that Mr. Bozella was Ms. Crapser's assailant.

228.    Defendant O'Neill violated Mr. Bozella's constitutional rights by training Officers to violate *Brady* by destroying exculpatory and impeachment evidence so that Defendant O'Neill would not have to produce *Brady* evidence to defense counsel.

229.    By engaging in the conduct alleged above, Defendant O'Neill knowingly and deliberately violated Mr. Bozella's clearly established constitutional rights, including those under the Fifth and/or Fourteenth Amendments.

230.    Defendant O'Neill violated Mr. Bozella's constitutional rights by suppressing exculpatory and impeachment evidence exculpating Mr. Bozella and incriminating Donald Wise

during the February 1978 interrogation of Saul Holland by instructing Holland not to provide additional evidence implicating Donald Wise as the perpetrator of the Crapser Murder.

231.   Defendant O'Neill violated Mr. Bozella's constitutional rights by failing to investigate numerous known and exculpatory leads pointing toward Donald Wise as the perpetrator of the Crapser Murder, including but not limited to failing to, among other things, further investigate Donald Wise's involvement in the Crapser Murder following the Dobler Assault, further question Holland regarding Donald Wise's confessing to committing the Crapser Murder, and attempt to match Donald Wise's fingerprint to the latent fingerprint recovered from the inside of Ms. Crapser's bathroom window at any time prior to 1983.

232.   Defendant O'Neill violated Mr. Bozella's constitutional rights by coercing South to testify falsely before the Grand Jury in 1983, and thus employing the grand jury indictment process to help secure an indictment through bad faith, perjury, and suppressed evidence, with the intent to do inexcusable and unjustifiable harm, and for the improper purpose of obtaining an indictment and continuing the prosecution of Mr. Bozella despite the legal infirmity of a lack of probable cause.

233.   As a direct and proximate result of Defendant O'Neill's actions, Mr. Bozella was deprived of his constitutional rights to due process and a fair trial, and was wrongfully prosecuted, convicted, and imprisoned for more than 26 years, and suffered other grievous and continuing damages and injuries, including those set forth above.

## COUNT IV

### 42 U.S.C. § 1983 Claim Against William O'Neill and Robert DeMattio for Conspiracy

234. Mr. Bozella incorporates by reference the allegations set forth above.

235. Defendants O'Neill and DeMattio, acting within the scope of their employment and under color of law, agreed among themselves and with others, to act in concert to deprive Mr. Bozella of his clearly established Fifth, Sixth, and/or Fourteenth Amendment rights, including his rights to due process and a fair trial.

236. During their interrogation of Holland in connection with the King Murder, Defendant O'Neill, Defendant DeMattio, and Officer Grey instructed Holland not to discuss Donald Wise's role in the Crapser Murder and thereby suppressed this exculpatory and impeachment evidence from coming to light. Defendant O'Neill, Defendant DeMattio, and Officer Grey's instruction to Holland, and subsequent conduct during and after Holland's statement implicating Donald Wise for the Crapser Murder, evidences an agreement among them to act in concert to inflict a constitutional injury upon Mr. Bozella.

237. Overt acts in furtherance of this conspiracy include but are not limited to all those acts described above in paragraphs 62-143, of this Complaint, beginning with the baseless arrest and unlawful incarceration of Mr. Bozella in 1977.

238. At no time did Defendant O'Neill, Defendant DeMattio, or Officer Grey withdraw from this conspiracy.

239. As a direct and proximate result of Defendant O'Neill, Defendant DeMattio, and Officer Grey's actions, Mr. Bozella was deprived of his constitutional rights to due process and a fair trial, and was wrongfully prosecuted, convicted, and imprisoned for more than 26 years, and suffered other grievous and continuing damages and injuries, including those set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dewey R. Bozella requests judgment as follows:

(a)    Compensatory damages in an amount to be shown by the evidence at trial but in no event less than $25,000,000.00 (TWENTY-FIVE MILLION DOLLARS);

(b)    Punitive damages, as allowed by law;

(c)    Costs of suit, including but not limited to reasonable attorney's fees and costs, under 42 U.S.C. § 1988;

(d)    Prejudgment and postjudgment interest as allowed by law;

(e)    Such other and further relief to which Mr. Bozella justly may be entitled.

Dated:  New York, New York
        June 24, 2010

Peter J. Macdonald
Ross E. Firsenbaum
Somil Trivedi
Margaux J. Hall
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, New York 10022
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiff Dewey R. Bozella*