UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

DEWEY R. BOZELLA,

        Plaintiff,

v.

THE COUNTY OF DUTCHESS; THE
CITY OF POUGHKEEPSIE; WILLIAM J.
O'NEILL; AND ROBERT J. DEMATTIO

        Defendants.

No. 10 Civ. 4917 (CS)

ORAL ARGUMENT
REQUESTED

PLAINTIFF DEWEY R. BOZELLA'S OMNIBUS MEMORANDUM IN OPPOSITION
TO THE MOTIONS TO DISMISS BY DEFENDANTS COUNTY OF DUTCHESS,
WILLIAM J. O'NEILL AND ROBERT J. DEMATTIO AND MOTION FOR
JUDGMENT ON THE PLEADINGS BY DEFENDANT CITY OF POUGHKEEPSIE

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .........................................................................................................1

STATEMENT OF ALLEGATIONS...................................................................................................4

    A.    The June 14, 1977 Murder Of J. Emma Crapser ......................................................5

    B.    William O'Neill's Role In The Investigation ...........................................................5

    C.    City Officers Did Not Record And Preserve Exeulpatory Evidence......................6

    D.    Detective DeMattio Arrested Mr. Bozella And The District Attorney
        Attempted And Failed To Indict Mr. Bozella............................................................7

    E.    Donald Wise Committed The Dobler Assault ..........................................................8

    F.    Donald Wise Committed The King Murder ..............................................................8

    G.    Saul Holland Informed The Defendants That Donald Wise Committed The
        Crapser Murder, But The Defendants Suppressed The Exeulpatory Evidence.......9

    H.    The District Attorney Struck a Deal With Moseley To Testify Falsely Against
        Mr. Bozella ...............................................................................................................10

    I.    William O'Neill Coerced Madeline Dixon South To Lie To The Grand Jury
        And The Grand Jury Indicted Mr. Bozella ............................................................11

    J.    The Defendants Learned That A Fingerprint Found On The Inside Of Ms.
        Crapser's Bathroom Window Matched Donald Wise's Fingerprint....................12

    K.    The District Attorney Violated Mr. Bozella's *Brady* Rights.................................13

    L.    The Dutchess County Court Concluded That Mr. Bozella Had Been
        Wrongfully Convicted And Incarcerated For More Than 26 Years.......................14

    M.    The Defendants' Violations Of Mr. Bozella's Constitutional Rights Were
        Foreseeable In Light Of The District Attorney's and Police's Policies,
        Customs, and Practices ...........................................................................................17

ARGUMENT......................................................................................................................................17

I.    The Complaint States Claims Against The County Of Dutchess and City of
    Poughkeepsie For Violations Of Section 1983 ....................................................................18

    A.    The Complaint States A Claim Against The County (Count I)..............................19

|   |   | 1. | The Complaint States A Claim Against The County Based On The District Attorney's Failure To Train Or Supervise Its Assistant District Attorneys......19 |
|---|---|---|---|

1. The Complaint States A Claim Against The County Based On The District Attorney's Failure To Train Or Supervise Its Assistant District Attorneys....................................................................................................19

2. The Complaint States A Claim Against The County Based On William O'Neill's Acts As An Official Policymaker ..............................................23

3. The County Is Not Entitled to Absolute Immunity.....................................24

4. The Complaint Alleges Violations of Mr. Bozella's Constitutional Rights Under *Brady v. Maryland*.................................................................25

    a. The Upstairs' Neighbors Statements ..............................................27

    b. The Next-Door Neighbor's Statement ...........................................29

    c. The Holland Tape and Dobler Reports ...........................................30

B. The Complaint States A Claim Against The City (Count II)..................................31

1. The Complaint States A Claim Against The City Based On The City's Failure To Train Or Supervise Its Officers To Memorialize, Preserve, And Disclose Eyewitness Statements .........................................................31

2. The Complaint States A Claim Against the City Based On The City's Policy Of Destroying Officers' Notes During Open Investigations ..........35

II. The Complaint States Claims Against William O'Neill For Violations Of Section 1983 (Count III)...............................................................................................................37

A. The Complaint States Claims Against William O'Neill For Fabrication of Evidence, Malicious Abuse of Process, And Malicious Prosecution ....................38

B. William O'Neill Is Not Entitled To Absolute Immunity........................................41

III. The Complaint States Claims Against William O'Neill and Mr. DeMattio For Conspiracy Under Section 1983 (Count IV).........................................................................44

A. Messrs. DeMattio And O'Neill Agreed To Violate Mr. Bozella's Constitutional Rights .............................................................................................44

B. William O'Neill's Overt Acts Caused Several Constitutional Violations.............48

C. The Complaint Also Alleges That Mr. DeMattio Violated Mr. Bozella's Constitutional Rights .............................................................................................48

D. Mr. DeMattio Is Not Protected By Qualified Immunity........................................49

CONCLUSION.......................................................................................................................51

## TABLE OF AUTHORITIES

### CASES

Page

*Alfaro v. Labador,*
   300 F. App'x 85 (2d Cir. 2008) ............................................................................................50

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ..................................................................................................17, 25

*Atherton v. D.C. Office of the Mayor,*
   567 F.3d 672 (D.C. Cir. 2009) .............................................................................................41

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...........................................................................................17, 18, 22

*Bellikoff v. Eaton Vance Corp.,*
   481 F.3d 110 (2d Cir. 2007) .................................................................................................52

*Board of County Commissioners of Bryan County v. Brown,*
   520 U.S. 397 (1997) ...........................................................................................18, 22, 33, 35

*Boyd v. City of New York,*
   336 F.3d 72 (2d Cir. 2003) .............................................................................................39, 40

*Buckley v. Fitzsimmons,*
   509 U.S. 259 (1993) .......................................................................................41, 42, 43

*Bumbury v. City of New York,*
   62 A.D.3d 621 (N.Y. App. Div. 2009) ...........................................................................33, 37

*Burns v. Reed,*
   500 U.S. 478 (1991) .....................................................................................................41, 42

*Burrell v. Adkins,*
   No. CV01-2679-M, 2007 WL 4699166 (W.D. La. Oct. 22, 2007) ...........................................26

*City of Canton v. Harris,*
   489 U.S. 378 (1989) .................................................................................................19, 22, 33

*Conte v. County of Nassau,*
   No 06-CV-4746 (JFB) (ETB), 2010 U.S. Dist. LEXIS 104815 (E.D.N.Y. Sept. 30, 2010) ...23

*Cook v. Sheldon,*
   41 F.3d 73 (2d Cir. 1994) .............................................................................................39, 40

*Cruz v. County of Dupage*,
No. 96 C 7170, 1997 WL 589463 (N.D. Ill. Sept. 17, 1997)...............................................45, 48

*Doswell v. City of Pittsburgh*,
No. 07 Civ. 0761, 2009 WL 1734199 (W.D. Pa. 2009) ...........................................................33

*Dwares v. City of New York*,
985 F.2d 94 (2d Cir. 1993)........................................................................................................33

*Freeman v. Georgia*,
599 F.2d 65 (11th Cir. 1979) ....................................................................................................49

*Green v. City of New York*,
465 F.3d 65 (2d Cir. 2006)........................................................................................................34

*Gronowski v. Spencer*,
424 F.3d 285 (2d Cir. 2005)......................................................................................................23

*Guzman v. City of New York*,
No. 08 Civ. 2853, 2010 WL 4025563 (S.D.N.Y. Oct. 13, 2010) .......................................19, 40

*Hafner v. Brown*,
983 F.2d 570 (4th Cir. 1992) ....................................................................................................44

*Hill v. City of New York*,
45 F.3d 653 (2d Cir. 1995).........................................................................................................43

*Hope v. Pelzer*,
536 U.S. 730 (2002)...................................................................................................................49

*Imbler v. Pachtman*,
424 U.S. 409 (1976)...................................................................................................................41

*Jacobs v. City of Chicago*,
215 F.3d 758 (7th Cir. 2000) ....................................................................................................49

*Jeffes v. Barnes*,
208 F.3d 49 (2d Cir. 2000).........................................................................................................24

*Jovanovic v. City of New York*,
No. 04-CV-8437 (PAC), slip op. (S.D.N.Y. Sept. 28, 2010)....................................................25

*Kalina v. Fletcher*,
522 U.S. 118 (1997)...................................................................................................................41

- iv -

*Karedes v. Ackerley Group, Inc.*,
423 F.3d 107 (2d Cir. 2005)...................................................................................................18

*Kashi v. Gratsos*,
790 F.2d 1050 (2d Cir. 1986)............................................................................................44, 48

*Kulwicki v. Dawson*,
969 F.2d 1454 (3d Cir. 1992)................................................................................................42

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
507 U.S. 163 (1993)..............................................................................................................19

*Limone v. Condon*,
372 F.3d 39 (1st Cir. 2004)........................................................................................36, 38, 51

*McClellan v. Smith*,
439 F.3d 137 (2d Cir. 2006)............................................................................................39, 40

*McCray v. City of New York*,
No. 03 Civ. 9685, 2007 WL 4352748 (S.D.N.Y. Dec. 11, 2007)......................................46, 51

*McGhee v. Pottawattamie County*,
547 F.3d 922 (8th Cir. 2008) *cert. granted*, 129 S. Ct. 2002 (2009),
*cert. dismissed*, 130 S. Ct. 1047 (Jan. 4, 2010).........................................................................38

*McKenna v. Wright*,
386 F.3d 432 (2d Cir. 2004)...................................................................................................49

*Moldowan v. City of Warren*,
578 F.3d 351 (6th Cir. 2009) .....................................................................................31, 32, 33

*Monell v. Department of Social Services of New York*,
436 U.S. 658 (1978)..............................................................................................................18

*Myers v. County of Orange*,
157 F.3d 66 (2d Cir. 1998).......................................................................................19, 35, 36

*Napue v. Illinois*,
360 U.S. 264 (1959)..............................................................................................................50

*Newton v. City of New York*,
681 F. Supp. 2d 473 (S.D.N.Y. 2010)......................................................................31, 32, 37

*O'Fee v. City of Philadelphia*,
No. 09-2724, 2009 WL 3172759 (E.D. Pa. Oct. 2, 2009) ..........................................................5

*Owen v. City of Independence*,
    445 U.S. 622 (1980)............................................................................................................24

*Padilla v. Yoo*,
    633 F. Supp. 2d 1005 (N.D. Cal. 2009) ...............................................................................49

*Pangburn v. Culbertson*,
    200 F.3d 65 (2d Cir. 1999)............................................................................................44, 45

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986)..............................................................................................18, 23, 35

*Pension Committee of University of Montreal Pension Plan v. Banc of America Securities LLC*,
    568 F.3d 374 (2d Cir. 2009)....................................................................................................5

*People v. Bozella*,
    25 Misc. 3d 1215(A), 2009 WL 3364575 (Dutchess County Ct. Oct. 14, 2009)..............32, 36

*People v. Roberts*,
    178 A.D.2d 622 (N.Y. App. Div. 1991) ..........................................................................21, 36

*Peterson v. Tomaselli*,
    469 F. Supp. 2d 146 (S.D.N.Y. 2007)...................................................................................23

*Pyle v. Kansas*,
    317 U.S. 213 (1942)..............................................................................................................50

*Ricciuti v. N.Y. City Transit Authority*,
    124 F.3d 123 (2d Cir. 1997)..........................................................................................*passim*

*Rosario v. Coughlin*,
    No. 88-CV-56, 1995 U.S. Dist. LEXIS 172 (N.D.N.Y. 1995) ................................................48

*Rounseville v. Zahl*,
    13 F.3d 625 (2d Cir. 1994)............................................................................................44, 45

*Russo v. City of Bridgeport*,
    479 F.3d 196 (2d Cir. 2007)..................................................................................................48

*Smith v. Gribetz*,
    958 F. Supp. 145 (S.D.N.Y. 1997) .......................................................................................24

*Smith v. Holtz*,
    210 F.3d 186 (3d Cir. 2000)..................................................................................................26

*Sorlucco v. New York City Police Department,*
    971 F.2d 864 (2d Cir. 1992)................................................................................................24

*Taylor v. Hansen,*
    731 F. Supp. 72 (N.D.N.Y. 1990).................................................................................45, 48

*Thompson v. Connick,*
    553 F.3d 836 (5th Cir. 2008), *vacated by full panel decision on other grounds, cert.*
    *granted on other grounds, Connick v. Thompson,* 130 S. Ct. 1880 (Mar. 22, 2010) .............26

*Torres v. Superintendent of Police of P.R.,*
    893 F.2d 404 (1st Cir. 1990)................................................................................................39

*Tyree v. Zenk,*
    No. 05-CV-2998, 2009 U.S. Dist. LEXIS 43872 (E.D.N.Y. May 22, 2009).........................50

*United States v. Agurs,*
    427 U.S. 97 (1976)...............................................................................................................50

*United States v. Perdomo,*
    929 F.2d 967 (3d Cir. 1991)................................................................................................30

*Van de Kamp v. Goldstein,*
    129 S. Ct. 855 (2009).....................................................................................................25, 43

*Vann v. City of New York,*
    72 F.3d 1040 (2d Cir. 1995)................................................................................................24

*Walker v. City of New York,*
    974 F.2d 293 (2d Cir. 1992)......................................................................................... *passim*

*White v. McKinley,*
    519 F.3d 806 (8th Cir. 2008) ..............................................................................................46

*Woodward v. Correctional Medical Services of Ill.,*
    368 F.3d 917 (7th Cir. 2004) ..............................................................................................34

*Yanez v. City of New York,*
    29 F. Supp. 2d 100 (E.D.N.Y. 1998) ..................................................................................46

*Zahrey v. City of New York,*
    No. 98-CV-4546, 2009 U.S. Dist. LEXIS 8177 (S.D.N.Y. Jan. 7, 2009) ..............................49

*Zahrey v. Coffey,*
    221 F.3d 342 (2d Cir. 2000).....................................................................................38, 40, 42

## **RULES**

Fed. R. Civ. P. 15(a) ...........................................................................................................52

Plaintiff Dewey R. Bozella respectfully submits this memorandum in opposition to the motions to dismiss the complaint filed by Defendants County of Dutchess, William J. O'Neill, and Robert J. DeMattio, dated October 6, 2010, and the motion for judgment on the pleadings filed by Defendant City of Poughkeepsie, dated October 13, 2010.

## PRELIMINARY STATEMENT

Dewey Bozella lost more than 26 years—his entire adult life—wrongfully incarcerated for the June 14, 1977 murder of Emma Crapser in Poughkeepsie, New York. More than 30 years after the murder, Mr. Bozella discovered that the Dutchess County District Attorney[1] and City of Poughkeepsie Police Department withheld four pieces of exculpatory evidence in violation of Mr. Bozella's constitutional rights under *Brady v. Maryland.* In 2009, Mr. Bozella presented this evidence to the Dutchess County Court in support of a motion to vacate his conviction of second degree murder, and, after considering the District Attorney's opposition to the motion, the Dutchess County Court concluded "without reservation" that Mr. Bozella's "legal and factual arguments advanced in support of the motion [were] compelling, indeed overwhelming."

This civil rights action seeks compensation from the municipalities and individuals who are responsible for the constitutional violations that caused Mr. Bozella's wrongful conviction and incarceration. The Defendants move to dismiss the Complaint principally on the basis that the Dutchess County Court got it wrong and that there were no *Brady* violations in Mr. Bozella's criminal case. Seeking to re-write Mr. Bozella's Complaint, Defendants improperly rely on an affidavit and thousands of pages of exhibits not referenced in the Complaint to support their motion—documents that in any event *bolster* the allegations of Defendants' *Brady* and other constitutional violations, and further demonstrate the policies that were the moving force behind

---

[1] All capitalized terms are defined as they are in the Complaint, unless otherwise noted herein.

those violations. Contrary to the Defendants' assertions, the Complaint states a claim against each of the Defendants for the following reasons.

*First,* the Complaint states a claim against the County. Compl. ¶¶ 157-70, 186-97; *see infra* at Section I.A. The Complaint alleges that District Attorneys John King and William Grady failed to train or supervise assistant district attorneys regarding their *Brady* obligations even though the District Attorneys knew that certain assistant district attorneys, including William J. O'Neill, routinely violated *Brady* by, among other things, failing to produce police reports to criminal defendants. Compl. ¶¶ 157-64. The Complaint further alleges that the District Attorney did not set any policies to foster *Brady* compliance, and failed to implement mechanisms to cross-check information across open investigations to ensure that exculpatory information was preserved and produced in relevant cases. *Id.* ¶¶ 171-72. In fact, as the Complaint alleges, the District Attorney actually trained the Police to destroy their notebooks for the express purpose of ensuring that such notes would not have to be disclosed to defense counsel as *Brady* material. *Id.* ¶¶ 165-66. The Complaint also alleges that this conduct (or lack thereof) directly caused one or more of the violations of Mr. Bozella's constitutional rights identified by the Dutchess County Court and Mr. Bozella's resulting wrongful conviction and 26-year incarceration. *Id.* ¶¶ 164, 168-69, 172.

*Second,* the Complaint states a claim against the City. Compl. ¶¶ 173-81, 198-207; *see infra* at Section I.B. The Complaint alleges that the City failed to implement any policies to ensure that detectives and police officers ("Officers") memorialized, preserved, and disclosed exculpatory information and failed to train or supervise Officers regarding such obligations, such as the need to memorialize, preserve, and disclose eyewitness statements. Compl. ¶¶ 173-76. Indeed, the City implemented an unconstitutional policy of destroying Officers' notebooks

during open investigations with deliberate indifference to the constitutional violations that would inevitably result given that such notebooks likely contained exculpatory information. *Id.* ¶¶ 177-81. The Complaint alleges that these policies also directly caused one or more of the violations of Mr. Bozella's constitutional rights identified by the Dutchess County Court and Mr. Bozella's subsequent wrongful conviction and 26-year incarceration. *Id.* ¶¶ 180-81.

*Third*, the Complaint states four claims against William O'Neill. Compl. ¶¶ 208-39; *see infra* at Sections II and III. The Complaint alleges that William O'Neill coerced a witness to testify falsely to the Grand Jury and suppressed exculpatory information identifying someone other than Mr. Bozella as the actual perpetrator of the Crapser Murder. Compl. ¶¶ 59-70, 96-103, 213-18. 231-32. The Complaint thus states claims against William O'Neill for fabrication of evidence, malicious abuse of process, malicious prosecution, and conspiracy. As William O'Neill concedes in an exhibit included with his motion, he served in an investigatory rather than prosecutorial capacity in connection with the Crapser Murder when he engaged in this misconduct. *Id.* ¶¶ 62-68, 210; *see infra* at Section II.B. Thus, William O'Neill is not absolutely immune from the claims in the Complaint.

*Fourth*, the Complaint states a conspiracy claim against Mr. DeMattio. Compl. ¶¶ 234-39; *see infra* at Section III. The Complaint alleges that Mr. DeMattio conspired with William O'Neill and another Officer to suppress information pointing to a different person as Ms. Crapser's murderer and to not investigate further that other person's potential role in the Crapser Murder. Compl. ¶¶ 62-67; 236-37. Mr. DeMattio is not entitled to qualified immunity because legal authorities clearly established at the time of this misconduct that suppression of evidence favorable to Mr. Bozella was a violation of Mr. Bozella's constitutional rights.

- 3 -

For these reasons, the Defendants' motions should be denied. Mr. Bozella has stated a claim against each Defendant and is entitled to pursue this action to compensate him for the 26 years he lost as a result of the Defendants' deliberate disregard for his constitutional rights.

## STATEMENT OF ALLEGATIONS

The allegations in the Complaint are the result of a detailed and comprehensive investigation conducted by WilmerHale over more than one year regarding the wrongful conviction of Mr. Bozella for the Crapser Murder. Compl. Ex. A at *7. Following that investigation, Mr. Bozella moved to vacate his conviction with the Dutchess County Court based on many allegations also in the Complaint. *Id.* at *7-8. Mr. Bozella identified four *Brady* violations, some of which were presented in an affidavit from retired Lieutenant Arthur Regula who informed the Dutchess County Court that "the murder of Ms. Crapser was the one case that stood out to [him] over the course of [his] entire twenty-two year service with the Poughkeepsie Police Department" and thus "he held onto a copy of his entire case file [] for over eighteen years, because he suspected that someone would one day ask him to see it." *Id.* at *8.

The District Attorney pledged publically to conduct a comprehensive investigation, took three months to respond to Mr. Bozella's motion, but then submitted a scant ten-page affirmation with citations to five cases (one of which was *Brady v. Maryland*) which lacked "any supporting affidavit by a party with first hand knowledge" of the investigation and prosecution of the Crapser Murder. *Id.* at *10. If such an investigation were undertaken, no evidence of it appeared from the District Attorney's delayed submission. On October 14, 2009, the Dutchess County Court concluded, "upon a thorough and careful review of the record" that it was "without reservation", "firmly and soundly convinced of the meritorious nature of [Mr. Bozella's] application" and that "the legal and factual arguments advanced in support of the motion are compelling, indeed overwhelming." *Id.* at *16.

- 4 -

These and the other allegations in the Complaint must be taken as true, with all reasonable inferences construed in Mr. Bozella's favor when evaluating the Defendants' motions. *See, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs. LLC,* 568 F.3d 374, 377 (2d Cir. 2009); *see also O'Fee v. City of Philadelphia,* No. 09-2724, 2009 WL 3172759, at *3 (E.D. Pa. Oct. 2, 2009) ("Notwithstanding *Twombly* and *Iqbal,* the general rules of pleading still require only a short and plain statement of the [Seetion 1983] elaim showing that the pleader is entitled to relief, not detailed faetual allegations.").

A. The June 14, 1977 Murder Of J. Emma Crapser

Ninety-two year old J. Emma Crapser was brutally murdered in her home at 15 North Hamilton Street in Poughkeepsie, New York at approximately 11:00 p.m. on June 14, 1977. Compl. ¶ 19. Ms. Crapser was beaten, bound, and "asphyxiated by suffocation" as her assailants stuffed five pieces of material down her throat—ineluding a chisel-like instrument, eloth, and lace measuring more than 7 feet in length. *Id.* ¶ 20; *see* Affidavit in Support of a Motion to Dismiss Pursuant to Rule 12(B)(6), Federal Rules of Civil Procedure on Behalf of Dutchess County and William O'Neill ("Burke Aff.") ¶ 9 (aeknowledging Ms. Crapser was murdered "in a gratuitously gruesome fashion").

The Crapser Murder sparked an outcry in the community. Compl. ¶ 21. The July 31, 1977 *Poughkeepsie Journal* reported that "[t]he Crapser murder heightened public resentment of a growing number of crimes against the elderly and put pressure on the law enforcement establishment to come up with some answers." *Id.* Accordingly, the Defendants were under tremendous public pressure to arrest and conviet *someone* for the Crapser Murder. *Id.*

B. William O'Neill's Role In The Investigation

William O'Neill played an active role in the investigation of the Crapser Murder from its earliest stages. *Id.* ¶¶ 22-24. William O'Neill condueted investigatory activities at the crime

- 5 -

scene on June 15, 1977, directing Officers to take photographs of the scene and to collect
fingerprints. *Id.* In the ensuing weeks and months, William O'Neill continued to investigate the
Crapser Murder, working alongside Officers during witness interviews and other fact
investigation. *Id.* ¶ 24; *see* Burke Aff. Ex. C.1884 (William O'Neill affirming under penalty of
perjury that he is "thoroughly familiar with all the facts and circumstances surrounding this
matter inasmuch as [he] initially *investigated* the case in 1977 and again in 1983 when the matter
was presented to the Grand Jury.") (emphasis added).

C.     City Officers Did Not Record And Preserve Exculpatory Evidence

Approximately one day after the Crapser Murder, Officer Pete Murphy interviewed a
female neighbor of Ms. Crapser about whether she had heard anything unusual on the night of
the murder. Compl. ¶ 25. The neighbor informed Officer Murphy that she had heard loud noises
in the alley at the side of Ms. Crapser's home that sounded like garbage cans being moved. *Id.*
Consistent with a custom within the City that was known to Chief Bowles, Officer Murphy did
not record in writing the neighbor's statement. *Id.* ¶¶ 26, 179-80. Instead, Officer Murphy
informed his partner, Officer Art Regula, of the sum and substance of the statement. *Id.* ¶ 26.
Officer Regula also failed to record in writing the statement. *Id.* ¶¶ 26-27. Neither Officer
disclosed this information to the District Attorney or Mr. Bozella prior to 2008. *Id.* ¶ 148.

Shortly after this incident, Detective Regula questioned Lamar Smith and his brother
Stanley Smith on June 25, 1977 regarding the Crapser Murder. *Id.* ¶ 28. Lamar Smith and
Stanley Smith informed the Officers that they were not at the scene of the murder. *Id.*; *see* Burke
Aff. ¶ 13. The questioning took place in the back of a police car and was tape-recorded. Compl.
¶ 28. However, consistent with the Police's policy and custom of failing to preserve,
memorialize, and disclose evidence likely to contain exculpatory information during open

- 6 -

investigations, the Police destroyed the tape of the conversation before a copy could be produced to Mr. Bozella. *Id.* ¶¶ 29, 165.

Four days after denying any knowledge about the Crapser Murder, on June 29, 1977, Lamar Smith changed his story. *Id.* ¶ 30. In exchange for his release from custody in connection with an unrelated burglary, Lamar Smith informed the Police that he and Stanley Smith were across the street from Ms. Crapser's house and saw Mr. Bozella and Wayne Moseley enter Ms. Crapser's home. *Id.* The Police recorded this statement as well. *Id.* ¶ 31. However, unlike the exculpatory tape of Lamar Smith's June 25 statement, the Police preserved Lamar Smith's June 29, 1977 statement inculpating Mr. Bozella. *Id.*

### D. Detective DeMattio Arrested Mr. Bozella And The District Attorney Attempted And Failed To Indict Mr. Bozella

On June 29, 1977, Chief Bowles, William O'Neill, and certain Officers met and decided to file warrants charging Mr. Bozella, Wayne Moseley, and Elbert Pittman with the Crapser Murder, based solely on the statements of Lamar Smith and Stanley Smith. *Id.* ¶ 37. Mr. DeMattio and Officer Siegel arrested Mr. Bozella the next day. *Id.* In violation of state law, Mr. Bozella was held in county jail without bail for *27 days* without being granted a hearing and without probable cause to indict. *Id.* ¶ 38. Eventually, on July 28, 1977, Mr. Bozella was released after the District Attorney acknowledged that it had "insufficient" evidence to convene a preliminary hearing. *Id.* The District Attorney understood that Lamar Smith and Stanley Smith's statements were "low priority" evidence that "would not stand up to a Grand Jury or preliminary hearing test" and indeed, William O'Neill told a reporter, "[w]e just need more evidence" to support a finding of probable cause against Mr. Bozella. *Id.* ¶ 40.

Nonetheless, the District Attorney convened a Grand Jury against Mr. Bozella. *Id.* ¶ 41. After considering Lamar Smith and Stanley Smith's testimony, the Grand Jury concluded that

Lamar Smith and Stanley Smith's stories did not constitute sufficient evidence to support a finding of probable cause to indict Mr. Bozella for the Crapser Murder. *Id.* ¶ 44.

### E.    Donald Wise Committed The Dobler Assault

On August 2, 1977, two days after Chief Bowles maintained that the investigation of the Crapser Murder was "complete" and credited Officers with an "outstanding job," the Police found 82-year old Estelle Dobler in her home, located approximately six blocks away from Ms. Crapser's residence, "laying on the floor and her hands, legs, and mouth were bound with black electrical tape" and with "a stocking [] stuffed in her mouth and then covered with tape." *Id.* ¶¶ 45-46. Ms. Dobler, who survived her attack, informed the Police that she observed two black males enter her apartment, one of whom matched the description of the 5 foot, 1 inch-tall Donald Wise. *Id.* ¶ 47. Shortly thereafter, Christopher Gill informed Officers Regula and Groth –the same Officers working on the Crapser Murder investigation—that Donald Wise was Ms. Dobler's attacker. *Id.* ¶¶ 48-49; *see* Burke Aff. ¶ 21 (acknowledging that "Donald Wise was a suspect" for the Dobler attack). Gill's statement was recorded in a police report, which the District Attorney kept in its files for the murder of Mary King, *see* Statement of Allegations at F, *infra,* but did not place in its file for the open Crapser Murder investigation despite the strikingly similar modus operandi between the three attacks of elderly women. Compl. ¶¶ 50, 55-56, 58.

### F.    Donald Wise Committed The King Murder

Approximately six months after the Dobler Assault, the Police arrested Donald Wise and his brother Anthony Wise for the February 20, 1978 murder of 80-year old Mary King in Ms. King's home, just blocks away from Ms. Crapser's and Ms. Dobler's homes. *Id.* ¶ 52. At the scene of the crime, William O'Neill "assisted in the coordination of the [King Murder crime scene] investigation" and observed the similarities between the Crapser Murder and the King Murder, including that Ms. King and Ms. Crapser were elderly women who were attacked in

their homes late at night, asphyxiated with items stuffed down their throats, and had been

"strangled and hit with blunt objects" within six blocks of each other and in the same time frame.

*Id.* ¶¶ 53, 55-56. Indeed, on February 22, 1978, District Attorney King publicly acknowledged

the similarity between the Crapser Murder and the King Murder, stating, "We have had the

thought that the age alone (of the victims) is enough to make the parallel." *Id.* ¶ 58.

## G. Saul Holland Informed The Defendants That Donald Wise Committed The Crapser Murder, But The Defendants Suppressed The Exculpatory Evidence

On February 23, 1978, just one day after District Attorney King acknowledged the

similarity between the King Murder and the Crapser Murder, Mr. DeMattio, Officer William

Grey and William O'Neill questioned Saul Holland about his involvement in the King Murder.

*Id.* ¶ 62. During the interrogation, Holland informed William O'Neill, Mr. DeMattio, and

Officer Grey that Donald Wise had convinced him to participate in the King Murder because

Donald Wise said he had previously committed a similar crime and gotten away with it:

> Oh, they had did – *they had did one of these jobs here before.*
> [Donald Wise] said, you ain't got nothing to be scared of or
> nervous about.

*Id.* ¶ 63. Holland proceeded to describe the specifics of Donald Wise's previous crime:

> He said the way they did it, they, you know, *when they got to the
> house, there wasn't nobody there,* you know, and they just found
> all this money and stuff and then around, you know – *they said
> around 9 or 10 or 11, that's when the lady came home. She must
> have come home.*

*Id.* Holland's description of Donald Wise's previous crime matched the description of the

Crapser Murder—Ms. Crapser's assailants were inside her apartment and attacked her when she

arrived home at approximately 11:00 p.m. *Id.* ¶ 64.

Rather than asking Holland additional questions about Donald Wise's previous crime,

Officer Grey steered the conversation away from this previous crime, responding, "*Well, I don't*

- 9 -

*want to get into that because we're liable to get confused." Id.* ¶ 66. Defendants O'Neill and DeMattio, alongside Officer Grey, did not suggest otherwise. *Id.* ¶ 67. Neither Defendant interrupted Grey and asked Holland to provide additional information regarding Donald Wise's previous attack, although nothing prevented either Defendant from doing so. *Id.* Neither Defendant pursued Holland's description of Donald Wise's prior attack at the end of the interrogation, although nothing prevented them from doing so. *Id.* And neither Defendant took any action following the interrogation to follow-up on the exculpatory lead, although nothing prevented either Defendant from doing so. *Id.* Rather, William O'Neill placed a cassette tape of the interrogation in the District Attorney's file for the King Murder as evidence to prosecute Donald Wise, but did not place a record of the tape or Holland's statement in the Crapser file where the very same statement was exculpatory information with respect to Mr. Bozella—the principal suspect for the Crapser Murder. *Id.* ¶¶ 68-69. That tape, like the exculpatory Dobler Reports, was never produced to Mr. Bozella prior to 2008. *Id.* ¶ 70.

## H. The District Attorney Struck a Deal With Moseley To Testify Falsely Against Mr. Bozella

In March 1983, *five years* after Donald Wise was convicted for the King Murder, and the Crapser Murder investigation had gone cold, in March 1983 the District Attorney struck a deal with Wayne Moseley to obtain his testimony against Mr. Bozella. *Id.* ¶¶ 74-88. After a series of meetings with Moseley and increasingly favorable offers to Moseley, on March 23, 1983 the District Attorney arranged for Moseley to file a motion to vacate a conviction (for an unrelated crime) that, in D. James O'Neil's own words, was "more or less a maneuver mechanism to give him something for his help." *Id.* ¶ 85. The deal was virtually unprecedented, allowed Moseley to be released from prison before he was even eligible for parole, and was driven entirely by the District Attorney to find some basis upon which to procure a conviction of Mr. Bozella. *Id.* ¶¶

- 10 -

85-87. After securing Moscley's testimony, the District Attorney presented its case against Mr. Bozella to a Grand Jury, and obtained an indictment on March 31, 1983. *Id.* ¶¶ 88, 104. Moseley was promptly released from prison in April 1983. *Id.* ¶ 88.

I.     William O'Neill Coerced Madeline Dixon South To Lie To The Grand Jury And The Grand Jury Indicted Mr. Bozella

Mr. Bozella was arrested for the Crapser Murder on April 7, 1983. Shortly after Mr. Bozella's arrest, a woman named Madeline Dixon South (the girlfriend of Anthony Wise, Donald Wise's brother) informed the Police, Distriet Attorney, and William O'Neill that Donald Wise and Anthony Wise—not Mr. Bozella—had committed the Crapser Murder. *Id.* ¶¶ 90-95. South informed the Police, District Attorney, and William O'Neill that Donald Wise and Anthony Wise were at her apartment on the night of the Crapser Murder, said "they planned to do a burglary," "left the apartmcnt," and "later earne back saying they had done a burglary." *Id.* ¶ 92. Donald Wise told South that "he went through the window, the side window, through the little alley and went into the room and he gagged and tied [Ms. Crapser] up and laid her on the floor and he went through the drawcrs." *Id.* ¶ 95.

Days later, South testified before the Grand Jury; but, remarkably, the story she told the Grand Jury had changed from the information she had just provided the Police, District Attorney, and William O'Neill. *Id.* ¶ 96. Despite having just informed the Police, District Attorney, and William O'Neill that Donald Wise had confessed to her that he eommitted the crime in Ms. Crapser's home, South told the Grand Jury that she had made up her earlier story that Donald Wise had confessed to the Crapser Murder. *Id.* ¶¶ 96-98.

Months later, during Mr. Bozella's trial in December 1983, when asked why she had told the Grand Jury that she made up her earlier story, South testified under oath, "*[b]ecause I was*

- 11 -

*pressured*" by William O'Neill to do so. *Id.* ¶ 98; *see* Burke Aff. ¶ 25(b).[2] William O'Neill coerced Ms. South while acting as an investigator, not as a prosecutor, sinee he was not responsible for presenting the case against Mr. Bozella to the Grand Jury. Compl. ¶ 99; *see* Burke Aff. ¶ 25(a) ("Assistant District Attorney D. James O'Neil (the Assistant who presented the Bozella ease to the Grand Jury)"); C.1884 (William O'Neill affirming under penalty of perjury that he "*investigated* the ease in 1977 and again in 1983 when the matter was presented to the Grand Jury.") (emphasis added).

## J. The Defendants Learned That A Fingerprint Found On The Inside Of Ms. Crapser's Bathroom Window Matched Donald Wise's Fingerprint

Perhaps revealing their own doubts about their "case" against Mr. Bozella, and their own belief that South's statement implieating Donald Wise was aecurate, on May 3, 1983 the Poliee and District Attorney sent Donald Wise's fingerprints to the FBI to detennine whether Donald Wise's fingerprints matehed any of the latent fingerprints reeovered from Ms. Crapser's residence. Compl. ¶ 105. When the Police and District Attorney reeeived the results from the FBI on June 17, 1983, they learned that Denald Wise's fingerprint matched a fingerprint found on the *inside* of Ms. Crapser's bathroom window. *Id.* ¶ 107. That window was the same window faeing the alley where a neighbor informed Officer Murphy that she had heard noises on the night of the murder, a statement that Officer Murphy never wrote down and that was never disclosed to Mr. Bozella's defense counsel at or before either of his trials. *Id.* ¶ 108.

Thus, in June 1983, after Moseley was released from prison, and after Mr. Bozella was indicted and incarcerated, the Police and District Attorney learned of the first, and only, piece of

---

[2] The Burke Affidavit contains two paragraphs labeled number 25. Mr. Bozella shall refer to the first paragraph as 25(a) and the second as 25(b).

physical evidence suggesting the identity of Ms. Crapser's murderer. *Id.* ¶ 109. That evidence implicated Donald Wise—not Mr. Bozella—as the murderer of Ms. Crapser. *Id.*

## K. The District Attorney Violated Mr. Bozella's *Brady* Rights

Despite the discovery of physical evidence pointing to Donald Wise, Assistant District Attorney D. James O'Neil nonetheless continued to prosecute Mr. Bozella. Compl. ¶ 110; Burke Aff. ¶¶ 25(b), 32-35. D. James O'Neil received from defense counsel requests for *Brady* information, but failed to disclose four pieces of *Brady* material—evidence that the Dutchess County Court deemed "overwhelming" evidence of violations of Mr. Bozella's constitutional rights. Compl. ¶¶ 118, 145-50. Sometime prior to trial, William O'Neill replaced D. James O'Neil as the trial prosecutor for the Crapser Murder. *Id.* ¶ 114. William O'Neill, like D. James O'Neil, failed to produce the *Brady* Evidence to Mr. Bozella at or prior to the 1983 trial. *Id.* ¶ 118. In December 1983, Mr. Bozella was tried for the Crapser Murder for the first time, six years after the fact. *Id.* ¶ 120. The District Attorney misused peremptory challenges to strike African-American jurors from the case. *Id.* ¶¶ 121-22. At the conclusion of the trial Mr. Bozella was convicted of second-degree murder. *Id.* ¶ 120.

The District Attorney and William O'Neill re-tried Mr. Bozella in 1990 after Mr. Bozella's 1983 conviction was vacated on appeal because William O'Neill had violated Mr. Bozella's constitutional rights under *Batson v. Kentucky.* *Id.* ¶¶ 121-22, 125. William O'Neill served as the trial prosecutor for the District Attorney during the 1990 Trial. *Id.* ¶ 125. In preparation for the 1990 Trial, Mr. Bozella's counsel filed a pre-trial motion to obtain *Brady* materials from the District Attorney and obtained a judicial subpoena duces tecum ordering the District Attorney to produce "any and all records, investigative reports, statements of witnesses concerning the murder of Emma Crapser in the custody of the Dutchess County District Attorney's office." *Id.* ¶ 127. Despite such a request, the District Attorney and William O'Neill

- 13 -

failed to produce four categories of *Brady* evidence to Mr. Bozella or his counsel. *Id.* ¶¶ 127, 145-50. Without this key evidence, Mr. Bozella was convicted of second-degree murder and the trial judge sentenced Mr. Bozella to twenty years to life. *Id.* ¶ 142.

## L. The Dutchess County Court Concluded That Mr. Bozella Had Been Wrongfully Convicted And Incarcerated For More Than 26 Years

Approximately seventeen years after Mr. Bozella's 1991 conviction, Mr. Bozella discovered the "*Brady* Evidence"—evidence establishing that the Defendants violated his constitutional rights in connection with the Crapser Murder. *Id.* ¶ 145.

The first category of *Brady* Evidence was a report authored by Officer Regula, which included statements of four unbiased neighbors on or around June 25, 1977, contradicting Moseley and Lamar Smith's testimony. *Id.* ¶ 146. Despite Mr. Bozella's *Brady* requests, the District Attorney never provided Mr. Bozella's trial counsel with the report and critical portions of these statements. *Id.* In granting Mr. Bozella's motion to vacate his conviction, the Dutchess County Court found that "the potential testimony of the neighbors" whose statements were in Officer Regula's report, "at best, wholly contradicts the People's eyewitnesses [Lamar Smith and Moseley] and, at least, seriously calls their version of the events into question. Significantly, these witnesses are, in contrast to the People's only eyewitnesses, uninterested parties." Thus, the Dutchess County Court held that the statements found in Officer Regula's report, "would have seriously called into question the testimony of the People's key witnesses, testimony which was already rife with credibility problems" and "that this information would have been favorable to the defense and is therefore *Brady* material which should have been produced." *Id.* ¶ 147.

The second category of *Brady* Evidence was presented to the Dutchess County Court through an affidavit by Officer Regula in support of Mr. Bozella's motion to vacate his conviction, in which Officer Regula averred that a witness informed Officer Murphy that "she

- 14 -

heard loud noises in an alley adjacent to Ms. Crapser's home at 15 North Hamilton Street in Poughkeepsie on the night of Ms. Crapser's murder" and "that the noises sounded like one or more garbage cans were being moved." *Id.* ¶ 148. Officer Murphy relayed the neighbor's statement to Officer Regula. *Id.* Although both Officers found the statement credible, neither Officer wrote it down or relayed the statement to the District Attorney. *Id.* The Dutchess County Court concluded that the statement was *Brady* material because it "clearly support[ed] the defendant's theory that Donald Wise gained access through a window and corroborate[d] Madeline Dixon South's testimony that Donald Wise claimed to have gained access to Emma Crapser's apartment through an alley window and was involved in the murder." *Id.*

The third category of *Brady* Evidence was the Holland tape, which Mr. Bozella's counsel collected in 2009 during an inspection of the District Attorney's files from the King Murder. *Id.* ¶ 149. The Dutchess County Court concluded that the tape was *Brady* material because it contained "enough information . . ., especially given the timing of the interview in relation to law enforcement officials' reported contemporaneous belief that the King and Crapser crimes could be related, to constitute information 'favorable to the defense and material to guilt.'" *Id.*

The fourth category of *Brady* Evidence was the Dobler Reports—police reports evidencing that Donald Wise was the perpetrator in an attack similar to the Crapser Murder insofar as the attack: (i) victimized an elderly woman in her own home; (ii) was located approximately six blocks from Ms. Crapser's residence; (iii) took place less than two months after the Crapser Murder; (iv) entailed stuffing cloth down the victim's throat; and (v) involved breaking several of the victim's bones. *Id.* ¶ 150. The Dutchess County Court concluded that the reports were *Brady* material because they were "located inside the King file and the People and police reportedly considered a link between the King and the Crapser murders." *Id.*

In granting Mr. Bozella's motion to vacate his conviction, the Dutchess County Court

concluded that the case against Mr. Bozella was weak:

> Clearly, the evidence against Dewey Bozella was far from
> overwhelming. The heart of the People's case consisted of the
> testimony of two career criminals, who repeatedly changed their
> stories during the long history of this case, who admittedly were
> under the influence of mind-altering substances the day of the
> murder and who finally testified for the prosecution only after
> receiving favorable deals in exchange for their testimony, years
> after Emma Crapser was murdered. Lamar Smith and Wayne
> Moseley were the only witnesses who placed the defendant at the
> scene, and only Moseley placed the defendant inside the victim's
> apartment. Their testimony was contradicted by Lamar's brother,
> Stanley Smith, Wayne Moseley's mother and Madeline Dixon
> South and, moreover, was wholly unsupported by any forensic
> evidence. Indeed, the only forensic evidence tending to connect
> anyone to this crime is the fingerprint of Donald Wise, who
> allegedly confessed to Madeline Dixon South that he was involved
> in Emma Crapser's murder and who was convicted of murdering
> another elderly woman in an alarmingly similar incident.

*Id.* ¶ 151. Accordingly, the Dutchess County Court concluded, "without reservation" that it was

"firmly and soundly convinced of the meritorious nature of [Mr. Bozella's] application, finding

that "[t]he legal and factual arguments advanced in support of the motion [were] compelling,

indeed overwhelming." *Id.* ¶ 152.

On October 28, 2009, the Dutchess County Court held a hearing in Mr. Bozella's

criminal case to determine what course of action the District Attorney would take given the

court's October 14 order vacating Mr. Bozella's conviction. *Id.* ¶ 153. During the hearing, the

District Attorney said that it found no "sound legal basis for the People to appeal the Court's

decision" and that the District Attorney "c[ould] not go forward with a third trial" of Mr.

Bozella. *Id.* Accordingly, Assistant District Attorney Whitesell moved the Dutchess County

Court to dismiss the Indictment against Mr. Bozella, and the Court granted the motion. *Id.* ¶¶

- 16 -

153-55. On October 28, 2009, Mr. Bozella was released from custody after serving more than 26 years in prison for the Crapser Murder. *Id.* ¶ 156.

M.  The Defendants' Violations Of Mr. Bozella's Constitutional Rights Were Foreseeable In Light Of The District Attorney's and Police's Policies, Customs, and Practices

The Defendants' violations of Mr. Bozella's constitutional rights were foreseeable given the policies, customs, and practices of the District Attorney and Police. The District Attorney, despite knowing of the significant "grey area" that existed under *Brady* at the time and the routine practice among assistant district attorneys such as William O'Neill of not disclosing police reports to the defense, failed to train and supervise prosecutors to ensure that *Brady* violations would not occur. *Id.* ¶¶ 157-64. The Police, in turn, was aware of Officers' repeated failures to memorialize, preserve, and disclose exculpatory evidence and yet failed to train or supervise Officers regarding their *Brady* obligations. *Id.* ¶¶ 173-76, 179-81, 184. Further, when policies and training did exist, the District Attorney joined the Police in promulgating a policy of destruction—i.e., the destruction of Officers' notebooks so that exculpatory information would not have to be disclosed to defense counsel as *Brady* material. *Id.* ¶¶ 165-69, 173-78, 180-81. With such unconstitutional policies, customs, and practices, it was inevitable that a person such as Mr. Bozella would be wrongfully convicted and deprived of his liberty.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint is sufficient if the fact allegations "raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555. This is based on "the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.*

Here, Mr. Bozella satisfies these pleading standards. Defendants rely on *Iqbal* and *Twombly* without addressing the factual allegations in the Complaint, which Defendants admit are "so long." Declaration of Ross E. Firsenbaum, dated November 15, 2010, Ex. 1. When Mr. Bozella's factual allegations are taken as true, as they must be on a motion to dismiss,[3] they provide a sufficient basis to state a claim against each Defendant.

## I.     The Complaint States Claims Against The County Of Dutchess and City of Poughkeepsie For Violations Of Section 1983

A municipality is liable under Section 1983 for violating a criminal defendant's constitutional rights where the municipality's policies or customs directly cause the violation. *Monell v. Department of Soc. Servs. of New York*, 436 U.S. 658 (1978) (establishing municipal liability under Section 1983). A plaintiff may establish municipal liability in any of the following three ways: where (i) a municipality establishes or ratifies a generally applicable policy, and the act complained of is an implementation of that policy; (ii) an official policymaker of the municipality violates federal law such that the municipality's policies and implementation of those policies are one and the same; or (iii) a municipality fails to adequately train and supervise when the need for training or supervision is obvious and the failure to act so likely to result in a constitutional violation that the failure to act rises to deliberate indifference. *See Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 417-19 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-78 (1986). A plaintiff also must prove a causal nexus between

---

[3] The same pleading standards apply to the City's motion for judgment on the pleadings. *See Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005).

the municipal policy and the constitutional injury he has suffered. *Myers v. County of Orange*, 157 F.3d 66, 73 (2d Cir. 1998). Claims of municipal liability require "only a short and plain statement of the claim showing that the pleader is entitled to relief." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Guzman v. City of New York*, No. 08 Civ. 2853, 2010 WL 4025563, at *4 (S.D.N.Y. Oct. 13, 2010).

A.     The Complaint States A Claim Against The County (Count I)

Mr. Bozella asserts two independent grounds for liability against the County. First, the Complaint alleges that the County failed to train and supervise its assistant district attorneys regarding compliance with *Brady*. Compl. ¶¶ 157-72, 186-97. Second, the Complaint alleges that unconstitutional acts of a County policy-maker—Chief Assistant District Attorney William O'Neill—give rise to a municipal liability claim against the County. *Id.* ¶¶ 160-63, 165-68, 192. The Complaint alleges that these acts and omissions directly caused Mr. Bozella's wrongful deprivation of liberty for more than 26 years in violation of his constitutional rights. Compl. ¶¶ *Id.* ¶¶ 172, 197. These allegations state a municipal liability claim against the County on two independent grounds.

1.     *The Complaint States A Claim Against The County Based On The District Attorney's Failure To Train Or Supervise Its Assistant District Attorneys*

A county can be liable for its failure to train or supervise assistant district attorneys to protect criminal defendants' constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). The need to train and supervise must be obvious, such that the failure to do so constitutes deliberate indifference to the risk of deprivation. *City of Canton*, 489 U.S. at 389. The county has failed to train and supervise if: (i) a policymaker knows "to a moral certainty" that subordinates will confront a given situation; (ii) the situation either presents the subordinate with a difficult choice of the sort that

- 19 -

training or supervision will make less difficult, or there is a history of subordinates mishandling the situation; and (iii) the wrong choice by the subordinate will frequently cause the deprivation of a citizen's constitutional rights. *Walker*, 974 F.2d at 297-98.

In *Walker*, the Second Circuit addressed a claim against a county nearly identical to the claim Mr. Bozella asserts here. *Id.* at 293. The plaintiff alleged that the county violated Section 1983 because its district attorney failed to train assistant prosecutors regarding compliance with *Brady*. *Id.* The court held that the district attorney knew to a moral certainty that his subordinates would acquire *Brady* evidence, and that "withholding *Brady* material will virtually always lead to a substantial violation of constitutional rights." *Id.* at 300. The Second Circuit further noted that the "proper course of conduct [is] not at all obvious" with respect to any one situation or piece of evidence. *Id.* Therefore, the need to train in those situations was clear, and the failure to do so constituted deliberate indifference. *Id.*

Like the plaintiff in *Walker*, Mr. Bozella has alleged that the District Attorney knew to a moral certainty of prosecutors' repeated violations of criminal defendants' *Brady* rights; the need to train prosecutors regarding compliance with *Brady* was clear; and the District Attorney's failure to implement such training constituted deliberate indifference. Compl. ¶¶ 157-72, 186-97. The Complaint also alleges that the District Attorney's failure to train prosecutors, including William O'Neill, directly caused the violation of Mr. Bozella's constitutional rights and 26-year wrongful incarceration. *Id.* ¶¶ 194-97. These allegations are sufficient to state a claim for municipal liability against the County. *See Walker*, 974 F.2d at 300 ("[A] jury could find that the complete failure to train or supervise alleged here would likely result in ADAs making the wrong choices about turning over this kind of *Brady* material.").

The County's principal argument in support of its motion to dismiss is that Mr. Bozella's allegations are conclusory and thus do not satisfy *Iqbal* and *Twombly*. County Br. at 1-3. The County's argument is baseless. The Complaint alleges detailed facts regarding the County's policies, customs, and practices that were destined to result in the violation of criminal defendants' *Brady* rights. *See* Compl. ¶¶ 157-72. Specifically, the Complaint alleges that District Attorneys King and Grady did not promulgate a written policy regarding *Brady*, Compl ¶ 160; did not train or supervise train assistant district attorneys regarding their duties under *Brady*, *id.* ¶¶ 158-61; failed to act although they were aware that prosecutors such as William O'Neill did not produce police reports to criminal defendants, *id.* ¶ 161; failed to act although they were aware that William O'Neill and other assistant prosecutors instructed police officers to destroy interview notebooks, *id.* ¶¶ 165-66 (a practice that a New York state appellate court has concluded was constitutionally improper, *see People v. Roberts*, 178 A.D.2d 622, 622-23 (N.Y. App. Div. 1991)); and failed to implement procedures to ensure that evidence collected in one criminal investigation was cross-checked with evidence in pending similar investigations, despite knowing that such evidence could be exculpatory in another investigation, *id.* ¶¶ 170, 172.

The Complaint also details how each of these failures directly caused a violation of Mr. Bozella's constitutional rights. Compl. ¶¶ 147, 150, 161, 163 (alleging that the County's failure to train regarding the disclosure of police reports caused the non-disclosure of the Regula report and Dobler Reports); Compl. ¶¶ 148, 165, 169 (alleging that the County's training police officers regarding non-disclosure of exculpatory information caused the suppression of the next-door neighbor's oral statement); Compl. ¶¶ 149, 157-63 (alleging that the County's deficient or non-existent *Brady* policies led to the non-disclosure of the Holland tape). Accordingly, far from

alleging "mere conclusory statements," the Complaint alleges facts that are sufficient to state a claim to relief that is "plausible on its face" against the County. *See Twombly*, 550 U.S. at 570.

The County also argues that Mr. Bozella has not stated a claim because he has only alleged violations of *Brady* in his case, but not in others. The County misconstrues applicable law. The Supreme Court noted that allegations of a single constitutional violation can, in certain circumstances, be sufficient to state a claim based on a failure to train or supervise where the harm at risk is sufficiently severe. *Bryan Cnty.*, 520 U.S. at 409 ("the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability") (citing *City of Canton*, 489 U.S. at 390, n.10). And in *Walker*, the Second Circuit addressed this very issue, holding that a *Brady* violation in plaintiff's criminal case alone was sufficient to survive a motion to dismiss. 974 F.2d at 300.

Indeed, the allegations in the Complaint illustrate why the Supreme Court and Second Circuit precedent counsel against dismissal here. Mr. Bozella has alleged more than a single *Brady* violation. The Complaint alleges that the County committed three *Brady* violations in 1983 by failing to disclose three pieces of *Brady* Evidence, and was responsible for a fourth *Brady* violation because of its faulty training to the Police. Compl. ¶¶ 25-27, 33-36, 45-51, 59-70. The Complaint alleges that the County committed each of these violations on two occasions—once in 1983 before Mr. Bozella's first trial, *id.* ¶¶ 114-20, and again in 1990 before Mr. Bozella's second trial, *id.* ¶¶ 125-43. Thus, the Complaint alleges that the County was responsible for eight violations of Mr. Bozella's *Brady* rights in connection with two separate trials spanning seven years. Such allegations evidence a practice within the County that resulted

- 22 -

in repeated violations of Mr. Bozella's *Brady* rights by at least two prosecutors.[4] They are sufficient to withstand a motion to dismiss.

2. *The Complaint States A Claim Against The County Based On William O'Neill's Acts As An Official Policymaker*

The Complaint also states a claim against the County based on the alleged acts of an official policymaker, namely William O'Neill. *See Pembaur*, 475 U.S. at 480; *Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005). Without question, some courts in this Circuit have concluded that certain assistant district attorneys are not policymakers. *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 169 (S.D.N.Y. 2007). However, other courts have concluded that the determination of who is a policymaker is a "fact-intensive inquiry" and should be decided on a case-by-case basis. *See Conte v. County of Nassau*, No 06-CV-4746 (JFB) (ETB), 2010 U.S. Dist. LEXIS 104815 (E.D.N.Y. Sept. 30, 2010) (denying summary judgment because disputed issue of material fact existed as to whether assistant district attorneys were policymakers).

In *Conte*, for example, the court concluded that the "Chiefs" of two bureaus in the Nassau County District Attorney's Office who were "involved in the investigation" of the plaintiff had policymaking authority. *Conte*, 2010 U.S. Dist. LEXIS 104815, at *107-08. The court noted that an assistant district attorney's title, responsibilities, and involvement in the case at bar could establish her as a policymaker. *Id.* Accordingly, the court denied the county's motion for summary judgment on this issue. *Id.* at *108. Likewise, here, the Complaint alleges that William O'Neill was a policymaker for the County. Compl. ¶¶ 160-65. The Complaint alleges

---

[4] Documents included in Exhibit C to the Burke Affidavit reveal that assistant district attorney D. James O'Neil was responsible for *Brady* disclosures during the prosecution of Mr. Bozella prior to William O'Neill, and failed to produce the *Brady* evidence to Mr. Bozella. *E.g.*, Burke Aff. Ex. C.1858-60. Thus, more than one prosecutor employed by the County violated Mr. Bozella's Brady rights, further evidencing the County's failure to train its prosecutors.

that District Attorney John King delegated policy-making authority to William O'Neill prior to Mr. Bozella's 1983 trial. *Id.* Indeed, documents attached to Exhibit C to the County's motion reveal that William O'Neill, like the "Chiefs" of the bureaus in *Conte*, was the "Chief Assistant District Attorney of Dutchess County . . .." Burke Aff. Ex. C.1884 ¶ 1. And, as discussed in Section I.A, *supra*, the Complaint alleges that William O'Neill was responsible for violating Mr. Bozella's constitutional rights four times in 1983, and four more times in 1990.[5] Compl. ¶¶ 114-20, 125-143. Such allegations are sufficient to withstand the County's motion to dismiss.

### 3. *The County Is Not Entitled to Absolute Immunity*

The County's remaining basis for dismissal is that the County enjoys absolute immunity for the conduct alleged in the Complaint. County Br. at 9-10. This argument is without merit. A municipality is not entitled to assert an absolute immunity defense to a municipal liability claim. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980) ("[T]here is no tradition of immunity for municipal corporations, and neither history nor policy supports a construction of § 1983 that would justify" extension of individual immunities to the municipality); *Smith v. Gribetz*, 958 F. Supp. 145, 155 (S.D.N.Y. 1997) ("A governmental entity, as opposed to an individual official, possesses no personal privilege of absolute immunity.").

---

[5] Mr. Bozella can also state a claim against the County based on District Attorney John King's acts. District Attorney King ratified County policies regarding destruction of police notebooks and failure to preserve or disclose police reports. Burke Aff. Ex. C.1968 (memo from Lieutenant Doherty to Mr. King indicating that several police officers including Messrs. DeMattio and Murphy had destroyed their notebooks relevant to Mr. Bozella's case). Mr. King also signed memoranda acknowledging and condoning unconstitutional practices. *Id.* at Ex. C.1858-60, C.1874-77, C.1880-82, C.1937, C.1959-62. Such conduct gives rise to a municipal liability claim. *See Jeffes v. Barnes*, 208 F.3d 49, 63 (2d Cir. 2000) (Sheriff's acquiescence in unconstitutional retaliation inferred from tolerance of subordinates' harassing practices); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *see also Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) (municipal liability accrues where subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials").

--

The County's reliance on *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 862 (2009), is misplaced. County Br. at 16. *Van de Kamp* involved a claim against an individual prosecutor, not a municipality. 129 S. Ct. at 861. The Court held that the *supervising prosecutor* was absolutely immune for the alleged misconduct. *Id.* at 864. *Van de Kamp* did not hold that a municipality such as the County is absolutely immune for misconduct alleged based on a municipal liability theory, as this Complaint alleges. *See Jovanovic v. City of New York*, No. 04-CV-8437 (PAC), slip op. (S.D.N.Y. Sept. 28, 2010) (finding that *"Van de Kamp* did not address *Monell* liability; it addressed only failure to supervise liability of individual district attorneys").

> 4. *The Complaint Alleges Violations of Mr. Bozella's Constitutional Rights Under Brady v. Maryland*

The County and William O'Neill spend five pages of their brief and ten pages of their affidavit arguing that Mr. Bozella fails to allege adequately that the Defendants violated Mr. Bozella's constitutional rights under *Brady v. Maryland*. County Br. at 10-14; Burke Aff. at 11-21. Their argument fails for three reasons.

*First*, the Complaint alleges that the Defendants violated Mr. Bozella's *Brady* rights. Mr. Bozella alleges that the upstairs neighbors' statements, next-door neighbor's oral statement, Holland tape, and Dobler reports were never disclosed to Mr. Bozella or his counsel at or prior to Mr. Bozella's 1983 and 1990 trials. Compl. ¶¶ 145-53. And the Complaint alleges in detail how each of these pieces of evidence either contradicted the testimony of the prosecution's witnesses (Wayne Moseley and Lamar Smith) or corroborated the defense's argument at trial that Donald Wise was the actual perpetrator of the Crapser Murder. *Id.* ¶¶ 27, 33-36, 46-51, 62-70, 145-53. These allegations, which must be "taken as true" for the purpose of a motion to dismiss, adequately allege violations of Mr. Bozella's *Brady* rights. *See Iqbal*, 129 S. Ct. at 1959.

- 25 -

*Second,* the County is collaterally estopped from disputing these *Brady* violations. As alleged in the Complaint, the Dutchess County Court granted Mr. Bozella's motion to vacate his second-degree murder conviction for the Crapser Murder because the Dutchess County District Attorney had violated Mr. Bozella's constitutional rights by committing the same four *Brady* violations alleged in the Complaint. Compl. ¶¶ 145-56, Ex. A. In his motion to vacate, Mr. Bozella identified these *Brady* violations. The Dutchess County District Attorney took three months to respond to Mr. Bozella's motion and presented factual and legal arguments contending that Mr. Bozella's *Brady* rights had not been violated. *See* Firsenbaum Declaration, Ex. 2. Thus, the District Attorney had a full and fair opportunity to litigate this very issue, and the Dutchess County Court decided this issue in Mr. Bozella's favor. *See* Compl. Ex. A. Here, the County is in privity[6] with the District Attorney and is thus barred by collateral estoppel from re-litigating this issue. *See Thompson v. Connick,* 553 F.3d 836, 864-65 (5th Cir. 2008) ("Whether Thompson was guilty beyond a reasonable doubt was exactly what was at stake in Thompson's second murder trial. The issue was actually litigated, and its determination was necessary to the judgment. Therefore, Defendants are collaterally estopped from attempting to prove (for the third time) that Thompson murdered Liuzza."), *vacated by full panel decision on other grounds, cert. granted on other grounds, Connick v. Thompson,* 130 S. Ct. 1880 (Mar. 22, 2010); *Burrell v. Adkins,* No. CV01-2679-M, 2007 WL 4699166, at *1 n.4 (W.D. La. Oct. 22, 2007) (collateral estoppel barred district attorney from re-litigating issue of *Brady* violations from underlying criminal case); *Smith v. Holtz,* 210 F.3d 186, 199 n.18 (3d Cir. 2000) (suggesting same).

---

[6] *See* Firsenbaum Decl. Ex. 1 at 1 (William O'Neill stating that he was "a Senior Assistant District Attorney in and *for the County of Dutchess* . . .") (emphasis added).

*Third*, even if the Court were to reach the merits of the County's argument, the Dutchess County Court correctly concluded that the evidence identified in the Complaint as *Brady* Evidence was, in fact, *Brady* material that was never disclosed to Mr. Bozella or his counsel until 2008.

### a.     *The Upstairs' Neighbors Statements*

The County contends that "appropriate disclosnre of the four 'unbiased neighbors' statements" was made. Burke Aff. at 12.[7] The County rests this argument primarily on a June 14, 1983 memorandum from Assistant District Attorney D. James O'Neil to Mickey Steiman ("June 1983 Memo"). *Id.* at 14. The County correctly points out that "[i]tems 27, 29, 30, and 31 are immcdiately relevant." *Id.* But, contrary to the County's assertion, the selective disclosures contained in those paragraphs of the June 1983 Memo prove the County's knowing and deliberate withholding of the key information material to Mr. Bozella's defense, not the diselosure of the *Brady* Evidence.

The information disclosed in paragraphs 27, 29 and 30 of the June 1983 Memo foeuses on the time that Cecil Carpenter and Linda Miller (two of the upstairs neighbors) entered 15 North Hamilton Street on the night of June 14—the time period between 9:30 and 10:00 p.m. *Id.*; Burke Aff. Ex. C.1858-60. This information omitted the most critical statements by the upstairs neighbors. The June 1983 Memo failed to disclose the most pertinent information to the defense—what the neighbors observed while in the second floor apartment and while leaving the apartment *between 10:30-11:30 p.m. Compare* Burke Aff. Ex. C.1858-60 (focusing on 9:30-10:00 time frame) *with* Compl. ¶ 33 (foeusing on 10:00-11:00 p.m. time frame). The 10:30-

---

[7] The County made a similar argument in opposition to Mr. Bozella's 440 motion, which the Dutchess County Court rejected. *See* Firsenbaum Decl. Ex. 1 at 3 ("The People do not eoncede that the entirety of Detective Regula's Police Report was not diselosed to the defensc . . .").

- 27 -

11:30 time period was the relevant time period because John White (a prosecution witness) testified that he dropped Ms. Crapser off at approximately 11:00 p.m. and Moseley and Lamar Smith testified that they saw Mr. Bozella enter the house shortly before Mr. White's car approached the house. Burke Aff. Ex. A at 60; *see* Burke Aff. ¶ 38 ("it is fair to deduce that that assault occurred at or near to 10:55 p.m. on June 14, 1977"). Thus, the information in Detective Regula's report contradicting Moseley or Smith's testimony about events taking place between 10:30-11:30 p.m. was the most exculpatory information in the report and was not disclosed.

The *Brady* material in Detective Regula's report—i.e., the material Mr. Bozella relied upon in his motion to vacate his conviction and relies upon here in the Complaint—is not in the June 1983 Memo.[8] The June 1983 Memo did not disclose any of the following exculpatory or impeachment information:

- Ms. Ellerbee informed the police that Ms. Miller walked her downstairs at approximately 10:45 p.m. as she left the apartment and that Ms. Ellerbee informed the police that "when she left the apartment she observed no one in the vicinity and nothing out of the ordinary." *Compare* Burke Aff. Ex. C.1858-60 *with* Burke Aff. Ex. B.1847;

- Cecil Carpenter confirmed that he and Ms. Miller walked Ms. Ellerbee out of the apartment around 10:30 or 10:45 p.m., and that Cecil walked his brother Curtis Carpenter out of the apartment between 11:00 and 11:30 p.m., at which time Curtis "did not observe anything unusual." *Compare* Burke Aff. Ex. C.1858-60 *with* Burke Aff. Ex. B.1845; and

- Ms. Miller confirmed that she walked Ms. Ellerbee downstairs to the front landing of the house at approximately 10:30 p.m., at which time Ms. Ellerbee and Ms. Miller focused on Ms. Crapser's apartment and Ms. Miller "did not notice anything out of the ordinary" at 10:30 p.m.—the time that she walked Ms. Ellerbee out of the front door. *Compare* Burke Aff. Ex. C.1858-60 *with* Burke Aff. Ex. B.1843-44.

---

[8] The *Brady* material from Detective Regula's report is not included in the other correspondence relied upon by the County. *See* Burke Aff. ¶ 32; Burke Aff. Ex. C.1880-82; Burke Aff. ¶ 34; Burke Aff. Ex. C.1874-77; Burke Aff. ¶ 35; Burke Aff. Ex. C.1925-26; Burke Aff. ¶¶ 36-38.

Moreover, the June 1983 Memo did not disclose *anything* about two additional witnesses

present at or near 15 North Hamilton Street during the critical 10:30-11:30 p.m. timeframe.

*Compare* Burke Aff. Ex. C.1858-60 *with* Burke Aff. Ex. B.1845 & B.1848. Specifically, the

memo did not reveal that:

- Cynthia Murphy told police that she was loitering by a bench with her aunt Marie Kieth on the corner of North Hamilton Street and Main Street from 7:00 until 11:00 p.m. on June 14, 1977, and "did not observe [Lamar Smith, Stanley Smith, and Elbert Pittman] at any point during that evening." *Compare* Burke Aff. Ex. C.1858-60 *with* Burke Aff. Ex. B.1848;

- "[W]hen [Ms. Murphy] returned to her apartment [next to Ms. Crapser's residence] around 11:00 p.m., she observed nothing unusual in the street and [did] not recall seeing any pedestrians in the block of her house and the vicinity." *Id.*; and

- Curtis Carpenter was in the second-floor apartment at 15 North Hamilton Street on the night of the murder, left around 11:30 p.m., and did not see anyone when he left the apartment and did not see Ms. Crapser's inner door open at that time. *Compare* Burke Aff. Ex. C.1858-60 *with* Burke Aff. Ex. B.1845.

In short, the June 1983 Memo did not disclose any of the *Brady* Evidence identified in

the Complaint. Indeed, the County's selective and misleading disclosures to the defense in the

June 1983 Memo highlight the plausibility of Mr. Bozella's municipal liability claim against the

County. Had the County disclosed Detective Regula's entire report to Mr. Bozella, there would

not have been any *Brady* violation concerning the upstairs neighbors' statements. However,

because of the County's policy of failing to produce such reports as *Brady* material, *see* Compl. ¶

161, Mr. Bozella's trial counsel never received the most critical statements from that report.

b. *The Next-Door Neighbor's Statement*

The County argues that the exculpatory next-door neighbor's statement is not *Brady*

material because it was disclosed through a June 16, 1977 article in the *Poughkeepsie Journal*,

- 29 -

Burke Aff. ¶ 39.[9] Here, too, the County's argument fails. The County has not presented any evidence that the woman referred to in Detective Regula's affidavit was Mary Nathan. Moreover, even if the woman was Mary Nathan, the mere fact that Ms. Nathan's statement was buried in a newspaper article does not satisfy the County's *Brady* obligations. The Police and District Attorney must disclose exculpatory information in their possession, regardless of the availability of alternate sources of information. *See United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991) ("It is untenable to suggest that, in order to obtain impeachment evidence on behalf of a client, a public defender is, in any way, obligated to check the total list of persons who have been served by the agency to ascertain [potential exculpatory evidence]"). This rule is particularly applicable here, where Mr. Bozella was appointed counsel and tried *six years* after the murder and the date of the neighbor's statement.

         c.   *The Holland Tape and Dobler Reports*

Finally, the County does not dispute that it failed to produce the Holland Tape or the Dobler Reports to Mr. Bozella prior to 2009. Instead, the County argues that "there is no reliable link between the Crapser murder, on the one hand, and the Dobler/King crimes on the other," Burke Aff. at ¶ 40, and thus the Holland Tape and Dobler Reports are not *Brady* material. The County made these same arguments to the Dutchess County Court, and that court rejected them. Firsenbaum Decl. Ex. 2 at 7-9. Based on the allegations in the Complaint, this Court should do the same. *See* Compl. ¶¶ 45-70, 149-50.[10]

_____

[9] The County made the same argument in opposition to Mr. Bozella's 440 motion. *See* Firsenbaum Decl. Ex. 1 at 6 ("the People submit that the existence of this witness, who was a neighbor of the victim, could have been discovered by counsel as part of his investigation at the time of trial, should counsel have exercised due diligence to canvass the neighborhood.").

[10] To the extent the City, William O'Neill, or Mr. DeMattio base their motions on the assertion that Mr. Bozella has not adequately pled *Brady* violations, Mr. Bozella incorporates the

- 30 -

B. The Complaint States A Claim Against The City (Count II)

Mr. Bozella also asserts two independent grounds for liability against the City. First, the Complaint alleges that the City failed to train or supervise its Officers regarding the need to memorialize, preserve, and disclose exculpatory evidence. Compl. ¶¶ 173-76, 180-81. Second, the Complaint alleges that the City maintained unconstitutional policies, customs, and practices regarding the preservation and disclosure of exculpatory evidence. Compl. ¶¶ 177-81. The Complaint alleges that these acts and omissions directly caused Mr. Bozella's wrongful deprivation of liberty for more than 26 years in violation of his constitutional rights. Compl. ¶¶ 25-29, 148, 173-81, 199-207. These allegations state a municipal liability claim against the City on two independent grounds. *See, e.g., Newton v. City of New York*, 681 F. Supp. 2d 473 (S.D.N.Y. 2010); *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).

> 1. *The Complaint States A Claim Against The City Based On The City's Failure To Train Or Supervise Its Officers To Memorialize, Preserve, And Disclose Eyewitness Statements*

The Complaint alleges detailed facts regarding the City's failure to train or supervise Officers regarding their duty to memorialize, preserve, and disclose exculpatory evidence. Compl. ¶¶ 25-29, 148, 173-81, 198-207. Specifically, the Complaint alleges that Police Chief Stuart Bowles, as an official policymaker for the City, was aware of an obvious need to train and supervise Officers regarding the need to memorialize, preserve, and disclose exculpatory information to prevent violations of criminal defendants' constitutional rights. *Id.* ¶¶ 175-76. The Complaint alleges that Chief Bowles knew that Officers routinely failed to record statements taken from eyewitnesses—statements that were likely to contain exculpatory and impeachment information. *Id.* ¶¶ 179-80, 203-05. And the Complaint alleges that Chief Bowles knew that

arguments set forth in Sections I.A.4, except for collateral estoppel, in opposition to those motions.

- 31 -

Officers involved in open investigations destroyed their notes—notes that were likely to contain exculpatory and impeachment information. *Id.* ¶ 180. Yet, despite the obvious and known need to train and supervise in these areas, Chief Bowles failed to act, thereby demonstrating deliberate indifference to individuals' constitutional rights. *Id.* ¶¶ 175-76, 180, 204.

The Complaint also alleges that Chief Bowles' failure to act directly caused the violation of Mr. Bozella's constitutional rights. Officer Murphy and Officer Regula each violated Mr. Bozella's *Brady* rights when they failed to record or ultimately disclose an exculpatory statement from Ms. Crapser's next door neighbor. *Id.* ¶¶ 25-27, 148, 181, 206-07; *see also People v. Bozella*, 25 Misc. 3d 1215(A), 2009 WL 3364575, at *15 (Dutchess Cnty. Ct. Oct. 14, 2009) (finding that the neighbor's statement constituted *Brady* material).[11] These allegations state a claim against the City. *See Walker*, 974 F.2d at 297, 300 (reversing district court's dismissal of claims alleging city's deliberate indifference to the need to train and supervise the police not to assist in convicting the innocent); *Newton*, 681 F. Supp. 2d at 494 (denying city's motion for summary judgment where evidence was "sufficient to show a persistent or widespread policy, custom, or practice of inconsistently destroying invoices and evidence, resulting in the inability to determine when and if evidence was destroyed . . ."); *Moldowan*, 578 F.3d at 393 ("The police

---

[11] The City incorrectly states that "Plaintiff does not directly assert that any specific City of Poughkeepsie police officer failed to disclose Brady material" and that "there is no allegation . . . that the failure to record or disclose the [neighbor's statement] was the result of inadequate training or municipal policy." City Br. at 4, 9-10. The Complaint alleges both propositions. First, the Complaint alleges that "although both Officers [Murphy and Regula] found the statement [from Ms. Crapser's neighbor] credible, neither Officer wrote it down or relayed the statement to the District Attorney." Compl. ¶ 148. The Complaint alleges that Dutchess County Court concluded the statement was *Brady* material and that the statement is, in fact, *Brady* material. Compl. ¶¶ 148, 181 (citing *People v. Bozella*, 25 Misc. 3d 1215(A), 2009 WL 3364575, at *15 (Dutchess Cnty. Ct. Oct. 14, 2009)). Second, the Complaint alleges that Murphy and Regula's failures were the result of the City's failure to train or supervise and of the City's policies. Compl. ¶ 181.

have a duty to preserve and turn over to the prosecutor evidence that the police recognize as having exculpatory value or where the exeulpatory value of the evidence is apparent, [and] *Harris* dictates that the City has a corresponding obligation to adequately train its officers in that regard.") (eiting *City of Canton*, 489 U.S. at 378); *Doswell v. City of Pittsburgh*, No. 07 Civ. 0761, 2009 WL 1734199, at *12 (W.D. Pa. 2009) (reversing summary judgment where "no training was provided on an investigating officer's *Brady* obligations or duty to turn over exculpatory evidenee"); *Bumbury v. City of New York*, 62 A.D.3d 621, 622 (N.Y. App. Div. 2009) (denying city's motion to dismiss where plaintiff alleged that the city failed to adequately train, supervise, and/or implement proper policies for offieers with respect to eollecting and turning over exculpatory information).

The City argues that Mr. Bozella's claim against the City fails as a matter of law because it is based on "one event"— i.e., "an allegation that police officers Peter Murphy and Arthur Regula failed to record or disclose an oral statement made during the investigation of the Crapser murder." City Br. at 4. Even if that were the case (which it is not, *see infra* at Section I.B.1, 33-35), that allegation is sufficient to state a claim against the City for a failure to train and supervise regarding the preservation and disclosure of exculpatory evidence. *See, supra*, at Section I.A.1, (citing *Bryan Cnty.*, 520 U.S. at 409; *City of Canton*, 489 U.S. at 390, n.10); *Walker*, 974 F.2d at 300.

Even if Mr. Bozella were required to allege more than a "one event" as the City suggests, City Br. at 4,[12] Mr. Bozella has done so. The Complaint alleges multiple failures by Officers to

_____

[12] The City's cited cases for the proposition that "[a] single incident . . . generally will not suffice to raise an inference of the existence of a eustom or policy," City Br. at 8, are inapposite. The cited cases either lacked "allegations of fact tending to support, at least circumstantially, such an inference," *see Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), or involved a

-33-

record or disclose exculpatory evidence. First, the Complaint alleges that Detective Murphy obtained a statement from a neutral eyewitness but did not record or disclose the statement. Compl. ¶¶ 25-27, 148. Second, the Complaint alleges that Detective Murphy relayed the neighbor's statement to Detective Regula, but Detective Regula also failed to record or disclose the statement. *Id.* ¶¶ 26-27, 148. Thus, the Complaint alleges two failures, by two officers, at two distinct times, to memorialize, preserve, or disclose information which directly caused the violation of Mr. Bozella's constitutional rights. *Id.* ¶¶ 25-27, 181, 206-07. Allegations of these repeated failures are sufficient to state a failure to train or supervise claim. *See, e.g., Woodward v. Correctional Med. Servs. of Ill.*, 368 F.3d 917, 929 (7th Cir. 2004) (affirming district court's motion for judgment as a matter of law where plaintiff demonstrated "much more than a single instance of flawed conduct"—he had alleged "repeated failures" with respect to one individual, "as well as a culture that permitted and condoned violations of policies").

The Complaint also alleges a third incident of the City's destruction of exculpatory evidence. On June 25, 1977, Detectives Regula and Enno Groth tape-recorded exculpatory statements from Lamar and Stanley Smith, but the City destroyed the tape prior to Mr. Bozella's trials and never provided the tape to Mr. Bozella or his defense counsel. Compl. ¶¶ 28-29. The City contends that "nowhere in the complaint does plaintiff allege that the police or prosecution had a constitutional obligation to preserve the tape." City Br. at 6 n.2. But such conduct renders plausible the inference that the City failed to adequately train or supervise Officers to

_____

presumptively constitutional policy, *see Green v. City of New York*, 465 F.3d 65, 82 (2d Cir. 2006). Here, in contrast, Mr. Bozella alleges that Chief Bowles failed to train and supervise Officers regarding memorializing, preserving, and disclosing exculpatory information, and the City implemented an unconstitutional policy of destroying such information. Compl. ¶¶ 25-29, 148, 173-85, 198-207.

memorialize, preserve, and disclose exculpatory information, leading to the likely result that the City would commit *Brady* violations, as it did in Mr. Bozella's case.

Finally, if there were any doubt about the sufficiency of the allegations in the Complaint against the City, a memorandum attached to Exhibit C to the County's motion to dismiss further evidences the City's failure to train its Officers regarding memorializing, preserving, and disclosing exculpatory evidence. In particular, when approached by the District Attorney regarding their "notes that they took in connection with the Crapser Case," *five* City officers involved in the Crapser Murder investigation—Officer Regula, Officer DeMattio, Officer Murphy, Officer Seegal, and Officer Sheeley—"*all state[d] they destroyed their notes after reducing to report. . ."* See Burke Aff. Ex. C.1968 (emphasis added). These notes likely contained exculpatory information, including, perhaps, documentation of the Holland interrogation. Compl. ¶¶ 62-70. This memorandum evidences the City's deliberate indifference to the inherent risk of *Brady* violations through the destruction of notes during open investigations, and a failure to take action in response to a known risk of violating criminal defendants' constitutional rights.[13]

> 2. *The Complaint States A Claim Against the City Based On The City's Policy Of Destroying Officers' Notes During Open Investigations*

The Complaint also states a claim against the City on the independent ground that the City implemented an unconstitutional policy that caused Mr. Bozella's injury. *See Bryan Cnty.*, 520 U.S. at 417-19; *Pembaur*, 475 U.S. at 477-78; *Myers*, 157 F.3d at 73-74. Specifically, the

---

[13] Another memorandum submitted by the County counters the City's argument that Mr. Bozella's claim is based on a "failure to record one witness statement." Burke Aff. Ex. C.1925; City Br. at 12. A June 1983 memorandum from D. James O'Neil to Mr. Bozella's counsel reveals that "[n]o notes were taken" during an interview of Christopher Gill—an interview that defense counsel believed contained exculpatory information. Burke Aff. Ex. C.1925. Thus, Officer Murphy's failure to record the neighbor's statement was not an isolated instance.

Complaint alleges that the City promulgated an official policy requiring police officers to destroy their notebooks containing eyewitness statements after police officers translated their notes into formal police reports, and that "[t]he purpose of such a policy was to prevent defense counsel from obtaining *access to information* recorded in Officers' notebooks," *Id.* ¶ 177 (emphasis added), i.e. to withhold from criminal defendants evidence with apparent exculpatory and impeachment value in violation of *Brady*. Compl. ¶¶ 177-81, 202, 206. The New York State Appellate Division, Second Department concluded that this policy was constitutionally improper in a reported decision captioned *People v. Roberts*, 178 A.D.2d 622, 622-23 (N.Y. App. Div. 1991) (determining that the destruction of notes pursuant to the policy constituted harmless error under the specific facts before the court). Compl. ¶ 178; *Roberts*, 178 A.D.2d at 622-23. The Complaint further alleges that this unconstitutional policy of instructing Officers to destroy information directly caused the violation of Mr. Bozella's constitutional rights because Detective Murphy and Detective Regula both failed to preserve or disclose exculpatory information from Ms. Crapser's next-door neighbor. *Id.* ¶¶ 26-27, 206-07; *see also People v. Bozella*, 2009 WL 3364575, at *15. These allegations state a claim against the City. *See Myers*, 157 F.3d at 73-74 (affirming judgment against city based on city's unconstitutional policy of refusing to accept criminal cross-complaints which "caused the Port Jervis police department not to promptly investigate evidence potentially favorable to Myers").

The City contends that Detectives Murphy and Regula's failures to record the neighbor's statement have "no relevance to plaintiff's claim against the City" because the violations do not "stem from the alleged destruction of documents." City Br. at 10. The City reads the allegations in the Complaint too narrowly. *See Limone v. Condon*, 372 F.3d 39, 46 (1st Cir. 2004) (while plaintiffs may not allege nebulous rights, "[c]ourts must be equally careful . . . not to permit a

defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability."). The Complaint alleges that the City's policy was one of disregarding criminal defendants' rights to exculpatory information. Compl. ¶¶ 173-76. The Complaint alleges that the City implemented this policy in various ways. For example, despite knowing that Officers failed to record eyewitness statements, the City failed to train or supervise Officers to ensure they memorialized, preserved, and disclosed exculpatory information and thus did not violate criminal defendants' constitutional rights. *Id.* ¶¶ 179-80. And where a City policy existed regarding the preservation and disclosure of exculpatory information, the policy required the destruction of notebooks while a criminal investigation was still ongoing. *Id.* ¶¶ 177-78. These allegations are sufficient to support Count II of the Complaint. *See, e.g., Walker*, 974 F.2d at 297, 300 (reversing district court's dismissal of claims alleging city's deliberate indifference to the need to train and supervise the police not to assist in perjury and convicting the innocent); *Newton*, 681 F. Supp. 2d at 494 (denying city's motion for summary judgment where the evidence plaintiff proffered was "sufficient to show a persistent or widespread policy, custom, or practice of inconsistently destroying invoices and evidence"); *Bumbury*, 62 A.D.3d at 622 (denying city's motion to dismiss where plaintiff alleged failure to adequately train, supervise, and/or implement proper policies for officers with respect to collecting and turning over exculpatory information).

## II.     The Complaint States Claims Against William O'Neill For Violations Of Section 1983 (Count III)

The Complaint also alleges facts that state claims under Section 1983 against William O'Neill for violating Mr. Bozella's constitutional rights, including Mr. Bozella's right to due process. Compl. ¶¶ 22-24, 37, 50-70, 90-103. In particular, Mr. Bozella has alleged that, through William O'Neill's fabrication of evidence, malicious abuse of process, and malicious

- 37 -

prosecution, William O'Neill caused Mr. Bozella's constitutional injuries. Compl. ¶¶ 22-24, 37, 50-70, 90-103, 231-33. William O'Neill is not entitled to absolute immunity for such challenged conduct, which constituted *investigative* work conducted alongside detectives who were investigating the Crapser Murder, most of which occurred prior to Mr. Bozella's indictment, and all of which occurred *before* William O'Neill was the prosecutor of the Crapser Murder case. *Id.* Accordingly, William O'Neill's asserted affirmative defense of absolute immunity, O'Neill Br. at 5-11, must fail.[14]

## A. The Complaint States Claims Against William O'Neill For Fabrication of Evidence, Malicious Abuse of Process, And Malicious Prosecution

A plaintiff can state a Section 1983 claim based on a violation of his constitutional right not to be deprived of liberty as a result of a state official's fabrication of evidence. *See Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000) ("there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity"); *McGhee v. Pottawattamie Cnty.*, 547 F.3d 922 (8th Cir. 2008) (a prosecutor is not immune for the procurement of false evidence "where the prosecutor was accused of both fabricating evidence and then using the fabricated evidence at trial" resulting in a post-trial deprivation of liberty) *cert. granted*, 129 S. Ct. 2002 (2009), *cert. dismissed*, 130 S. Ct. 1047, (Jan. 4, 2010); *Limone*, 372 F.3d at 44-45 ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").

A plaintiff also can state a Section 1983 claim for a malicious abuse of process. A malicious abuse of process occurs when a defendant (i) employs regularly issued legal process to

---

[14] William O'Neill does not assert a qualified immunity defense. O'Neill Br. at 3 ("[t]he prosecutorial actions of William O'Neill are protected by absolute, not qualified, immunity.")

compel performance or forbearance of some act; (ii) with intent to do harm without excuse or justification; and (iii) to obtain a collateral objective that is outside the legitimate ends of the process. *See Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir. 1994); *see also Torres v. Superintendent of Police of P.R.,* 893 F.2d 404, 410 (1st Cir. 1990) (procedural due process violations include deprivations "of liberty by a distortion and corruption of the processes of law.").

A plaintiff also can state a Section 1983 claim for a malicious prosecution. A malicious prosecution occurs when a defendant (i) initiates a prosecution against the plaintiff; (ii) without probable cause to believe the proceeding and can succeed; (iii) with malice; and (iv) the matter terminates in plaintiff's favor. *See, e.g., Cook,* 41 F.3d at 80; *McClellan v. Smith,* 439 F.3d 137, 146 (2d Cir. 2006); *Boyd v. City of New York,* 336 F.3d 72, 78 (2d Cir. 2003); *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997).

Here, Mr. Bozella has alleged facts that state each of these claims against William O'Neill. The Complaint alleges that while serving as an investigator, William O'Neill coerced Madeline Dixon South to provide false testimony under oath to a grand jury that implicated Mr. Bozella for the Crapser Murder. Compl. ¶¶ 96-103, 112-13, 210, 218, 220, 232-33. The Complaint also alleges that William O'Neill suppressed and buried evidence pointing to Mr. Bozella's innocence and another man's guilt. Compl. ¶¶ 22-24, 59-70. In particular, when Donald Wise's accomplice Saul Holland told William O'Neill and two detectives during a custodial interrogation that Donald Wise had committed a previous crime matching the description of the Crapser Murder, William O'Neill suppressed Holland's statement by condoning Officer Grey's instruction to Holland to not discuss the Crapser Murder. *Id.* ¶¶ 66-67. William O'Neill knew that there was an open investigation focusing on Mr. Bozella in connection with the Crapser Murder, but did not pursue this exculpatory lead. Instead, he placed

- 39 -

a copy of the tape of Holland's statement in the District Attorney's file for the King Murder and omitted any mention of the statement in the file for the Crapser Murder. Compl. ¶¶ 62-70, 210, 217, 220, 230-31.

First, these allegations that William O'Neill coerced Madeline Dixon South to provide false testimony to the grand jury are sufficient to state a Section 1983 claim against him based on fabrication of evidence. *See Zahrey*, 221 F.3d at 344 (prosecutor's coercion of witness in advance of grand jury testimony stated claim for fabrication of evidence). Second, the Complaint alleges that William O'Neill maliciously abused legal process through (i) coercing a witness to lie to the grand jury; (ii) with the intent to harm Mr. Bozella without excuse or justification; and (iii) to secure a wrongful conviction outside the legitimate ends of a grand jury proceeding. *See* Compl. ¶¶ 38, 40, 96-103, 112-13, 210, 218, 220, 232-33; *Cook*, 41 F.3d at 80 (denying defendant's motion for summary judgment because triable issue of fact remained as to whether officers violated the plaintiff's constitutional rights through malicious abuse of process by charging the plaintiff with a crime without probable cause and for the sole purpose of retaliation).

Third, the Complaint alleges that William O'Neill maliciously prosecuted Mr. Bozella by (i) coercing a witness to lie, and fabricating evidence presented, to a grand jury convened by a different prosecutor; (ii) without probable cause to believe the prosecution could succeed; and (iii) with malice; and the criminal prosecution terminated in Mr. Bozella's favor when Mr. Bozella's conviction was vacated in 2009. Compl. ¶¶ 22-24, 37-41, 44, 62-70, 96-104, 112-14, 116-18, 126, 147, 151-56, 212-29; *see Guzman*, 2010 WL 4025563, at *3 (denying motion to dismiss malicious prosecution claim); *McClellan*, 439 F.3d at 146 (denying summary judgment because "it could be concluded that Smith's prosecution of the case was impelled solely by a

- 40 -

personal animus" and grand jury indictment "could reasonably be found to have been the result of conduct comparable to fraud or perjury"); *Boyd*, 336 F.3d at 78 (denying summary judgment because "[a]t this preliminary stage, construing all inferences in the light most favorable to Boyd, a jury could reasonably find that the indictment was secured through bad faith or perjury").[15]

### B.   William O'Neill Is Not Entitled To Absolute Immunity

Absolute immunity is available as an affirmative defense only where the challenged conduct constitutes a judicial, prosecutorial, or legislative function. *See Buckley v. Fitzsimmons*, 509 U.S. 259 (1993). Accordingly, the Supreme Court uses a functional approach to determine whether conduct falls within the category considered to be absolutely immune. *See Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (in determining whether a prosecutor is acting as an advocate, the court must examine the "nature of the function performed, not the identity of the actor who performed it") (citation omitted). On the one hand, prosecutors are absolutely immune for activities that are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) (emphasis added). On the other hand, prosecutors are not absolutely immune for investigative or administrative functions. *See id.* at 431 n.33; *Kalina*, 522 U.S. at 119 (prosecutor's conduct in connection with application for an arrest warrant not protected by absolute immunity); *Buckley*, 509 U.S. at 273-74 (prosecutor's fabrication of evidence during investigation of unsolved murder not protected by absolute immunity); *Burns v. Reed*, 500 U.S. 478, 492-93 (1991) (prosecutor's conduct in connection with interrogation of suspect not protected by absolute immunity); *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 686 (D.C. Cir. 2009) (prosecutor's participation in the unlawful removal

---

[15] As discussed in section III, *infra*, the Complaint also states a claim against William O'Neill in Count IV based on William O'Neill's participation in a conspiracy to violate Mr. Bozella's constitutional rights.

of a sworn grand juror not "intimately associated with the judicial phase of the criminal process" and did not "occur in the course of his role as an advocate for the State") (citation omitted).

The timing of the prosecutor's conduct is a critical factor in determining whether the challenged conduct is intimately associated with the judicial phase of the criminal process, on the one hand, or is investigative or administrative, on the other hand. *See, e.g.*, *Buckley*, 509 U.S. at 274. Courts routinely find that a prosecutor's conduct prior to indictment falls in the latter category and thus is not protected by absolute immunity. *See id.* ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."); *Zahrey*, 221 F. 3d at 347 n.2 ("[A] prosecutor's conduct prior to the establishment of probable cause should be considered investigative.").

Applying these fundamental principles to the allegations in the Complaint, William O'Neill's conduct is not shielded by absolute immunity. Counts III and IV of the Complaint assert claims against William O'Neill based on William O'Neill's conduct (1) during and immediately following the February 23, 1978 interrogation of Saul Holland, and (2) during a conversation with Madeline Dixon South prior to her grand jury testimony. Compl. ¶¶ 62-70, 90-103. As to the former, William O'Neill's conduct took place more than five years before Mr. Bozella was indicted and arrested for the Crapser Murder, Compl. ¶¶ 62-70, 104, and was performed alongside two detectives during a custodial interrogation in a police station. Such conduct is not protected by absolute immunity. *See Burns*, 500 U.S. at 492-93 (prosecutor's conduct during interrogation of suspect not protected by absolute immunity); *Buckley*, 509 U.S. at 273-74 (prosecutor not entitled to absolute immunity when performing investigative activities of the type normally performed by a detective or police officer and "*before he has probable cause to have anyone arrested*") (emphasis added); *Kulwicki v. Dawson*, 969 F.2d 1454, 1466

- 42 -

(3d Cir. 1992) (prosecutor not entitled to absolute immunity when participating in witness
interviews prior to filing charges). As to the latter, William O'Neill's coercion of Madeline
Dixon South occurred when he was not the prosecuting attorney for the Crapser Murder, and
thus was not judicial conduct or conduct of an advocate.[16] Compl. ¶¶ 98-99; *see, e.g., Buckley*,
509 U.S. at 273-74 (prosecutor is not entitled to absolute immunity for fabricating evidence
during the preliminary investigation of an unsolved crime); *Hill v. City of New York*, 45 F.3d
653, 662 (2d Cir. 1995) (although "a prosecutor is [absolutely] immune for out-of-court efforts to
control witnesses' grand jury testimony that are made subsequent to decision to indict", this
"does not protect [a prosecutor's] efforts to manufacture evidence that occurs during
investigatory phase of a criminal case").

William O'Neill relies on *Van de Kamp*, 129 S. Ct. at 855, to argue that a prosecutor is
immune from all acts *underlying* his decision to initiate a prosecution, including the "evaluative
period" before the initiation of grand jury proceedings. O'Neill Br. at 6-7. He misapplies *Van
de Kamp*, which addressed a prosecutor's failure to turn over exculpatory evidence and held that
such conduct was absolutely immune because it involved conduct "directly connected with the
conduct of a trial." *Van de Kamp*, 129 S. Ct. at 862. The conduct giving rise to Mr. Bozella's
claims against William O'Neill occurred during his role as an investigator of the Crapser Murder
and before he was the prosecutor trying Mr. Bozella. Accordingly, he was not acting as an
advocate when he violated Mr. Bozella's constitutional rights and is not absolutely immune for

---

[16] Indeed, in an exhibit attached to his motion, William O'Neill recognizes the distinction
between the investigatory and prosecutorial functions he played during the investigation and
prosecution of the Crapser Murder, respectively. *See* Burke Aff. Ex. C.1884. In an affirmation
dated August 21, 1990, he affirmed under "penalty of perjury" that he "*investigated* the [Crapser
Murder] case in 1977 and *again* in 1983 when the matter was presented to the Grand Jury, and
was the *trial prosecutor* during the first trial in Dutchess County Court in 1983-84.") (emphasis
added).

such conduct.

## III. The Complaint States Claims Against William O'Neill and Mr. DeMattio For Conspiracy Under Section 1983 (Count IV)

Mr. Bozella also states a claim against Messrs. O'Neill and DeMattio for a civil rights conspiracy. To state a claim for a Section 1983 conspiracy, a plaintiff must allege: (1) an agreement between two or more state actors; (2) an unconstitutional injury; and (3) an overt act in furtherance of that goal causing damages. *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (reversing grant of summary judgment on conspiracy claims).

Conspiracy is a theory of secondary—not primary—liability. *See, e.g., Kashi v. Gratsos*, 790 F.2d 1050, 1054 (2d Cir. 1986) (civil conspiracy "connects a defendant with the transaction and . . . charges him with the acts and declarations of his co-conspirators . . ."). Hence, both defendants are liable for their own constitutional violations and those of their co-defendants, where an agreement between the defendants is alleged. *See, e.g., Ricciuti*, 124 F.3d at 131 ("[A] jury could assign responsibility to Lopez for acts taken by Wheeler in furtherance of the conspiracy."). Here, the Complaint alleges the requisite elements against Messrs. O'Neill and DeMattio. Compl. ¶¶ 62-70, 96-98, 208-33.

### A. Messrs. DeMattio And O'Neill Agreed To Violate Mr. Bozella's Constitutional Rights

The Complaint alleges that Mr. DeMattio entered into an agreement with William O'Neill to violate Mr. Bozella's constitutional rights. Compl. ¶¶ 63-67; 235-36. An agreement need not be alleged through express words or actions. *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994). Allegations of a tacit, implied, or even silent agreement are sufficient. *Pangburn*, 200 F.3d at 72 (defendants' simultaneous silence evidenced an agreement). Ratification by a state actor of another's constitutionally tortious conduct also can evidence an agreement. *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992) (defendant's "mere acquiescence" in a co-

- 44 -

conspirator's constitutional violation gives rise to Section 1983 conspiracy liability). Allegations of a common motive to convict the defendant can render plausible allegations of an agreement. *See, e.g., Taylor v. Hansen*, 731 F. Supp. 72, 78-79 (N.D.N.Y. 1990) ("Existence of a motive to conspire to convict plaintiff . . . is evidence from which a reasonable juror could infer an agreement . . .."); *Cruz v. County of Dupage*, No. 96 C 7170, 1997 WL 589463, at *8 (N.D. Ill. Sept. 17, 1997) ("public pressure" to solve high profile crimes can provide such a motive.). The Second Circuit has repeatedly held that "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks and citation omitted); *Ricciuti*, 124 F.3d at 131; *Rounseville*, 13 F.3d at 632.

Here, Mr. Bozella has adequately alleged an agreement between William O'Neill and Mr. DeMattio. The Complaint alleges that, during the Holland interview, Officer Grey redirected Holland's statement regarding Donald Wise's commission of the Crapser Murder to prevent Holland from disclosing additional evidence that would exculpate Mr. Bozella. Compl. ¶¶ 63-67.[17] The Complaint alleges that the Crapser Murder was an open investigation at the time of Holland's statement. *Id.* ¶ 65. And the Complaint alleges that Mr. DeMattio was aware of the open investigation since he had arrested Mr. Bozella for the Crapser Murder just a few months earlier. Thus, it is plausible to infer that Mr. DeMattio and William O'Neill understood the import of Holland's statement, and their collective silence in response to Officer Grey's instruction was a tacit agreement not to follow-up on an exculpatory lead. Compl. ¶ 64; *see Ricciuti*, 124 F.3d at 131 (vacating dismissal of conspiracy claim); *White v. McKinley*, 519 F.3d

---

[17] The Holland transcript reveals that Grey asked William O'Neill and Mr. DeMattio, "anything [else]? and both responded "no." Burke Aff. Ex. B.1706. Thus, both had an opportunity to inquire about the Crapser Murder, but elected not to do so.

806, 816 (8th Cir. 2008) (affirming denial of motion for summary judgment regarding conspiracy to withhold exculpatory evidence); *McCray v. City of New York*, No. 03 Civ. 9685, 2007 WL 4352748, at *4, 23 (S.D.N.Y. Dec. 11, 2007) (denying motion to dismiss where plaintiffs alleged that detectives and prosecutors manipulated interview testimony during interrogations rooms, and suppressed "evidence of another, more likely suspect" who had committed similar crimes); *Yanez v. City of New York*, 29 F. Supp. 2d 100, 110 (E.D.N.Y. 1998) (denying summary judgment where complaint provided "where, when, and how [plaintiff] believe[d]" conspiracy was formed).

Mr. DeMattio attempts to shield himself from liability because Holland's statement "was in the hands of the District Attorney's office." DeMattio Br. at 11. But the Complaint alleges that Mr. DeMattio saw William O'Neill (the assistant district attorney in the interrogation room) ignore Holland's exculpatory statement, condone Grey's instruction not to provide additional exculpatory information, and fail to follow-up on Holland's statement. Compl. ¶¶ 59-70. Drawing all plausible inferences in favor of Mr. Bozella, the Complaint alleges that Mr. DeMattio knew that William O'Neill would not conduct a further investigation on the exculpatory lead provided by Holland and knew that he would conceal Holland's statement from Mr. Bozella. Accordingly, "we do not encounter here a bare allegation of conspiracy supported only by an allegation of conduct that is readily explained as individual action plausibly taken in the actors' own economic interests." *See McCray*, 2007 WL 4352748 at *23 (citation omitted).

Mr. DeMattio also suggests that he "had no duty to . . . Mr. Bozella" because Mr. Bozella "was not indicted until April 1983 whereas the tape [of Holland's statement] was made in February 1978 and the King murder closed with convictions that year." DeMattio Br. at 9. This argument fails for two reasons. First, it is black letter law that once a co-conspirator enters into a

eonspiraey, he is liable for all foreseeable acts committed by his co-conspirators unless and until he withdraws from that conspiracy. *Ricciuti*, 124 F.3d at 131. The Complaint alleges that Mr. DeMattio entered into the conspiracy in 1978 during the Holland interview and that he did not withdraw. Thus, Mr. DeMattio is liable for conspiracy based on William O'Neill's failure to disclose the Holland tape and other Brady Evidence in 1983—aets that were foreseeable to Mr. DeMattio since he saw William O'Neill condone the suppression of Holland's exculpatory statement in 1978.

Second, a memorandum attached to Exhibit C to the County's motion to dismiss reveals that Mr. DeMattio was consulted during the prosecution of the Crapser Murder in June 1983—after Mr. Bozella was indicted for the Crapser Murder. *See* Burke Aff. Ex. C.1968. In that memorandum, Lieutenant Doherty informs assistant district attorney D. James O'Neil that he consulted with Mr. DeMattio regarding his notes from Mr. Bozella's case, and Mr. DeMattio informed Lieutenant Doherty that he had destroyed all of his notes from that case. Thus, Mr. DeMattio knew of the 1983 prosecution of Mr. Bozella, knew that he had destroyed his notes, knew that Holland had informed him that Donald Wise was Ms. Crapser's assailant, and knew that William O'Neill would not relay the exculpatory information to D. James O'Neil—the one who was prosecuting Mr. Bozella at the time. Compl. ¶¶ 71-89; *see* Burke Aff. Ex. C.1968. Based on these allegations, it is plausible that Mr. DeMattio's failure to inform Lieutenant Doherty or Assistant District Attorney D. James O'Neil of Holland's statement evidences Mr. DeMattio's continued participation in a conspiracy to violate Mr. Bozella's constitutional rights.

Finally, the Complaint alleges that both William O'Neill and Mr. DeMattio had a motive to indiet Mr. Bozella for the Crapser Murder beeause of heightened public pressure to convict someone for the crime, the failed attempt to indict Mr. Bozella in 1977, and their superiors'

- 47 -

public remarks about finding additional evidence to convict Mr. Bozella. Compl. ¶¶ 21, 40-41, 74. These allegations underscore the plausibility of Mr. Bozella's allegations that Mr. DeMattio and William O'Neill conspired to violate Mr. Bozella's constitutional rights. *See, e.g., Taylor,* 731 F. Supp. at 78-79; *Cruz,* 1997 WL 589463, at *8.

B.   William O'Neill's Overt Acts Caused Several Constitutional Violations

As alleged in the Complaint and discussed above in Section II.A, *supra,* William O'Neill engaged in unlawful acts during the investigation of the Crapser Murder, including coercing a witness to lie to the grand jury and suppressing Holland's exculpatory statement. Compl. ¶¶ 62-70. The Complaint also alleges that he failed to disclose three pieces of *Brady* material at or prior to Mr. Bozella's 1983 and 1990 trials. *Id.* ¶¶ 36, 51, 70, 118, 127, 143-47. Thus, Mr. Bozella has alleged that William O'Neill committed overt acts that violated his constitutional rights.

C.   The Complaint Also Alleges That Mr. DeMattio Violated Mr. Bozella's
     Constitutional Rights

Mr. Bozella need not allege that Mr. DeMattio personally violated Mr. Bozella's constitutional rights because conspiracy is a theory of secondary liability. *See, e.g., Kashi,* 790 F.2d at 1054. Nevertheless, the Complaint, in fact, alleges that Mr. DeMattio, like William O'Neill, violated Mr. Bozella's constitutional rights. Compl. ¶¶ 59-70. The Complaint alleges that Mr. DeMattio failed to investigate or follow-up on the exculpatory information unveiled during the Holland interrogation. *Id.* at ¶ 65. Such conduct violated Mr. Bozella's constitutional rights. *See Russo v. City of Bridgeport,* 479 F.3d 196, 208 (2d Cir. 2007) (holding that a "law enforcement official's refusal to investigate available exculpatory evidence" violates due process); *Rosario v. Coughlin,* No. 88-CV-56, 1995 U.S. Dist. LEXIS 172, at *24 (N.D.N.Y. 1995) ("failure to intercede can become tacit collaboration, for which officer can be held liable").

- 48 -

That William O'Neill was present in the interrogation room is of no import because he was not prosecuting the Crapser Murder at the time. Compl. ¶ 99. Mr. DeMattio took no steps to convey the exculpatory information to D. James O'Neil, the prosecuting attorney at the time, and his failure to do so did not comport with his obligations under *Brady*. *See Freeman v. Georgia*, 599 F.2d 65, 69-70 (11th Cir. 1979) ("The duty to disclosure is that of the state, which ordinarily acts through *the prosecuting attorney*; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.") (emphasis added).[18]

### D.     Mr. DeMattio Is Not Protected By Qualified Immunity

Mr. DeMattio argues that he is entitled to qualified immunity. DeMattio Br. at 10-12. That assertion fails for two reasons. First, qualified immunity seldom is appropriate as a basis for dismissal prior to discovery. *See McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) ("the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted . . . .") (internal quotation marks and citation omitted).[19] Here, factual matters concerning the nature and extent of Mr. DeMattio and William O'Neill's violations of Mr. Bozella's constitutional rights are in dispute and are primarily within the province of the Defendants' witnesses. Compl. ¶¶ 208-33. Therefore Mr. DeMattio should not be granted immunity prior to discovery.

---

[18] Mr. DeMattio asserts that he met his constitutional obligations in connection with the Holland interview because William O'Neill was in the room. DeMattio Br. at 8. But it is sheer happenstance that William O'Neill tried Mr. Bozella's case five (and again twelve) years after the interrogation.

[19] *See also Zahrey v. City of New York*, No. 98-CV-4546, 2009 U.S. Dist. LEXIS 8177, at *125-26 (S.D.N.Y. Jan. 7, 2009) (qualified immunity should only be decided by the court "where the facts . . . are undisputed") (internal quotations omitted); *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring in part) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."); *Padilla v. Yoo*, 633 F. Supp. 2d 1005, 1031 (N.D. Cal. 2009).

- 49 -

Second, Mr. DeMattio's qualified immunity defense fails on the merits. A state actor is not entitled to qualified immunity if (i) he violates a citizen's constitutional rights; and (ii) those rights were clearly established at the time of the constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). When an alleged conspirator asserts qualified immunity, the analysis applies to any rights violated by any co-conspirator. *Ricciuti*, 124 F.3d at 131 (vacating summary judgment for police officer claiming qualified immunity against conspiracy claim); *Alfaro v. Labador*, 300 F. App'x. 85 (2d Cir. 2008) (denying qualified immunity for all defendants where plaintiff alleged concerted action by co-conspirators); *Tyree v. Zenk*, No. 05-CV-2998, 2009 U.S. Dist. LEXIS 43872, at *21-22 (E.D.N.Y. May 22, 2009) (denying qualified immunity for all co-conspirators where only one committed a Fifth Amendment violation).[20] Thus, Mr. Bozella's allegations of constitutional violations by both William O'Neill and Mr. DeMattio, *see supra,* Seetions II.A., III.B-C, satisfy the first prong of this analysis.

As to the second prong, Mr. Bozella's constitutional rights were clearly established at the time of the Holland interrogation. *See Pyle v. Kansas,* 317 U.S. 213, 216 (1942) (holding that "deliberate suppression by [state] authorities of evidence favorable to [plaintiff] . . . sufficiently charge[d] a deprivation of rights guaranteed by the Federal Constitution."); *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (noting that Supreme Court precedent had "established that a conviction obtained through use of false evidence . . . must fall under the Fourteenth Amendment"); *United States v. Agurs*, 427 U.S. 97 (1976) (affirming *Brady*).[21]

---

[20] This is because the right to be free of unconstitutional conspiracy is itself well-established. *Tyree*, 2009 U.S. Dist. LEXIS 43872, at *21 ("The Fifth Amendment right to be free of pre-trial punishment is clearly established. It is likewise clearly established that constitutional rights may be violated through participation in a conspiracy to do so.") (internal citations omitted)).

[21] *See also* DeMattio Br. at 11 (asserting that Mr. Bozella's "Brady rights and prosecutor's Brady obligations were well known . . . .").

Mr. DeMattio contends that Mr. Bozella's rights were not clearly established because "despite Brady it was not clearly established that a police officer had an obligation to provide potentially exculpatory material directly to a defendant rather than the prosecution." DeMattio Br. at 11. Mr. DeMattio reads the Complaint too narrowly. *See supra,* at Section I.B.2, (citing *Limone,* 372 F.3d at 46).

Mr. DeMattio's argument closely parallels the one asserted by the defendants in *Limone.* 372 F.3d at 46. There, the defendants attempted to assert qualified immunity by reframing the plaintiffs' well-pleaded allegations as arising only under *Brady. Id.* The court rejected this attempt, instead crediting plaintiffs' allegations that "the appellants actively participated in a plot to secure and sustain unjust convictions against innocent men" and that "[t]hough this scheme includes suballegations that occasionally involve *Brady* violations (e.g., suppression of exculpatory information), the overall charge cannot be shoehorned into the relatively narrow confines of the *Brady* rubric." *Id.* at 46-47 (denying qualified immunity); *see also McCray,* 2007 WL 4352748, at *18-19 (allowing even "broad, general claims . . . that Defendants intentionally suppressed material, exculpatory evidence, that Defendants fabricated evidence wholesale, and that Defendants engaged in impermissibly coercive interrogation tactics" to defeat police officers' assertion of qualified immunity at motion to dismiss stage). As in *Limone* and *McCray,* Mr. Bozella alleges that William O'Neill and Mr. DeMattio violated Mr. Bozella's clearly established constitutional rights to not be subject to fabrication of evidence and the suppression and withholding of exculpatory evidence in furtherance of a conspiracy to secure an unjust conviction. Accordingly, Mr. DeMattio's qualified immunity defense should be rejected.

## CONCLUSION

For these reasons, Mr. Bozella respectfully requests that the Court deny the Defendants' motions to dismiss the Complaint and motion for judgment on the pleadings. To the extent the

- 51 -

Court grants any of the Defendants' motions, Mr. Bozella respectfully requests permission to file

an Amended Complaint to cure any deficiencies identified by the Court in the Complaint. *See,*

*e.g., Bellikoff v. Eaton Vance Corp.,* 481 F.3d 110, 118 (2d Cir. 2007) ("when a motion to

dismiss is granted, the usual practice is to grant leave to amend the complaint") (internal

quotation marks and citation omitted); Fed. R. Civ. P. 15(a) ("[t]he court shall freely give leave

when justice so requires").[22]

Dated: New York, New York
       November 15, 2010

                                    WILMER CUTLER PICKERING
                                    HALE AND DORR LLP

                                    By:

                                       Peter J. Macdonald
                                       Ross E. Firsenbaum
                                       Margaux J. Hall
                                       Somil Trivedi
                                       399 Park Avenue
                                       New York, NY 10022
                                       Tel.: (212) 230-8800
                                       Fax: (212) 230-8888

                                    *Attorneys for Plaintiff Dewey R. Bozella*

---

[22] Mr. Bozella respectfully seeks leave from the Court to consider the final two pages of this memorandum of law. During the September 8 pre-motion conference, the Court authorized Mr. Bozella to file a single memorandum of law up to 50 pages in opposition to dispositive motions filed by the County, William O'Neill, and Mr. DeMattio. At the time of the pre-motion conference the City had filed an Answer to the Complaint and had not indicated to Mr. Bozella or the Court an intent to file a dispositive motion. After the pre-motion conference the City sought and obtained leave to file, without objection by Mr. Bozella, a motion for judgment on the pleadings. Mr. Bozella has responded in this memorandum of law to all of the Defendants' motions, including two motions accompanied by a substantive affidavit and thousands of pages of exhibits outside the Complaint.