UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DEWEY R. BOZELLA,                                        : ECF CASE
                                                        :
                         Plaintiff,                     : Docket No.: 10-CV-4917 (CS)
                                                        :
           against                                      :
                                                        :
THE COUNTY OF DUTCHESS; THE CITY OF                     :     **ATTORNEY AFFIDAVIT**
POUGHKEEPSIE; WILLIAM J. O'NEILL;                       :
ROBERT J. DeMATTIO,                                     :
                         Defendant.                     :
--------------------------------------------------------X

DAVID GANDIN, ESQ. an attorney duly admitted to practice law before the Courts of the

State of New York, hereby affirms the following:

1.       I am an associate with the firm Jacobowitz and Gubits, LLP, attorneys for the

plaintiff herein.

2.       I submit this affidavit in support of defendant City of Poughkeepsie's motion to

dismiss.

3.       Plaintiff commenced this action by filing a complaint on June 24,

2010, a copy of which is annexed hereto as Exhibit "1."

4.       Defendant City of Poughkeepsie answered same complaint on August 12, 2010,

a copy of which is annexed hereto as Exhibit " 2."

5.       On October 7th this Court granted defendant City of Poughkeepsie leave to file a pre-

trial motion to dismiss on the pleadings.

6.       Based on the pleadings and for the reasons set forth in the accompanying

Memorandum of Law, defendant City of Poughkeepsie herein moves pursuant to Fed. R. Civ.

P. 12(c) for judgment on the pleadings based on plaintiff's failure to state a claim upon which relief

can be granted.

7.       Wherefore, it is respectfully requested that plaintiff's complaint be dismissed in its

entirety as against the City of Poughkeepsie.

Dated:   October 13, 2010
         Walden, New York

_____
David Gandin (DG-0533)

Exhibit "1"

ORIGINAL

JUDGE SEIBEL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEWEY R. BOZELLA,<br><br>        Plaintiff,<br><br>        v.<br><br>THE COUNTY OF DUTCHESS; THE<br>CITY OF POUGHKEEPSIE; WILLIAM J.<br>O'NEILL; AND ROBERT J. DEMATTIO<br><br>        Defendants. | No. 10 Civ. _____<br>COMPLAINT AND<br>JURY DEMAND |

WILMER CUTLER PICKERING
HALE AND DORR LLP
Peter J. Macdonald
Ross E. Firsenbaum
Somil Trivedi
Margaux J. Hall
399 Park Avenue
New York, New York 10022
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiff Dewey R. Bozella*

Plaintiff Dewey R. Bozella, by and through his attorneys, alleges as follows:

## I.    **INTRODUCTION**

1.    This civil action seeks monetary damages for the extraordinary injuries and damages suffered by Dewey R. Bozella, who was wrongfully convicted and incarcerated for more than 26 years for a murder that he did not commit.

2.    On October 14, 2009, after Mr. Bozella spent more than 26 years incarcerated for the June 14, 1977 murder of J. Emma Crapser in Poughkeepsie, New York ("Crapser Murder"), the Dutchess County Court vacated Mr. Bozella's murder conviction based upon the Defendants' multiple violations of Mr. Bozella's constitutional rights. *People v. Bozella*, 25 Misc. 3d 1215(A), 2009 WL 3364575 (Dutchess Co. Ct. Oct. 14, 2009) (attached hereto as Exhibit A). Specifically, the Dutchess County Court found that there was "overwhelming" evidence demonstrating that the Dutchess County District Attorney's office ("District Attorney") and City of Poughkeepsie Police Department ("Police") violated Mr. Bozella's constitutional rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to Mr. Bozella's defense counsel at or before trial (or anytime between 1977 and 2008) various *Brady* materials – including eyewitness statements, police reports, and even another man's confession to having committed the Crapser Murder.

3.    The egregious misconduct perpetrated against Mr. Bozella spanned the course of 32 years – Mr. Bozella's entire adult life – and included the malicious and relentless prosecution of his case by an assistant district attorney, Defendant William J. O'Neill, who was determined to prosecute and convict Mr. Bozella for the highly-publicized murder at whatever cost. Specifically, Defendant O'Neill, among other things, suppressed exculpatory and impeachment evidence, failed to investigate known and exculpatory leads that pointed to another person as the

actual perpetrator of the crime, and maliciously abused the legal process by coercing a witness to testify falsely before a Grand Jury to indict Mr. Bozella.

4.     Defendant O'Neill also conspired with Defendant Robert J. DeMattio and Officer William Grey to suppress and conceal exculpatory and impeachment evidence that implicated a young man named Donald Wise as the actual perpetrator of the Crapser Murder in violation of Mr. Bozella's constitutional rights.

5.     Instead of prohibiting or discouraging these contemptible violations, the District Attorney and Police permitted, encouraged, and in certain instances *required* such conduct as part of their policies, customs, and/or practices. Among other things, in response to training from the District Attorney, the Police adopted an official policy, custom, and/or practice of destroying detectives' and police officers' interview notebooks after reducing their notes into official reports for the express purpose of ensuring that the notebooks would not have to be produced to defense counsel in connection with criminal trials of individuals such as Mr. Bozella – a policy, custom and/or practice that the Second Department subsequently deemed constitutionally improper. *See People v. Roberts*, 178 A.D.2d 622, 622-23 (N.Y. App. Div. 1991).

6.     Moreover, assistant district attorneys, including Defendant O'Neill, routinely failed to disclose police reports and grand jury testimony to defense counsel, even when such documentation contained exculpatory or impeachment evidence.

7.     These and other policies, customs, and/or practices demonstrated a deliberate indifference towards the constitutional rights of individuals, and in the case of the Crapser Murder, directly and proximately caused violations of Mr. Bozella's constitutional rights.

8.      If not for the misdeeds of Defendants, Mr. Bozella would not have been

prosecuted, convicted, and incarcerated in violation of his constitutional rights, and would not

have spent 32 years asserting his innocence and fighting for his liberty in connection with a

crime that he did not commit.

## II.    PARTIES

9.      Plaintiff Dewey R. Bozella is a 51-year old man residing in Beacon, New York.

10.     Defendant Dutchess County is a body politic and corporate empowered to

exercise home rule. The Dutchess County Legislature, the County's policymaker, has delegated

final policymaking authority for the supervision and control of the Dutchess County District

Attorney's office to the duly elected Dutchess County District Attorney, currently William

Grady, and for the relevant time period, John King and William Grady. Messrs. King and Grady

further delegated authority to Defendant O'Neill as a final policymaker responsible for his own

actions and the actions of subordinate employees. Defendant Dutchess County is sued for the

constitutional harm Mr. Bozella has suffered as a direct result of the County's policies, customs,

and/or practices with respect to *Brady* and federal law; acts of a County policy-maker in

violation of *Brady* and federal law, such that the policies, customs, and/or practices and

implementation were one; and a County policy-maker's failure to act in training and supervising

assistant district attorneys with regard to *Brady* and federal law when the need was so obvious

that the failure to act demonstrated deliberate indifference to criminal suspects' constitutional

rights.

11.     Defendant City of Poughkeepsie is a home-rule city located in this judicial

district. The City was the employer of Defendant DeMattio and other police officers and

detectives (collectively "Officers") at all relevant times, and is and was at all times before and

during the investigation and prosecution of the Crapser Murder responsible for the policies,

- 4 -

customs, and/or practices of the Police. Defendant City of Poughkeepsie is sued for the constitutional harm Mr. Bozella suffered as a result of the City's policies, customs, and/or practices with respect to *Brady* and federal law, and a City policy-maker's failure to act in training and supervising Officers with regard to *Brady* and federal law when the need was so obvious that the failure to act demonstrated deliberate indifference to criminal suspects' constitutional rights.

12.     Defendant William O'Neill was employed by the District Attorney at all times relevant to this Complaint. Defendant O'Neill is being sued in his individual capacity, as well as in his official capacity because at relevant times he was a delegated final policymaker responsible for his own actions and the actions of his subordinate employees in the Dutchess County District Attorney's office, and was acting in an administrative capacity in connection with certain matters alleged herein. Defendant O'Neill was acting within the scope of his employment and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York and County of Dutchess when he conducted all activities alleged in this Complaint. Defendant O'Neill resides in Red Hook, New York, which is located in Dutchess County.

13.     Defendant Robert DeMattio was employed by the Police at all times relevant to this Complaint. Defendant DeMattio was acting in his individual capacity, within the scope of his employment, and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York and City of Poughkeepsie when he conducted all activities alleged in this Complaint. Defendant DeMattio resides in Poughkeepsie, New York, which is located in Dutchess County.

## III.   RELEVANT NON-PARTIES

14.     Officer William Grey was employed by the Police at all times relevant to this Complaint. Officer Grey was acting in his individual capacity, within the scope of his employment, and under color of law pursuant to the statutes, ordinances, regulations, policies, customs and usage of the State of New York and City of Poughkeepsie when he conducted all activities alleged in this Complaint. Officer Grey resides in Punta Gorda, Florida. On May 20, 2010, Officer Grey initiated a Chapter 7 bankruptcy proceeding in the United States Bankruptcy Court for the Middle District of Florida, naming himself, among others, as the debtor in those proceedings. Accordingly, pursuant to 11 U.S.C. § 362, Officer Grey has not been named as a defendant in this action.

## IV.   JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims arising under 42 U.S.C. § 1983.

16.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because that is the judicial district in which the claims arose.

17.     This action is properly designated for assignment in White Plains under Rule 21 of the Rules For the Division of Business Among District Judges of this Court because the claims arose in whole or in major part in Dutchess County.

## V.   JURY DEMAND

18.     Pursuant to the Seventh Amendment of the United States Constitution, Mr. Bozella requests a jury trial on all issues and claims set forth in this Complaint.

## VI.   FACTUAL ALLEGATIONS

### A.   THE MURDER OF EMMA CRAPSER

19.   Ninety-two year old J. Emma Crapser was brutally murdered in her home at 15 North Hamilton Street in Poughkeepsie, New York at approximately 11:00 p.m. on June 14, 1977.

20.   Ms. Crapser was beaten, bound, and murdered in an unusual and gruesome manner.  She was "asphyxiated by suffocation" as her assailants stuffed five pieces of material down her throat – including a chisel-like instrument, cloth, and lace measuring more than 7 feet in length.

21.   The Crapser Murder sparked an outcry in the community.   The July 31, 1977 *Poughkeepsie Journal* reported that "[t]he Crapser murder heightened public resentment of a growing number of crimes against the elderly and put pressure on the law enforcement establishment to come up with some answers."  Accordingly, the Defendants were under tremendous public pressure to arrest and convict *someone* for the Crapser Murder.

### B.   FROM THE OUTSET, THE DISTRICT ATTORNEY PLAYED AN ACTIVE ROLE IN THE INVESTIGATION OF THE CRAPSER MURDER

22.   The District Attorney and Defendant O'Neill played an active role in the investigation of the Crapser Murder from its earliest stages.  Defendant O'Neill conducted investigatory activities at the crime scene on June 15, 1977, directing Officers to take photographs of the scene and to collect fingerprints.

23.   Defendant O'Neill directed Officers to take photographs of all doors and windows in the apartment, including the rear windows facing an alley next to Ms. Crapser's residence, one of which had a missing screw as part of its locking mechanism.

-7-

24.     In the ensuing weeks and months, the District Attorney and Defendant O'Neill continued to investigate the Crapser Murder, working alongside Officers during witness interviews and other fact investigation.

### C.     THE POLICE FAILED TO RECORD AND PRESERVE EXCULPATORY AND IMPEACHMENT EVIDENCE

25.     Approximately one day after the Crapser Murder, Officer Pete Murphy interviewed a female neighbor of Ms. Crapser about whether she had heard anything unusual on the night of the murder.  The neighbor informed Officer Murphy that she had heard loud noises in the alley at the side of Ms. Crapser's home that sounded like garbage cans being moved.

26.     Officer Murphy did not record in writing the neighbor's statement.  Officer Murphy informed his partner, Officer Art Regula, of the sum and substance of the statement, but Officer Regula failed to record in writing the statement as well.

27.     Thus, the Police did not record in writing the neighbor's exculpatory statement – a statement that would have bolstered Mr. Bozella's asserted defense at his criminal trials that the point of entry into Ms. Crapser's home was through a window in the side alley rather than through the front door.  On October 14, 2009, the Dutchess County Court concluded that such misconduct constituted a *Brady* violation.

### D.     THE POLICE AND DISTRICT ATTORNEY STRUCK A DEAL WITH LAMAR SMITH TO OBTAIN A FALSE STATEMENT IMPLICATING MR. BOZELLA

28.     On June 25, 1977, Officers Regula and Enno Groth questioned a young man named Lamar Smith and his brother Stanley Smith regarding the Crapser Murder.  Lamar Smith and Stanley Smith informed the Officers that they were not at the scene of the murder.  The questioning took place in the back of a police car and was tape-recorded.

- 8 -

29.     This cassette tape was subsequently destroyed prior to Mr. Bozella's indictment

(which took place six years after the Crapser Murder) and would never be made available to Mr.

Bozella or his defense counsel.

30.     Four days later, on June 29, 1977, Officers Regula and Groth arrested Lamar

Smith for a separate burglary.  In exchange for his release for the burglary, Lamar Smith changed

his story regarding the Crapser Murder and informed the Officers that he had seen Mr. Bozella

and Wayne Moseley on Ms. Crapser's porch on the evening of June 14, 1977 while a third

individual, Elbert Pittman, served as a lookout.  Lamar Smith informed the Officers that he was

an observer situated across the street from Ms. Crapser's residence – thus, he claimed to have a

vantage point where he could be of value to the Police without implicating himself as a

wrongdoer.

31.     The Police tape-recorded this second conversation and, in contrast to the

exculpatory June 25, 1977 tape, preserved the tape of Lamar Smith's coerced, fabricated, and

incriminating account.

32.     Officers Regula and Groth also questioned Stanley Smith on June 29, 1977.

Stanley Smith echoed his brother's revised story.

33.     On or around June 25, 1977, the very same day that Lamar Smith and Stanley

Smith informed Officers Regula and Groth that they had nothing to do with the Crapser Murder,

the Police interviewed several of Ms. Crapser's neighbors (who lived in the second-floor

apartment above Ms. Crapser's first-floor apartment in the same two-family house) and others

regarding their observations from the night of the murder.  These four witnesses had either (a)

entered and exited the second-floor apartment between 10:00 p.m. and 11:00 p.m. on the night of

the murder, or (b) approached the house next door to Ms. Crapser's apartment during the same time frame.

34.     The four witnesses all provided the Police with voluntary statements that they did not see or hear anything unusual in front of Ms. Crapser's home on the night of the murder. One witness told the Police that she loitered on a bench on the street adjacent to Ms. Crapser's home from 7:00 p.m. until 11:00 p.m. on the night of the Crapser Murder and did not observe anything unusual. She further told the Police that she did not observe Lamar Smith, Stanley Smith, or Pittman (whom she knew) at any point that evening.

35.     The neighbors' statements contradicted Lamar Smith's June 29, 1977 story to the Officers. Specifically, the statements undermined Lamar Smith's account that he, Stanley Smith, and Pittman were outside the house just before 11:00 p.m. while Mr. Bozella and Wayne Moseley were entering the house.

36.     The neighbors' statements were recorded in a police report but never produced to Mr. Bozella's defense counsel at any time between 1977 and 2008. As the Dutchess County Court concluded in 2009, the neighbors' statements constituted *Brady* material because they contradicted, among other things, Lamar Smith's June 29, 1977 statement to the Police.

**E.     THE DEFENDANTS ARRESTED MR. BOZELLA BASED ON LAMAR SMITH'S BARGAINED-FOR STATEMENT AND UNLAWFULLY HELD MR. BOZELLA IN CUSTODY FOR ALMOST A MONTH WITHOUT A HEARING**

37.     Notwithstanding the neighbors' statements contradicting Lamar Smith's story, on or about June 29, 1977, the Chief of Police, Defendant O'Neill, and other Officers met and decided to file warrants charging Mr. Bozella, Moseley, and Pittman with the Crapser Murder, based solely on the statements of Lamar Smith and Stanley Smith. On or about June 30, 1977, Defendant DeMattio and Officer Siegel arrested Mr. Bozella.

- 10 -

38.     Although a state law prohibited the detention of prisoners beyond 72 hours without bringing their case to a preliminary hearing or the Grand Jury, the Defendants held Mr. Bozella in county jail without bail for *27 days* without granting him a hearing, and without probable cause to indict.  Eventually, on July 28, 1977, Mr. Bozella was released after the District Attorney acknowledged that it had "insufficient" evidence to convene a preliminary hearing.

39.     While Mr. Bozella was in custody, the District Attorney and Police sent latent fingerprints lifted from the crime scene to the FBI to be compared to the fingerprints of Mr. Bozella, Moseley, and Pittman.  The FBI's results revealed that none of the suspects' fingerprints matched any of the latent fingerprints.

F.     **DESPITE HAVING NO CREDIBLE EVIDENCE IMPLICATING MR. BOZELLA, THE DISTRICT ATTORNEY NONETHELESS ATTEMPTED TO INDICT MR. BOZELLA AND FAILED**

40.     Two days after Mr. Bozella's release, the District Attorney deemed its case against Mr. Bozella "insufficient."  According to a *Poughkeepsie Journal* article dated July 31, 1977, the District Attorney understood that Lamar Smith and Stanley Smith's statements were "low priority" evidence that "would not stand up to a Grand Jury or preliminary hearing test." Specifically, Defendant O'Neill told a reporter, "[w]e just need more evidence" to support a finding of probable cause against Mr. Bozella.

41.     In response to public pressure, and with full knowledge that probable cause was lacking given the "low priority" evidence, the District Attorney nevertheless convened a Grand Jury and sought an indictment against Mr. Bozella for the charges of Intentional Murder and Felony-Murder.

42.     Moseley testified before the Grand Jury with immunity and said that he knew nothing about the Crapser Murder.  Moseley informed the Grand Jury that he last saw Mr.

- 11 -

Bozella at approximately 8:00 p.m. on the night of the Crapser Murder. Moseley further testified that he went to McDonald's that evening with Christopher Whitaker, and then went home.

43.     Whitaker gave Officer Regula a statement on July 5, 1977 that corroborated Moseley's Grand Jury testimony.

44.     After considering Lamar Smith and Stanley Smith's testimony, the Grand Jury "no-billed" the case against Mr. Bozella. In other words, the Grand Jury concluded that Lamar Smith and Stanley Smith's stories did not constitute sufficient evidence to support a finding of probable cause to indict Mr. Bozella for the Crapser Murder.

### G.     DONALD WISE COMMITTED A STRIKINGLY SIMILAR ASSAULT IN AUGUST 1977, BUT THE DEFENDANTS FAILED TO INVESTIGATE LEADS CONNECTING DONALD WISE TO THE CRAPSER MURDER

45.     According to a July 31, 1977 *Poughkeepsie Journal* article, Chief of Police Stuart Bowles maintained that the Police's investigation of the Crapser Murder was "complete" and credited Officers with an "outstanding job," even though the case built by the Police "rest[ed] uneasily on the statements of two unidentified informants [Lamar Smith and Stanley Smith] placing the defendants at the murder scene."

46.     Two days later, on August 2, 1977, the Police found 82-year old Estelle Dobler in her bedroom, located at 210 Main Street in Poughkeepsie, approximately six blocks away from Ms. Crapser's residence. The Police found Ms. Dobler in a strikingly similar position as Ms. Crapser: "laying on the floor and her hands, legs, and mouth were bound with black electrical tape" and with "a stocking [] stuffed in her mouth and then covered with tape."

47.     Ms. Dobler, who survived her attack (the "Dobler Assault"), informed the Police that she observed two black males enter her apartment, one of whom matched the description of the 5 foot, 1 inch-tall Donald Wise.

- 12 -

48.    Within one month of the Dobler Assault, a man named Christopher Gill informed

Officers Regula and Groth – the same Officers working on the Crapser Murder investigation –

that Donald Wise was Ms. Dobler's attacker.  Specifically, police reports authored by Officer

Groth (the "Dobler Reports") indicated that Gill "had a conversation with Donald Wise in which

the latter made reference to Mrs. Dobler" and "stated that Donald Wise had carried a rag and that

he used this rag to wipe areas that he had touched."  According to Officer Groth's reports, both

Officer Regula and Officer Groth believed Gill's statement that Donald Wise was one of Ms.

Dobler's attackers.

49.    The District Attorney was aware of Gill's identification of Donald Wise as Ms.

Dobler's attacker.  The Dobler Reports state that the interview of Mr. Gill was conducted "with

the knowledge of Assistant District Attorney Otto Williams."

50.    The District Attorney kept a copy of the Dobler Reports in its file for a

subsequent February 1978 murder in the same neighborhood ("King Murder"), a murder for

which Defendant O'Neill prosecuted Donald Wise and for which Donald Wise was convicted

and sentenced to 20 years to life in prison.  Thus, during the prosecution of Donald Wise for the

King Murder in 1978, Defendant O'Neill was aware of the Dobler Assault.  However, the

District Attorney *did not* place a record of the Dobler Reports in its files for the Crapser Murder.

In short, the District Attorney took no steps to ensure that Defendant O'Neill or any other

assistant district attorney preserved this exculpatory and impeachment evidence in connection

with the Crapser Murder to ensure that it would be produced to Mr. Bozella in accordance with

Mr. Bozella's constitutional rights.

51.    The Defendants never produced the Dobler Reports to Mr. Bozella's defense

counsel between 1977 and 2008.  As the Dutchess County Court concluded in 2009, the Dobler

- 13 -

Reports constituted *Brady* material because they implicated Donald Wise as Ms. Crapser's assailant.

**H.    DONALD WISE COMMITTED A STRIKINGLY SIMILAR MURDER IN FEBRUARY 1978, BUT THE DEFENDANTS FAILED TO INVESTIGATE LEADS CONNECTING DONALD WISE TO THE CRAPSER MURDER**

52.    Approximately six months after the Dobler Assault, the Police arrested Donald Wise and his brother Anthony Wise for the February 20, 1978 murder of 80-year old Mary King in Ms. King's home (the "King Murder"), just blocks away from Ms. Crapser's and Ms. Dobler's homes.

53.    Defendant O'Neill visited the scene of the King Murder approximately thirty minutes after the Police were informed of the King Murder. As he did at the scene of the Crapser Murder, Defendant O'Neill "assisted in the coordination of the [King Murder crime scene] investigation." Defendant O'Neill observed that Ms. King, like Ms. Crapser, had been "strangled and hit with blunt objects."

54.    Officer Grey and Defendant DeMattio also assisted with the criminal investigation for the King Murder.

55.    The Defendants and the community at large were aware of the similarities between the King Murder and the Crapser Murder, which both involved elderly women who were assaulted and murdered in their homes late at night within a close time frame and geographic proximity.

56.    The King Murder was similar to the Crapser Murder in at least three ways. First, the perpetrators used the same modus operandi – asphyxiating their victim by stuffing objects down her throat. Second, both crimes evidenced wanton violence, far beyond what young men in their late teens would need to do to steal from elderly women. Third, the assailants in both murders canvassed the scene prior to burglarizing the victim's home.

- 14 -

57.    Defendant O'Neill served as the lead prosecutor of Donald Wise for the King Murder in 1978.

58.    The District Attorney publicly acknowledged the similarity between the Crapser Murder and the King Murder. On February 22, 1978, District Attorney King stated, "We have had the thought that the age alone (of the victims) is enough to make the parallel."

I.      **THE DEFENDANTS LEARNED THAT DONALD WISE CONFESSED TO COMMITTING THE CRAPSER MURDER, BUT THEY SUPPRESSED AND CONCEALED THE CONFESSION AND FAILED TO INVESTIGATE THE EXCULPATORY LEAD**

59.    On February 22, 1978, Defendant O'Neill participated in an interrogation of Anthony Wise in connection with the King Murder. During the interrogation, Anthony Wise confessed that he, Donald Wise, and a young man named Saul Holland had committed the King Murder.

60.    On February 22, 1978, Defendant O'Neill participated in an interview of Shirley Wise, Carmen Wise, and Tina Wise in connection with the King Murder. During the interview, the three women (who were Donald Wise and Anthony Wise's sisters) informed Defendant O'Neill that Anthony Wise, Donald Wise, and Saul Holland had committed the King Murder.

61.    On February 22, 1978, Defendant O'Neill participated in an interview of Madeline Dixon South, Anthony Wise's girlfriend, in connection with the King Murder. During the interview, South informed Defendant O'Neill that Anthony Wise, Donald Wise, and Saul Holland had committed the King Murder.

62.    On February 23, 1978, just one day after District Attorney King's statement that the King Murder and the Crapser Murder were similar based upon the age of the victims, Officer Grey, Defendant DeMattio (the same Officer who arrested Mr. Bozella for the Crapser Murder

months earlier), and Defendant O'Neill questioned Saul Holland about his involvement in the

King Murder.

63.     During the interrogation, Holland informed Defendant O'Neill, Defendant

DeMattio, and Officer Grey that Donald Wise had convinced him to participate in the King

Murder because Donald Wise said he had previously committed a similar crime and gotten away

with it:

> Oh, they had did – *they had did one of these jobs here before.*
> [Donald Wise] said, you ain't got nothing to be scared of or
> nervous about.

Holland proceeded to describe the specifics of Donald Wise's previous crime:

> He said the way they did it, they, you know, *when they got to the
> house, there wasn't nobody there,* you know, and they just found
> all this money and stuff and then around, you know – *they said
> around 9 or 10 or 11, that's when the lady came home.  She must
> have come home.*

64.     Holland's description of Donald Wise's previous crime to Defendant O'Neill,

Defendant DeMattio, and Officer Grey matched the description of the Crapser Murder – Ms.

Crapser's assailants were inside her apartment and attacked her when she arrived home at

approximately 11:00 p.m.

65.     But the Defendants took no further steps to investigate this lead despite the fact

that there was no unsolved crime other than the Crapser Murder which could fit the description

conveyed by Holland.

66.     Holland had just informed the Defendants that his accomplice Donald Wise had

confessed to the Crapser Murder. But rather than ask Holland additional questions about Donald

Wise's previous crime, Officer Grey steered the conversation away from this previous crime,

responding:

> *Well, I don't want to get into that because we're liable to get*
> *confused.*

67.     The Defendants suppressed this favorable evidence from ever coming to light.

The Defendants did not follow up on Holland's statement about Donald Wise's previous crime at

any point during the interrogation or afterwards. For example, although the District Attorney

and Police had by this time previously attempted to match the fingerprints of Mr. Bozella to

those recovered from Ms. Crapser's home, none of the Defendants attempted to match Donald

Wise's fingerprints to the latent fingerprints at any time between 1977 and 1982, despite

knowing of the striking similarities between the Crapser Murder, King Murder, and Dobler

Assault, and despite Holland's statement that Donald Wise had committed a crime that matched

the description of the Crapser Murder. In suppressing and failing to further investigate this

highly exculpatory evidence, the Defendants violated Mr. Bozella's constitutional rights.

68.     The Police recorded the Holland interrogation on a cassette tape. The District

Attorney kept a copy of the cassette in its files for the prosecution of Donald Wise, Anthony

Wise, and Holland in connection with the King Murder.

69.     However, the District Attorney *did not* keep a copy of the cassette in its files for

the Crapser Murder. Nor did the District Attorney or Defendant O'Neill place a record of the

Holland interrogation or Donald Wise's confession in its files for the Crapser Murder. In short,

the District Attorney took no steps to ensure that Defendant O'Neill or another assistant district

attorney preserved this exculpatory and impeachment evidence in connection with the Crapser

Murder to ensure that it would be produced to Mr. Bozella in accordance with Mr. Bozella's constitutional rights.

70.     The Defendants never produced the Holland tape to Mr. Bozella's defense counsel between 1977 and 2008. As the Dutchess County Court concluded in 2009, the Holland tape constituted *Brady* material because it implicated Donald Wise as Ms. Crapser's assailant.

**J.      THE DISTRICT ATTORNEY CONTINUED TO MALICIOUSLY PROSECUTE MR. BOZELLA BY STRIKING A DEAL WITH MOSELEY TO TESTIFY FALSELY AGAINST MR. BOZELLA**

71.     The District Attorney secured convictions of Donald Wise and Anthony Wise for the King Murder in 1978.

72.     Upon information and belief, there were no brutal attacks of elderly women in their homes in Poughkeepsie, New York between the date of the arrests of Anthony Wise, Donald Wise, and Holland in 1978 and the arrest of Mr. Bozella for the Crapser Murder in 1983.

73.     The investigation of the Crapser Murder reached an apparent dead-end in 1978. For approximately *five years*, the Defendants failed to procure any evidence to corroborate Lamar Smith's story that he had seen Moseley and Mr. Bozella outside Ms. Crapser's residence on the night of the Crapser Murder and that he had seen them enter through the front door.

74.     In October 1981, the District Attorney saw an opportunity to obtain the so-called "evidence" it needed to indict Mr. Bozella. Specifically, the District Attorney learned that Moseley had been arrested for a separate crime and was serving a sentence for a felony with a maximum expiration date of December 16, 1986. The District Attorney sent a young assistant district attorney – Thomas Whelan – to visit Moseley at Arthur Kill Correctional Facility to suggest that if Moseley would change his account to implicate Mr. Bozella in the Crapser Murder, he could thereby secure his own release from state prison.

- 18 -

75.     During his very first meeting with Moseley, Whelan told Moseley that "based on the review of the file, it was *totally obvious* that he [Moseley] was involved and that we could talk frankly because there was no chance of his being prosecuted," even though there was no credible evidence suggesting that Moseley or Mr. Bozella had any connection with the crime.

76.     Whelan "proposed . . . in exchange for his truthful testimony concerning what happened in connection with the burglary and homicide of Ms. Crapser, that perhaps a favorable recommendation could be made concerning his parole status." Whelan's offer focused specifically on Mr. Bozella:

> Q.     Mr. Whalen, did you tell ... Mr. Moseley, we want your cooperation about Dewey Bozella's involvement, or did you ask him for his truthful testimony in general, his truthful information?
>
> A.     *I was specific as to Dewey Bozella being the target . . ..*

77.     Whelan's supervisor, Assistant District Attorney D. James O'Neil, authorized Whelan's deal with Moseley because, according to O'Neil, the Crapser Murder was one that the People remained "very, very interested in."

78.     Whelan informed Moseley that Moseley had immunity with regard to the Crapser Murder. Yet even with that reassurance, Moseley reiterated what he said in 1977 – that he did not have any information concerning the Crapser Murder.

79.     According to Whelan's testimony, over the next *18 months* of negotiations with Moseley, Whelan "never remember[ed] getting any phone calls from him [Moseley] or any letters written directly to me. *I sought him out.*"

80.     During this time, after several unfruitful meetings between Whelan and Moseley, Assistant District Attorney D. James O'Neil paid a visit to Moseley. Moseley again denied knowledge of the Crapser Murder. But, understanding the favorable offer that was on the table,

Moseley soon realized that he could gain his freedom if he told the assistant district attorneys the information that they wanted to hear. Moseley offered D. James O'Neil fabricated tidbits of details about a murder to "entice" him for a deal. Moseley lacked credibility but nonetheless proceeded to "negotiate" his freedom with the District Attorney.

81.    Despite knowing that Moseley had previously testified before the Grand Jury in 1977 that he had no knowledge about the Crapser Murder, and possessing ample evidence corroborating Moseley's Grand Jury testimony, the District Attorney nonetheless was determined to coerce Moseley to "flip" to implicate Mr. Bozella.

82.    Moseley threatened that he would not provide additional information unless the District Attorney promised him, in writing, complete immunity for any involvement with the Crapser Murder. Moseley also demanded that the District Attorney release him from state prison as a condition of his providing further information.

83.    The District Attorney asked the New York State Division of Parole to release Moseley early as part of an effort to secure false testimony from Moseley against Mr. Bozella. The New York State Division of Parole refused.

84.    The District Attorney was in a logjam – it had arranged for Moseley to testify against Mr. Bozella before the Grand Jury in March 1983, but Moseley was unwilling to do so unless the District Attorney had secured his release from prison by then. Ultimately, with deliberate disregard for Mr. Bozella's constitutional rights, the District Attorney crafted a creative solution to obtain the false testimony that it had sought for six years.

85.    Assistant District Attorney D. James O'Neil described Moseley's deal as follows:

> So I told him if we could not get him released through the parole process, we would use the process in the Criminal Procedure law called a 440 motion to go back and have the court review his prior conviction and sentence and to find a way, not that there was a

- 20 -

problem with the case, but to find a way to change the sentence, reduce it to a misdemeanor, which would allow him to be released from prison. *It was more or less a maneuver mechanism to give him something for his help.*

86.     The District Attorney's offer to Moseley was extremely generous, particularly given that there was no legal infirmity with Moseley's existing felony conviction. According to Moseley's court-appointed attorney:

> [The deal] was extraordinarily good, that here he was in prison on a felony, and he was then going to be released on a misdemeanor conviction with a vacating of the felony. I was very pleased, even though it had nothing to do with my abilities. If it had something to do with my abilities, I would have been even more pleased.

87.     The District Attorney suggested to Moseley's attorney what arguments to make in the 440 motion and played an active role in preparing and organizing this unprecedented procedural move to secure Moseley's testimony against Mr. Bozella. Not surprisingly, the District Attorney did not oppose the 440 motion that it had helped to prepare and organize.

88.     Moseley was released from prison in April 1983, after testifying against Mr. Bozella before the Grand Jury with complete immunity for the Crapser Murder and for perjury.

89.     The District Attorney also struck a deal with Lamar Smith, who was incarcerated for a separate crime in 1983, to obtain his testimony against Mr. Bozella.

## K.   MADELINE DIXON SOUTH INFORMED THE POLICE, DISTRICT ATTORNEY, AND DEFENDANT O'NEILL THAT DONALD WISE CONFESSED TO THE CRAPSER MURDER

90.     At approximately the same time that the District Attorney struck a deal with Moseley, Madeline Dixon South informed the Police, District Attorney, and Defendant O'Neill that Donald Wise and Anthony Wise – not Mr. Bozella – had committed the Crapser Murder.

- 21 -

91.    South, who was Anthony Wise's girlfriend at the time of the Crapser Murder,

informed the Police, District Attorney, and Defendant O'Neill that on the morning of June 15,

1977, Donald and Anthony Wise boasted to her about killing Ms. Crapser the previous evening.

92.    South informed the Police, District Attorney, and Defendant O'Neill:

> That at her apartment she was then living with Anthony Wise and
> that Donald Wise and Sonia Williams was there, and Wayne Wise
> and Carol Valle, and they planned to do a burglary, and that
> Anthony, Donald, Wayne, Sonia Williams, and Carol Valle left the
> apartment, and that they later came back saying they had done a
> burglary.  And Donald told her that she would read about it in the
> paper.  I'm not sure she specified it was on June 14th.  I think the
> nearest she could recall was that it was in June of 1977.

93.    South also told the Police, District Attorney, and Defendant O'Neill:

> [T]he following day Donald Wise came back to her apartment and
> that he brought a paper with him in which the story was.  She said
> that they then left her apartment, walked to the Main Mall, going
> by the house where the murder occurred, and that they went on to
> the Mall to a jewelry store to sell some jewelry they had gotten
> from the burglary.

94.    South further informed the Police, District Attorney, and Defendant O'Neill that

Donald Wise and Anthony Wise indicated to her on June 15, 1977 that they had committed a

"movie" (i.e., a robbery "hurting someone") at Ms. Crapser's residence the previous evening.

95.    According to South, Donald Wise told her that "he went through the window, the

side window, through the little alley and went into the room and he gagged and tied [Ms.

Crapser] up and laid her on the floor and he went through the drawers."  In short, South informed

the Police, District Attorney, and Defendant O'Neill that Donald Wise had confessed to her that

he had murdered Ms. Crapser.

- 22 -

**L.   THE DISTRICT ATTORNEY SECURED AN INDICTMENT AGAINST MR. BOZELLA BY COERCING MADELINE DIXON SOUTH TO LIE TO THE GRAND JURY**

96.    South also testified before the Grand Jury in 1983; but, remarkably, despite having just informed the Police, District Attorney, and Defendant O'Neill that Donald Wise had confessed to her that he committed the crime in Ms. Crapser's home, her story changed.

97.    South did not relay to the Grand Jury what she had told the Police, District Attorney, and Defendant O'Neill. Instead, South withheld from the Grand Jury evidence that Donald Wise had committed the Crapser Murder.

98.    South told the Grand Jury that she had made up her earlier story that Donald Wise had confessed to the Crapser Murder. Months later, when asked why she had told the Grand Jury that she made up her earlier story, South testified under oath, "*[b]ecause I was pressured*" by Defendant O'Neill to do so.

99.    Defendant O'Neill's coercion of South was in an investigatory rather than judicial capacity. Defendant O'Neill did not prosecute the Indictment of Mr. Bozella in 1983.

100.   Using the combination of South's coerced, false testimony and Moseley's negotiated, false testimony, the District Attorney secured an indictment against Mr. Bozella for the murder of Ms. Crapser.

101.   Yet the District Attorney and Defendant O'Neill knew that there was no probable cause to secure such an indictment – an indictment that was the product of malice, bad faith, and fabricated, coerced, and suppressed evidence.

102.   Specifically, the District Attorney itself had acknowledged in 1977 (and the 1977 Grand Jury had confirmed) that Lamar Smith and Stanley Smith's statements were "insufficient" to constitute probable cause. Even with Moseley's testimony, there was still no probable cause because Moseley's testimony was (a) inconsistent with Moseley's prior statements that he lacked

- 23 -

personal knowledge of the Crapser Murder, (b) inconsistent with Lamar Smith's account of the timeline and events on the evening of the Crapser Murder, (c) inconsistent with the statements of Christopher Whitaker as to Moseley's whereabouts on the evening of the Crapser Murder, and (d) obtained only through prolonged, coercive negotiations and an unusually favorable deal with the District Attorney that resulted in Moseley's early release from prison.

103.    Defendant O'Neill also had coerced South to lie to the Grand Jury. Thus, South's testimony, combined with that of Lamar Smith, Stanley Smith, and Moseley, did not constitute probable cause.

104.    On or about April 3, 1983, days after the Indictment, District Attorney King made a statement to the press that demonstrated the relentless pursuit of Mr. Bozella: "[t]his arrest indicates that neither my office or Chief [Stuart] Bowles and the city police give up on a case."

## M.    THE DEFENDANTS LEARNED THAT A FINGERPRINT FOUND ON THE INSIDE OF MS. CRAPSER'S BATHROOM WINDOW MATCHED DONALD WISE'S FINGERPRINT

105.    Revealing their own doubts about their "case" against Mr. Bozella, and their own belief that South's statement implicating Donald Wise was accurate, the Police and District Attorney sent Donald Wise's fingerprints to the FBI to determine whether Donald Wise's fingerprints matched any of the latent fingerprints recovered from Ms. Crapser's residence.

106.    Rather than wait for the results of the fingerprint analysis to return, the District Attorney pleaded its case to the Grand Jury. By pushing forward relentlessly with its prosecution six years after the Crapser Murder, the District Attorney ensured that the Grand Jury would never get to consider exculpatory and impeachment evidence from the fingerprint analysis.

107.    When the Police and District Attorney received the results from the FBI on June 17, 1983, they learned that Donald Wise's fingerprint matched a fingerprint found on the *inside* of Ms. Crapser's bathroom window.

- 24 -

108.    This window was the same window facing the alley where a neighbor informed Officer Murphy that she had heard noises on the night of the murder, a statement that Officer Murphy never wrote down and that was never disclosed to Mr. Bozella's defense counsel at or before either of his trials.

109.    Thus, in June 1983, after Moseley was released from prison, and after Mr. Bozella was indicted and incarcerated, the Police and District Attorney learned of the first, and only, piece of physical evidence suggesting the identity of Ms. Crapser's murderer. That evidence implicated Donald Wise – not Mr. Bozella – as the murderer of Ms. Crapser.

110.    The District Attorney and Defendant O'Neill were aware of, but nonetheless ignored, this evidence and proceeded to trial against Mr. Bozella. They had no reasonable explanation for pursuing Mr. Bozella rather than Donald Wise for the Crapser Murder.

111.    In a November 29, 1983 news article, Assistant District Attorney D. James O'Neil informed a *Poughkeepsie Journal* reporter "that a witness provided information that the Wise brothers had been involved in the Crapser killing" and that "[w]e investigated that story: as part of it we sent the prints of the Wise brothers to the FBI to check against the print on the window." Assistant District Attorney D. James O'Neil did not explain why the District Attorney and Defendant O'Neill did not pursue a case against Donald Wise after discovering physical evidence suggesting Donald Wise was the perpetrator.

112.    The District Attorney and Defendant O'Neill knew that Donald Wise had been convicted of the King Murder, had confessed to the Dobler Assault, and had confessed to Holland and South that he had committed a burglary matching the one at Ms. Crapser's residence. Yet, without any evidence to support his theory, Assistant District Attorney D. James

- 25 -

O'Neil suggested that "the Wise fingerprint was most likely left on the window prior to the night of the slaying, possibly during another burglary."

113.    In short, on the intractable theory that Mr. Bozella had committed the Crapser Murder, the District Attorney and Defendant O'Neill arranged for the release of two convicted felons – Moseley and Lamar Smith. Having arranged the release of both, and having based the Indictment against Mr. Bozella on these convicted felons' coerced testimony, the District Attorney and Defendant O'Neill refused to dismiss the Indictment, despite physical evidence implicating Donald Wise (who was already incarcerated for the King Murder). Instead, the District Attorney and Defendant O'Neill failed to pursue exculpatory leads pointing to Donald Wise as the perpetrator and continued to suppress exculpatory and impeachment evidence (i.e. the Dobler Reports and the Holland tape) from defense counsel and the Grand Jury. The District Attorney and Defendant O'Neill continued their malicious prosecution of Mr. Bozella in violation of his constitutional rights.

### N.    THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL TRIED MR. BOZELLA WITHOUT PROBABLE CAUSE AND THEN VIOLATED MR. BOZELLA'S *BATSON* RIGHTS DURING HIS 1983 TRIAL

114.    Defendant O'Neill served as the lead prosecutor for the District Attorney during the 1983 trial of Mr. Bozella.

115.    Defendant O'Neill lacked probable cause to justify the existing Indictment against Mr. Bozella since he had procured the Indictment through false testimony, the coercion of a key witness, and the incomplete presentation of exculpatory and impeachment evidence to the Grand Jury.

116.    Just as the statements of Lamar Smith and Stanley Smith had been "insufficient" to constitute probable cause in 1977, Lamar Smith and Stanley Smith's testimony, combined

with Moseley's testimony and South's coerced testimony, also was insufficient to constitute probable cause to support an indictment.

117.    In addition, on the eve of trial, Defendant O'Neill knew that Donald Wise's fingerprint had been found inside Ms. Crapser's bathroom window. Without probable cause, with malice, and in deliberate disregard of Mr. Bozella's constitutional rights, Defendant O'Neill nonetheless proceeded to trial against Mr. Bozella.

118.    Prior to Mr. Bozella's trial, Mr. Bozella's trial counsel requested that the District Attorney and Defendant O'Neill produce to them all *Brady* material. The District Attorney and Defendant O'Neill failed to produce the four categories of *Brady* material (discussed in Section R below) to Mr. Bozella or his counsel.

119.    Prior to Mr. Bozella's trial, during voir dire, Defendant O'Neill excluded all six African-Americans available in the venire without having race-neutral reasons for doing so.

120.    Following a three week trial, on December 3, 1983, a jury without a single African-American individual found Mr. Bozella (who is African-American) guilty of second-degree murder.

121.    Mr. Bozella appealed his conviction on the grounds that Defendant O'Neill's exclusion of all African-American individuals from the venire violated Mr. Bozella's constitutional rights. The Second Department remitted the matter to the trial court to conduct a hearing to determine whether Defendant O'Neill's use of peremptory challenges to remove potential jurors violated Mr. Bozella's constitutional rights.

122.    In reviewing the hearing, the Second Department concluded that Defendant O'Neill's testimony at the hearing "amounted to little more than a denial of discriminatory purpose and a general assertion of good faith, [which] failed to satisfy the[] [People's] burden of

- 27 -

establishing racially neutral explanations for the challenges." Thus, the Second Department

vacated Mr. Bozella's conviction, holding that Defendant O'Neill's use of preemptory

challenges violated Mr. Bozella's constitutional rights, and ordered a new trial.

### O.   STANLEY SMITH RECANTED HIS TESTIMONY IMMEDIATELY AFTER THE JURY CONVICTED MR. BOZELLA

123.   On the Monday morning following the jury's verdict, Stanley Smith recanted his

trial testimony implicating Mr. Bozella. Stanley Smith told the District Attorney that he had lied

under oath during the trial in order to corroborate his brother's testimony: "I looked up to my

brother, so there wasn't nothing I wouldn't do for my brother."

124.   Instead of encouraging Stanley Smith to provide a truthful account, or exploring

the merits of Stanley Smith's account, Defendant O'Neill threatened Stanley Smith with a

perjury charge if Smith pursued his recantation.

### P.   THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL RE-TRIED MR. BOZELLA IN 1990, AGAIN VIOLATING HIS CONSTITUTIONAL RIGHTS

125.   The District Attorney and Defendant O'Neill re-tried Mr. Bozella in 1990 (the

"1990 Trial"). Defendant O'Neill served as the lead prosecutor for the District Attorney during

the 1990 Trial.

126.   Defendant O'Neill lacked probable cause to pursue his prosecution for the same

reasons that he lacked probable cause on the eve of the 1983 trial. In addition, on the eve of the

1990 Trial, Stanley Smith had recanted his testimony from the 1983 trial and had informed the

Dutchess County Court that neither he nor Lamar Smith was present at or near Ms. Crapser's

residence at the time of the Crapser Murder. Yet, without probable cause, with malice, and in

deliberate disregard of Mr. Bozella's constitutional rights, Defendant O'Neill nonetheless

proceeded to re-try Mr. Bozella based on false testimony, the coercion of a key witness, and suppressed exculpatory and impeachment evidence.

127.    In preparation for the 1990 Trial, Mr. Bozella's counsel filed a pre-trial motion to obtain *Brady* materials from the District Attorney and obtained a judicial subpoena duces tecum ordering District Attorney William V. Grady to appear before the court on November 16, 1990 and to bring with him, among other items, "any and all records, investigative reports, statements of witnesses concerning the murder of Emma Crapser in the custody of the Dutchess County District Attorney's office." Despite such a request, the District Attorney and Defendant O'Neill failed to produce the *Brady* evidence (discussed in Section R below) to Mr. Bozella or his counsel.

128.    The District Attorney and Defendant O'Neill's evidence against Mr. Bozella in the 1990 Trial was insubstantial. No physical evidence placed Mr. Bozella at or near the scene of the crime. The District Attorney and Defendant O'Neill did not prove that Mr. Bozella had a unique motive for the crime. The District Attorney and Defendant O'Neill failed to present the testimony of a single unbiased witness who could identify Mr. Bozella as the perpetrator. Instead, the case hinged exclusively on the testimony of Lamar Smith and Moseley, two convicted felons who had received highly favorable deals in exchange for their testimony against Mr. Bozella.

129.    Lamar Smith testified at the 1990 Trial that he was smoking marijuana and drinking beer in Mansion Square Park with his brother Stanley Smith, Moseley, Pittman, and Mr. Bozella on the evening in question.

130.  Lamar Smith also testified that Pittman served as the lookout, but never entered Ms. Crapser's house. This testimony contradicted Lamar Smith's initial statement to the Police on June 25, 1977.

131.  Lamar Smith testified that Moseley and Mr. Bozella were inside the house for between 5-10 minutes. This testimony contradicted Lamar Smith's June 29, 1977 statement to the Police, in which he informed the Police that he remained across the street from Ms. Crapser's residence for forty-five minutes while Pittman "was walking up and down the street in the vicinity of the house" serving as a lookout for Moseley and Mr. Bozella.

132.  Moseley testified at the 1990 Trial that he had drunk "anywhere in between from eight to fourteen quarts" of beer on June 14, 1977, and was "pretty high" and "pretty drunk."

133.  Lamar Smith and Moseley's collective testimony had significant holes. They testified that they broke two doors to gain entry to Ms. Crapser's residence. Yet neither Ms. Crapser's niece Evelyn Petterson nor Officer Sauter – both of whom arrived at Ms. Crapser's apartment after Moseley and Mr. Bozella supposedly broke in her front door – observed anything unusual about the front door.

134.  The Grand Jury testimony of Joan Moseley, Moseley's mother, was read into the record during the 1990 Trial, revealing that Moseley was with his mother in their home at the time of the Crapser Murder.

135.  Stanley Smith testified as a defense witness without immunity and offered additional testimony contradicting his brother Lamar Smith's testimony. Stanley Smith testified that he and his brother Lamar Smith were at Lamar Smith's girlfriend's house on the evening of June 14, 1977, and he never saw Mr. Bozella or Moseley that night.

- 30 -

136.    Accordingly, there was evidence presented suggesting that neither Lamar Smith nor Moseley were involved in any way with the murder of Ms. Crapser, thereby casting doubt on the entire story, and thus Mr. Bozella's alleged involvement in the murder.

137.    Despite the Defendants' concealment and suppression of exculpatory and impeachment evidence from Mr. Bozella implicating Donald Wise, Mr. Bozella's counsel presented the evidence it had assembled indicating that Donald Wise was the murderer. Defense counsel presented evidence showing that Donald Wise's fingerprint was found on the inside of Ms. Crapser's bathroom window and was the only matching fingerprint or matching forensic evidence found in the entire investigation:

> Q.    Do you know the name of the individual for whom a match was sought for those fingerprints in 1983?
>
> . . .
>
> A.    They were compared to Dewey Bozella, Lamar Smith, Wayne Moseley, Elbert Pittman,
>
> . . .
>
> Q.    And do you know whether the fingerprints that were sent down to the FBI matched any of the individuals that you just named?
>
> A.    *One print matched Donald Wise.*

138.    Officer Regula confirmed that Donald Wise's fingerprint was found on the inside of Ms. Crapser's bathroom window, indicating that Wise had been inside her house:

> Q. And was that on the inside of the bathroom window, the side inside the victim's apartment?
>
> A. It was on the pane of the glass on the interior of the glass."

139.    When called to testify at trial, Donald Wise invoked the Fifth Amendment outside the jury's presence. Donald Wise's brother Anthony Wise also invoked the Fifth Amendment.

140.   The Defense read into the record South's 1983 testimony. South testified that
Donald Wise and Anthony Wise showed her a stolen brown leather pocketbook with old coins,
silver dollars, and rings and then led her to Ms. Crapser's house on North Hamilton Street and
indicated that they had committed a "movie" in that house on the night of her murder. South
testified that Donald Wise told her that "he went through the side window, through the little alley
and went into the room and he gagged and tied [Ms. Crapser] up and laid her on the floor and he
went through the drawers."

141.   During the 1990 Trial, Defendant O'Neill failed to adhere to the trial judge's
rulings regarding appropriate trial conduct. Specifically, Defendant O'Neill spoke with Officer
Paul Slater, a prosecution witness, in between the first and second days of trial about his prior
testimony "[r]egarding who may have directed me, as to who may have directed me to take
photographs of a window," despite being admonished by the trial judge not to do so. Notably,
Defendant O'Neill had been present at the Crapser Murder crime scene and had directed Officers
to take photographs of all windows and doors, including a window in the rear of the house that
was observed to have a broken latch.

142.   Despite the paucity of evidence against Mr. Bozella, and wealth of evidence
pointing to an alternate suspect, a jury convicted Mr. Bozella of second-degree murder and the
trial judge sentenced Mr. Bozella to twenty years to life.

143.   In ruling on Mr. Bozella's appeal of his 1991 conviction, the Second Department
concluded that "[t]he prosecutor [Defendant O'Neill] exceeded the court's evidentiary ruling
with respect to a tape-recorded conversation, in which the defendant's accomplice had initially
implicated himself and the defendant in the homicide, during both his cross-examination of the
accomplice and his summary." *People v. Dewey Bozella*, 205 A.D.2d 790 (N.Y. App. Div.

1994). Although the Second Department concluded that Defendant O'Neill's misconduct

amounted to harmless error, the Second Department was not privy to the substantial *Brady*

material that Defendant O'Neill had concealed from the defense, the trial court, and the jury.

**Q.   THE NEW YORK STATE PAROLE BOARD REPEATEDLY DENIED MR. BOZELLA'S APPLICATIONS FOR PAROLE BECAUSE MR. BOZELLA WOULD NOT ADMIT TO A MURDER HE DID NOT COMMIT**

144.    Mr. Bozella first became eligible for parole in 2003, and the New York State

Board of Parole ("Board") rejected his application for parole four times. The Board denied Mr.

Bozella parole because of Mr. Bozella's apparent failure to appreciate the nature and seriousness

of "his" crime (i.e. the Crapser Murder). Of course, Mr. Bozella was unable to do so because he

has always maintained his innocence.

**R.   THE DUTCHESS COUNTY COURT CONCLUDED THAT MR. BOZELLA HAD BEEN WRONGFULLY CONVICTED AND INCARCERATED FOR MORE THAN 26 YEARS**

145.    Approximately seventeen years after Mr. Bozella's 1991 conviction, Mr. Bozella

discovered four categories of new evidence (the "*Brady* Evidence") establishing that the

Defendants violated his constitutional rights in connection with the investigation and prosecution

of the Crapser Murder.

146.    The first category of *Brady* Evidence was a report authored by Officer Regula,

which included statements of four unbiased neighbors on or around June 25, 1977, contradicting

Moseley and Lamar Smith's testimony. Despite Mr. Bozella's *Brady* requests, the District

Attorney and Defendant O'Neill never provided Mr. Bozella's trial counsel with these

statements.

147.    In granting Mr. Bozella's motion to vacate his conviction, the Dutchess County

Court found that "the potential testimony of the neighbors" whose statements were in Officer

Regula's report, "at best, wholly contradicts the People's eyewitnesses [Lamar Smith and

Moseley] and, at least, seriously calls their version of the events into question. Significantly,

these witnesses are, in contrast to the People's only eyewitnesses, uninterested parties." Thus,

the Dutchess County Court held that the statements found in Officer Regula's report, "would

have seriously called into question the testimony of the People's key witnesses, testimony which

was already rife with credibility problems" and "that this information would have been favorable

to the defense and is therefore *Brady* material which should have been produced."

148.    The second category of *Brady* Evidence was presented to the Dutchess County

Court through an affidavit by Officer Regula in support of Mr. Bozella's motion to vacate his

conviction, in which Officer Regula averred that a witness informed Officer Murphy that "she

heard loud noises in an alley adjacent to Ms. Crapser's home at 15 North Hamilton Street in

Poughkeepsie on the night of Ms. Crapser's murder" and "that the noises sounded like one or

more garbage cans were being moved." Officer Murphy relayed the neighbor's statement to

Officer Regula. As discussed above in paragraphs 25-27, although both Officers found the

statement credible, neither Officer wrote it down or relayed the statement to the District

Attorney. The Dutchess County Court concluded that the statement was *Brady* material because

it "clearly support[ed] the defendant's theory that Donald Wise gained access through a window

and corroborate[d] Madeline Dixon South's testimony that Donald Wise claimed to have gained

access to Emma Crapser's apartment through an alley window and was involved in the murder."

149.    The third category of *Brady* Evidence was the Holland tape, which Mr. Bozella's

counsel collected in 2009 during an inspection of the District Attorney's files from the King

Murder. The Dutchess County Court concluded that the tape was *Brady* material because it

contained "enough information . . ., especially given the timing of the interview in relation to law

enforcement officials' reported contemporaneous belief that the King and Crapser crimes could
be related, to constitute information 'favorable to the defense and material to guilt.'"

150.    The fourth category of *Brady* Evidence was the Dobler Reports – police reports
evidencing that Donald Wise was the perpetrator in an attack similar to the Crapser Murder
insofar as the attack:  (1) victimized an elderly woman in her own home, (2) was located
approximately six blocks from Ms. Crapser's residence, (3) took place less than two months after
the Crapser Murder, (4) entailed stuffing cloth down the victim's throat, and (5) broke several of
the victim's bones.  The Dutchess County Court concluded that the reports were *Brady* material
because they were "located inside the King file and the People and police reportedly considered a
link between the King and the Crapser murders."

151.    In granting Mr. Bozella's motion to vacate his conviction, the Dutchess County
Court concluded that the case against Mr. Bozella was weak:

> Clearly, the evidence against Dewey Bozella was far from
> overwhelming. The heart of the People's case consisted of the
> testimony of two career criminals, who repeatedly changed their
> stories during the long history of this case, who admittedly were
> under the influence of mind-altering substances the day of the
> murder and who finally testified for the prosecution only after
> receiving favorable deals in exchange for their testimony, years
> after Emma Crapser was murdered. Lamar Smith and Wayne
> Moseley were the only witnesses who placed the defendant at the
> scene, and only Moseley placed the defendant inside the victim's
> apartment. Their testimony was contradicted by Lamar's brother,
> Stanley Smith, Wayne Moseley's mother and Madeline Dixon
> South and, moreover, was wholly unsupported by any forensic
> evidence. Indeed, the only forensic evidence tending to connect
> anyone to this crime is the fingerprint of Donald Wise, who
> allegedly confessed to Madeline Dixon South that he was involved
> in Emma Crapsers' murder and who was convicted of murdering
> another elderly woman in an alarmingly similar incident.

152.    Accordingly, the Dutchess County Court concluded:

> [U]pon a thorough and careful review of the record, the court, without reservation, is firmly and soundly convinced of the meritorious nature of the defendant's application. The legal and factual arguments advanced in support of the motion are compelling, indeed overwhelming.

153.   On October 28, 2009, the Dutchess County Court held a hearing in Mr. Bozella's criminal case to determine what course of action the District Attorney would take given the court's October 14 order vacating Mr. Bozella's conviction. During the hearing, Assistant District Attorney Edward Whitesell informed the court that the District Attorney found no "sound legal basis for the People to appeal the Court's decision" and that the District Attorney "c[ould] not go forward with a third trial" of Mr. Bozella. Accordingly, Assistant District Attorney Whitesell moved the Dutchess County Court to dismiss the Indictment against Mr. Bozella.

154.   The District Attorney's decision to move the court to dismiss the indictment was not the result of a compromise with Mr. Bozella. Nor was the decision a result of any misconduct by Mr. Bozella.

155.   The Dutchess County Court granted Assistant District Attorney Whitesell's motion and ordered the immediate release of Mr. Bozella from custody. The court's dismissal of the Indictment constituted a favorable termination of the criminal case against Mr. Bozella.

156.   On October 28, 2009, Mr. Bozella was released from custody after serving more than 26 years in prison for the Crapser Murder, a crime he did not commit.

### S.    THE DISTRICT ATTORNEY'S POLICIES, CUSTOMS, AND/OR PRACTICES PROXIMATELY AND DIRECTLY CAUSED THE VIOLATIONS OF MR. BOZELLA'S CONSTITUTIONAL RIGHTS

157.   Prior to and during the investigation and prosecution of the Crapser Murder, the County, by and through its final policymakers, maintained policies, customs, and/or practices of

- 36 -

promoting, facilitating, or condoning improper, illegal, and unconstitutional practices, including but not limited to disregarding criminal defendants' *Brady* rights.

158.    Prior to and during the investigation and prosecution of the Crapser Murder, District Attorneys John King and William Grady knew that there was significant "grey-area" under *Brady*, and that assistant district attorneys would be confronted with choices implicating criminal suspects' constitutional rights.

159.    Prior to and during the investigation and prosecution of the Crapser Murder, District Attorneys John King and William Grady knew that there was an obvious need to act – by training, supervising, monitoring, and/or disciplining assistant district attorneys – to prevent violations of criminal defendants' constitutional rights.

160.    Upon information and belief, neither District Attorney John King, District Attorney William Grady, nor any County policy-maker promulgated a written policy regarding *Brady*, or offered any formal training to assistant district attorneys regarding *Brady*. Each assistant district attorney applied *Brady* as he or she understood it. The District Attorney thus delegated policymaking authority to assistant district attorneys, including but not limited to Defendant O'Neill, by allowing assistant district attorneys to decide for themselves what constituted *Brady* material.

161.    In furtherance of the District Attorney's policies, customs, and/or practices, Defendant O'Neill, as a matter of custom and practice, withheld police reports and grand jury testimony from defense counsel in response to *Brady* requests, despite the fact that such documentation likely contained exculpatory and impeachment evidence. Defendant O'Neill, thus, as a matter of custom and practice, violated *Brady*.

162.    Defendant O'Neill's practices regarding the disclosure of *Rosario* materials were equally reprehensible. Defendant O'Neill would provide defense counsel with the *Rosario* material only *after* a witness had testified on direct examination at trial for the District Attorney and immediately before cross-examination. Thus, Defendant O'Neill's practices deprived defense counsel of a sufficient and meaningful opportunity to use this evidence and violated the text, or at minimum the spirit, of *Rosario*.

163.    The County's policies, customs, and/or practices, as evidenced by Defendant O'Neill's well-known practices described above, directly caused the violation of Mr. Bozella's constitutional rights. Specifically, Defendant O'Neill's practices prevented the disclosure of the exculpatory statements of Ms. Crapser's neighbors found in Officer Regula's police report to Mr. Bozella's defense counsel at or before trial, in violation of *Brady*.

164.    District Attorneys John King and William Grady knew of Defendant O'Neill's practices described above. But neither Mr. King, Mr. Grady, nor any County policymaker initiated training or supervision to ensure that Defendant O'Neill altered his practices to comply with *Brady*. This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

165.    Upon information and belief, in furtherance of the District Attorney's policies, customs, and/or practices, Defendant O'Neill and other assistant district attorneys employed by the District Attorney trained Officers in the City of Poughkeepsie Police Department to *destroy* interview notebooks after the Officers reduced their notes into official reports for the express purpose of ensuring that the District Attorney would not have to produce the notebooks to defense counsel as *Brady* material in connection with criminal trials of individuals such as Mr. Bozella.

- 38 -

166.    The Second Department addressed this policy, custom, or procedure in a 1991 ruling in which it stated: "Pursuant to a procedure established within the Poughkeepsie Police Department, the detectives destroyed these notes after they had been transcribed into a formal report.  Such a procedure is [constitutionally] improper. . . ." *People v. Roberts*, 178 A.D.2d 622, 622-23 (N.Y. App. Div. 1991).

167.    Upon information and belief, in furtherance of the District Attorney's policies, customs, and/or practices, Defendant O'Neill and the District Attorney knew that Officers in the City of Poughkeepsie Police Department did not record in writing all statements taken from eyewitnesses in connection with criminal investigations.

168.    Defendant O'Neill's training of the Officers, and knowledge of the Officers' failure to record in writing all statements taken from eyewitnesses in connection with criminal investigations, directly caused the violation of Mr. Bozella's constitutional rights.  Specifically, Defendant O'Neill's instruction to destroy notebooks and his deliberate indifference to the risk of constitutional violations resulting from Officers' failure to record eyewitness statements directly caused both Officer Murphy and Officer Regula to fail to record the exculpatory statement of Ms. Crapser's neighbor.

169.    District Attorneys John King and William Grady knew of Defendant O'Neill's training of the Officers described above, as well as the Officers' practice of failing to record eyewitness statements.  But neither Mr. King, Mr. Grady nor any County policymaker initiated training or discipline to ensure that Defendant O'Neill altered his training of Officers to ensure that the District Attorney and Police complied with *Brady*.  This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

- 39 -

170.    Prior to and during the investigation and prosecution of the Crapser Murder, the District Attorney's policymakers did not implement any mechanism to ensure that evidence collected in connection with an open criminal investigation was cross-checked with other pending similar criminal investigations to make sure that exculpatory or impeachment evidence would be disclosed to defense counsel pursuant to *Brady.*

171.    The County's failure to implement such a mechanism directly caused the violation of Mr. Bozella's constitutional rights.  Specifically, the lack of an appropriate mechanism ensured that the Holland tape and Dobler Reports – inculpatory evidence used in connection with the King Murder – would never be disclosed to defense counsel in connection with the Crapser Murder as required under *Brady.*

172.    District Attorneys John King and William Grady knew of the lack of such a mechanism, and the resulting risk of constitutional violations.  But neither Mr. King, Mr. Grady, nor any County policymaker initiated training or supervision, or otherwise addressed this fundamental flaw to ensure that assistant district attorneys would cross-check evidence across related investigations to ensure compliance with *Brady.*  This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

**T.   THE CITY OF POUGHKEEPSIE POLICE DEPARTMENT'S POLICIES,
CUSTOMS, AND/OR PRACTICES PROXIMATELY AND DIRECTLY
CAUSED THE VIOLATIONS OF MR. BOZELLA'S CONSTITUTIONAL
RIGHTS**

173.   Prior to and during the investigation and prosecution of the Crapser Murder, the

City, by and through its final policymakers, maintained policies, customs, and/or practices of

promoting, facilitating, or condoning improper, illegal, and unconstitutional practices, including

but not limited to disregarding criminal defendants' *Brady* rights.

174.   Prior to and during the investigation and prosecution of the Crapser Murder,

Police Chief Stuart Bowles knew that there was significant "grey-area" under *Brady*, and that

Officers would be confronted with choices implicating criminal suspects' constitutional rights.

175.   Prior to and during the investigation and prosecution of the Crapser Murder,

Police Chief Stuart Bowles knew that there was an obvious need to act – by training, supervising,

monitoring, and/or disciplining Officers – to prevent a violation of criminal defendants'

constitutional rights.

176.   Upon information and belief, the City did not promulgate any written policies and

did not offer any formal training to ensure Officers' compliance with *Brady*.

177.   Prior to and during the investigation and prosecution of the Crapser Murder, the

City promulgated an official policy which instructed Officers to *destroy* their notebooks after the

Officers had translated their notes into formal police reports.  The purpose of such a policy was

to prevent defense counsel from obtaining access to information recorded in the Officers'

notebooks.

178.   The Second Department addressed this policy, custom, or procedure in a 1991

ruling in which it stated: "Pursuant to a procedure established within the Poughkeepsie Police

Department, the detectives destroyed these notes after they had been transcribed into a formal report. Such a procedure is [constitutionally] improper. . . ." *Roberts*, 178 A.D.2d at 622-23.

179.     In furtherance of the City's policies, customs, and/or practices, Officers in the City of Poughkeepsie Police Department did not record in writing all statements taken from eyewitnesses in connection with felony investigations.

180.     Upon information and belief, Police Chief Stuart Bowles knew of Defendant O'Neill's training of the Officers described above, as well as the Officers' practice of failing to record eyewitness statements. But, neither Chief Bowles nor any City policymaker initiated training or discipline to ensure that Officers complied with *Brady*. This failure to act demonstrated deliberate indifference to, and proximately and directly caused the violation of, Mr. Bozella's constitutional rights.

181.     The Officers' destruction of notebooks and failure to record in writing all statements taken from eyewitnesses in connection with felony investigations directly caused the violation of Mr. Bozella's constitutional rights. Specifically, these practices proximately and directly caused both Officer Murphy and Officer Regula to fail to record the exculpatory statement of Ms. Crapser's neighbor.

## U.     DAMAGES

182.     The actions of the Defendants deprived Mr. Bozella of his civil rights under the Fifth, Sixth, and/or Fourteenth Amendments of the Constitution of the United States.

183.     The unlawful, intentional, willful, deliberately indifferent, and/or reckless acts and omissions of the Defendants caused Mr. Bozella to be maliciously prosecuted, wrongfully convicted and incarcerated, and forced to spend more than 26 years in prison for a crime he did not commit.

- 42 -

184.    The Defendants' acts and omissions caused Mr. Bozella injuries and damages including, but not limited to, the following, which continue to date and will continue into the future: pain and suffering; severe mental anguish; emotional distress; loss of family relationships; several psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom, for which he is entitled to monetary relief.

185.    All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, and/or recklessly, and the acts meet all of the standards for the imposition of punitive damages.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 *Monell* Claim Against Dutchess County

186.    Mr. Bozella incorporates by reference the allegations set forth above.

187.    Dutchess County is and was at all times before and during the investigation and prosecution of the Crapser Murder responsible for the policies, customs, and practices of the District Attorney and its policy-makers.

188.    Dutchess County was the employer of District Attorney John King before and during the investigation and prosecution of the Crapser Murder.

189.    Dutchess County was the employer of District Attorney William Grady during the investigation and prosecution of the Crapser Murder.

190.    Dutchess County was the employer of Defendant O'Neill before and during the investigation and prosecution of the Crapser Murder.

191.    Prior to and during the investigation and prosecution of the Crapser Murder, the

- 43 -

County maintained policies, customs, and/or practices of concealing, suppressing, and/or withholding exculpatory and impeachment evidence and conducting constitutionally inadequate investigations and prosecutions. This general practice, even if not authorized by officially adopted or promulgated policy, was so common and well-settled as to constitute an official policy that fairly represented the District Attorney's official policies, customs, and/or practices.

192.    The District Attorney delegated policymaking authority to assistant district attorneys by allowing assistant district attorneys to decide for themselves what constituted *Brady* material. In the absence of an official policy regarding *Brady*, Defendant O'Neill acted as an official policymaker when he violated *Brady*.

193.    The County's policymakers, including District Attorneys John King and William Grady, knew of the misconduct of Defendant O'Neill and other assistant district attorneys through, among other things, their direct involvement in the investigation and prosecution of the Crapser Murder, their awareness of Defendant O'Neill's practices of engaging in, encouraging, and condoning unconstitutional conduct, and their awareness of the unconstitutional policies, customs, and/or practices described above. Thus, the County's policymakers knew of the risk of constitutional violations by assistant district attorneys such as Defendant O'Neill.

194.    In this context, the need for the County's policymakers to act was obvious and the failure to act so likely to result in constitutional violations that County's policymakers' failure to act rose to deliberate indifference.

195.    But the County failed to act. The County failed to adequately train and/or discipline assistant district attorneys regarding concealing, suppressing, and/or withholding exculpatory and impeachment evidence and conducting constitutionally inadequate investigations and prosecutions.

- 44 -

196.    The County's official policies, customs, and/or practices of concealing,

suppressing, and/or withholding exculpatory and impeachment evidence, conducting

constitutionally inadequate investigations, and maliciously prosecuting individuals, without

regard to guilt and in disregard of their constitutional rights, were a moving force behind the

denial of Mr. Bozella's rights to due process and a fair trial under the Fifth, Sixth, and/or

Fourteenth Amendments of the Constitution of the United States. These official policies,

customs, and/or practices proximately and directly caused the violations of Mr. Bozella's

constitutional rights described above.

197.    As a direct and proximate result of the County's policies, customs, and/or

practices, Mr. Bozella was wrongfully prosecuted, convicted, and imprisoned for more than 26

years, and suffered grievous and continuing injuries, including those set forth above.

## COUNT II
### 42 U.S.C. § 1983 *Monell* Claim Against the City of Poughkeepsie

198.    Mr. Bozella incorporates by reference the allegations set forth above.

199.    The City of Poughkeepsie is and was at all times before and during the

investigation and prosecution of the Crapser Murder responsible for the policies, customs, and/or

practices of the Police and its policy-makers.

200.    The City of Poughkeepsie was the employer of Police Chief Stuart Bowles before

and during the investigation and prosecution of the Crapser Murder.

201.    The City of Poughkeepsie was the employer of Defendant DeMattio, Officer

Grey, Officer Murphy, Officer Regula and other Officers employed by the Police before and

during the investigation and prosecution of the Crapser Murder.

202.    Prior to and during the investigation and prosecution of the Crapser Murder, the

City of Poughkeepsie maintained policies, customs, and/or practices of instructing Officers to

- 45 -

destroy exculpatory and impeachment evidence in violation of the duties imposed by *Brady* and

fail to memorialize, preserve, and disclose exculpatory and impeachment evidence. This general

policy, custom, or practice, even if not authorized by officially adopted or promulgated policy,

was so common and well-settled as to constitute an official policy that fairly represented the

Police's official policies, customs, and/or practices.

203.    The City's policymakers, including the Chief of the Police, Stuart Bowles, knew

of the misconduct of Defendant DeMattio, Officer Grey, Officer Murphy, Officer Regula and

other Officers, through, among other things, their direct involvement in the investigation and

prosecution of the Crapser Murder, and their awareness of the unconstitutional policies, customs,

and/or practices described above. Thus, the City's policymakers knew of the risk of

constitutional violations by Officers such as Defendant DeMattio, Officer Grey, Officer Murphy,

Officer Regula and other Officers.

204.    In this context, the need for the City's policymakers to act was obvious and the

failure to act so likely to result in constitutional violations that City's policymakers' failure to act

rose to deliberate indifference.

205.    But the City failed to act. The City failed to adequately discipline Officers for

destroying exculpatory and impeachment evidence in violation of the duties imposed by *Brady*.

And, the City failed to adequately train its Officers to memorialize, preserve, and disclose

exculpatory and impeachment evidence, and to conduct adequate investigations.

206.    The City's official policies, customs, and/or practices of instructing Officers to

destroy exculpatory and impeachment evidence in violation of the duties imposed by *Brady* and

failing to memorialize, preserve, and disclose exculpatory and impeachment evidence were a

moving force behind the denial of Mr. Bozella's rights to due process and a fair trial under the

Fifth, Sixth, and/or Fourteenth Amendments of the Constitution of the United States. These

official policies, customs, and/or practices proximately and directly caused the violations of Mr.

Bozella's constitutional rights described above.

207.    As a direct and proximate result of the City's policies, customs, and/or practices,

Mr. Bozella was wrongfully prosecuted, convicted, and imprisoned for more than 26 years, and

suffered grievous and continuing injuries, including those set forth above.

### COUNT III
### 42 U.S.C. § 1983 Claim Against Defendant O'Neill for Violating Mr. Bozella's Constitutional Rights Under the Fifth and/or Fourteenth Amendments Based Upon Malicious Prosecution, Suppression of Exculpatory and Impeachment Evidence, Failure to Investigate Known and Exculpatory Leads, and Malicious Abuse of Process

208.    Mr. Bozella incorporates by reference the allegations set forth above.

209.    Defendant O'Neill, acting deliberately and with malice, initiated and continued

the criminal prosecution of Mr. Bozella without probable cause or other legal justification,

suppressed exculpatory and impeachment evidence exculpating Mr. Bozella and incriminating

Donald Wise, failed to investigate known and exculpatory leads, and maliciously abused legal

process.

210.    Defendant O'Neill played an active role in investigating the Crapser Murder.

Defendant O'Neill's investigatory role included examining the scene of the Crapser Murder,

directing Officers to take photographs of the scene and to collect fingerprints, working alongside

Officers during witness interviews and other fact investigation, participating in conversations

with Officers resulting in Mr. Bozella's arrest and unlawful detention in 1977, and participating

in witness interviews and other fact investigation in connection with the King Murder, including

the interrogation of Saul Holland. All of these activities occurred more than four years before a

Grand Jury indicted Mr. Bozella. In addition, Defendant O'Neill coerced South to provide false

testimony to the Grand Jury to secure the indictment of Mr. Bozella. Defendant O'Neill engaged in all of this conduct in an investigatory capacity.

211.   Defendant O'Neill initiated a criminal prosecution of Mr. Bozella in 1977. The malicious prosecution began with Mr. Bozella's arrest and nearly month-long incarceration without cause, without a hearing, and in violation of applicable New York law.

212.   Defendant O'Neill continued the malicious prosecution of Mr. Bozella by seeking an indictment based solely on Lamar Smith and Stanley Smith's statements, knowing that such statements were "low priority" evidence that "would not stand up to a Grand Jury or preliminary hearing test."

213.   Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to record Donald Wise's involvement in the Dobler Assault as exculpatory evidence in the Crapser Murder.

214.   Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to pursue Donald Wise as a suspect in the Crapser Murder following the discovery of evidence identifying Donald Wise as the assailant in the Dobler Assault.

215.   Defendant O'Neill continued the malicious prosecution of Mr. Bozella by instructing Holland during the February 23, 1978 interrogation not to discuss Donald Wise's role in the Crapser Murder.

216.   Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to pursue Donald Wise as a suspect in the Crapser Murder following Holland's statement that Donald Wise had committed the Crapser Murder.

- 48 -

217.   Defendant O'Neill continued the malicious prosecution of Mr. Bozella by failing to record Holland's statement that Donald Wise had committed the Crapser Murder as exculpatory evidence in the Crapser Murder.

218.   Defendant O'Neill continued the malicious prosecution of Mr. Bozella in 1983 by coercing South to testify falsely before the Grand Jury.

219.   Further evidencing Defendant O'Neill's malice, Defendant O'Neill refused to present evidence to a Grand Jury that Donald Wise's fingerprint was found on the inside of Ms. Crapser's bathroom window, and instead, initiated a trial against Mr. Bozella in 1983.

220.   Further evidencing Defendant O'Neill's malice, Defendant O'Neill tried Mr. Bozella in 1983 based on the same evidence he knew was insufficient to constitute probable cause in 1977, together with the fabricated testimony of Moseley and coerced testimony of South. Defendant O'Neill was aware that the only physical evidence connecting an individual to the Crapser Murder implicated not Mr. Bozella, but rather Donald Wise, for the Crapser Murder.

221.   Further evidencing Defendant O'Neill's malice, Defendant O'Neill failed to disclose the *Brady* Evidence to Mr. Bozella at or before the 1983 trial.

222.   Further evidencing Defendant O'Neill's malice, Defendant O'Neill excluded all potential African-American jurors from the venire during the jury selection process of the 1983 trial, in violation of Mr. Bozella's constitutional rights under *Batson*.

223.   Further evidencing Defendant O'Neill's malice, Defendant O'Neill re-tried Mr. Bozella in 1990 based on Lamar Smith's story and the fabricated testimony of Moseley, despite the fact that he was aware of physical evidence implicating Donald Wise for the Crapser Murder, Holland's statement implicating Donald Wise for the Crapser Murder, evidence implicating Donald Wise for the Dobler Assault, Stanley Smith's recanted testimony, and South's 1983 trial

testimony. No reasonable person would have believed that such evidence constituted probable cause.

224.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill failed to disclose the *Brady* Evidence to Mr. Bozella at or before the 1990 Trial.

225.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill engaged in misconduct during the 1990 Trial by speaking to prosecutorial witness Officer Slater outside the courtroom, in direct violation of the trial judge's explicit instruction not to do so.

226.    Further evidencing Defendant O'Neill's malice, Defendant O'Neill engaged in misconduct during the 1990 Trial by referring to a tape-recorded conversation in direct violation of the trial judge's explicit instruction not to do so.

227.    Defendant O'Neill's malicious prosecution of Mr. Bozella terminated in Mr. Bozella's favor on October 28, 2009 when Mr. Bozella's conviction was vacated, and the District Attorney moved the Dutchess County Court to dismiss the Indictment because the District Attorney lacked sufficient evidence to convince a jury that Mr. Bozella was Ms. Crapser's assailant.

228.    Defendant O'Neill violated Mr. Bozella's constitutional rights by training Officers to violate *Brady* by destroying exculpatory and impeachment evidence so that Defendant O'Neill would not have to produce *Brady* evidence to defense counsel.

229.    By engaging in the conduct alleged above, Defendant O'Neill knowingly and deliberately violated Mr. Bozella's clearly established constitutional rights, including those under the Fifth and/or Fourteenth Amendments.

230.    Defendant O'Neill violated Mr. Bozella's constitutional rights by suppressing exculpatory and impeachment evidence exculpating Mr. Bozella and incriminating Donald Wise

- 50 -

during the February 1978 interrogation of Saul Holland by instructing Holland not to provide additional evidence implicating Donald Wise as the perpetrator of the Crapser Murder.

231. Defendant O'Neill violated Mr. Bozella's constitutional rights by failing to investigate numerous known and exculpatory leads pointing toward Donald Wise as the perpetrator of the Crapser Murder, including but not limited to failing to, among other things,: further investigate Donald Wise's involvement in the Crapser Murder following the Dobler Assault, further question Holland regarding Donald Wise's confessing to committing the Crapser Murder, and attempt to match Donald Wise's fingerprint to the latent fingerprint recovered from the inside of Ms. Crapser's bathroom window at any time prior to 1983.

232. Defendant O'Neill violated Mr. Bozella's constitutional rights by coercing South to testify falsely before the Grand Jury in 1983, and thus employing the grand jury indictment process to help secure an indictment through bad faith, perjury, and suppressed evidence, with the intent to do inexcusable and unjustifiable harm, and for the improper purpose of obtaining an indictment and continuing the prosecution of Mr. Bozella despite the legal infirmity of a lack of probable cause.

233. As a direct and proximate result of Defendant O'Neill's actions, Mr. Bozella was deprived of his constitutional rights to due process and a fair trial, and was wrongfully prosecuted, convicted, and imprisoned for more than 26 years, and suffered other grievous and continuing damages and injuries, including those set forth above.

## COUNT IV
### 42 U.S.C. § 1983 Claim Against William O'Neill and Robert DeMattio for Conspiracy

234.    Mr. Bozella incorporates by reference the allegations set forth above.

235.    Defendants O'Neill and DeMattio, acting within the scope of their employment and under color of law, agreed among themselves and with others, to act in concert to deprive Mr. Bozella of his clearly established Fifth, Sixth, and/or Fourteenth Amendment rights, including his rights to due process and a fair trial.

236.    During their interrogation of Holland in connection with the King Murder, Defendant O'Neill, Defendant DeMattio, and Officer Grey instructed Holland not to discuss Donald Wise's role in the Crapser Murder and thereby suppressed this exculpatory and impeachment evidence from coming to light. Defendant O'Neill, Defendant DeMattio, and Officer Grey's instruction to Holland, and subsequent conduct during and after Holland's statement implicating Donald Wise for the Crapser Murder, evidences an agreement among them to act in concert to inflict a constitutional injury upon Mr. Bozella.

237.    Overt acts in furtherance of this conspiracy include but are not limited to all those acts described above in paragraphs 62-143, of this Complaint, beginning with the baseless arrest and unlawful incarceration of Mr. Bozella in 1977.

238.    At no time did Defendant O'Neill, Defendant DeMattio, or Officer Grey withdraw from this conspiracy.

239.    As a direct and proximate result of Defendant O'Neill, Defendant DeMattio, and Officer Grey's actions, Mr. Bozella was deprived of his constitutional rights to due process and a fair trial, and was wrongfully prosecuted, convicted, and imprisoned for more than 26 years, and suffered other grievous and continuing damages and injuries, including those set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dewey R. Bozella requests judgment as follows:

(a)     Compensatory damages in an amount to be shown by the evidence at trial

but in no event less than $25,000,000.00 (TWENTY-FIVE MILLION DOLLARS);

(b)     Punitive damages, as allowed by law;

(c)     Costs of suit, including but not limited to reasonable attorney's fees and

costs, under 42 U.S.C. § 1988;

(d)     Prejudgment and postjudgment interest as allowed by law;

(e)     Such other and further relief to which Mr. Bozella justly may be entitled.

Dated:  New York, New York
        June 24, 2010

Peter J. Macdonald
Ross E. Firsenbaum
Somil Trivedi
Margaux J. Hall
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
399 Park Avenue
New York, New York 10022
Telephone: (212) 230-8800
Fax:  (212) 230-8888

*Attorneys for Plaintiff Dewey R.
Bozella*

- 53 -

Exhibit "2"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
DEWEY R. BOZELLA,

                           Plaintiff,                   **ANSWER**

                                               Civil Action No.:
                                                 10-CV-4917 (CS)

               -against-

THE COUNTY OF DUTCHESS; THE CITY OF
POUGHKEEPSIE; WILLIAM J. O'NEILL;
ROBERT J. DeMATTIO,

                          Defendants.
-------------------------------------------------------------------------x

       The City of Poughkeepsie, by its attorneys, Jacobowitz and Gubits, LLP, for its Answer

to the Complaint, respectfully alleges, upon information and belief, as follows:

**I.**     **INTRODUCTION**

       1.     Denies the allegations set forth in paragraph "1" of the complaint that Plaintiff

was wrongfully convicted and incarcerated for a murder he did not commit, except admit

plaintiff purports to invoke the jurisdiction of the Court as stated therein.

       2.     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "2" of the complaint and refers the Court to the Dutchess

County Court's Decision People v Bozella, 25 Misc.3d 1215(A), 2009 WL 3364575.

       3.     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "3" of the complaint.

       4.     Denies the allegations set forth in paragraph "4 "of the complaint.

5.      Denies the allegations set forth in paragraph "5 "of the complaint.

6.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "6" of the complaint.

7.      Denies the allegations set forth in paragraph "7 "of the complaint.

8.      Denies the allegations set forth in paragraph "8 "of the complaint.

## II.   **PARTIES**

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "9" of the complaint.

10.     Admits the allegations set forth in paragraph "10" of the complaint that Dutchess County is a body politic and corporate entity empowered to exercise home rule and that John King and William Grady are or were District Attorneys, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

11.     Admits the allegations set forth in paragraph "11" of the complaint that the City of Poughkeepsie is a home rule city located in this judicial district, that the City was the employer of defendant DeMattio and other police officers and detectives at all relevant times, and is and was at all times before and during the investigation and prosecution of the Crapser Murder responsible for the policies, customs, and/or practices of the Police. The remaining allegations of paragraph "11"of the complaint are conclusory statements to which no answer is required by Defendant; however, to the extent that an answer may be required, Defendant denies the allegations and further asserts that Plaintiff is not entitled to relief against this answering Defendant based upon any allegation contained in Plaintiff's Complaint.

12.     Admits the allegations set forth in paragraph "12" of the complaint that William

2

O'Neil was employed by the District Attorney and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

13.    Admits the allegations set forth in paragraph "13" of the complaint that Robert DeMattio was employed by the Police but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

### III.    RELEVANT NON-PARTIES

14.    Admits the allegations set forth in paragraph "14" of the complaint that William Grey was employed by the Police but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

### IV.    JURISDICTION AND VENUE

15.    Denies the allegations set forth in paragraph "15" of the complaint, except admits plaintiff purports to invoke the jurisdiction of the Court as stated therein.

16.    Defendant states that the allegations in paragraph "16" of the complaint constitute legal conclusions to which no response is required

17.    Defendant states that the allegations in paragraph "17" of the complaint constitute legal conclusions to which no response is required.

### V.    JURY DEMAND

18.    Defendant states that the allegations in paragraph "18" of the complaint constitute legal conclusions to which no response is required.

### VI.    FACTUAL ALLEGATIONS

#### A.    THE MURDER OF EMMA CRAPSER

19.    Admits the allegations set forth in paragraph "19" of the complaint.

20.     Admits the allegations set forth in paragraph "20" of the complaint.

21.     Admits the allegations set forth in paragraph "21" of the complaint that the July 31, 1977 Poughkeepsie Journal reported on the Crapser murder and respectfully refers the Court to the July 31, 1977 Poughkeepsie Journal for the complete report. The Defendant denies the remaining allegations therein.

### B.     FROM THE OUTSET, THE DISTRICT ATTORNEY PLAYED AN ACTIVE ROLE IN THE INVESTIGATION OF THE CRAPSER MURDER

22.     Admits the allegations set forth in paragraph "22" of the complaint that the Defendant O'Neill played an active role in the investigation of the Crapser Murder and directed Officers to take photographs of the scene and to collect fingerprints, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

23.     Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "23" of the complaint.

24.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "24" of the complaint.

### C.     THE POLICE FAILED TO RECORD AND PRESERVE EXCULPATORY AND IMPEACHMENT EVIDENCE

25.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "25" of the complaint.

26.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "26" of the complaint.

27.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "27" and refers the Court to the Dutchess County Court's

4

Decision People v Bozella, 25 Misc.3d 1215(A), 2009 WL 3364575.

**D.          THE POLICE AND DISTRICT ATTORNEY STRUCK A DEAL WITH LAMAR SMITH TO OBTAIN A FALSE STATEMENT IMPLICATING MR. BOZELLA**

28.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "28" of the complaint.

29.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "29" of the complaint.

30.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "30" of the complaint.

31.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "31" of the complaint.

32.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "32" of the complaint.

33.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "33" of the complaint.

34.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "34" of the complaint.

35.      The allegations of paragraph "35" of the complaint are conclusory statements to which no answer is required by Defendant; however, to the extent that an answer may be required, Defendant denies the allegations.

36.      Admits the allegation in paragraph "36" of the complaint that the neighbor's statements were recorded in a police report but denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of paragraph "36" and respectfully refers

the Court to the Dutchess County Court's Decision People v Bozella, 25 Misc.3d 1215(A), 2009

WL 3364575.

**E.**     **THE DEFENDANTS ARRESTED MR. BOZELLA BASED ON LAMAR**
         **SMITH'S BARGAINED-FOR STATEMENT AND UNLAWFULLY HELD**
         **MR. BOZELLA IN CUSTODY FOR ALMOST A MONTH WITHOUT A**
         **HEARING**

37.     Admits that Defendant DeMattio and Officer Siegel arrested Mr. Bozella, but

denies knowledge or information sufficient to form a belief as to the truth of the remaining

allegations set forth in paragraph "37".

38.     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "38" with respect to whether Mr. Bozella was held in the

county jail and then released on July 28, 1977.  Denies that this answering Defendant held Mr.

Bozella in the County Jail without granting him a hearing. The remaining allegations are

recitations of law and conclusory statements to which no response is required by Defendant;

however, to the extent that an answer may be required, Defendant denies the allegations.

39.     Admits the allegations set forth in paragraph "39" of the complaint that the Police

sent latent fingerprints lifted from the crime scene to the FBI and that the results revealed that

none of the suspects' fingerprints matched any of the latent fingerprints, but denies knowledge or

information sufficient to form a belief as to the truth of the remaining allegations therein.

**F.**     **DESPITE HAVING NO CREDIBLE EVIDENCE IMPLICATING MR.**
         **BOZELLA, THE DISTRICT ATTORNEY NONETHELESS ATTEMPTED**
         **TO INDICT MR. BOZELLA AND FAILED**

40.     Denies knowledge or information sufficient to form a belief as to the truth of the

6

allegations set forth in paragraph "40" of the complaint.

41.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "41" of the complaint.

42.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "42"of the complaint and respectfully refers the Court to the stenographic minutes of Mosely's grand jury testimony.

43.     Denies knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph "43" of the complaint.

44.     Denies knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph "44" of the complaint.

**G.      DONALD WISE COMMITTED A STRIKINGLY SIMILAR ASSAULT IN AUGUST 1977, BUT THE DEFENDANTS FAILED TO INVESTIGATE LEADS CONNECTING DONALD WISE TO THE CRAPSER MURDER.**

45.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "45" of the complaint.

46.     Admits the allegation in paragraph "46" of the complaint that on August 2, 1977, the Police found 82-year old Estelle Dobler in her bedroom, located at 210 Main Street Poughkeepsie "laying on the floor and her hands, legs, and mouth were bound with black electrical tape" and with "a stocking stuffed in her mouth and then covered with tape" but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

47.     Admits the allegation in paragraph "47" of the complaint that Mrs. Dobler survived her attack but denies knowledge or information sufficient to form a belief as to the truth

of the remaining allegations therein.

48.     Denies knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph "48" of the complaint.

49.     Admits the allegation in paragraph "49" of the complaint that the Dobler Reports state that the interview of Mr. Gill was conducted "with the knowledge of Assistant District Attorney Otto Williams", but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

50.     Denies knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph "50" of the complaint

51.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "51" of the complaint that the Dobler reports were never produced to Mr. Bozella's defense counsel. The remaining allegations constitute legal conclusions to which no response is required, except defendant respectfully refers the Court to the Dutchess County Court's Decision People v Bozella, 25 Misc.3d 1215(A), 2009 WL 3364575.

**H.          DONALD WISE COMMITTED A STRIKINGLY SIMILAR MURDER IN FEBRUARY 1978, BUT THE DEFENDANTS FAILED TO INVESTIGATE LEADS CONNECTING DONALD WISE TO THE CRAPSER MURDER**

52.     Admits the allegations set forth in paragraph "52" of the complaint except the characterization that the arrest was just "blocks away" from Ms. Crasper's and Ms. Dobler's homes is ambiguous and conclusory and therefore denied.

53.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "53" of the complaint.

8

54.       Admits the allegations set forth in paragraph "54" of the complaint.

55.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "55" of the complaint.

56.       Admits the allegation set forth in paragraph "56" of the complaint that there were similarities between the King Murder and the Crapser Murder, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

57.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "57" of the complaint.

58.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "58" of the complaint.

I.        **THE DEFENDANTS LEARNED THAT DONALD WISE CONFESSED TO COMMITTING THE CRAPSER MURDER, BUT THEY SUPPRESSED AND CONCEALED THE CONFESSION AND FAILED TO INVESTIGATE THE EXCULPATORY LEAD**

59.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "59 of the complaint.

60.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "60" of the complaint.

61.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "61" of the complaint.

62.       Admits the allegations set forth in paragraph "62" of the complaint.

63.       Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "63" of the complaint.

64.       Denies knowledge or information sufficient to form a belief as to the truth of the

9

allegations set forth in paragraph "64" of the complaint.

65.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "65" of the complaint.

66.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "66" of the complaint.

67.     Denies that this answering Defendant suppressed evidence and denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "67" of the complaint.

68.     Admits the allegations set forth in paragraph "68" of the complaint that the Police recorded the Holland interrogation on a cassette tape but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

69.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "69" of the complaint.

70.     Admits that this answering Defendant never produced the tape to Mr. Bozella's defense counsel; denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "70" of the complaint and refers the Court to the Dutchess County Court's Decision People v Bozella, 25 Misc.3d 1215(A), 2009 WL 3364575.

J.      **THE DISTRICT ATTORNEY CONTINUED TO MALICIOUSLY PROSECUTE MR. BOZELLA BY STRIKING A DEAL WITH MOSELEY TO TESTIFY FALSELY AGAINST MR. BOZELLA**

71.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "71" of the complaint.

72.     Denies knowledge or information sufficient to form a belief as to the truth of the

10

allegations set forth in paragraph "72" of the complaint.

    73.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "73" of the complaint.

    74.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "74" of the complaint.

    75.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "75" of the complaint.

    76.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "76" of the complaint.

    77.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "77" of the complaint.

    78.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "78" of the complaint.

    79.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "79" of the complaint.

    80.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "80" of the complaint.

    81.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "81" of the complaint.

    82.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "82" of the complaint.

    83.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "83" of the complaint.

84.     Denies knowledge or information sufficient to form a belief as to the truth of the
allegations set forth in paragraph "84" of the complaint.

85.     Denies knowledge or information sufficient to form a belief as to the truth of the
allegations set forth in paragraph "85" of the complaint.

86.     Denies knowledge or information sufficient to form a belief as to the truth of the
allegations set forth in paragraph "86" of the complaint.

87.     Denies knowledge or information sufficient to form a belief as to the truth of the
allegations set forth in paragraph "87" of the complaint.

88.     Denies knowledge or information sufficient to form a belief as to the truth of the
allegations set forth in paragraph "88" of the complaint.

89.     Denies knowledge or information sufficient to form a belief as to the truth of the
allegations set forth in paragraph "89" of the complaint.

**K.     MADELINE DIXON SOUGH INFORMED THE POLICE, DISTRICT
ATTORNEY, AND DEFENDANT O'NEILL THAT DONALD WISE
CONFESSED TO THE CRAPSER MURDER**

90.     Admits the allegations set forth in paragraph "90" of the complaint that  Madeline
Dixon South informed the Police that Donald Wise and Anthony Wise had committed the
Crapser Murder but denies knowledge or information sufficient to form a belief as to the truth of
the remaining allegations therein.

91.     Denies knowledge or information sufficient to form a belief as to the truth of the
allegations set forth in paragraph "91" of the complaint.

92.     Admits the allegations set forth in paragraph "92" of the complaint.

12

93.     Admits the allegations set forth in paragraph "93" of the complaint.

94.     Admits the allegations set forth in paragraph "94" of the complaint that South claimed Donald Wise and Anthony Wise indicated that they had committed a "movie" and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

95.     Admits the allegations set forth in paragraph "95" of the complaint that South claimed Donald Wise told her "he went through the window, the side window, through the little alley and went into the room and he gagged and tied up and laid her on the floor and he went through the drawers" but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

**L.      THE DISTRICT ATTORNEY SECURED AN INDICTMENT AGAINST MR. BOZELLA BY COERCING MADELINE DIXON SOUTH TO LIE TO THE GRAND JURY**

96.     Admits the allegations set forth in paragraph "96" of the complaint that South testified before the Grand Jury in 1983, but the remaining allegations therein are conclusory statements to which no response is required by Defendant except defendant respectfully refers the Court to the minutes of the Grand Jury; however, to the extent that an answer may be required, Defendant denies the allegations.

97.     Denies knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph "97" of the complaint but refers the Court to the stenographic minutes of South's grand jury testimony.

98.     Denies knowledge and information sufficient to form a belief as to the truth of the  allegations in paragraph "98" of the complaint but refers the Court to the stenographic

13

minutes of South's grand jury testimony.

99. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "99" of the complaint.

100. Admits that Mr. Bozella was indicted and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

101. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "101" of the complaint.

102. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "102" of the complaint and as to those allegations therein which are conclusory statements to which no response is required by Defendant, to the extent that an answer may be required, Defendant denies the allegations.

103. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "86" of the complaint

104. Denies knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph '104" of the complaint.

**M.      THE DEFENDANTS LEARNED THAT A FINGERPRINT FOUND ON THE INSIDE OF MS. CRAPSER'S BATHROOM WINDOW MATCHED DONALD WISE'S FINGERPRINT**

105. Admits the allegation set forth in paragraph "105" of the complaint that Donald Wise's fingerprints were sent to the FBI, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

106. Denies knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph '106" of the complaint.

107.    Admits the allegation in paragraph '107" of the complaint that the Police received the results from the FBI on June 17, 1983 that Donald Wise's fingerprint matched a fingerprint found on the inside of Ms Crapser's bathroom window, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

108.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "108" of the complaint.

109.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "109" of the complaint.

110.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "110" of the complaint.

111.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "111" of the complaint.

112.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "112" of the complaint.

113.    The allegations of paragraph "113"of the complaint are conclusory statements to which no response is required by Defendant; however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations therein.

N.      **THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL TRIED MR. BOZELLA WITHOUT PROBABLE CAUSE AND THEN VIOLATED MR. BOZELLA'S *BATSON* RIGHTS DURING HIS 1983 TRIAL**

114.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "114" of the complaint.

115.   The allegations in paragraph "115" of the complaint constitute legal conclusions to which no response is required; however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

116.   The allegations in paragraph "116" of the complaint constitute legal conclusions to which no response is required; however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

117.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "117" of the complaint.

118.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "118" of the complaint.

119.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "119" of the complaint.

120.   Admits the allegations set forth in paragraph "120" of the complaint that on December 3, 1983 a jury found Mr. Bozella guilty of second-degree murder, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

121.   Admits the allegations set forth in paragraph "121" of the complaint that Mr. Bozella appealed his conviction but the remaining allegations constitute legal conclusions to which no response is required, however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

16

122.    The allegations in paragraph "122" of the complaint constitute legal conclusions to which no response is required, except defendant respectfully refers the Court to the Second Department's decision.

**O.      STANLEY SMITH RECANTED HIS TESTIMONY IMMEDIATELY AFTER THE JURY CONVICTED MR. BOZELLA**

123.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "123" of the complaint.

124.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "124" of the complaint.

**P.      THE DISTRICT ATTORNEY AND DEFENDANT O'NEILL RE-TRIED MR. BOZELLA IN 1990, AGAIN VIOLATING HIS CONSTITUTIONAL RIGHTS**

125.    Admits that the District Attorney retried Mr. Bozella and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph "125" of the complaint.

126.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "126" of the complaint.

127.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "127" of the complaint.

128.    The allegations in paragraph "128" of the complaint constitute legal conclusions to which no response is required; however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

129.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph "129" of the complaint.

130.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "130" of the complaint.

131.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "131" of the complaint.

132.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "132" of the complaint.

133.   The allegations in paragraph "133" of the complaint are conclusory allegations to which no response is required; however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

134.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "134" of the complaint are conclusory allegations to which no response is required; however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

135.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "135" of the complaint.

136.   The allegations in paragraph "136" of the complaint are conclusory allegations to which no response is required; however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

137.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "137" of the complaint.

138.   Admits the allegations set forth in paragraph "138" of the complaint.

139.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "139" of the complaint.

140.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "140" of the complaint.

141.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "141" of the complaint.

142.   Admits the allegations set forth in paragraph "142" of the complaint that a jury convicted Mr. Bozella of Second-degree murder and the trial judge sentenced Mr. Bozella to twenty years to life, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

143.   The allegations in paragraph "143" of the complaint constitute legal conclusions to which no response is required and refers this court to the Second Department's decision in People v Dewey Bozella, 205 A.D. 2d 790, however, to the extent that an answer may be required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Q.   **THE NEW YORK STATE PAROLE BOARD REPEATEDLY DENIED MR. BOZELLA'S APPLICATIONS FOR PAROLE BECAUSE MR. BOZELLA WOULD NOT ADMIT TO A MURDER HE DID NOT COMMIT**

144.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "144" of the complaint.

R.   **THE DUTCHESS COUNTY COURT CONCLUDED THAT MR. BOZELLA HAD BEEN WRONGFULLY CONVICTED AND INCARCERATED FOR MORE THAN 26 YEARS**

145.   Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "145" of the complaint.

146.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "146" of the complaint.

147.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "147" of the complaint and refers this court to the Dutchess County Court's decision in People v Dewey Bozella, 25 Misc 3d 1215.

148.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "148" of the complaint and refers this court to the Dutchess County Court's decision in People v Dewey Bozella, 25 Misc 3d 1215.

149.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "149" of the complaint and refers this court to the Dutchess County Court's decision in People v Dewey Bozella, 25 Misc 3d 1215.

150.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "150" of the complaint and refers this court to the Dutchess County Court's decision in People v Dewey Bozella, 25 Misc 3d 1215.

151.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "151" of the complaint and refers this court to the Dutchess County Court's decision in People v Dewey Bozella, 25 Misc 3d 1215.

152.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "152" of the complaint and refers this court to the Dutchess County Court's decision in People v Dewey Bozella, 25 Misc 3d 1215.

153.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "153" of the complaint.

154.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "154" of the complaint.

155.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "155" of the complaint.

156.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph "156" of the complaint.

S.    **THE DISTRICT ATTORNEY'S POLICIES, CUSTOMS, AND/OR PRACTICES PROXIMATELY AND DIRECTLY CAUSED THE VIOLATIONS OF MR. BOZELLA'S CONSTITUTIONAL RIGHTS**

157.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "157" of the complaint.

158.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "158" of the complaint.

159.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "159" of the complaint.

160.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "160" of the complaint.

161.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "161" of the complaint.

162.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "162" of the complaint.

163.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "163" of the complaint.

164.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "164" of the complaint.

165.    Denies the allegations set forth in paragraph "165" of the complaint

166.    The allegations in paragraph "166" of the complaint constitute legal conclusions to which no response is required and refers this court to the Second Department's decision in People v Roberts, 178 A.D.2d 622, 622-623.

167.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "167" of the complaint.

168.    Denies the allegations set forth in paragraph "168" of the complaint.

169.    Denies that the officers had a practice of failing to record eyewitness statements and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph "169" of the complaint.

170.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "170" of the complaint.

171.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "171" of the complaint.

172.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "172" of the complaint.

T.        **THE CITY OF POUGHKEEPSIE POLICE DEPARTMENT'S POLICIES, CUSTOMS, AND/OR PRACTICES PROXIMATELY AND DIRECTLY CAUSED THE VIOLATIONS OF MR. BOZELLA'S CONSTITUTIONAL RIGHTS**

173.    Denies the allegations set forth in paragraph "173" of the complaint.

174.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "174" of the complaint.

175.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "175" of the complaint.

176.    Denies the allegations set forth in paragraph "176" of the complaint.

177.    Denies the allegations set forth in paragraph "177" of the complaint.

178.    The allegations in paragraph "166" of the complaint constitute legal conclusions to which no response is required and refers this court to the Second Department's decision in People v Roberts, 178 A.D.2d 622, 622-623.

179.    Denies the allegations set forth in paragraph "179" of the complaint.

180.    Denies the allegations set forth in paragraph "180" of the complaint.

181.    Denies the allegations set forth in paragraph "181" of the complaint.

U.        **DAMAGES**

182.    Denies the allegations set forth in paragraph "182" of the complaint.

183.    Denies the allegations set forth in paragraph "183" of the complaint.

184.    Denies the allegations set forth in paragraph "184" of the complaint.

185.    Denies the allegations set forth in paragraph "185" of the complaint.

## COUNT I
## 42 U.S.C. §1983 *Monell* Claim Against Dutchess County

186.   In response to the allegations set forth, in paragraph "186" of the complaint, defendant repeats and realleges the responses set forth in paragraphs "1" through  "185" inclusive of this answer, as if fully set forth herein.

187.   Admits the allegations set forth in paragraph "187" of the complaint.

188.   Admits the allegations set forth in paragraph "188" of the complaint.

189.   Admits the allegations set forth in paragraph "189" of the complaint.

190.   Admits the allegations set forth in paragraph "190" of the complaint.

191.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "191" of the complaint.

192.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "192" of the complaint.

193.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "193" of the complaint.

194.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "194" of the complaint.

195.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "195" of the complaint.

196.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "196" of the complaint.

197.   Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph "197" of the complaint.

**COUNT II**

**42 U.S.C. §1983 *Monell* Claim Against the City of Poughkeepsie**

198.    In response to the allegations set forth, in paragraph "198" of the complaint,

defendant repeats and realleges the responses set forth in paragraphs "1" through  "197" inclusive

of this answer, as if fully set forth herein.

199.    Admits the allegations set forth in paragraph "199" of the complaint.

200.    Admits the allegations set forth in paragraph "200" of the complaint.

201.    Admits the allegations set forth in paragraph "201" of the complaint.

202.    Denies the allegations set forth in paragraph "202" of the complaint.

203.    Denies the allegations set forth in paragraph "203" of the complaint.

204.    Denies the allegations set forth in paragraph "204" of the complaint.

205.    Denies the allegations set forth in paragraph "205" of the complaint.

206.    Denies the allegations set forth in paragraph "206" of the complaint.

207.    Denies the allegations set forth in paragraph "207" of the complaint.

**COUNT III**

**42 U.S.C. §1983 Claim Against Defendant O'Neill for Violating Mr. Bozella's
Constitutional Rights Under the Fifth and/or Fourteenth Amendments Based Upon
Malicious Prosecution, Suppression of Exculpatory and Impeachment Evidence, Failure
to Investigate Known and Exculpatory Leads and Malicious Abuse of Process**

208.    In response to the allegations set forth, in paragraph "208" of the complaint,

defendant repeats and realleges the responses set forth in paragraphs "1" through  "207" inclusive

of this answer, as if fully set forth herein.

209.    Denies knowledge or information sufficient to form a belief as to the truth of the

25

allegations set forth in paragraph "209" of the complaint

210.    The allegations set forth in paragraph "210" of the complaint are properly addressed to the Defendant County and defendant O'Neill rather than this answering Defendant, however to the extent an answer from this Defendant is required, Defendant admits the that the Defendant O'Neill played a role in the investigation of the Crapser Murder but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations therein.

211.    The allegations set forth in paragraph "211" of the complaint are properly addressed to the Defendant County and defendant O'Neill rather than this answering Defendant, however to the extent an answer from this Defendant is required, Defendant admits the allegation in paragraph "211" of the complaint that defendant O'Neill initiated a criminal prosecution of Mr. Bozella in 1977 and denies knowledge or information of the remaining allegations therein.

212.    The allegations set forth in paragraph "212" of the complaint are properly addressed to the Defendant County and defendant O'Neill rather than this answering Defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "212".

213.    The allegations set forth in paragraph "213" of the complaint are properly addressed to the Defendant County and defendant O'Neill rather than this answering Defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "213".

214.    The allegations set forth in paragraph "214" of the complaint are properly

26

addressed to the Defendant County and defendant O'Neill rather than this answering Defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "214".

215.    The allegations set forth in paragraph "215" of the complaint are properly addressed to the Defendant County and defendant O'Neill rather than this answering Defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "215"

216.    The allegations set forth in paragraph "216" of the complaint are properly addressed to the Defendant County and defendant O'Neill rather than this answering Defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "216".

217.    The allegations set forth in paragraph "217" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "217".

218.    The allegations set forth in paragraph "218" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or

information sufficient to form a belief as to the truth of the allegations in "218".

219.    The allegations set forth in paragraph "219" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "219".

220.    The allegations set forth in paragraph "220" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "220".

221.    The allegations set forth in paragraph "221" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "221".

222.    The allegations set forth in paragraph "222" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "222".

223.    The allegations set forth in paragraph "223" of the complaint are properly

addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "223".

224.   The allegations set forth in paragraph "224" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "224".

225.   The allegations set forth in paragraph "225" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "225".

226.   The allegations set forth in paragraph "226" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "226".

227.   The allegations set forth in paragraph "227" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or

information sufficient to form a belief as to the truth of the allegations set forth in paragraph "227".

228.    The allegations set forth in paragraph "228" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies that the City of Poughkeepsie Police were trained to destroy exculpatory and impeachment evidence and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph "228".

229.    The allegations set forth in paragraph "229" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "229".

230.    The allegations set forth in paragraph "230" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "230".

231.    The allegations set forth in paragraph "231" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph

"231".

232.    The allegations set forth in paragraph "232" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "232".

233.    The allegations set forth in paragraph "233" of the complaint are properly addressed to the defendant County and defendant O'Neill rather than this answering defendant, however to the extent an answer from this Defendant is required, defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "233".

## COUNT IV

### 42 U.S.C. §1983 Claim Against William O'Neill and Robert DeMattio for Conspiracy

234.    In response to the allegations set forth, in paragraph "234" of the complaint, defendant repeats and realleges the responses set forth in paragraphs "1" through "233" inclusive of this answer, as if fully set forth herein.

235.    Denies the allegations set forth in paragraph "235" of the complaint.

236.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "236" of the complaint.

237.    Denies the allegations set forth in paragraph "237" of the complaint.

238.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "238" of the complaint.

31

239.   Denies the allegations set forth in paragraph "239" of the complaint.

### AND FOR A FIRST AFFIRMATIVE DEFENSE:

240.   The complaint fails to state a claim against the Defendant City of Poughkeepsie, upon which relief can be granted.

### AND FOR A SECOND AFFIRMATIVE DEFENSE:

241.   Any injury alleged to have been sustained resulted from plaintiff's own culpable or negligent conduct or the conduct of third parties over whom the Defendant City had no control and was not the proximate result of any act of the Defendant, City of Poughkeepsie.

### AND FOR A THIRD AFFIRMATIVE DEFENSE:

242.   To the extent that the Plaintiff relies upon traditional tort and negligence theories as a basis for his claim, he has failed to comply with New York General Municipal Law § 50-e.

### AND FOR A FOURTH AFFIRMATIVE DEFENSE:

243.   Defendant City of Poughkeepsie cannot be held liable for punitive or exemplary damages.

### AND FOR A FIFTH AFFIRMATIVE DEFENSE:

244.   Plaintiff claims are barred in whole or in part by the applicable statutes of limitations.

### AND FOR A SIXTH AFFIRMATIVE DEFENSE:

245.   To the extent that the Plaintiff relies upon traditional tort and negligence theories as a basis for his claim, in the event the liability of the Defendant City of Poughkeepsie for the injuries and damages, if any, to Plaintiff is found to be 50% or less of the total liability assigned to all parties liable, the liability of the Defendant City for non-economic loss should be found not

to exceed the Defendant City's equitable share determined in accordance with the relative culpability of each party causing or contributing to such loss.

## AS AND FOR A FIRST CROSS CLAIM AGAINST COUNTY OF DUTCHESS

246.    To the extent that the Plaintiff relies upon traditional tort and negligence theories as a basis for his claim, if Defendant City of Poughkeepsie is held liable in damages to the Plaintiff based upon the allegations in the Complaint, such liability will have been the result of the negligence and/or culpable conduct of said Defendant County of Dutchess and, in that event, the Defendant City of Poughkeepsie must be indemnified in full by Defendant County in such proportion as the finder of fact deems appropriate.

**WHEREFORE**, Defendant, the City of Poughkeepsie, demands judgment dismissing the Complaint as against said Defendant, or, in the event judgment is rendered against said Defendant in favor of the Plaintiff, judgment over and against Defendant County of Dutchess for such sums as may be determined in accordance with the appropriate laws, together with the costs and disbursements of this action and such other and further relief as to the Court deems just and reasonable.

Dated: Walden, New York
      August 12, 2010

              Yours etc.,

              Howard Protter, Esq. (HP-4256)
              JACOBOWITZ & GUBITS, LLP
              Attorneys for Defendant - City of Poughkeepsie
              158 Orange Ave., P.O. Box 367
              Walden, New York 12586
              (845) 778-2121

TO:   Peter J. MacDonald, Esq.
      Wilmer, Cutler, Pickering, Hale and Door, LLP
      *Attorney for Plaintiff*
      399 Park Avenue
      New York, New York 10022

      Michael K. Burke, Esq.
      Burke, Miele & Golden, LLP
      *Attorney for Defendants - County of Dutchess and William J. O'Neill*
      40 Matthews Street, Suite 209
      P.O. Box 216
      Goshen, New York 10924

      David L. Posner, Esq.
      McCabe & Mack, LLP
      *Attorneys for Defendant Robert DeMattio*
      63 Washington Street
      P.O. Box 509
      Poughkeepsie, New York 12602

T:\DOCS\8624\440\1AE1459.DOC-DG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DEWEY R. BOZELLA.,

                              Plaintiff,

                  -against-

THE COUNTY OF DUTCHESS, THE CITY OF
POUGHKEEPSIE, WILLIAM J. O'NEILL and
ROBERT J. DeMATTIO,

                              Defendants.
------------------------------------------------------------------x

STATE OF NEW YORK          )
                           )SS.:
COUNTY OF   ORANGE         )

AFFIDAVIT OF
MAILING and SERVICE BY
E-MAIL

Civil Action No.
10 CV 4917 (CS)

DIANE GROSS, being duly sworn, deposes and says:

1.      I am not a party to the action, am over 18 years of age and reside at New Windsor, New

York.

2.      On October 14, 2010, I served a true copy of Notice of Motion, Attorney Affidavit with

exhibits and Memorandum of Law, in the above-entitled action by placing the same in a United States Postal

Service depository within the State of New York, addressed to the last known address of the addressee(s)

as indicated below:

David Posner, Esq.
McCabe & Mack, LLP
63 Washington Street
P.O. Box 509
Poughkeepsie, NY 12602

Michael Burke, Esq.
Burke, Miele & Golden
40 Matthews Street
P.O. Box 216
Goshen, NY 10924

and served Plaintiff's attorney by email at ross.firsenbaum@wilmerhale.com at their request and consent.

_____
Diane Gross

Sworn to before me this
14th day of October, 2010

_____
Notary Public - State of New York

CAROLE SMITH
Notary Public, State Of New York
No. 01SM6093616
Qualified In Orange County
My Commission Expires June 2, 20 11