**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------

DEWEY R. BOZELLA,

Plaintiff,

v.

THE COUNTY OF DUTCHESS; THE
CITY OF POUGHKEEPSIE; WILLIAM J.
O'NEILL; AND ROBERT J. DEMATTIO,

Defendants.

**AFFIDAVIT IN SUPPORT OF A
MOTION TO DISMISS
PURSUANT TO RULE 12(b)(6),
FEDERAL RULES OF CIVIL
PROCEDURE ON BEHALF
OF DUTCHESS COUNTY AND
WILLIAM O'NEILL**

**10 Civ. 4917**

------------------------------------------------------------------------

Patrick T. Burke, being duly sworn, deposes and says:

1. I am a member of Burke, Miele & Golden, LLP, the attorneys for Dutchess County and William P. O'Neill, Esq., a retired Dutchess County Assistant District Attorney. We present this affidavit with its supporting data and a memorandum of law in support of our clients' application to dismiss Dewey Bozella's complaint because it fails to state a claim upon which relief can be granted.

2. We develop in the accompanying memorandum the principles which guide both our presentation and this Court's analysis of it. These principles have evolved over time from a pre-Rule 8 FRCP dissection of formulaic pleading requirements, to Rule 8's more relaxed acceptance of a "short and plain statement of the claim showing that the pleader is entitled to relief," to the pleading standards of the recent *Twombley-Igbal* Supreme Court cases, which provide for a balanced search through a plaintiff's pleading to determine whether or not it presents "a plausible claim for relief." To accomplish this goal we are not required to accept as true a plaintiff's conclusory allegations. We are, in fact, required to ignore them and to test the plausibility of the plaintiff's remaining theories.

1

3. Dewey Bozella's complaint, a 239 paragraph, 53 page tome, evolved out of a criminal proceeding in the Dutchess County, New York, County Court. Section 440 of New York's Criminal Procedure Law provides for post-conviction relief in certain circumstances. Dewey Bozella is a twice convicted murderer. His current attorneys successfully presented a CPL 440 application to a Dutchess County Acting County Court Judge who, on October 14, 2009, found that certain required pre-trial disclosures had not been made to Bozella. The Judge set aside Dewey Bozella's murder conviction and ordered a new trial. Dutchess County's current District Attorney chose not to go forward. This law suit ensued.

4. In order to test the plausibility of Dewey Bozella's federal civil rights complaint, we must review the underlying State Court proceeding. The Dutchess County County Court's decision is appended to Bozella's complaint. We have included with our papers the motion papers submitted to the state court by Bozella's current attorneys which included the record of his 1990 criminal trial but not all the pre-trial and trial disclosures. We have included these with our motion papers. They are necessary for this Court to weigh the plausibility of Dewey Bozella's claims.

## INTRODUCTION

5. This case presents an example of the power of one of America's largest law firms to manipulate the presentation of raw data so as to distort underlying realities. Dewey Bozella's current attorneys, who have invested more than a million dollars of their time on his behalf, have, with their rhetoric and invective, overwhelmed a local prosecutor's office and a local acting county court judge.[1] Now they bring this civil rights suit against Dutchess County and William O'Neill, alleging that, because of the County's unconstitutional practices, Dewey

---

[1] See, New York *Times*, October 29, 2009,
www.NYTIMES.com/2009/10/29/nyregion/2gtowns.html.?-R.=.1&  _ R

Bozella was wrongfully prosecuted and convicted and that, because Assistant District Attorney William J. O'Neill had acted with malice in initiating and continuing the prosecution of Bozella for a most foul crime, he violated Bozella's Constitutional rights.

6. The specifics of Bozella's complaint cannot withstand scrutiny. This court, drawing upon its judicial experience and common sense, focusing upon the germaine factual contentions here, will be able to find that Dewey Bozella's complaint does not contain a plausible claim for relief.

7. Because the historic information found in Bozella's complaint is strategically and cleverly realigned, it will be necessary to, first, establish a proper chronology and, second, remove from Bozella's complaint emotionally charged and misleading conclusory language and, finally, clearly delineate the story of the brutal murder of a defenseless elderly woman and the detection and prosecution of the man responsible for it.

## THE FACTS[2]

**An overview**

8. In the late evening of June 14, 1977, 92 year old Emma Crapser returned from a night of Bingo at a local church to her small two-family home at 15 North Hamilton Street in a crime-ridden area of downtown Poughkeepsie. She interrupted a burglary which was in progress. Two men were inside her home: Dewey Bozella and Wayne Moseley. Elbert Pittman was walking

---

[2] Reference to the supporting record will be by citation to the Bates stamp numbers on the exhibits attached. Bates stamp numbers 1-1522, collected under Exhibit A, consist of the trial record of Bozella's 1990 murder trial submitted to the County Court by Bozella's current attorneys, those under Exhibit B bearing numbers 1523-1857 are documents submitted to the County Court by Bozella's current attorneys, those under Exhibit C are documents received by Bozella's criminal trial attorney and reviewed by his current attorneys which should have been submitted to the County Court but were not.

outside, acting as a lookout. Across the street, two other young men, Lamar and Stanley Smith, who knew of the burglars' plans, were watching. After the murder, everyone fled.

9. The next morning, Emma Crapser was found dead. She had been bound, beaten, and murdered in a gratuitously gruesome fashion. Her murderers had stuffed five pieces of material, a chisel-like instrument, and a strip of lace more than seven feet long down her throat. Nothing of value was taken from Mrs. Crapser's home. Nothing of value had ever been in her home.

10. It wasn't until 1983 that Dewey Bozella was indicted for the murder of Emma Crapser. Six years after it occurred, Bozella was convicted of her murder. His conviction was reversed in May of 1990 because of a *Batson* violation. He was re-tried in November of 1990. Again, on December 13, 1990, he was convicted of Mrs. Crapser's murder. His conviction was affirmed on appeal. Thirty-two years after Ms. Crapser's murder, in 2009, a Dutchess County County Court granted Bozella's motion for a new trial under CPL 440 and set aside his conviction because of *Brady* violations.

The County Court said:

> This court, while granting the defendant's application on the basis of non-disclosure of *Brady* material, does not ascribe intentional misconduct or bad faith to the police or prosecution.

> and

> . . . it is not the function of the court to speak as to the guilt or non-guilt of the defendant, and nothing contained in this decision should be interpreted as any such finding or opinion.

The District Attorney decided not to re-prosecute Bozella.

11. There has never been a finding that Dewey Bozella has been "incarcerated for more than 26 years for a murder he did not commit," as he claims. Evidence sufficient to twice establish beyond a reasonable doubt that Dewey Bozella is guilty of the murder of Emma

4

Crapser was presented to two Dutchess County juries. Dewey Bozella and Wayne Moseley in fact murdered Emma Crapser in her home on June 14, 1977.

**The initial investigation of Emma Crapser's murder**

12. Emma Crapser's murder was discovered by her niece Evelyn Petterson on Wednesday morning, June 15, 1977. Ms. Petterson called the City of Poughkeepsie Police Department which responded immediately. (A, 31;37-40) Police officers secured the crime scene and scoured it for clues. (A64-67;135-132) The same day, detectives began to canvass the neighborhood for suspects and witnesses. Their focus soon narrowed to five young men: Lamar Smith (18) and his brother Stanley (17), who were said to have been witnesses who had information about the crime; Elbert Pittman (18), who was said to have been a "lookout" for the burglars who committed the murder; Wayne Moseley (15) and Dewey Bozella (18), who were said to have been the actual burglars/murderers. (A321;322;331) The police set out to locate and interview them. Only three could be found. Moseley and Bozella had left the area.

13. When, on June 25th, the Smith brothers were initially interviewed, they denied any knowledge of Mrs. Crapser's murder. (A332) They also produced an alibi witness, a live-in girlfriend of Lamar Smith, who said, as they had, that the Smith brothers were not in the area of the crime when it occurred. (A334) But four days later, on June 29th, after Lamar was questioned about another crime in which he was said to be involved, both young men admitted that they had witnessed the burglary/murder as it began to unfold, although they could not discern what had happened within Ms. Crapser's home because they had never entered it. They had been observing from a vantage point across the street. (A339;B1679-1680).

14. The Smith brothers told the investigators that they had first heard incriminating discussions in the evening of Tuesday, June 14th among Pittman, Moseley and Bozella while they were all together in a local park, that they then saw the three young men leave the park

5

together, that they followed them to see where they were going and, that they saw them walk to Ms. Crapser's home where Moseley and Bozella went up onto the front porch while Pittman paced up and down the street outside. The Smiths then saw Moseley and Bozella using a device at the front door of the Crapser residence to force their way through it. After Moseley and Bozella entered the home, the Smith brothers could not see what they were doing. Time passed. Some cars drove by. Finally, a car pulled up and stopped and an elderly woman got out and entered the house. Stanley Smith fled immediately. Lamar waited for a while. He saw Pittman run away. He did not see Moseley and Bozella leave the house. After the local police learned this from the Smiths they tested their credibility. Both were given a polygraph (lie detector) exam. (A367-375) The events as they described them passed muster. (A429-432;B1675;C1994)

15. In the meantime, between the date of the murder and the Smiths' statements, the police continued their examination of Ms. Crapser's home. Although they had not noticed this when first they arrived at her home, several days after her murder the detectives found pry marks in the area of the lock on the front door of Ms. Crapser's residence. An upstairs neighbor told the police that these marks were not on the front door of the home prior to Ms. Crapser's murder and that she first noticed them on the day after her murder. (B1535) (The front door of the Crapser home was a common door leading to both Ms. Crapser's and the witness' apartment.) Thus, the Smiths' story rang even more true.

16. The police were still looking for Moseley and Bozella. On the night of the murder, (a Tuesday) Bozella went to the Poughkeepsie apartment of his stepbrother Anthony Graham who was not at the time actually residing there. On Thursday, June 16th, after Pittman had told Bozella that the police had questioned him about Mrs. Crapser's murder, Bozella asked his

6

stepbrother to drive him and Moseley to Times Square. They then took a subway and a bus to Queens where they were put up in an apartment of a Bozella acquaintance. Moseley, the 15 year old, did not stay. He returned home to Poughkeepsie on Saturday, June 18th. (C 1893-1894; 1896-1897)

17.  On June 24th Moseley was questioned in the presence of his father by the police. During this interview, Moseley acknowledged that he was together with Bozella on the evening of June 14, 1977. He said, however, that he and Bozella had left Poughkeepsie at about 9:00 p.m. on that evening with Bozella's stepbrother who drove them to Manhattan. They then went to Queens. However, about an hour into his interview, Moseley changed his story. He then told the police that he and Bozella did not leave for New York City until Thursday evening, June 17th. He acknowledged that their journey began after Elbert Pittman had told Bozella that he had been questioned by the police about Emma Crapser's murder. As the Smiths had done originally, Moseley denied involvement in the Crapser murder. Like the Smiths, he claimed he was elsewhere. Like the Smiths, Moseley had someone who would vouch for him: his mother. (C1893-1894).

18.  The police presented their information to a Poughkeepsie City Court Judge who, on June 29th, issued a warrant for the arrest of Bozella, Moseley and Pittman. The next day, June 30th, Bozella was arrested in New York City for an attempted burglary. A computer check revealed the Poughkeepsie warrant. Bozella was returned to Dutchess County where he was incarcerated in a pre-trial status. On July 2nd, Bozella called one of the detectives and said he wanted to speak to him at the jail. Bozella told the investigators that he had heard that Lamar Smith and Stanley Smith had murdered Mrs. Crapser. It was after Bozella made this claim that

the Smiths were subjected to polygraph exams. (B1674-1675). Bozella was ultimately released before the required date for a preliminary hearing. (B1895).

19. The police continued to investigate, trying to find evidence to bolster the testimony of the Smiths. Moseley (who could not be charged with the murder because of his youth) would not cooperate. Even when granted immunity, Moseley did not change his original story. He maintained his story before the Grand Jury and his mother continued to back him up. The Grand Jury found that there was insufficient evidence for it to indict anyone. It was not until 1983 that Moseley agreed to testify against Bozella. The District Attorney's office got permission from a County Court Judge to re-present the matter to a new Grand Jury. On March 31, 1983, Bozella was indicted for the murder of Emma Crapser.

**The red herring**

20. It is a not uncommon tactic for a defendant in a criminal case not merely to deny his guilt – his perfect right – but also to deflect blame to another. Both have occurred here.

21. On August 2, 1977, Estelle Dobler, an 82 year old Poughkeepsie resident, was assaulted in her home. Donald Wise was a suspect. Then, more than seven months later, on February 20, 1978, the home of three elderly sisters, the King sisters, was invaded. Two of the women were beaten, one was murdered. The cases were investigated by the City of Poughkeepsie Police Department. The murder/assault case was prosecuted by Assistant District Attorney William O'Neill. Among the defendants was Donald Wise. He was convicted of murder.

22. By 1980, two years after Wise's conviction, Wayne Moseley was in prison serving a one to four year sentence for stealing a woman's pocketbook. On several occasions starting in late 1981 attorneys from the Dutchess County District Attorney's office approached Moseley

with offers of leniency if he would testify truthfully against Bozella. Finally, in 1983, Moseley

agreed to do so. He subsequently testified before the Grand Jury which indicted Bozella and at

both of Bozella's criminal trials in 1983 and 1990.

23.  The indictment charging Bozella with the murder of Emma Crapser was returned on

March 31, 1983. Bozella was arrested in the first week of April.  Shortly after his arraignment,

Bozella's trial attorney raised the claim that someone other than Bozella had committed the

crime. He identified five young men as suspect. Among them was Donald Wise.

24.  When the police initially investigated the Crapser murder in 1977, they had

submitted a number of latent fingerprints to the FBI lab for comparison with the fingerprints of

Bozella and of the other young men whom they had suspected.  Among the original areas of

interest to the investigators as a possible entry point into Emma Crapser's home on the night of

June 14, 1977 was a loose window in her bathroom which opened to a narrow alleyway.  In

1977, none of the latent prints taken from this window or anywhere else produced a match.  Then

in 1983, after Bozella's attorneys presented a claim to the prosecutors that Donald Wise and four

other young men had murdered Mrs. Crapser, their fingerprints were sent to the FBI lab for

comparison with latent prints found at Ms. Crapser's home.

25.  On May 3, 1983, Assistant District Attorney D. James O'Neil (the Assistant who

presented the Bozella case to the Grand Jury) sent a letter to the FBI lab. (C 1941-1944)  It said:

> The Grand Jury has indicted Dewey Bozella.  Wayne Moseley was also
> implicated in this crime.  In addition, Lamar Smith, Stanley Smith,
> Anthony Wise, Donald Wise and Wayne Wise *have been named by the*
> *defense* as having committed the crime. (C. 1941)

Mr. O'Neil asked the FBI lab to run tests on the prints of the five men accused by

Bozella's trial attorney of Mrs. Crapser's murder.  One latent print from the inside of Mrs.

Crapser's bathroom window came back positive for Donald Wise.  All of this information was

disclosed to Bozella's criminal defense lawyers who made full use of it at both of Bozella's criminal trials.

**The red herring continues.**

25.  Madeline Dixon South was the mother of a baby girl fathered by Donald Wise. (A1213:11-15) Ms. South lived a relatively brief, sad life. (A1251:14-1253-16)  She died after the first Bozella trial.  In April of 1983, prior to the first Bozella trial and well after the Wise murder conviction, a local attorney informed the District Attorney's office that Ms. South had told Elbert Pittman's girlfriend that Donald Wise had admitted to Ms. South that he had murdered Emma Crapser.  An assistant district attorney and the police immediately went to Ms. South's apartment to interview her.  They found that Dewey Bozella's brother was also there. Ms. South was interviewed at her apartment and later at the District Attorney's office.  Both times she said Wise had told her that he murdered Ms. Crapser.  Ms. South then testified before grand jury which indicted Dewey Bozella.  Before the grand jury Ms. South denied that which she had previously told the authorities.  She denied that Wise had confessed to her that he had murdered Emma Crapser.  *All of this was disclosed to Bozella's trial attorney prior to both criminal trials.*  (C1858,59;1875)  All of Ms. South's statements were presented at both trials. Both juries convicted Bozella.

**THE MANIPULATION OF THE RECORD:**
**THE *AD HOMINEM* ATTACK ON WILLIAM J. O'NEILL**

26.  An introductory paragraph of Dewey Bozella's complaint contains an early example of the hyperbolic, misleading accusations that are to follow.  It says (at paragraph 3):

> "(t)he egregious misconduct perpetrated against Bozella . . . included the malicious and relentless prosecution of his case by an assistant district attorney, William J. O'Neill, who was determined to prosecute and convict Bozella for the highly-publicized murder of Emma Crapser at whatever cost."

10

Stripped of unwarranted invective this sentence translates to: "ADA O'Neill twice prosecuted and convicted Bozella for murder." That was, of course, William O'Neill's duty and, although this is hardly the worst example of the Bozella pleader's use of unsupported, highly charged, conclusory allegations, it is mentioned first simply because it demeans a man who, since his graduation from Brown (in 1960) and Duke Law School (in 1963) has spent his entire career in service to others, first as an FBI agent (for 8 years) and, then for 31 years, as an Assistant District Attorney in his native Dutchess County, until he retired in December, 2002.

THE *BRADY* DISCLOSURES AND THE
CLAIMED *BRADY* VIOLATIONS

27. At part "R" of Bozella's complaint we find Bozella's only pertinent accusations against William O'Neill. These claim that *Brady* violations had occurred prior to Bozella's criminal trials.

28. This portion of Bozella's complaint starts with the cleverly inaccurate statement that "(a)pproximately seventeen years after Bozella's 1990 conviction "he discovered four categories of new evidence. (The *Brady* Evidence) . . ." As will be seen, this is patently not true.

29. The four claimed newly discovered items are:

1.) a report authored by (former Poughkeepsie Police Lieutenant Art) Regula which included statements of four unbiased neighbors on or around June 25, 1977 contradicting Moseley's and Lamar Smith's testimony. (para. 146, compl.)

2.) An Officer Murphy had told Regula that a witness had told him that "she heard loud noises in an alley adjacent to Ms. Crapser's home . . . and that the noises sounded like one or more garbage cans were moved." Neither Murphy nor Regula entered this information in a report. (para. 148)

3.) The *Holland* tape: "which Bozella's current counsel collected in 2009 during an inspection of the District Attorney's files from the King murder. The County Court concluded that this tape was *Brady* material because it contained "enough information . . . especially given the timing of the

11

interview in relation to *law enforcement officials'* reported contemporaneous *belief* that the *King and Crapser crimes could be related*, to constitute information "favorable to the defense and material to guilt." (para. 149) Bozella's current attorneys have included in their pleading only a snippet from the Holland interview. (B. 1701-1706) The entire transcript is collected under (C 1975-2015) (We have added emphasis here because of what is to follow.)

4.) The "Dobler Reports" evidencing, in the words of Bozella's complaint, that Donald Wise was the perpetrator of an attack similar to the Crapser murder. The Dutchess County Court concluded that the reports were *Brady* material because they were 'located inside the King File and the police reportedly considered a link between the King and the Crapser murders." (para. 150)

Much deception underlies Bozella's pleader's claim of prejudice here. We shall, piece by piece, expose it. First, the introductory contention that "approximately seventeen years after his 1991 conviction Bozella discovered four categories of new evidence (the *Brady* evidence)" is not true.

**i.) Appropriate Disclosure of the four "unbiased neighbors" was made.**

30. To understand the casuistry at work here it is necessary to study the hyper-careful way that Bozella's attorneys presented this claim to the County Court during their CPL 440 application because their methodology there is replicated here. Bozella's current attorneys told the Dutchess County County Court that *they* had only recently received (in December 2008) a copy of the June 15, 1973 statements of Cecil Carpenter and his brother Curtis, and of Shirlee Ellerbee and Linda Miller, the "unbiased neighbors". (B. 15 23;1528,29, paras.32,33,34,35). When *they* received this information is, however, of no moment.

31. Bozella's trial attorney, Mickey Steiman, in an affirmation supporting Bozella's new attorney's CPL 440 motion, told the County Court that "(w)hile in both 1983 (prior to Bozella's first trial) and in 1990 (prior to his second) I learned some of the information contained in (the Poughkeepsie police reports recently acquired by Bozella's new attorneys) from other sources, I was unaware of significant exculpatory information contained in the police interviews of Shirlee

Ellerby, Linda Miller, Cecil Carpenter and Cynthia Murphy." (B. 1717, para. 33). Both

Bozella's current attorneys and Mr. Steiman were too cute here: they provided the County Court

only with the Omnibus Motion Steiman submitted prior to Bozella's second murder trial, which

included a demand for *Brady* material, to show what it was that he demanded. (B. 1734-1736)

They did not provide the County Court with the many responses submitted by the Dutchess

County District Attorney's office. Neither have Bozella's current attorneys made any reference

to these responses in this federal matter – even though they were well aware of them – and, even

though they have been advocating a claim that *Brady* violations have occurred here because of a

failure by the prosecution to make certain disclosures prior to Bozella's criminal trials. In the

eyes of some, such litigation techniques are sanctionable.

32. On May 12, 1983 in one of his responses to Steiman's disclosure demands, Assistant

District Attorney O'Neil said:

> (j) The People are in possession of certain items of *Brady* material which
> we are more than willing to disclose to the defense. Since those items are
> extensive in number, the People consent to turning them over at a
> mutually convenient time as soon as possible.

> . . .

> (r) The People are in possession of numerous items of evidence which are
> available for inspection at any time. (C 1880-1882)

The County Court never knew this. This was never disclosed to the County Court by either

Bozella's current attorneys or by his original trial attorney. (By the time Bozella's 440 motion

was filed neither D. James O'Neil nor William O'Neill were members of the Dutchess County

District Attorney's Office.)

33.  On June 14, 1983, prior to the first Bozella trial, Assistant District Attorney O'Neil

sent a three page letter to Steiman the subject of which was "Brady Material." (C 1858-1860)

Thirty-three items were addressed.  Items 27, 29, 30 and 31 are immediately relevant.  They say:

> The City of Poughkeepsie Police interviewed Cecil Carpenter, 15
> North Hamilton Street, second floor, during 1977.  Mr. Carpenter said
> that he was going to play basketball at the Morse School on Mansion
> Street.  He said he stayed there until 9:30 – 9:45 p.m. and left.  When
> Mr. Carpenter said he entered 15 North Hamilton Street, he observed
> absolutely nothing outside.  The outer door was locked.  He unlocked
> it with his key and went in, the lights were out at that point.  He said
> that he locked his door and went upstairs to his apartment.  He said
> that he got to the house at approximately 10:00 p.m.
>
> The police interviewed Cheryl Ellerby who also resides at 15 North
> Hamilton Street.  She confirmed the statement of Cecil Carpenter that
> he came home at 10:00 p.m.
>
> The City of Poughkeepsie Police also interviewed Linda Miller who
> was alleged to have been upstairs in the second floor apartment over
> 15 North Hamilton Street.  Linda Miller says that she heard nothing
> from the downstairs apartment on the evening in question.
>
> The City of Poughkeepsie Police interviewed Christopher Gill, 210
> Main Street, Poughkeepsie, N.Y., apartment 1F, during June of 1977.
> Mr. McGill said that on June 14, 1977 he recalled being in the vicinity
> of Main Street and North Hamilton Street.  He said that he did not see
> Lamar Smith, Stanley Smith, Elbert Pittman, Dewey Bozella or
> Wayne Moseley that evening.

The story of the "unbiased neighbors" was all there.  *It was all disclosed* to Bozella's trial

attorney on June 14, 1983 prior to his first criminal trial.  The Dutchess County County Court

had been misled into believing that it was not.

34.  There is more.  On June 21, 1983, ADA D. James O'Neil sent another detailed three

page letter to Steiman. (C 1874-1877)  In his June 21st letter, Mr. O'Neil confirmed in writing

that which he had orally reported to Mr. Steiman a week earlier.  Some parts of this letter are

immediately interesting.  Mr. O'Neil said:

(18)  I told you that the People claim that the defendant entered the apartment through the front door.

(20)  I advised you that there is direct evidence linking the defendant to the murder.

(21)  I advised you that Sandra Williams would testify that she was standing on a corner near Mill Street and North Hamilton Street sometime during the month of June, and she will say that Anthony Wise, Wayne Wise, and Donald Wise walked in the direction of the Crapser residence.

(16)  . . . I advised you that I had indicated to the Grand Jury that Madeline South had made inconsistent statements to me prior to her testimony.

(11)  I advised you that Madeline South originally told me that the Wises had committed the Crapser murder.  I advised you that she informed me of this at her apartment and again in the District Attorney's office.  I advised you that Madeline South then testified before the Grand Jury.  I advised you that her testimony before the Grand Jury was not exculpatory.

It was all disclosed.

35.   There is even more.   On September 29th, Assistant District Attorney O'Neil responded to a further request from Mr. Steiman. (C 1925-1926) O'Neil said:

-- He had not taken any notes when he interviewed Madeline Smith on April 11, 1983.

-- He has a tape recording of the Smith brothers' second statement to the police but, because these statements "clearly implicate" Bozella they "do not constitute *Brady* material."  An earlier tape recording of the Smiths which exculpated Bozella has been lost.

-- Enclosed are the criminal histories of Elbert Pittman, Wayne Moseley, Lamar Smith and Stanley Smith.

--Enclosed are copies of a report concerning a polygraph examination conducted by Nat Laurendi on August 17, 1977 and of a report by New York State Police investigator Thomas Samon of an examination conducted on March 14, 1983.

Assistant District Attorney O'Neil also told Steiman that:  "(t)he only other item I feel may be discoverable by you, is the letter I sent to the Commissioner of New York State Division of

Parole, on April 8, 1983, on behalf of Lamar Smith." A copy of that letter and of a letter O'Neil

had sent to Lamar Smith were sent to Steiman.   (C 1927-28)   Assistant District Attorney

O'Neil's letter to the Commissioner said:

> During the past six years that I have been employed as an Assistant
> District Attorney, I have met many individuals serving time in prison who
> have agreed to cooperate in an important case.  Everyone of these
> witnesses wanted something from me in return . . . Mr. Smith however
> was an exception. He asked for nothing.  He was content to do his duty as
> a citizen and appear as a witness even though his life might be placed in
> jeopardy, both inside the prison and out . . .

36.   Finally, Mr. Steiman's original Omnibus Motion before the first criminal trial

acknowledged that the prosecutors had, on May 12, 1983, provided exculpatory testimony given

by five witnesses who testified before the 1977 Grand Jury:   Wayne Moseley, Cornelius

Moseley, Joan Moseley, Lillie Mae Harris and Terralyn Brown.  None of this was disclosed to

the County Court or this Court.  There were no *Brady* violations here.  The County Court had

been misled into believing that there were.

37. One thing Steiman told the County Court about the significance the "unbiased

witness'" observations, which had a material effect on the County Court's decision, is

demonstrably wrong.  He said in Bozella's CPL 440 application: "of equal if not greater

significance, none of these potential witnesses . . . noticed anything which would indicate a

forcible entry. . ." (B. 1717, para.33)  Not so.  The detective's report which is appended to the

CPL 440 motion contains the following:

> On June 25, 1977, upon leaving the upstairs at 15 N. Hamilton Street, we
> examined the front outer door and at this time a mark on the door in the
> vicinity of the lock, this would be on the trim of the doorjamb, appears to
> be a pry mark and it is indicated that perhaps that front door was pried
> open as there is fresh damage to the door in the area of the lock and on the
> metal piece that fits on the doorjamb itself in which the lock would fit into
> is bent indicating that some tool was used to bend it in order to slip the
> lock.   Cecil Carpenter and  Linda Miller  were  questioned about this

damage to the door and on the door itself there is chips of wood out and *Linda stated that she observed this the day after the homicide and had not observed it prior to the homicide.* (emphasis added.)

38.    Also, the allegation in Bozella's complaint that "the (neighbors') statements undermined Lamar Smith's statement that he, Stanley Smith and Pittman were outside the (Crapser) house just before 11:00 p.m. while Bozella and Wayne Moseley were entering the house" is not quite accurate.  One could accept all of the witnesses' recollections of June 14, 1977 as true and still find the Smiths' statements concerning what had occurred that night to be accurate.  Both the statements of the "unbiased witnesses" and the testimony of the Smiths contained infirm recollections of time.  The only firm time established at trial was that found on the shattered, stopped wrist watch of Emma Crapser which read 10:55 p.m.  Assuming her watch kept accurate time prior to the assault upon her, it is fair to deduce that that assault occurred at or near to 10:55 p.m. on June 14, 1977.  None of the "unbiased" witnesses' statements would vitiate the thesis that Bozella and Moseley were in Ms. Crapser's house at that time and, therefore, that their testimony was false.  The Smiths, Moseley – and all the other young people who were questioned – could never fix a precise time and were never asked to do so.  But, their statements are not clearly contradicted by the upstairs neighbors.  And, most important, the identity of these potential witnesses and the substance of their observations were disclosed to Bozella's trial attorney. There was no *Brady* violation.  Bozella's current attorneys should have brought these disclosures to the attention of the Dutchess County County Court Judge and they should not have obscured their disclosure in Bozella's federal complaint as they have.

## ii.)  The next door neighbor

39.  According to Bozella's complaint, a day or so after the murder of Emma Crapser, a Poughkeepsie police officer (Pete Murphy, who by the time of Bozella's complaint had died) is

17

said to have been told by a neighbor of Ms. Crapser that, on the night of Ms. Crapser's murder, she heard "loud noises in the alley at the side of her home that sounded like garbage cans being moved." Regula, the sole source of this hearsay information, now says that Murphy reported this to him and that neither of them recorded this information in an official report. Thus, the claim is that exculpatory information was lost. According to the Dutchess County Court's opinion upon Bozella's 440 motion, this was a *Brady* violation.

> However, a Poughkeepsie *Journal* article dated June 16, 1977 reported:

>> Next door neighbor Mary Nathan remembered hearing some noise Tuesday night outside her window – "I heard a sound like someone had bumped up against something. Then I heard this heavy running but I thought it was the cat and dog that are always running around. This morning I looked out the window and someone had moved a garbage can in front of her window and it looked like someone cut the screen." (B 1560,61)

This information which Bozella claims was not disclosed was part of the public record, if not the police files. And, the failure to disclose it cannot be a *Brady* violation attributable to Dutchess County or William O'Neill in any event.

### iii and iv) The "Holland tape" and the "Dobler Reports"

40. These two categories of claimed *Brady* violations are joined here because they both spring from a false premise cleverly foisted upon the Dutchess County Court by Bozella's current attorneys. These items should have been disclosed, argued Bozella's current attorneys, "especially given . . . law enforcement officials' reported contemporaneous belief that the King and Crapser crimes could be related." The Dobler reports were, according to the County Court, *Brady* material in the Crapser murder case because they were "located inside the King file and the police reportedly considered a link between the King and the Crapser murders." As will be seen, Bozella's current attorneys cleverly manipulated the public reports of what law

enforcement officials had said so as to create the impression that they had said more than they actually had – in fact – they manipulated the published reports so as to make it appear that the police had affirmed that which they had actually denied.  Properly read (and neither Bozella's current attorneys nor the County Court Judge did so) these reported public statements indicate that there is *no* reliable link between the Crapser murder, on the one hand, and the Dobler/King crimes on the other.

41. Bozella's complaint says that Dutchess County District Attorney, after the murder of 78 year old Mary King, made a statement to the press that "the King murder and the Crapser murder were similar based upon the age of the victims."  This purported public statement of the District Attorney forms the basis of the County Court's determination that evidence from the Mary King murder case – which involved Donald Wise – should have been disclosed to Bozella as *Brady* material.  The full quotes from District Attorney John R. King and Police Chief Stewart Bowles found in the local Poughkeepsie newspaper of February 22, 1978 are:

> Law enforcement officials are considering the possibility of a link between the death Monday night of a 78-year-old city woman and the unsolved slaying last June of 92-year-old Emma Crapser.

> Although the officials say they have no solid leads in Monday's brutal beating of three elderly sisters – one of whom died – *and no evidence to link the incident to the Crapser murder*, they say they cannot ignore the possibility that the cases are related.

> "That aspect will be considered along with all other aspects," said City Police Chief Stewart Bowles of the possible link.

> But he added, *"There's nothing right now to indicate the perpetrators involved were one and the same*, but the investigation is too much in its infant stage to form any real concrete opinion."

> District Attorney John R. King said he was also unsure about the connection, but he said the age factor alone makes it a possibility.

"We have had the thought that the age alone (of the victims) is enough to make a parallel." He added, however, *"We have nothing more than that to go on."* (B 1600-1601)

The only link between the King sisters case and that of Emma Crapser was the red herring artfully created by Bozella's trial attorney in 1983, six years after Ms. Crapser's murder.

42. There was no valid basis for local law enforcement authorities to link the Dobler/King cases to Emma Crapser's murder at the time of their occurrence. And, by the time in 2009 that Bozella's new lawyers filed his CPL 440 motion in the Dutchess County County Court, whatever their theoretical basis there may have been in 1978 to compare the brutal murders of two elderly women had evaporated. The District Attorney's office had direct evidence of the identity of the murderers in both cases and they were not the same person. Three petit juries convicted the actual murders.

43. Other parts of the pre-trial disclosures made by the local prosecutors prior to Bozella's criminal trials may explain why it is that Dewey Bozella has never, to this day, submitted his own affidavit proclaiming in his own words his innocence. New York's CPL 710.30 requires disclosure of a defendant's statements which the prosecution intends to introduce at trial. The prosecutors were aware of four incriminating statements Bozella had made, some in 1977 and others in 1983. Because they were made at a point in time that Bozella was represented and because they were made in the absence of his counsel, the prosecutors took the position that they could not use these statements in their case in chief. They could, however, they thought, use them on cross-examination of Bozella should he testify. They were, therefore, disclosed to Bozella prior to his criminal trial. (C 1878, 1879) These statements are admissible in this proceeding. They, together with the two petit jury verdicts, together with all the

exculpatory data delivered to Bozella prior to those trials, diminish the plausibility of Dewey
Bozella's civil rights claim to the point of meaninglessness.

## BOZELLA'S ALLEGATIONS AGAINST DUTCHESS COUNTY

44. The underlying premise of Bozella's complaint against Dutchess County is flawed.
At part S of Bozella's complaint, a general allegation is made that: "the District Attorney's
policies, customs and/or practices proximately and directly caused the violations of Bozella's
constitutional rights" which were addressed earlier in his complaint. Since no violations of
Bozella's constitutional rights occurred during the processes leading to his two murder
convictions, no basis exists for this more generalized accusation against Dutchess County. To
add emphasis to this empty theory, Bozella's current attorneys allege that the Dutchess County
District Attorney's office, instead of prohibiting or discouraging the "contemptible violations" of
Bozella's rights visited upon him by Assistant District Attorney O'Neill and two City of
Poughkeepsie police officers, "permitted and sometimes *required* (pleader's emphasis) this
conduct." (para. 5, Compl.) There is no plausible basis for this claim.

45. A specific example of only one instance of Dutchess County's policy, custom or
practice is set forth. Bozella's current attorneys allege that the City of Poughkeepsie Police
Department, "*in response to training by the District Attorney*," adopted a policy of destroying
interview notes which, according to the pleader, "the Second Department subsequently deemed
constitutionally improper in *People v. Roberts*, 178 AD2d 622 (2d Dep't, 1992)." This
contention is a typically facile manipulation of the record. On the issue of the Poughkeepsie
police officers' destruction of their interview notes the *Roberts* court said:

> Pursuant to a procedure adopted *within the Poughkeepsie Police
> Department* the detectives destroyed their notes after they had been
> transcribed into a formal report. Such a procedure is improper. (emphasis
> added).

21

There is no indication whatsoever in the *Roberts* decision that the Dutchess County District

Attorney's office had any hand in the Poughkeepsie Police Department's procedures. It is wrong

– but, by now, not surprising - for Bozella's current attorneys to suggest otherwise.

46. The specific allegations against the Dutchess County District Attorney's office are

found at Subpart S, paragraphs 157-172 (pp. 36-40) of Bozella's complaint. There is found there

a significant amount of unfounded conclusory allegations and "upon information and belief"

contentions with no showing of any information upon which the belief is based. These

allegations, which fall into two broad categories, cannot withstand scrutiny. The two categories

are: a failure to honor the *Brady* rule and a failure to follow the provisions of CPL 240.45 (the

*Rosario* rule). The *Brady* rule is said to have been violated by the District Attorney's office

because, "upon information and belief", neither District Attorney John King (who was in office

at the time of Mrs. Crapser's murder and of Bozella's first trial in 1983) or District Attorney

William Grady (who was in office during the second trial in 1990) promulgated a written policy

or any formal training regarding the *Brady* rule. (para. 160, Compl.). Other than the pleader's

ungrounded speculation, there is nothing in Bozella's complaint which would support this

contention. Nor is there any plausible basis for the contention that Assistant District Attorney

William O'Neil is a Dutchess County policymaker.

47. Amidst the stew of *Brady* violation allegations Bozella's current attorneys add a

dollop of *Rosario* violations claims which, if it were not found in such a serious matter, would be

risible. Within that portion of Bozella's complaint which addresses Bozella's claim against

Dutchess County, we are told that William O'Neill's "practices regarding the disclosure of

*Rosario* materials were equally reprehensible. Defendant O'Neill would provide defense counsel

with the *Rosario* material only *after* a witness had testified on direct examination (para. 162) . . . and immediately before cross examination." (emphasis the pleader's).

48. Like Bozella's other claims against Dutchess County, no plausible basis for this contention is expressed in his complaint. None exists. It is, indeed, implausible that two experienced County Court Judges would have countenanced such procedural violations and it is even more unlikely that the criminal defense bar of Dutchess County (much less Bozella's aggressive criminal defense attorney) would stand for a systemic abuse of the *Rosario* rule. No basis – never mind a plausible basis – is found in Bozella's complaint for this allegation against Dutchess County.

## CONCLUSION

49. Dewey Bozella's lengthy, lurid complaint might make good reading in the popular press or in his current attorneys' self-congratulatory press releases. It cannot withstand the scrutiny of this Court. The motion to dismiss submitted on behalf of Dutchess County and William J. O'Neill should be granted.

Dated: Goshen, New York
October 8, 2010

Respectfully submitted,

**Patrick T. Burke, Esq.**
**Michael K. Burke, Esq.**
**Burke, Miele & Golden, LLP**
**Attorneys for Defendants,**
**The County of Dutchess and**
**William J. O'Neill**
40 Matthews Street – Suite 209
P. O. Box 216
Goshen, New York 10924
845-294-4080

Subscribed and sworn to before me
this 8th day of October, 2010.

**Notary Public**

VICTORIA CALLIANO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 4954719
QUALIFIED IN ROCKLAND COUNTY
COMMISSION EXPIRES AUGUST 14, 20 /3

TO:   **Peter J. Macdonald, Esq.**
      **Wilmer Hale**
      399 Park Avenue
      New York, New York 10022
      212-230-8800

      **David Posner, Esq.**
      **McCabe & Mack, LLP**
      63 Washington Street
      P. O. Box 509
      Poughkeepsie, New York 12602-0509
      845-206-4379

      **David D. Gandin, Esq.**
      **Jacobowitz & Gubits, LLP**
      158 Orange Avenue
      Walden, New York 12586
      845-764-4285