UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DEWEY R. BOZELLA,

                          Plaintiff,

            - against -

THE COUNTY OF DUTCHESS; THE CITY OF
POUGHKEEPSIE; WILLIAM J. O'NEILL; and
ROBERT J. DEMATTIO

                         Defendants.

------------------------------------------------------------------x

**DECISION AND ORDER**

10 Civ. 4917 (CS)

<u>Appearances</u>:
Peter J. Macdonald
Ross E. Firsenbaum
Somil Trivedi
Margaux J. Hall
Wilmer Cutler Pickering Hale and Dorr LLP
New York, New York
*Counsel for Plaintiff*

Patrick T. Burke
Michael K. Burke
Burke, Miele, & Golden LLP
Goshen, New York
*Counsel for Defendants William O'Neill and County of Dutchess*

David Gandin
Jacobowitz and Gubits LLP
Walden, New York
*Counsel for Defendant City of Poughkeepsie*

David L. Posner
McCabe & Mack LLP
Poughkeepsie, New York
*Counsel for Defendant Robert J. DeMattio*

<u>Seibel, J.</u>

       Before the Court are Defendants William O'Neill's, Dutchess County's, and Robert J.

DeMattio's Motions to Dismiss Plaintiff's Complaint for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6), and Defendant City of Poughkeepsie's Motion for

Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c), (Docs. 33, 39, 46.)

For the reasons that follow, Defendant O'Neill's Motion to Dismiss is GRANTED in part and

DENIED in part; Defendant Dutchess County's Motion to Dismiss is GRANTED; Defendant

DeMattio's Motion to Dismiss is GRANTED; and Defendant City of Poughkeepsie's Motion for

Judgment on the Pleadings is GRANTED.

## I.      BACKGROUND

The following facts are assumed to be true for purposes of the motion.

Plaintiff Dewey Bozella was twice convicted of the brutal June 14, 1977 murder of 92-

year-old Emma Crapser (the "Crapser murder") at her home in Poughkeepsie, New York.

(Compl. ¶¶ 2, 19–20, 120, 142.)  The Crapser murder was gruesome and highly publicized, and

sparked a local outcry.  (*Id.* ¶ 21.)  Approximately one day after the Crapser murder,

Poughkeepsie police officer Pete Murphy interviewed Crapser's next-door neighbor, who

claimed she heard noises in the alley next to Crapser's home the night before.  (*Id.* ¶ 25.)

Murphy did not write down this information but he provided it orally to Officer Regula.  (*Id.* ¶

26.)  On June 25, 1977, police officers questioned brothers Lamar and Stanley Smith in a police

car; both claimed they were not at the scene the night of the Crapser murder.  (*Id.* ¶ 28.)  This

interview was tape-recorded, but the only tape was destroyed.  (*Id.* ¶¶ 28–29.)  On that same day,

Officer Regula interviewed four witnesses who claimed they did not hear or see anything

unusual in front of Crapser's home the night of the murder.  (*Id.* ¶¶ 33–34.)   These statements

were subsequently recorded in a police report (the "Regula report").  (*Id.* ¶ 36.)

Days later, on June 29, 1977, after being arrested for an unrelated burglary, Lamar

Smith was again interviewed by the police, and this time he stated that he saw Plaintiff and

Wayne Moseley on Crapser's front porch the night of the murder.  (*Id.* ¶ 30.)  Officers also interviewed Stanley Smith on June 29, and he likewise stated that he saw Plaintiff and Moseley on Crapser's front porch the night of the murder.  (*Id.* ¶ 32.)  On June 30, 1977, Plaintiff was arrested and charged with Crapser's murder.  (*Id.* ¶ 37.)  Shortly thereafter the District Attorney convened a grand jury, at which Stanley and Lamar Smith testified that they saw Plaintiff on Crapser's front porch the night of her murder, and Moseley testified—with immunity—that he knew nothing about the Crapser murder.  (*Id.* ¶¶ 41–42, 44.)  The grand jury did not indict Plaintiff.  (*Id.* ¶ 44.)

While the prosecution was pursuing Plaintiff as the primary suspect in the Crapser murder, evidence developed which tended to show that another man, Donald Wise, had in fact committed the Crapser murder.  First, on August 2, 1977, less than two months after the Crapser murder, an elderly woman named Estelle Dobler suffered an assault (the "Dobler assault") similar to Crapser's in the same neighborhood.  (*Id.* ¶ 46.)  As with Crapser, the assailant stuffed cloth down Dobler's throat, but unlike Crapser, Dobler survived the attack.  (*Id.* ¶¶ 46–47.)  Soon after the Dobler assault, a man named Christopher Gill informed officers Regula and Groth that Donald Wise was the Dobler assailant.  (*Id.* ¶ 48.)   Officer Groth authored police reports (the "Dobler reports") which indicated that he and Regula believed that Wise was, indeed, one of Ms. Dobler's attackers.  (*Id.*)

Second, in early 1978, a few months after the Dobler assault, another elderly woman, Mary King, was murdered (the "King murder") just a few blocks from Ms. Crapser's and Ms. Dobler's homes, in a fashion similar to Crapser's murder.  (*Id.* ¶¶ 52–53.)  In February 1978, police arrested Donald and Anthony Wise for the King murder.  (*Id.* ¶ 52.)  Shortly thereafter Anthony Wise confessed that he, Donald, and a man named Saul Holland were responsible for

the King murder.  (*Id.* ¶ 59.)  Defendant O'Neill, an Assistant District Attorney ("ADA"),

Defendant DeMattio, a police officer, and police officer William Grey tape-recorded a

subsequent interview with Saul Holland (the "Holland tape"), during which Holland claimed that

Donald Wise had told Holland that he had previously committed a murder similar to the King

murder.  (*Id.* ¶¶ 62–64, 68.)   Specifically, Holland said that before the King robbery/murder,

Donald Wise reassured Holland that he and his brother had done a similar crime before; that they

had broken in to an empty residence and found valuables; and that at 9, 10, or 11 p.m., the

occupant had returned home.  (*Id.* ¶ 63.)  This was similar to the Crapser murder in that Ms.

Crapser was attacked by assailants already in the apartment when she came home at

approximately 11 p.m.  (*Id.* ¶ 64.)  Officer Grey steered the conversation away from this other

murder, saying he did not want to get further into it "because we're liable to get confused," and

his subsequent questioning related only to the King murder.  (*Id.* ¶¶ 65–66.)  Neither DeMattio

nor O'Neill pursued questioning about the Crapser murder, and both remained silent when Grey

changed the subject.  (*Id.* ¶ 67.)  The Holland tape and the Dobler reports were placed in the

King murder file, (*id.*  ¶¶ 50, 68), and Plaintiff did not discover, and was not provided with,

either until 2009, (*id.* ¶¶ 51, 70).  Defendant O'Neill prosecuted and convicted Donald Wise for

the King murder.  (*Id.* ¶ 57.)

　　　　Finally, in 1983, Madeline Dixon South, Anthony Wise's girlfriend at the time of the

Crapser murder, told the police, the District Attorney, and O'Neill that on the morning of June

15, 1977, Donald and Anthony Wise boasted to her about killing Ms. Crapser the previous

evening.  (*Id.* ¶¶ 90–95.)  South reported that Donald Wise had said that he entered the apartment

through a side window from an alley, gagged and tied up the victim, and went through her

drawers.  (*Id.* ¶ 95.)

4

Despite evidence indicating that Donald Wise committed the Crapser murder, prosecutors continued to pursue Plaintiff as the sole suspect in that murder.  (*Id.* ¶¶ 73–74, 106.)  In 1983, prosecutors negotiated a deal with Moseley, wherein Moseley testified before a grand jury and implicated Plaintiff in the Crapser murder, in exchange for his early release from prison.  (*See id.* ¶¶ 80, 84–86, 88.)  This testimony contradicted Moseley's 1977 immunized grand jury testimony wherein he claimed he knew nothing about the Crapser murder.  (*Id.* ¶¶ 81, 88.)  Prosecutors also secured testimony from South, who testified before the grand jury that she had fabricated the story implicating Donald Wise in the Crapser murder.  (*Id.* ¶¶ 96–98.)  At Plaintiff's trial, South testified that she recanted her story implicating Wise because she had been pressured by O'Neill to do so.  (*Id.* ¶ 98.)  The combined testimony of Moseley, South, and Lamar and Stanley Smith led the second grand jury to indict Plaintiff in 1983 for the Crapser murder.  (*Id.* ¶¶ 100, 103.)

Following Plaintiff's 1983 indictment, fingerprint analysis revealed that Donald Wise's fingerprint was left on the inside of a window in Crapser's home.  (*Id.* ¶ 107.)  That window faced the alley where Crapser's neighbor had reported hearing noises the night of the murder.  (*Id.* ¶ 108.)  The District Attorney and O'Neill were both aware of this fingerprint evidence which implicated Donald Wise, but proceeded with the case against Plaintiff.  (*Id.* ¶ 110.)

In late 1983, with O'Neill as prosecutor, Plaintiff was convicted for the Crapser murder.  (*Id.* ¶¶ 114, 120.)  The Appellate Division vacated this conviction, finding that the prosecution utilized peremptory challenges in an unconstitutional manner.  (*Id.* ¶¶ 120–22.)  O'Neill retried Plaintiff's case in 1990, and Plaintiff was again convicted in 1991 for the Crapser murder.  (*Id.* ¶¶ 125, 142.)

Approximately seventeen years after Plaintiff's 1991 conviction, and after serving over twenty-six years in prison, Plaintiff discovered four pieces of exculpatory *Brady* evidence of

which he was previously unaware, and based upon which he moved to vacate his conviction. (*Id.* ¶¶ 1, 145, 151.)  This exculpatory evidence included:  (1) the Regula report, which contained information from four witnesses that contradicted Moseley and Smith's testimony placing Plaintiff at the crime scene, (*id.* ¶ 146); (2) the neighbor's statement Officer Murphy failed to record, which reported noises in the alley next to Crapser's home the night of the murder, perhaps indicating—in accord with South's initial statement to the police regarding what Donald Wise had told her—that the murderer had entered through Crapser's window, (*id.* ¶¶ 25–27, 148); (3) the Holland tape, which implicated Donald Wise in the Crapser murder, (*id.* ¶ 149); and (4) the Dobler Reports, (*id.* ¶ 150), which likewise implicated Donald Wise in the Crapser murder.  As a result, Plaintiff moved to vacate his conviction pursuant to New York Criminal Procedure Law Section 440.10.  (*Id.* ¶¶ 2, 151–56, Ex. A at 1.)  Combined, these four pieces of evidence led the Dutchess County Court to determine that there was "overwhelming" support for Plaintiff's motion, and on October 14, 2009, Plaintiff's conviction was vacated and he was released from prison.  (*Id.*  ¶¶ 152–53, 155–56.)

It is Plaintiff's information and belief that:  (1) prior to and during the investigation and prosecution of the Crapser murder, ADAs in Dutchess County interpreted and applied *Brady v. Maryland*, 373 U.S. 83 (1963),[1] as they found proper, and did not receive any specific training regarding *Brady* compliance, (*id.* ¶¶ 160–64), and (2) City of Poughkeepsie Police Chief Stuart Bowles (not a Defendant) also did not promulgate written policies or provide formal training regarding police officers' compliance with *Brady*, and the obligation to memorialize, preserve, and disclose exculpatory evidence.  (*Id.* ¶¶ 176, 205.)  Instead, Bowles allegedly promulgated an

---

[1]     *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.

official policy instructing police officers to destroy their notebooks after they transferred their notes into formal police reports.  (*Id.* ¶ 177.)

Plaintiff filed the Complaint in this case on June 24, 2010, asserting Section 1983 claims against:  (1) ADA William O'Neill, for malicious prosecution, malicious abuse of process, and fabrication of evidence; (2) Dutchess County, for failing to adequately train its ADAs to comply with *Brady*, and for the unconstitutional acts of ADA O'Neill as an official policymaker; (3) the City of Poughkeepsie, for failing to adequately train police officers to memorialize, preserve, and disclose exculpatory evidence to criminal Defendants, and for maintaining an unconstitutional policy mandating that police officers destroy their notebooks after they convert their notes into police reports; and (4) Officers Robert DeMattio and William O'Neill for conspiracy to deprive Plaintiff of his constitutional rights to due process and a fair trial.  (Doc. 1.)  The parties appeared before me for a pre-motion conference on September, 8, 2010.  (Docket Entry dated September 8, 2010.)[2]  On December 3, 2010, Defendants DeMattio, O'Neill, and Dutchess County moved to dismiss the Complaint, (Docs. 33, 46), and Defendant City of Poughkeepsie moved for judgment on the pleadings, (Doc. 39).

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

---

[2] The City of Poughkeepsie thereafter requested leave to file a post-answer Motion for Judgment on the Pleadings, (Doc. 25), which I granted, (Doc. 26).

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks

omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure

from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the

court may "begin by identifying pleadings that, because they are no more than conclusions, are

not entitled to the assumption of truth," and then determine whether the remaining well-pleaded

factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.*

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to

relief.'"  *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

The standard of review for a motion for judgment on the pleadings pursuant to Rule 12(c)

is the same as that for a Rule 12(b)(6) motion to dismiss.  *See Patel v. Contemporary Classics of

Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *Accelecare Wound Ctrs., Inc. v. Bank of N.Y.*,

No. 08-8351, 2009 WL 2460987, at *4 (S.D.N.Y. Aug. 11, 2009).

## III.   DISCUSSION

### A.   Consideration of Documents Outside the Pleadings

When deciding a motion to dismiss, the Court is entitled to consider:

(1) facts alleged in the complaint and documents attached to it or incorporated in
it by reference, (2) documents "integral" to the complaint and relied upon in it,

8

> even if not attached or incorporated by reference, (3) documents or information
> contained in [a] defendant's motion papers if plaintiff has knowledge or
> possession of the material and relied on it in framing the complaint, (4) public
> disclosure documents required by law to be, and that have been, filed with the
> Securities and Exchange Commission, and (5) facts of which judicial notice may
> properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).  A document is considered "integral" to the complaint where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers*, 282 F.3d at 153 (emphasis omitted).  Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  *Id.*; *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (integral documents may include documents partially quoted in complaint or on which plaintiff relied in drafting complaint).   If a document outside of the complaint is to form the basis for dismissal, however, two requirements must be met in addition to the requirement that the document be "integral" to the complaint:  (1) "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document"; and (2) "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134.

Plaintiff attaches to his Complaint, as Exhibit A, the Dutchess County Court's decision vacating Plaintiff's conviction, *People v. Bozella*, No. 102/83, 2009 WL 3364575 (Dutchess Cnty. Ct. Oct. 14, 2009), and thus it may be considered on this motion to dismiss.  Plaintiff relies on the court's decision in *People v. Roberts*, 577 N.Y.S.2d 672 (2d Dep't 1991), for his allegations that the City maintained an unconstitutional policy, (Compl. ¶ 5), and this decision is

thus integral to the Complaint and may be considered on this motion to dismiss.[3]  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (documents upon which Plaintiff relies, but chooses not to attach or incorporate by reference, may be attached by a defendant "when attacking the complaint for its failure to state a claim").  Plaintiff also requests that I take judicial notice of two documents, Exhibits 1 and 2, attached to Ross E. Firsenbaum's attorney declaration.  (Doc. 43.)  Exhibit 1 is a copy of Patrick T. Burke's letter to me dated October 12, 2010, which contains a "comment about the length of [Defendant's] papers;" this Exhibit is irrelevant to my decision on this motion and I therefore decline to take judicial notice of it. Exhibit 2 is a copy of an attorney affirmation responding to Plaintiff's 2009 motion to vacate his murder conviction, and Plaintiff submits it to demonstrate that Defendants have previously made arguments similar to those they make in the current dispute.  (Pl.'s Mem. 30.)[4]  I take judicial notice of Exhibit 2 solely to establish that these arguments were previously made.  *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) (on motion to dismiss court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings") (internal quotation marks omitted); *Sullivan v. Chappius*, 711 F. Supp. 2d 279, 281 n.3 (W.D.N.Y. 2010) (on motion to dismiss, court may take judicial notice of matters of public record, such as motion and memorandum filed in another lawsuit) (citing *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir. 1986)).

_____

[3] I may also take judicial notice of published materials, such as court cases, *Ferrari v. Cnty. of Suffolk*, No. 10-4218, 2011 WL 2297125, at *3 n.4 (E.D.N.Y. June 7, 2011) ("[A] court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*."), for the fact that they were litigated, not for the truth of their findings, *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).

[4] "Pl.'s Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated November 15, 2010.  (Doc. 38.)

Defendants O'Neill and Dutchess County submit six documents in addition to their motion papers:  Exhibits A–C attached to their Memorandum of Law in Support of their Motion to Dismiss, (Doc. 46)[5]; Exhibits D–E attached to their Reply Memorandum of Law, (Doc. 48); and Patrick T. Burke's attorney affidavit in support of the Motion to Dismiss, (Doc. 47).  I may consider Exhibits A, B, D, and E.  Exhibit A is the transcript of the 1991 murder trial against Plaintiff.  Plaintiff refers to these trial proceedings and quotes portions of the transcript, (Compl. ¶¶ 129–141), and the rest of the trial transcript is thus integral to the Complaint and may be considered as evidence of what was said at trial.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir. 1996) (consideration of full text of document partially quoted in complaint permissible on motion to dismiss).  Exhibit B is a copy of the documents submitted to the Dutchess County Court in support of Plaintiff's motion to vacate his conviction in 2009.  I may take judicial notice of these documents, which relate to relevant previous litigation, to establish the fact of such litigation.  *See Ferrari*, 2011 WL 2297125, at *3 n.4; *see also Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268–69 (S.D.N.Y. 2005) (court may take judicial notice of documents, including letters written by counsel, filed with court in other judicial proceedings).  Exhibit D is a transcript of the February 20, 1978, police interview of Anthony Wise.  Plaintiff relies on this interview transcript in his references to Anthony Wise's confession to the King murder, (Compl. ¶ 59), and it is thus integral to the Complaint and may be considered.  *See Cortec Indus., Inc.*, 949 F.2d at 47.  Exhibit E is a list of the municipalities in Dutchess County that have their own justice courts and police departments.  Presumably, Defendants include such documents to establish that the Town of Poughkeepsie and the City of Poughkeepsie are two distinct municipal entities.  Pursuant to

---

[5] Exhibits A through C were not filed on the Court's Electronic Case Filing System as they were too voluminous, (*see* Doc. 50), but were instead submitted to the Court on CD.

Federal Rule of Evidence 201, I may take judicial notice of "widely known and indisputable facts" such as this. *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, No. 06-6278, 2006 WL 3771013, at *2 (S.D.N.Y. Dec. 18, 2006).   I decline to consider Mr. Burke's attorney affidavit, (Doc. 47), as it is essentially an argumentative summary and incorporates facts and documents the truth of which I cannot accept on this motion to dismiss.  *See Wall v. Town Sports Int'l*, No. 05-3045, 2006 WL 226008, at *1 (S.D.N.Y. Jan. 31, 2006) ("[I]t is error for a district court to 'consider[ ] affidavits and exhibits submitted by [a party] or rel[y] on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.'") (quoting *Friedl v. City of N.Y.*, 210 F.3d 79, 83–84 (2d Cir. 2000)).   I also decline to consider Exhibit C, which contains attorney correspondence, including *Brady* requests and disclosures from the 1983 criminal trial against Plaintiff, because there is nothing indicating that these materials were part of the record before the Dutchess County Court in the 2009 proceedings in which Plaintiff sought to vacate his conviction,[6] nor do they appear to have been relied upon in framing the Complaint.

Defendant City of Poughkeepsie submits three documents beyond its moving papers— Appendices A–C attached to its Reply Memorandum of Law, (Doc. 42)—and I may consider two of them.  First, I take judicial notice of Appendix B which is a copy of the indictment, a publicly filed document, issued against Matthew H. Roberts, the defendant in *People v. Roberts*, 577 N.Y.S.2d 572 (2d Dep't 1991).  *See Certain Underwriters at Lloyds' v. Milberg LLP*, No. 08-7522, 2009 WL 3241489, at *10 n.7 (S.D.N.Y. Sept. 30, 2009) (taking judicial notice of an indictment).  Second, I consider Appendix C, which is a copy of a newspaper article reporting that a neighbor heard noises in the alley the night of Crapser's murder.  My consideration of this

---

[6] Indeed, Defendants O'Neill and the County concede that these records were not before the County Court. (Defendant O'Neill's and Dutchess County's Reply Memorandum of Law in Support of their Motion to Dismiss, (Doc. 48), at 2.)

article is "limited to the fact of publication and not the truth of the article's content." *In re Bank of Am. Corp. Secs., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010).[7]  I decline to consider Appendix A as it is a copy of Plaintiff's document requests with respect to the current litigation; it is neither integral to, nor referred to in, the Complaint, and it is not relevant to my decision.

Finally, Defendant DeMattio submits Exhibits A–D as attachments to David L. Posner's attorney affidavit in support of the Motion to Dismiss, (Doc. 34), and Exhibit E, attached to Posner's second affidavit ("Posner Exh. E") (Doc. 36).  Exhibit A is a copy of the Complaint.  I consider Exhibit C, which is a copy of the Grand Jury's 1977 decision not to indict Plaintiff for the Crapser murder, to establish the fact of the proceedings because it is a matter of public record.  I also consider Exhibit E, which is an excerpt of the Holland Interview, because it is partially quoted in, (Compl. ¶ 66), and thus integral to, the Complaint.  *See San Leandro*, 75 F.3d at 808–09.  I decline to consider DeMattio's remaining supplemental submissions.[8]

## B.    Section 1983 Claims Against William O'Neill

Defendant O'Neill asserts that Plaintiff's Section 1983 claims against him for malicious prosecution, abuse of process, and fabricated evidence in violation of Plaintiff's Fifth and Fourteenth Amendment due process rights to a fair trial must fail because he is entitled to

---

[7] The City submits this article only to support its claim that Plaintiff had "ready access to the allegedly exculpatory statement" of the neighbor, not for its truth, and I consider it only for that purpose.  (Defendant City of Poughkeepsie's Reply Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated December 3, 2010, (Doc. 42) ("City's Reply"), 10.)

[8] Exhibit B is a copy of the police report documenting Plaintiff's June 30, 1977 arrest in Queens, New York.  Although Plaintiff refers to the arrest documented in the report, he does not rely on the document, nor does he incorporate the document by reference, and as such I cannot consider it.  *Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 310 (N.D.N.Y. 2010) (refusing to consider police report on motion to dismiss).  Exhibit D is a copy of a 1978 newspaper article detailing Saul Holland's guilty plea to the King murder.  This article was submitted not for the fact of its publication, but for the truth of its contents, *see* Defendant DeMattio's Memorandum of Law in Support of Motion to Dismiss ("Demattio's Mem.") dated October 8, 2010, (Doc. 35), 9) (asserting that King murder prosecution closed with convictions in 1978, as evidenced by Exhibit D), and thus cannot be considered.  *See Bank of Am.*, 757 F. Supp. 2d at 302.

absolute immunity for his actions as an ADA.  (O'Neill & County Mem. 4.)[9]  Plaintiff argues

that O'Neill's conduct was investigative, not prosecutorial, and is thus not protected by absolute

immunity.  (Pl.'s Mem. 41–43.)

### 1.  Absolute Immunity

Absolute immunity protects prosecutors from civil suits arising from activities

"intimately associated with the judicial phase of the criminal process."  *Imbler v. Pachtman*, 424

U.S. 409, 430 (1976).  The essential purpose of absolute immunity is to insulate from judicial

scrutiny the motives and reasonableness of a prosecutor's official acts.   *Robison v. Via*, 821 F.2d

913, 918 (2d Cir. 1987).  In determining whether absolute immunity protects a prosecutor's

conduct from civil suit, courts look to the nature of the function performed rather than the

identity of the performer.  *See Kalina v. Fletcher*, 522 U.S. 118, 127 (1997).  Accordingly, while

a "prosecutor's administrative duties and those investigatory functions that do not relate to an

advocate's preparation for the initiation of a prosecution or for judicial proceedings are not

entitled to absolute immunity . . . acts undertaken by a prosecutor in preparing for the initiation

of judicial proceedings or for trial, and which occur in the course of his role as an advocate for

the State, are entitled to the protections of absolute immunity."  *Buckley v. Fitzsimmons*, 509

U.S. 259, 273 (1993).

A wide range of a prosecutor's conduct is protected by absolute immunity.  "The Second

Circuit has interpreted the absolute immunity defense to include all conduct closely associated

with the judicial process, which is part of the prosecutor's traditional role as an advocate for the

State."  *Belot v. Wieshaupt*, No. 96-3005, 1997 WL 218449, at *5 (S.D.N.Y. Apr. 29, 1997)

(internal quotation marks omitted).  A prosecutor's decision to initiate a prosecution is part and

---

[9] "O'Neill & County Mem." refers to Defendants O'Neill and Dutchess County's Memorandum of Law in Support of their Motion to Dismiss, dated October 8, 2010.  (Doc. 46.)

parcel of his role as an advocate and is therefore protected by absolute immunity, *see Hill v. City of N.Y.*, 45 F.3d 653, 661 (2d Cir. 1995) ("a district attorney is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial"), as is a prosecutor's failure to disclose exculpatory evidence to a defendant, *see Rodriguez v. Goetz*, No. 09-3728, 2010 WL 451032, at *3 (S.D.N.Y. Feb. 1, 2010) (finding "disclosure of exculpatory material is an advocacy function" and thus any "claims that might arise from an alleged failure to disclose exculpatory material" are barred on basis of absolute immunity); *McCray v. City of N.Y.*, No. 03-9685, 2007 WL 4352748, at *16 (Dec. 11, 2007) (prosecutors shielded from suit on basis of allegations "that they failed to disclose exculpatory material").[10]  Likewise, interviewing witnesses in preparation for an already assembled case, *see Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998), negotiating plea bargains, *see Doe v. Phillips*, 81 F.3d 1204, 1210 (2d Cir. 1996), and failure to investigate the accusations against defendant before filing charges, *see Robinson v. Rome*, No. 11-1411, 2011 WL 1541044, at *3 (E.D.N.Y. April 20, 2011), are prosecutorial tasks that are afforded absolute immunity.

O'Neill argues that his challenged actions—namely, his alleged failure to investigate the potentially exculpatory information he discovered in the Holland interview and the Dobler Reports, suppression of that exculpatory evidence, coercion of South's false testimony before the Grand Jury, and his initiation and prosecution of charges against Plaintiff without probable cause—were prosecutorial functions that are thus protected by absolute immunity.  (O'Neill & County Mem. 8–9.)

---

[10] Although Plaintiff includes these acts—the decision to initiate prosecution and the failure to turn over exculpatory evidence—in his Complaint, he apparently only intends to pursue the failure to investigate potentially exculpatory information learned during the Holland interview and the alleged coercion of South in advance of her grand jury testimony as bases for O'Neill's liability.  (*See* Pl.'s Mem. 42.)

With respect to the failure to pursue exculpatory information from the Dobler reports and Holland interview, Plaintiff claims that O'Neill's conduct was not prosecutorial but rather investigatory.  (Pl.'s Mem. 39, 42.)  The Holland interview and the generation of the Dobler Reports (of which O'Neill was presumably aware, as they were placed in the file for the King murder, which O'Neill prosecuted in 1978) occurred five years prior to Plaintiff's indictment for the Crapser murder and after Plaintiff had been released due to lack of evidence in connection with that murder.  (Compl. ¶¶ 38, 48–50, 62.)  Acts before a prosecutor has probable cause to arrest a suspect are considered investigatory, *see Zahrey v. Coffey*, 221 F.3d 342, 347 n.2 (2d Cir. 2000), as is searching for clues or corroboration that might lead to an arrest, *see Smith*, 147 F.3d at 94.  Although interviewing witnesses in preparation for trial is afforded absolute immunity, *see Armatas v. Maroulleti*, No. 08-310, 2010 WL 4340437, at *12 (S.D.N.Y. Oct. 19, 2010), because the Holland interview was not trial-related, but rather the police interrogation of a suspect, (Compl. ¶ 62), O'Neill's participation in that interview cannot be afforded absolute immunity, *see Buckley*, 509 U.S. at 276 (when functions of prosecutors and detectives are same, so is immunity that protects them).[11]

More fundamentally, the gravamen of Plaintiff's claim with respect to Holland's information about Donald Wise's involvement in the Crapser murder (and the information in the Dobler Reports on the same subject) is that O'Neill failed to pursue it—in other words, that O'Neill failed to incorporate that information into his investigation of the Crapser murder.[12]  By

---

[11] O'Neill does not, in the alternative, assert a defense of qualified immunity and I decline to address whether such immunity should apply here.

[12] Although Plaintiff also claims that O'Neill "instruct[ed] Holland during the February 23, 1978 interrogation not to discuss Donald Wise's role in the Crapser murder," (Compl. ¶ 215), this contention is belied by information Plaintiff sets forth elsewhere in the Complaint, where Plaintiff makes clear that it was Officer Grey who "steered the conversation away" from the Crapser murder, (*id.* ¶ 66).  The transcript of the Holland interrogation, (Doc. 36-1, attached as Exh. E to Posner's Reply Aff.), which I may consider on this motion as it was relied upon in forming the Complaint, *see Chambers*, 282 F.3d at 153, also makes clear that Officer Grey changed the subject without any instruction from O'Neill, (Posner Exh. E at 002002).

definition, then, his conduct was investigative, not prosecutorial, and therefore not protected by absolute immunity. *See Buckley*, 509 U.S. at 273–74 (2006) (prosecutor not absolutely immune when acting in investigative capacity indistinguishable from that of police officer); *Kalina*, 522 U.S. at 125 (same); *Zahrey*, 221 F.3d at 346–47 (same).

Plaintiff also contends that O'Neill's alleged coercion of South, in advance of her grand jury testimony, into falsely recanting the statements she had earlier given implicating Donald Wise, is not protected by absolute immunity because at the time of the coercion O'Neill was not the attorney prosecuting the Crapser murder, and he was therefore not functioning as an advocate. (Compl. ¶ 99; Pl.'s Mem. 43.) The Supreme Court has made clear that absolute immunity can extend beyond the individual attorney who is prosecuting a case. *See Van de Kamp v. Goldstein*, 129 S. Ct. 855, 862 (2009) (because "[d]ecisions about indictment or prosecution will often involve more than one prosecutor within an office," trying prosecutor's colleagues also enjoy absolute immunity); *Doe v. Smith*, 704 F. Supp. 1177, 1185 (S.D.N.Y. 1988) (absolute immunity extended to assistant district attorney whose duties were reviewing files and interviewing witnesses in preparation for trial, despite fact that she was not the prosecuting attorney). Thus, the fact that O'Neill was not the prosecuting attorney at the time he allegedly coerced South's false testimony does not necessarily preclude absolute immunity from protecting this conduct.

Whether there was probable cause to arrest Plaintiff when O'Neill allegedly coerced South's testimony is critical to determining whether O'Neill's conduct is protected by absolute immunity. In *Buckley*, the Court held that the prosecutors' search for expert testimony to confirm that a boot print matched the defendant's boot was not protected by absolute immunity because, before the boot was matched to defendant, there was no probable cause to arrest him,

17

and the grand jury was empanelled well after the prosecutors' search for expert testimony.  509 U.S. at 275.  Because in *Buckley* the expert testimony was evidence that the prosecutors needed in order to establish probable cause, their search for such evidence was investigatory, not prosecutorial.  *Id.* (no absolute immunity when prosecutors are searching for evidence "to decide whether a suspect may be arrested").  Nevertheless, the "determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards," and if a prosecutor continues to engage in investigatory functions after probable cause is established, he is not entitled to absolute immunity.  *Id.* at 274 n.5.

Further, in *Hill*, the court faced a situation similar to the one at bar and considered whether a prosecutor was absolutely immune for allegedly coercing false witness testimony during a videotaped interview that was played for a grand jury.  45 F.3d at 662.  Critical to the *Hill* court's analysis was whether the goal in preparing the videotaped interview was to provide probable cause to arrest the suspect.  If it was, then the false testimony was intended to "collect or corroborate evidence against" the suspect, the prosecutor's acts were investigatory, and absolute immunity would not apply.  *Id.* at 662–63 (if preparation of videotape and false testimony contributed to prosecutor's finding of probable cause, "interview would then be held to be an investigatory function").  If, however, the procurement of the false witness testimony was not to secure probable cause, but simply to bolster an already-assembled case, then these "out-of-court efforts to control a witness' grand jury testimony that [were] made subsequent to the decision to indict" would be protected by absolute immunity.  *Id.* at 662.  The *Hill* court also noted that the lapse of time between the coercion of the false testimony and its presentation to the grand jury was a factor (albeit not a controlling one) to consider in determining whether the task was investigatory or prosecutorial.  *Id* at 663.  Because it was unclear from the pleadings in

*Hill* whether there was already probable cause at the time the prosecutor conducted his videotaped interview, the *Hill* court declined to opine on whether that prosecutor was protected by absolute immunity.  *Id.*

  Here, it appears from the Complaint that O'Neill's alleged coercion of South's false testimony may have been an attempt to collect and corroborate evidence against the Plaintiff, and thus is comparable to the *Buckley* prosecutors' unprotected conduct.  Although it is unclear whether South's false testimony was necessary to establish probable cause, the fact that the prosecution felt the need to present the recantation to the grand jury before indicting Plaintiff makes it at least plausible that without it, the prosecutors did not have probable cause.  (Compl. ¶ 100.)  *See Hill*, 45 F.3d at 662.  Moreover, while O'Neill correctly notes that the presentation of falsified evidence to a grand jury and the coercion of witnesses to perjure themselves at trial are considered prosecutorial, not investigatory, acts (O'Neill & County Mem. 7–8), O'Neill's alleged coercion of South's false testimony does not represent such conduct.  First, O'Neill is not alleged to have presented the false testimony to the grand jury, but rather to have coerced it in advance.  (Compl. ¶ 99.)  *See Zahrey*, 221 F.3d at 353 (no absolute immunity if prosecutor, in role as investigator, fabricates evidence and hands it to another prosecutor who unwittingly uses it, resulting in a loss of liberty).  Indeed, because O'Neill was not the prosecutor charged with appearing in the grand jury, it is plausible that when he was "speaking with [South] prior to [her] grand jury testimony," he was not "preparing as an advocate" but rather "developing evidence as an investigator."  *Id.* at 347.  Further, even if O'Neill had presented this false evidence, the presentation of false evidence to a grand jury may arguably afford immunity only insofar as the prosecutor presenting such evidence had no role in its fabrication.  *See Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 506 (2d Cir. 2004) (even knowing presentation of false evidence to a jury

"without any prosecutorial involvement in its earlier inducement" is afforded immunity).

Because the Complaint plausibly alleges that O'Neill coerced South's false testimony for later

use at a grand jury proceeding, and to establish probable cause rather than to bolster evidence

against an already-indicted individual, I find that this conduct is plausibly alleged to be

investigative, not prosecutorial, and thus not protected by absolute immunity.  *See Anilao v.

Spota*, 774 F. Supp. 2d 457, 483–84 (E.D.N.Y. 2011) (prosecutor's fabrication of false testimony

before grand jury presentation not protected by absolute immunity); *Watson v. Grady*, No. 09-

3055, 2010 WL 3835047, at *17–18 (S.D.N.Y. Sept. 30, 2010) (prosecutor's fabrication of

evidence in investigatory role not absolutely immune); *Deskovic v. City of Peekskill*, No. 07-

8150, 2009 WL 2475001, at *13 (S.D.N.Y. Aug. 13, 2009) ("[A]bsolute prosecutorial immunity

is not available for investigative conduct that occurs prior to the establishment of probable

cause."); *cf. Deskovic*, 2009 WL 2475001, at *14 (citing *Cousin v. Small*, 325 F.3d 627, 635 (5th

Cir. 2003) (prosecutor's fabrication of evidence used to support continued prosecution of an

already identified suspect, not to identify suspect or establish probable cause, protected by

absolute immunity)); *Urrego v. United States*, No. 00-1203, 2005 WL 1263291, at *3 (E.D.N.Y.

May 27, 2005) (dismissing complaint against prosecutor based on pre-grand jury meeting with

witness where no allegation witness was pressured to lie), *aff'd*, 186 F. App'x 97 (2d Cir. 2006).

If the evidence as developed shows that O'Neill was not acting in an investigatory capacity in

speaking to South before she testified in the grand jury, the issue may be revisited on summary

judgment.

### 2.   Malicious Prosecution, Abuse of Process, and Fabrication of Evidence

Although O'Neill's conduct both during the Holland interview and in allegedly coercing

South's false testimony are not protected by absolute immunity, I must nonetheless dismiss

Plaintiff's malicious prosecution claim, as it involves other conduct that is protected by absolute immunity, and his malicious abuse of process claim, because it is insufficiently pleaded. Plaintiff's fabrication of evidence claim, however, does not involve any immune conduct and is sufficiently pleaded, and O'Neill's motion to dismiss as to this claim is therefore denied.[13]

To prevail on a Section 1983 malicious prosecution claim, a plaintiff must prove that his constitutional rights were violated, and that the elements of a state law malicious prosecution claim are satisfied. *Washington v. Cnty. of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004). To state a claim for malicious prosecution under New York law, a Plaintiff must allege: (1) initiation or continuation of a criminal proceeding against him, (2) termination of that proceeding in his favor, (3) absence of probable cause for the initiation or continuation of the proceeding, and (4) malice. *See Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991). O'Neill's decision to commence and continue the prosecution of Plaintiff, the first essential element of any malicious prosecution claim, is protected by absolute immunity. *Fields v. Soloff*, 920 F.2d 1114, 1119 (2d Cir. 1990) (decision to prosecute protected by absolute immunity). Thus even if I were to find the absence of probable cause, and that O'Neill acted with malice, a malicious prosecution claim against O'Neill would still fail. *Shmueli v. City of N.Y.*, 424 F.3d 231, 237 (2d Cir. 2005) (prosecutor immune for commencing and pursuing criminal prosecution regardless of improper state of mind or motive); *Bernard*, 356 F.3d at 504 (prosecutions pursued "without probable cause" protected by absolute immunity).

In New York, a malicious abuse of process claim lies against a Defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act, (2)

---

[13] The caption of the Section 1983 claim against O'Neill suggests that Plaintiff has also asserted claims for the "Suppression of Exculpatory and Impeachment Evidence, [and] Failure to Investigate Known and Exculpatory Leads," (Compl. at 47), but Plaintiff has confirmed that the three claims he asserts are "fabrication of evidence, malicious abuse of process, and malicious prosecution." (Pl.'s Mem. 37–38.)

with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of N.Y.*, 331 F.3d 63, 70 (2d Cir. 2003) (alteration in original).  To plead a collateral objective, one must "prove not that defendant acted with an improper motive, but rather an improper purpose—that is, 'he must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" *Douglas v. City of N.Y.*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009) (quoting *Savino*, 331 F.3d at 76).  Plaintiff fails to identify any collateral objective which O'Neill sought to achieve through his alleged malicious abuse of process.  Instead, Plaintiff's sole allegation with respect to improper purpose is that O'Neill sought to obtain "an indictment and [to] continu[e] the prosecution" of Plaintiff despite the lack of probable cause.  (Compl. ¶ 232.) Presumably, Plaintiff's intended allegation is that O'Neill was motivated by the public's outrage in reaction to the Crapser murder to quickly identify and lock up a perpetrator.  While this may well have been an improper motive, it does not reveal an improper purpose beyond Plaintiff's prosecution.  Plaintiff simply does not plead that O'Neill pursued a collateral objective besides the prosecution of Plaintiff, and he therefore fails to sufficiently plead the third element of a malicious abuse of process claim.  *See Crews v. Cnty. of Nassau*, No. 06-2610, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007) (defendants' use of criminal justice system to unlawfully indict and prosecute Plaintiff in order to cover up their misdeeds fails to allege improper purpose); *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 274 (S.D.N.Y. 2008) (dismissing abuse of process claim against ADAs and holding that "[r]egardless of why an individual was prosecuted," ADAs could not be liable for abuse of process unless they sought to achieve some other goal besides Plaintiff's conviction).  Further, obtaining an indictment and continuing a prosecution are, for reasons discussed above, acts for which a prosecutor is

absolutely immune in any event.  Accordingly, Plaintiff's abuse of process claim against

Defendant O'Neill is dismissed.

A Section 1983 fabrication of evidence claim protects an individual's "constitutional

right not to be deprived of liberty as a result of the fabrication of evidence by a government

officer acting in an investigatory capacity, at least where the officer foresees that he himself will

use the evidence with a resulting deprivation of liberty." *Zahrey*, 221 F.3d at 344.  Thus, to

successfully plead a Section 1983 fabrication of evidence claim, Plaintiff must assert that his

liberty was deprived as a result of the fabricated evidence.  *Id.* at 354.  Here, Plaintiff

successfully alleges that "the deprivation of [his] liberty was the legally cognizable result of

[O'Neill's] alleged misconduct in fabricating evidence," *id.*—specifically, O'Neill's "coercing

South to testify falsely before the Grand Jury in 1983."  (Compl. ¶¶ 232–33.)  After Plaintiff's

indictment in 1983, he was detained, (*id.* ¶ 109), a loss of liberty plausibly resulting at least in

part from South's allegedly coerced recantation.  Moreover, as explained above, I have already

found that that Complaint plausibly alleges that O'Neill was acting in an investigatory capacity

when he obtained South's false testimony, and "prosecutors are not protected by absolute

immunity for fabricating evidence if they acted in an investigatory role." *Watson*, 2010 WL

3835047, at \*17.  O'Neill's motion to dismiss Plaintiff's fabrication of evidence claim is

therefore denied.

> ### C.    *Monell* Claims
>
> #### 1.  Legal Standards

"Congress did not intend municipalities to be held liable [under § 1983] unless action

pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v.*

*Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978).  Thus,

> to prevail on a claim against a municipality under section 1983 based on acts of a
> public official, a plaintiff is required to prove:  (1) actions taken under color of
> law; (2) deprivation of a constitutional or statutory right; (3) causation; (4)
> damages; and (5) that an official policy of the municipality caused the
> constitutional injury.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  The fifth element reflects the notion

that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."

*In re Dayton*, No. 09-8140, 2011 WL 2020240, at *8 (S.D.N.Y. Mar. 31, 2011) (quoting *Bd. of

Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)).

There must be a "direct causal link between a municipal policy or custom and the alleged

constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  "[A]n act

performed pursuant to a 'custom' that has not been formally approved by an appropriate

decisionmaker may fairly subject a municipality to liability on the theory that the relevant

practice is so widespread as to have the force of law."  *Brown*, 520 U.S. at 404.  *Monell's* reach,

therefore, goes beyond unconstitutional policies that have been formally endorsed by the

municipality and includes "instances in which a municipality's knowledge of and support for its

officers' unconstitutional conduct can be inferred from its failure to curtail that conduct."

*MacIsaac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 597 (S.D.N.Y. 2011); *see Dorsett-

Felicelli, Inc. v. Cnty. of Clinton*, 371 F. Supp. 2d 183, 194 (N.D.N.Y. 2005) (describing the four

theories of *Monell* liability, only one of which involves "a formal policy officially endorsed by

the municipality").

A custom or policy cannot, however, be shown "by pointing to a single instance of

unconstitutional conduct by a mere [government] employee."  *Newton*, 566 F. Supp. 2d at 271;

*see City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a

single incident of unconstitutional activity is not sufficient to impose liability under *Monell*,

unless proof of the incident includes proof that it was caused by an existing, unconstitutional

24

municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

"In *City of Canton, Ohio v. Harris*, the Supreme Court established that a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (citing *City of Canton*, 489 U.S. at 387–90). Failure to train, however, is a narrow basis of liability and "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *see Tuttle*, 471 U.S. at 822–23 (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389; *see Connick*, 131 S. Ct. at 1359–60.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410; *see Cash v. Cnty. of Erie*, No. 09-4371, 2011 WL 3625093, at *7 (2d Cir. Aug. 18, 2011) ("deliberate indifference is a stringent standard of fault, and necessarily depends on a careful assessment of the facts at issue in a particular case") (internal citations and quotation marks

omitted).  Thus, when city policymakers are on actual or constructive notice that a particular

omission in their training program causes city employees to violate citizens' constitutional rights,

the city may be deemed deliberately indifferent if the policymakers choose to retain that

program.  *Brown*, 520 U.S. at 407.  The city's "policy of inaction" in light of notice that its

program will cause constitutional violations "is the functional equivalent of a decision by the city

itself to violate the Constitution."  *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and

dissenting in part).  A less stringent standard of fault for a failure-to-train claim "would result in

*de facto respondeat superior liability* on municipalities . . . ."  *Id.* at 392 (emphasis in original);

*see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983

attaches where—and only where—a deliberate choice to follow a course of action is made from

among various alternatives by [the relevant] officials . . .");  *see also Connick*, 131 S. Ct. at 1360

(same).

      In our Circuit, to demonstrate deliberate indifference, a plaintiff must establish:  (i) that a

policymaker knows to a "moral certainty" that the municipality's employees will confront a

certain situation; (ii) that that situation presents the municipal employee with either a difficult

choice of the type that training or supervision will make less difficult, or that there is a history of

municipal employees improperly handling the situation; and (iii) that the wrong choice by the

municipal employee will often cause the deprivation of an individual's constitutional rights.  *See*

*Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992).  A plaintiff also must ultimately

identify "a specific deficiency in the city's training program and establish that that deficiency is

'closely related to the ultimate injury,' such that it 'actually caused' the constitutional

deprivation."  *Amnesty Am.*, 361 F.3d at 129 (quoting *Canton*, 489 U.S. at 391).  In other words,

a plaintiff must demonstrate that the municipal employee's "'shortcomings . . . resulted from . . .

a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances."  *Id.* at 129–30 (quoting *Canton*, 489 U.S. at 390–91); *see Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440–41 (2d Cir. 2009) ("plaintiff must offer evidence to support the conclusion that the training program was inadequate, not that a particular [state actor] may be unsatisfactorily trained or that an otherwise sound program has occasionally been negligently administered, and that a hypothetically well-trained [state actor] would have avoided the constitutional violation").  "The elements of an identified training deficiency and a close causal relationship, which together require the plaintiff[] to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train does not collapse into respondeat superior liability."  *Amnesty Am.*, 361 F.3d at 130 (emphasis omitted).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cnty.*, 520 U.S. at 409).  Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability."  *Bryan Cnty.*, 520 U.S. at 407.  Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.  *See Connick*, 131 S. Ct. at 1360.

The *Canton* Court left open the possibility that, "in a narrow range of circumstances," a history or pattern of prior violations might not be necessary to show deliberate indifference because the need for more or different training is "obvious."  *Bryan Cty.*, 520 U.S. at 409; *see*

*Connick*, 131 S. Ct. at 1360–61.  This hypothesis, however, was premised on the assumption that

the municipality had decided not to train its officers about the constitutional limits of the use of

deadly force.  *Connick*, 131 S. Ct. at 1361.  Under such circumstances, the Court opined, the

highly predictable consequence—in *Canton*, that deadly force could be misused in violation of

citizens' rights—could be deemed so obvious as to reflect deliberate indifference.  *Id.*; *see*

*Harvey v. Campbell Cnty., Tenn.*, 09-5041, 2011 WL 1789955, at *5 (6th Cir. May 10, 2011)

(despite fact that deliberate indifference could be shown "through evidence of a single violation,"

plaintiff who had been subjected to officer's unreasonable use of deadly force failed to establish

deliberate indifference because he had "not produced even a scintilla of affirmative evidence

tending to show [defendant's] training was so inadequate as to evidence deliberate

indifference").  The obviousness of the risk of constitutional violations from the failure to take

action must be "obvious in the abstract," however, and not dependent upon the circumstances of

the individuals involved in any particular case.  *Gold v. City of Miami*, 151 F.3d 1346, 1352

(11th Cir. 1998) (quoting *Brown*, 520 U.S. at 410); *see Brown*, 520 U.S. at 410 (holding isolated

incident of sheriff's inadequate screening of deputy's job application did not create such an

obvious risk that it alone established municipality's deliberate indifference to risk that deputy

would use excessive force); *Btesh v. City of Maitland, Fla.*, 10-71-19, 2011 WL 3269647, at *32

(M.D. Fla. July 29, 2011) (finding that "risk of failing to train police officers to flag the

addresses of mentally ill persons is . . . insufficiently obvious in the abstract to impose municipal

liability under Section 1983 absent a prior history of injuries resulting from a failure to flag

residences").  Finally, merely showing "that additional training would have been helpful [to

municipal employees] in making difficult decisions does not establish municipal liability."

*Connick*, 131 S. Ct. at 1363; *see Canton*, 489 U.S. at 391 ("[P]rov[ing] that an injury or accident

could have been avoided if an [employee] had had better or more training, sufficient to equip

him to avoid the particular injury-causing conduct" is not sufficient to establish municipal

liability); *Harvey*, 2011 WL 1789955, at *5 ("mere allegations that an officer was improperly

trained or that an injury could have been avoided with better training are insufficient to make out

deliberate indifference").

### 2.   Section 1983 Claims Against Dutchess County

Plaintiff asserts a Section 1983 municipal liability claim against Dutchess County

alleging that it is liable for its failure to train and supervise ADAs regarding *Brady* compliance,

(Pl.'s Mem. 19), and for O'Neill's allegedly unconstitutional final decisions as a county

policymaker.  (*Id.*)  Dutchess County contends that Plaintiff fails to state both a failure to train

and a policymaker claim, because:  (1) Plaintiff does not plead a pattern of similar constitutional

violations, and (2) ADAs are not policymakers.  (O'Neill & County Mem. 15–17.)

### i.   Failure to Train Prosecutors to Comply with *Brady*

Plaintiff argues that the County was deliberately indifferent here because the need to train

ADAs to properly turn over exculpatory evidence "was obvious and the failure to act so likely to

result in constitutional violations."  (Compl. ¶ 194.)  Plaintiff does not, however, plead a pattern

of similar violations by untrained employees, and his allegations are limited to the constitutional

violations in his own case, including the failure of assistant district attorneys to turn over four

pieces of *Brady* evidence.  (*Id.* ¶¶ 146–50, 193–97.)[14]  The Supreme Court recently addressed a

nearly identical claim in *Connick*, 131 S. Ct. 1350.[15]  The *Connick* Plaintiff was wrongfully

---

[14]  These four pieces of *Brady* evidence are:  (1) the Regula report; (2) the neighbor's statement to Officer
Murphy that she heard noises in the alley adjacent to Crapser's home the night of the murder; (3) the Holland tape;
and (4) the Dobler reports.  *See* page 6 above.
[15]  The parties did not have the benefit of the Supreme Court's determination on this issue when they filed
their briefs, as the *Connick* decision came down after these motions were fully submitted.  *See Connick*, 131 S. Ct.
1350.

convicted after ADAs failed to turn over *Brady* evidence, and he brought a Section 1983 failure

to train claim against the District Attorney's office.  *See Connick*, 131 S. Ct. at 1357.  He argued

that—despite the lack of a pattern of violations—in the absence of *Brady* training the risk of

constitutional violations by ADAs was so obvious that the Defendant was deliberately

indifferent.  *Id.*  The Court held, however, that the "[f]ailure to train prosecutors in their *Brady*

obligations does not fall within the narrow range" of claims that do not require a pattern of

violations to establish deliberate indifference.  *Id.* at 1361.  Specifically, the Court pointed out

that prosecutors are equipped with years of extensive legal training both in and out of law school,

and as such "recurring constitutional violations are not the 'obvious consequence' of failing to

provide prosecutors with formal in-house training" regarding *Brady* compliance.  *Id.* at 1363.

Thus, because Plaintiff did not establish a pattern of similar constitutional violations, the

*Connick* Court held that Plaintiff's failure to train claim failed as a matter of law.  *Id.* at 1366.

     As in *Connick*, Plaintiff here alleges that "the need to train prosecutors regarding

compliance with *Brady* was clear; and the District Attorney's failure to implement such training

constituted deliberate indifference."  (Pl.'s Mem. 20.)  The Complaint does not allege a similar

pattern of constitutional violations, and instead merely asserts that because the County was aware

of "the misconduct of Defendant O'Neill and other assistant district attorneys . . . in the

investigation and prosecution of the Crapser murder . . . the need for the County's policymakers

to act was obvious."  (Compl. ¶¶ 193–94.)  The Court's holding in *Connick* thus precludes

Plaintiff's claim that the County "should be held liable for failing to train the ADAs as to their

responsibilities to turn over exculpatory evidence under *Brad*y."  *Robinson*, 2011 WL 1541044,

at *4.  Because the failure to train prosecutors to comply with *Brady*—which forms the basis of

Plaintiff's claim—cannot amount to deliberate indifference in the absence of a pattern of similar

constitutional violations, Plaintiff's failure to plead such a pattern compels dismissal of this claim.  Defendant Dutchess County's Motion to Dismiss Plaintiff's failure to train claim is therefore granted.

### ii.  Policymaker Liability

Municipalities can also incur liability when the act of a municipal policymaker who "possesses final authority to establish municipal policy with respect to the action ordered" violates an individual's constitutional rights.  *Pembaur*, 475 U.S. at 481 (plurality opinion). Because such policy decisions may fairly be said to represent official policy, they are no different than the direct acts of a municipality's legislative body, and the municipal liability is therefore identical.  *See id.* at 480–81.  Plaintiff here asserts a Section 1983 policymaker claim against Dutchess County based on the acts of ADA O'Neill as a final municipal policymaker. Specifically, Plaintiff claims that the District Attorney delegated policymaking authority regarding *Brady* compliance to ADAs; that O'Neill thus possessed final policymaking authority with respect to the turnover of *Brady* material; and that O'Neill's *Brady* violations therefore represent an unconstitutional, official, county policy.  (Compl. ¶¶ 160, 192.)

Determining whether an individual possesses final policymaking authority is a question of state law.  *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1348 (2d Cir. 1994) ("[I]dentification of policymaking officials is a question of state law.").  Courts in this circuit have repeatedly held that ADAs do not, as a matter of law, possess policymaking authority.  *See Weir v. City of N.Y.*, No. 05-9268, 2008 WL 3363129, at *7 (S.D.N.Y. Aug. 11, 2008) (ADA is not a policymaker); *Peterson v. Tomaselli*, No. 02-6325, 2004 WL 2211651, at *10 (S.D.N.Y. Sept. 30, 2004) (ADAs are below policymaking level); *Belot*, 1997 WL 218449, at *8 ("[P]laintiff's assertion that defendants acted as policymakers is without merit because

defendants are *assistant* district attorneys, who are below the policymaking level."); *Feerick v. Sudolnik*, 816 F. Supp. 879, 886 (S.D.N.Y. 1993), *aff'd* 2 F.3d 403 (2d Cir. 1993) (ADA's exercise of individual judgment did not reflect municipal policy).  Moreover, if the delegation of individual case-related decisions to trial prosecutors rendered them policymakers, *Monell's* and *Pembaur's* protections would be eviscerated, as every ADA would be a "final policymaker" for a given case.  No authority exists for such a proposition.  Because ADAs making *Brady* disclosure decisions are not policymakers, Plaintiff's claim for policymaker liability against Dutchess County based on O'Neill's actions in Plaintiff's case is dismissed.[16]

### 3.  Section 1983 Claims Against City of Poughkeepsie

Plaintiff also asserts a Section 1983 claim against the City of Poughkeepsie, alleging that the "Officers' destruction of notebooks and failure to record in writing all statements taken from eyewitnesses in connection with felony investigations directly caused the violation of Mr. Bozella's constitutional rights."  (Compl. ¶ 181.)[17]

With respect to the alleged policy instructing officers to destroy notebooks that contained notes relating to an investigation once the officer incorporated the information into a police report for that matter, there is no allegation in the Complaint that this policy was followed in Plaintiff's case or that such a policy led to a deprivation of Plaintiff's constitutional rights. "*Monell* does not provide a separate cause of action for the failure by the government to train its

---

[16] Plaintiff relies on *Conte v. County of Nassau*, No. 06-4746, 2010 WL 3924677, at *29 (E.D.N.Y. Sept. 30, 2010), to demonstrate that an ADA can be a policymaker, (Pl.'s Mem. 23), but that case—in which the Court in any event reached no final conclusions—addressed a situation in which the ADAs were arguably acting as supervisors, *Conte*, 2010 WL 3924677, at *30.  The Complaint's allegations in this case demonstrate that O'Neill, in making decisions regarding *Brady* disclosures in Plaintiff's case, was acting as a front-line, trial prosecutor. (Compl. ¶¶ 118, 127, 160–64, 192.)  The actions of an ADA "undertaken in the prosecution of a criminal case . . . cannot be said to represent the actions of a policymaker responsible for a delineated policy that caused a constitutional deprivation."  *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 170 (S.D.N.Y. 2007).

[17] The Court is puzzled by Plaintiff's implication that these obligations should be limited to felony investigations.  If officers were, in fact, constitutionally required to retain their original notebooks and to record every single witness statement in writing in connection with a felony investigation, presumably they would also be constitutionally required to do so in connection with misdemeanor investigations.

employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original); *see Canton*, 489 U.S. at 385 (municipality only liable under Section 1983 where there is "direct causal link between a municipal policy or custom and the alleged constitutional deprivation"); *Bohmer v. New York*, No. 06-11370, 2011 WL 2651872, at *3 (S.D.N.Y. June 16, 2011) (same); *Bowen v. Cnty. of Westchester*, 706 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (same). Thus, in the absence of an independent constitutional violation affecting Plaintiff which arose from the destruction of a notebook entry, there can be no *Monell* liability here on the basis of that alleged policy.[18]

Moreover, not only does Plaintiff not plead even a single example of officers destroying notebooks pursuant to this alleged policy in connection with his case, but he relies for the existence of the policy on *People v. Roberts*, 577 N.Y.S.2d 672 (2d Dep't 1991), which found such an unconstitutional policy existed in the *Town* of Poughkeepsie—an entirely separate municipal body from the *City* of Poughkeepsie.[19] *See id.* at 673–74; City's Reply, Appendix B,

---

[18] Plaintiff does not appear to be asserting that any constitutional violations arose from the alleged destruction of the recording of Lamar and Stanley Smith's statements in the police car which were inconsistent with their grand jury and trial testimony. If he did intend to set forth such an assertion, however, the same analysis would apply—namely, there is no allegation that Plaintiff was unaware of the Smiths' prior inconsistent statements, that the contents of those statements were withheld from him, or that the unavailability of the recording of those statements led to any deprivation of his constitutional rights.

[19] Even if the town and city were not distinct municipal entities, I still could not infer from *Roberts* that the city had an unconstitutional policy of instructing officers to destroy notebooks because I cannot consider *People v. Roberts* for its truth, but only to establish the fact that it was litigated. *See Global Network*, 458 F.3d at 157 (consideration of previous court opinion limited to establish fact of prior litigation, not truth of facts therein). Furthermore, the *Roberts* court determined that the material at issue, "notes taken by the assigned detectives during their initial interview with the victim," which was destroyed "[p]ursuant to a procedure established" by the Town of Poughkeepsie, "constituted *Rosario* material," not *Brady* material. *Roberts*, 577 N.Y.S.2d at 673. "*Rosario* went beyond requirements later defined in *Brady* and its progeny, holding that a prosecutor must disclose any prior statement of its witness, regardless of whether it is favorable to the accused," and thus "exceed[s] federal constitutional requirements." *Valentin v. Mazzuca*, No. 05-0298, 2011 WL 65759, at *7 n.2 (W.D.N.Y. Jan. 10, 2011). Therefore, to the extent that the *Roberts* decision turned on the fact that the destroyed notes were *Rosario*, but not necessarily *Brady*, material, it is even more inapplicable here.

Indictment of Matthew H. Roberts.  Plaintiff thus provides no factual support for the existence of this allegedly unconstitutional policy.

Accordingly, without the destruction-of-notes allegations, Plaintiff's allegations against the City rest exclusively on the failure to write down Crapser's neighbor's statement that she heard noise in the alleyway on the night of the murder.  Plaintiff alleges that this failure reflects both an unconstitutional policy as well as a failure to train.  Plaintiff apparently regards the failure to write down the neighbor's statement as a failure to memorialize an eyewitness statement.  (*See* Compl. ¶ 181 ("Officers' destruction of notebooks and failure to record in writing all statements taken from eyewitnesses . . . directly caused the [constitutional] violation").)  Plaintiff is mistaken.  Crapser's neighbor was not an eyewitness to the crime.  She was not even an "earwitness" because she did not hear the crime taking place.  Instead, she heard something that was perhaps relevant to the crime but which the officers, at the time they failed to record it, had no way of knowing would be relevant.  Nor, at the time, could the officers have known whether it was inculpatory or exculpatory as to any particular Defendant.  Thus, in this circumstance, even if the police had a policy of not writing down exculpatory or impeachment evidence—and there are no facts plausibly alleging same—the neighbor's statement could not have been understood to be, or regarded as, exculpatory or impeachment evidence at the time the officers heard and failed to record it.  In sum, the neighbor was not an eyewitness; she was an interviewee.  And what the officers failed to record was her interview statement, not exculpatory or impeachment material.  Plaintiff's claim, then, boils down to the argument that the City's training was inadequate because it did not require officers to write down every single item of information that they are told during the course of an investigation, and/or that the City had an unconstitutional policy of not so requiring.

The Court is aware of no constitutional requirement that officers write down every single thing they are told during an investigation.  Such a requirement would be wholly impractical.  If officers were to attempt such a feat, their work would be paralyzed.  They would spend ten minutes of every hour asking questions and the remaining fifty minutes writing down the answers.  Every statement, regardless of relevance or importance, would need to be treated equally.  In daily police work, and particularly in the context of a quickly evolving investigation, such a requirement would be absurd.  Officers make judgments every day (perhaps dozens of times a day) about what merits being written down; the fact that a single such decision in hindsight was a misjudgment does not establish a failure to train or an unconstitutional policy.  This Court is certainly not going to be the first to constitutionalize a mandate that officers cannot exercise judgment about what to record, but instead must memorialize every single thing they are told during an investigation—even those which appear unimportant, irrelevant or innocuous— lest one of those statements later turns out to be helpful to the defense.[20]  "As the late Emory Buckner, Esq., a really great trial lawyer, once truly remarked:  'There is no such thing as a democracy of facts.'"  *Radio Corp. of Am. v. Decca Records*, 51 F. Supp. 493, 494 (S.D.N.Y. 1943).  Application of the rule for which Plaintiff advocates here would force police officers to create just such a democracy, requiring them to treat every statement made to them as equally important.

---

[20] The police have an obligation to turn over exculpatory or impeachment material whether or not it is written down.  And although I reach no definitive conclusion on the matter, it is by no means obvious that a reasonable police officer, hearing (as Regula did) four days after the neighbor's interview that the Smiths placed Plaintiff on the front porch entry to the victim's apartment, would recognize as helpful to the defense the neighbor's statement about the noise in the alley.  Plaintiff entering the victim's apartment via the porch at one point, and someone being in the alley at an unknown point, are by no means mutually exclusive.  The Complaint alleges that Regula found the neighbor credible, but it does not allege that he regarded her statement as *Brady* material or that its nature as *Brady* material was apparent.

On the other hand, if the statement were *Brady* material, I am not convinced that it having been reported in the newspaper (assuming the neighbor discussed in the article to which Defendants point was the same neighbor to whom Murphy spoke), (*see* City's Reply App. C), would vitiate any *Brady* obligation.  A defense lawyer appointed in 1983—the pre-Internet era—could not reasonably be expected to hunt manually through a newspaper morgue on a fishing expedition for exculpatory information that might be contained in 1977 articles.

Furthermore, ordinarily a pattern is required to establish a policy and a single incident is insufficient to establish municipal liability under *Monell*.[21] *See Bowen*, 706 F. Supp. 2d at 484 (quoting *Newton*, 566 F. Supp. 2d at 271) (to successfully plead existence of official policy for *Monell*, Plaintiff must do more than simply point "'to a single instance of unconstitutional conduct by a mere [government] employee'"); *Tuttle*, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").  No such pattern is alleged here.[22]  That a single statement which later turned out to be helpful to the defense (but that the officers could not have known at the time might be helpful) was not written down also does not meet the *Canton* exception for a deliberate decision not to train on a subject that has patently obvious unconstitutional consequences.  *Canton* recognizes that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."  489 U.S. at 391; *see Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) (plaintiff cannot establish municipal liability solely by inference from evidence of occurrence of incident in question).  "[M]istakes alone are not sufficient to subject the municipality to § 1983 liability."  *Davis v. Dist. of Columbia*, No. 10-1756, 2011 WL

---

[21] Plaintiff argues, in connection with his claims against the County, that the Second Circuit has held that a single *Brady* violation in connection with Plaintiff's own case is sufficient to survive a motion to dismiss.  (Pl.'s Mem. at 22 (citing *Walker*, 974 F.2d at 300).)  *Walker*, however, was decided under the now-abandoned "no set of facts" standard for motions to dismiss.  *See* 974 F.2d at 298; *see also Twombly*, 550 U.S. at 562–63 ("*Conley*'s 'no set of facts language' . . . has earned its retirement").  It held that while Plaintiff had failed to plead a pattern, discovery might reveal one, and thus the complaint was not dismissed.  Under the presently applicable standards, however, a plaintiff is not allowed to fish for evidence of a pattern through discovery, but must instead set forth facts making a pattern plausible before the "doors of discovery" are unlocked.  *Iqbal*, 129 S. Ct. at 1950.  Thus, the failure to train claim in *Walker* survived not because the Court viewed a single incident as sufficient to make out a failure to train claim, but rather because the Court, under the then-applicable standard, had to give Plaintiff the chance to determine in discovery whether a pattern existed.  *Walker's* holding is thus of no aid to Plaintiff.

[22] The Complaint does not plausibly allege a general failure to memorialize witness statements.  Indeed, Plaintiff specifically pleads two instances where officers correctly memorialized exculpatory eyewitness statements.  (Compl. ¶¶ 33–36, 48.)  Thus, Plaintiff's allegation must be that not every single statement of every single witness was memorialized.

3240439, at *5 (D.D.C. July 21, 2011).  It is not patently obvious or predictable that preventing

officers from exercising judgment in recording statements is necessary to meet constitutional

requirements, even if doing so might reduce the possibility of a mistake.  In other words,

although one could reasonably conclude that writing every single thing down would reduce the

chance of an item of *Brady* material slipping through the cracks, that conclusion is insufficient to

meet the *Canton* exception.  *See Canton*, 489 U.S. at 391 (that injury could have been avoided

with different training is insufficient).  Indeed, if the need for such a policy or such training were

obvious, one would think there would be a case saying as much, or there would be police

departments that implement and train on such a policy, but there are none of which the Court is

aware or to which Plaintiff has pointed.

       Moreover, there is no indication here that what turned out to be a poor judgment call was

caused by a training failure.  The second prong of the deliberate indifference test requires either a

history of violations (absent here) or a situation that training would make less difficult.  There is

no plausible training that would make officers' decisions about what to write down less difficult;

such decisions are, by their nature, case-, fact-, and circumstance-specific.  Police officers can be

trained to write down what seems important, but there is no training that could tell them what

will be important in any given investigation.  Short of training officers to write down every

single solitary statement that is made to them—which would essentially grind policework to a

halt—there is no training that could help an officer discern, in a vacuum, which facts will later

turn out to be important in a given case.  Thus, Plaintiff's claim does not meet the second prong

of the deliberate indifference test.  Indeed, the Complaint just as plausibly supports the

conclusion that the officers did not record the neighbor's statement because of negligence or the

belief that it was not important—in other words, not as the result of a policy, and not the sort of

conduct that a training program could rectify.  Further, it is reasonable to expect officers to

exercise common sense unless there is a pattern of them not doing so, and in the absence of such

a pattern, it is reasonable to leave these judgment calls to their discretion.  *See Walker*, 974 F.2d

at 300; *Dunk v. Brower*, No. 07-7087, 2009 WL 650352, at *11 n.11 (S.D.N.Y. Mar. 12, 2009).

The Complaint here certainly does not suggest that the City, knowing that any and all statements

should be memorialized, made a deliberate choice not to train officers to do so.  *See Canton*, 489

U.S. at 389 (deliberate indifference requires policymakers making deliberate choice among

various alternatives).

In short, it cannot be "obvious" that officers are constitutionally required to write down

every single statement they are told and may not exercise independent judgment about what is

important enough to record.  Nor was there a pattern or history of violations alleged here.

Accordingly, any failure to train claim against the City necessarily must fail.  Stripped of the

formulaic recitation, labels and conclusions, *see Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at

555, Plaintiff's claim "is premised on nothing more than an unsupported opinion that the officer

must not have been adequately trained [in the recording of statements] because, had he been, he

would have [recorded the neighbor's statement] . . . . That is precisely the unwarranted leap of

logic against which the Supreme Court expressly warned."  *Johnson v. City of Gretna*, No. 10-

1660, 2011 WL 2144427, at *4 (E.D. La. May 31, 2011).  "[R]estating ([Plaintiff's] version of)

the facts in this singular case does not, without more, support any conclusion that the City failed

to train its agents."  *Schaer v. City of N.Y.*, No. 09-7441, 2011 WL 1239836, at *14 (S.D.N.Y.

Mar. 25, 2011).  Likewise, it does not suggest an unconstitutional policy.  Taking the allegations

of the Complaint in the light most favorable to Plaintiff, the failure to write down the neighbor's

statement was a single lapse (if that)[23] that cannot fairly be attributed to the Chief of Police or the City under applicable legal standards.  Accordingly, the *Monell* claim against the City is dismissed.

### D.      Conspiracy Claim Against Robert DeMattio & William O'Neill

Finally, Plaintiff asserts a Section 1983 conspiracy claim against Officer Robert DeMattio and ADA O'Neill.  To bring a Section 1983 conspiracy claim, Plaintiff must allege the existence of "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  Plaintiff must also plead with the "requisite specificity [which] requires that the plaintiff make an effort to provide some details of time and place and the alleged effect of the conspiracy." *Jessamy v. City of New Rochelle, N.Y.*, 292 F. Supp. 2d 498, 513 (S.D.N.Y. 2003) (internal quotation marks omitted).  "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights" are insufficient to survive a motion to dismiss.  *Id.*  Moreover, "to survive a motion to dismiss, the claim must contain facts that plausibly suggest a meeting of the minds and provide some details of time and place and must not contain conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights." *Cameron v. Wise*, No. 09-

---

[23] Plaintiff argues that it was a double lapse, in that neither Murphy nor Regula wrote down the statement. Even under the theory that all witness statements should be memorialized, however, only one officer would have that duty—either the officer who heard the statement or another officer assigned to memorialize statements heard by others; not even Plaintiff would argue (the Court does not think) that the obligation to memorialize would extend past the officer who heard the statement in the first place (or another officer tasked with memorializing such statement on behalf of the first officer) to cover every officer who heard the statement from a fellow officer in the course of an investigation.  If that were so, every time one officer shared with others the results of an interview, it would set off a cascading obligation of memorialization on the part of multiple other officers.

Plaintiff also argues that a pattern is formed by the failure to write down the neighbor's statement combined with the disappearance of the recording of the Smith brothers' statements in the police car.  The latter issue, however, is not one of failing to memorialize—to the contrary, the Smiths' statements were recorded—and the Complaint contains no facts suggesting that the unavailability of that recording was the result of conduct by the City, let alone conduct occurring as part of a policy or custom.

967, 2011 WL 1496341, at *7 (S.D.N.Y. Apr. 20, 2011) (internal quotation marks omitted); *see Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (plaintiff must plead facts demonstrating that defendants entered into agreement, express or tacit, to achieve the unlawful end); *Warren v. Fischl*, 33 F. Supp. 2d 171, 178 (E.D.N.Y. 1999) (dismissing claim because Plaintiff failed to allege facts showing that Defendant "entered into an agreement or any other facts to support that a conspiracy was formed").

Plaintiff asserts that DeMattio and O'Neill were silent during the interview of Saul Holland, when Officer Grey instructed Holland not to discuss the Crapser murder any further, and that such silence "evidences an agreement among them to act in concert to inflict a constitutional injury upon" Plaintiff. (Compl. ¶ 236.) Specifically, Plaintiff argues that "it is plausible to infer that Mr. DeMattio and William O'Neill understood the import of Holland's statement, and their collective silence in response to Officer Grey's instruction was a tacit agreement not to follow-up on an exculpatory lead." (Pl.'s Mem. 45.) This speculation as to the import of a single non-action, however, is exactly the type of conclusory allegation of agreement proscribed by the cases. *See Twombly*, 550 U.S. at 557 (allegation of parallel conduct and bare assertion of conspiracy insufficient to withstand motion to dismiss); *Anderson News, L.L.C. v. Am. Media, Inc.*, 732 F. Supp. 2d 389, 402 (S.D.N.Y. 2010) (no plausible inference of agreement where plaintiff merely alleges parallel conduct). Plaintiff pleads no facts suggesting that O'Neill and DeMattio's mutual silence evidenced a meeting of the minds to deprive Plaintiff of his constitutional rights—as is required at the pleading stage, *Cameron*, 2011 WL 1496341, at *7— as opposed to this silence evidencing, for example, the belief that they should not contradict or interrupt the questioner during a suspect's interrogation, their agreement with Grey that they did not want the suspect to get confused by discussing a different murder, or simple inattention. *See*

40

*Twombly*, 550 U.S. at 566–67 (allegations of parallel conduct explainable by reasons other than conspiracy are insufficient to plead an agreement among conspirators).  Plaintiff here alleges only a conspiracy "inferred from silence."  *Anderson*, 732 F. Supp. 2d at 402.  Rather than "provid[ing] some factual basis supporting a meeting of the minds," *Romer*, 119 F. Supp. 2d at 363, the allegations here "do not permit [me] to infer more than the mere possibility of misconduct," *Iqbal*, 129 S. Ct. at 1950.[24]  That both O'Neill and DeMattio did nothing to alter Grey's conduct of the Holland interview thus does not suffice to render the conspiracy allegation plausible, especially when neither DeMattio nor Grey is alleged to have had anything to do with the Crapser investigation from that point forward.  Taking the Complaint in the light most favorable to Plaintiff, the facts underlying his conspiracy claim "are merely consistent with [Defendants'] liability [but] stop[] short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).  Plaintiff's conspiracy claim against DeMattio and O'Neill is therefore dismissed.

## IV.   LEAVE TO AMEND

Leave to amend is ordinarily freely granted when a motion to dismiss is granted.  *See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[W]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.") (internal quotation

---

[24] Plaintiff cites *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992), for the proposition that ratification of another's unconstitutional conduct can evidence an agreement, (Pl.'s Mem. at 44), and describes that case as holding that "defendant's 'mere acquiescence' in a co-conspirator's constitutional violation gives rise to Section 1983 conspiracy liability," (*id.* at 44–45 (quoting *Hafner*, 983 F.2d at 577).)  Plaintiff mischaracterizes *Hafner* and its applicability to this case.  The court there found that the defendant had done more than merely acquiesce; he had initiated the assault at issue by applying the first kick, and stood by while other officers continued the beating.  *See* 983 F.2d at 577.  The court went on to say that mere acquiescence could be sufficient to show the meeting of the minds required for conspiracy where one officer "watches an open breach of the law" and fails to intervene.  *Id.* at 578.  O'Neill and DeMattio did not observe Grey engaging in an "open breach of the law" in his conduct of the Holland interview.

Plaintiff also misleadingly suggests that *McCray*, 2007 WL 4352748, at *4, 23, upheld a conspiracy claim where the detective and prosecutor defendants allegedly suppressed evidence of a more likely suspect by manipulating interview testimony.  (*See* Pl.'s Mem. at 46.)  It suffices to say that the conduct alleged in *McCray* (the "Central Park jogger" case) went well beyond what Plaintiff describes in his brief and well beyond anything he raises in his Complaint as supporting the notion of a conspiracy among O'Neill, DeMattio and Grey.

41

marks omitted); *Cohen v. Citibank, N.A.*, No. 95-4826, 1997 WL 88378, at *2 (S.D.N.Y. Feb.

28, 1997) (same).  Leave may be denied, however, where amendment would be futile.  *Malester*

*v. Adamo*, No. 09-9374, 2010 WL 5065865, at *4 (S.D.N.Y. Dec. 8, 2010) ("A motion for leave

to amend should be denied when allowing such an amendment would be futile in that it could not

withstand a motion to dismiss for failure to state a claim.").

      At the September 8, 2010 pre-motion conference, the parties and the Court discussed the

claimed deficiencies in the Plaintiff's Complaint and the bases upon which Defendants O'Neill,

Dutchess County, and DeMattio were going to seek dismissal of the action.  In addition, Plaintiff

was apprised in the City of Poughkeepsie's October 4, 2010 letter of the bases upon which the

City intended to move for judgment on the pleadings.  Plaintiff did not request permission to file

an amended Complaint to cure any deficiencies raised at the pre-motion conference or in the

City's letter.  Moreover, Plaintiff's Complaint is a lengthy fifty-three page, 259-paragraph,

document.  In light of the detail already included in Plaintiff's Complaint, and the care with

which it was obviously crafted, it does not appear that Plaintiff could adduce any additional

factual allegations to bolster his claims.  In any event, although Plaintiff has made a formulaic,

one-sentence request to amend should the Court grant any of Defendants' motions, (Pl.'s Mem.

at 52), Plaintiff has not suggested that he is in possession of any additional facts that would cure

the deficiencies identified in this Opinion, indicated what those facts would be, or proposed an

amended complaint.  *See Arnold v. KPMG LLP*, 334 F. App'x 349, 352–53 (2d Cir.) (leave to

amend may be denied where party fails to identify with sufficient specificity facts that would

save his complaint); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242

(S.D.N.Y. 2005) (denying leave to amend because, among other things, "plaintiffs ha[d] not

submitted a proposed amended complaint that would cure the[] pleading defects"), *aff'd sub*

*nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (plaintiffs "were not

entitled to an advisory opinion from the Court informing them of the deficiencies in the

complaint and then an opportunity to cure those deficiencies") (citations omitted); *Loren v. Levy*,

No. 00-7687, 2001 WL 921173, at *6 (S.D.N.Y. Aug. 14, 2001) (denying plaintiff's request to

amend complaint to add party because "plaintiff has not set forth sufficient facts from which a

claim against this individual could be made"); *Benfield v. Mocatta Metals Corp.*, No. 91-8255,

1992 WL 58879, at *7 n.10 (S.D.N.Y. Mar. 13, 1992) ("should [plaintiff] file a motion for leave

to amend pursuant to Fed. R. Civ. P. 15(a), she must include in her motion a copy of the

proposed amended pleading"). Accordingly, the request to amend is denied.

## V.     CONCLUSION

For the reasons stated above, Defendant O'Neill's Motion to Dismiss is GRANTED in

part and DENIED in part, Defendant Dutchess County's Motion to Dismiss is GRANTED,

Defendant City of Poughkeepsie's Motion for Judgment on the Pleadings is GRANTED, and

Defendant DeMattio's Motion to Dismiss is GRANTED. All of Plaintiff's claims are

DISMISSED except his claim against O'Neill for fabrication of evidence. The Clerk of Court is

respectfully directed to terminate the pending motions. (Docs. 33, 39, 46.) The remaining

parties are directed to appear for a status conference on **Monday, October 24, 2011** at **11:15

a.m.**

**SO ORDERED.**

Dated: September 29, 2011
         White Plains, New York

                                            CATHY SEIBEL, U.S.D.J.

43