1216iboc ag                    MOTION

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  DEWEY R. BOZELLA,

 4                  Plaintiff,

 5            v.                              10 Civ. 4917 CS

 6  THE COUNTY OF DUTCHESS,
    et al.,
 7
                    Defendants.
 8
    ------------------------------x
 9
                                             White Plains, N.Y.
10                                           January 6, 2012
                                             10:40 a.m.
11
    Before:
12
                        HON. CATHY SEIBEL,
13
                                             District Judge
14
                            APPEARANCES
15  WILMER, CUTLER, HALE & DORR
         Attorney for Plaintiff
16  PETER J. MACDONALD
    CRAIG R. HEEREN
17  ROSS ERIC FIRSENBAUM

18  SHAUNA KATHLEEN FRIEDMAN

19  PATRICK BURKE
    PHYLLIS INGRAM
20       Attorneys for Defendant Dutchess

21  PETER ERIKSEN
         Attorney for Defendant Poughkeepsie
22

23                          MOTION

24

25
```

1216iboc ag                    MOTION

1        THE COURTROOM DEPUTY:  Dewey Bozella v. the County of

2   Dutchess.

3        THE COURT:  Have a seat, everyone.  Mr. Macdonald.

4        MR. MACDONALD:  Good morning, your Honor.

5        THE COURT:  Mr. Firsenbaum.

6        MR. FIRSENBAUM:  Good morning, your Honor.

7        THE COURT:  And Mr. Heeren, Ms Friedman.  And

8   Mr. Bozella good morning.  And Mr. Burke for the County.

9        MR. BURKE:  Yes, your Honor.  And Phyllis Ingram is

10  with me.

11       THE COURT:  Is anybody coming for the City?

12       MR. BURKE:  I don't think so, Judge.

13       THE COURT:  That's a little odd.

14       MR. BURKE:  There was some confusion for whatever

15  reason on the defense side as to the timing.  I don't know why

16  it occurred.  There was confusion.  That's why I called

17  chambers to confirm that it was on.  I didn't call the City.

18  And that's all I can say.

19       THE COURT:  Have you talked to anybody from the City,

20  Mr. Macdonald?

21       MR. MACDONALD:  No, your Honor.  We got notice of the

22  date today and the only thing we heard, I believe we got a call

23  from Mr. Burke's office indicating that we were on.  That's

24  what we expected.

25       THE COURT:  I'm just looking on the docket sheet.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1216iboc ag                        MOTION

1   This date was in the end of my decision, right?

2              MR. BURKE:  That's what we thought.  I don't think the

3   date is at the end of the your decision.

4              THE COURT:  I think it is.  But it was for an earlier

5   date.

6              MR. BURKE:  That's what it was.

7              THE COURT:  It was for October.  Then we got the

8   motion to reconsider.  And here it is, document number 69, the

9   conference previously scheduled for October 24th, which was the

10  date in my decision, is adjourned to January 6th at 10:30.  I

11  think we should at less make an effort.  We don't think that

12  they're intentionally not here.  We think it's just a screw up.

13             MR. BURKE:  That's correct.

14             THE COURT:  Let's see if we can get somebody on the

15  phone.  There's three lawyers from the City of Poughkeepsie.

16  Let's try Mr. Gandin first.

17             (Pause).

18             MR. ERIKSEN:  Hello, this is Peter Eriksen.

19             THE COURT:  This is Judge Seibel.  We had a conference

20  on for 10:30 this morning in Bozella.  Nobody showed up

21  representing the City.

22             MR. ERIKSEN:  David Gandin isn't there?

23             THE COURT:  Nobody is here.

24             MR. ERIKSEN:  Oh God.

25             THE COURT:  Your secretary or receptionist or whoever

1216iboc ag                    MOTION

1    picked up the phone, said he was in court, but she didn't say

2    what court.

3            MR. ERIKSEN:  Well, that's a good question because I

4    don't know what court he's in either.  He's been the attorney

5    from this office primarily involved with this case.  I've been

6    somewhat tangentially involved, but more involved with

7    insurance coverage issues for the City.  So I have no

8    explanation for what happened.  It wasn't on my calendar and my

9    assumption is that -- he's been covering the conferences.  I

10   don't know what happened.  I have no reasonable explanation.

11           THE COURT:  Well, we've got a motion to reconsider

12   pending.  I'm going to hear argument and rule on it.  So you're

13   welcome to sit in, you are counsel of record, sit in

14   telephonically so that your client is represented.

15           MR. ERIKSEN:  We submitted opposition papers to that,

16   I believe.

17           THE COURT:  Yes, and I've read them and I'm not asking

18   to hear anything that's already been covered in the papers.

19   But if there's anybody who wants to add anything I'll give them

20   the opportunity to do so.  So let me start with Mr. Macdonald.

21   Anything that you or your team wants to add that's not in the

22   papers?

23           MR. MACDONALD:  Nothing really in particular, your

24   Honor.  I think the papers have tried to address most of the

25   issues.  There are some distinctions on particular cases that

1    we could address.  Obviously, we haven't joined issue on all

2    the substantive issues.  I do believe that on the cases that

3    your Honor cited on the amendment, I think those are

4    distinguishable on the facts.  I think we did try to point that

5    out on my brief.

6          THE COURT:  My main question for you guys is why all

7    these things that I'm hearing now for the first time on

8    reconsideration weren't made part of the record before I ruled.

9          MR. MACDONALD:  Well, your Honor, I think for a

10   variety of the reasons.  Part of it has been the nature of this

11   case.  We're dealing with a case that involves facts that

12   happened 25, 30 and in some cases 35 years ago, so it's been a

13   very difficult and onerous effort to gather all of those facts.

14   In addition, I think that the approach that the defendants have

15   taken, they have been represented by zealous advocates that

16   have done a very effective job, but as a result I think we've

17   had to push hard to get discovery.  And as your Honor knows, we

18   were provided only limited discovery in the first instance.

19         THE COURT:  There are a number of issues that you're

20   raising on the motion for reconsideration that by your own

21   account you knew about before the first motion to dismiss was

22   filed.  Wouldn't that have been the time to say to me:  Let us

23   amend because we have these new facts or to flag what you

24   regard as a change in law or whatever.

25         MR. MACDONALD:  The change in law issue came long

1216iboc ag                    MOTION

1    after the motion to dismiss was briefed.

2              THE COURT:  Come on, a Supreme Court case comes down

3    related to something that you have pending before a court, you

4    can write me a letter.  I knew about the case obviously because

5    I discussed it in the original decision.  If you think this is

6    a sea change...

7              MR. MACDONALD:  We didn't think it was a sea change,

8    your Honor.  We assumed your Honor knew about the case and we

9    also assumed that if your Honor thought additional briefing was

10   necessary, maybe we assumed incorrectly that that --

11             THE COURT:  I don't necessarily, I have enough

12   briefing.

13             MR. MACDONALD:  It's hard to know.  You can't brief

14   seriatim.

15             THE COURT:  You can write a letter saying the Supreme

16   Court decided *Connick*, we think this is relevant, can we brief

17   it.

18             MR. MACDONALD:  But there's a lot more in the proposed

19   amended complaint than addressed in *Connick*.  In fact, there

20   are new liability theories that were developed based on the

21   evidence that was gathered both before and after *Connick*.  And

22   the presumption in the Second Circuit is that if a motion to

23   dismiss is granted, normally leave to amend to address the

24   issues is going to be provided.

25             THE COURT:  That's true.  But I have, the reason I

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    have premotion conferences is in part to avoid exactly this

2    kind of situation.  I have a premotion conference, the

3    defendants front what their issues are, we talk about it at the

4    conference.  Ordinarily, if the plaintiff is in possession of

5    facts that might address some of those issues, the plaintiff

6    says we have facts that might address some of those issues and

7    ordinarily I say why don't you go ahead and amend now so we

8    save trees and time and all that.  And although I can't, I'm

9    not sure what the strategy would be, it seems to me that there

10   was a strategic decision on your side to not do that.  Maybe

11   you wanted to save all this stuff and spring it on the

12   defendants later, I don't know.

13              MR. MACDONALD:  That was not the case.  Absolutely not

14   the case.  We were trying to put our best case forward at the

15   outset of this case.  We did a lot of investigation before we

16   submitted the complaint.  And I would emphasize, it was an

17   extremely difficult situation.

18              THE COURT:  I don't dispute that.

19              MR. MACDONALD:  In addition, your Honor, the sequence

20   of when we got additional information came throughout the

21   period after the complaint was briefed.  We had two motions to

22   compel before Judge Yanthis.  We had document productions.  We

23   had our own ongoing investigation.  We were trying to gather

24   information diligently.  There was absolutely no intent to

25   sandbag anybody.  If anything, I think we've tried to be very

1216iboc ag                    MOTION

1   forthcoming in the complaint and we've gotten criticized for

2   our verbosity in the way we approached it.

3          THE COURT:  You've also been criticized for things

4   that you left out of the complaint that cast a number of things

5   that are in the complaint in a very different light.  So you

6   can't win.

7          MR. MACDONALD:  The complaint we've tried to put our

8   best case forward.  I think the issue that's happened in this

9   case, the way the defense has approached this is that they put

10  in a lot of factual assertions, and I would submit that those

11  factual assertions are not all they're cracked up to be.  But

12  the time to argue about the facts is not at the initial

13  pleading stage.

14         THE COURT:  Agreed, except to the extent that the

15  facts you allege have to be sufficient under the plausibility

16  standard.  I assume the facts you related are true and I'm not

17  going to consider, for example, an affidavit where I forget the

18  officers' name.

19         MR. MACDONALD:  Offer Doherty.

20         THE COURT:  Doherty says no, I didn't say those things

21  that are attributed to me.  That will be for later.  Anything

22  else you want to add?

23         MR. MACDONALD:  I would just add, your Honor, that we

24  have tried our best to be comprehensive.  We haven't tried to

25  make this process more onerous than it otherwise would be.  I

1216iboc ag                    MOTION

```
 1   think that we've done nothing that would be within the category
 2   of undue delay or prejudice.  I think in the spirit of Rule 15
 3   and in the Williams Citibank decision that the appropriate
 4   thing here is to give Mr. Bozella another opportunity to plead
 5   his best case so that the case may be decided on the merits.
 6           THE COURT:  Mr. Burke, why shouldn't I decide it on
 7   the merits?
 8           MR. BURKE:  There's a long and a short answer, Judge.
 9   The case from the very beginning, from the very stage of the
10   440 motion forward, had an exquisite lack of central veracity.
11   I don't blame counsel for this.  They did a job to put it
12   altogether.  But there came a point in time after they did
13   their 440 that they had to know that what they were trying to
14   sell was not marketable, in a legal sense.  And that's why I
15   don't think the Court should give them this second bite at an
16   unpalatable apple.
17           The Court alluded to the standards that we have to
18   live by in the decision, in your basic decision when you denied
19   the opportunity that this had asked for in their motions to
20   replead.  And what do they tell us now?  They didn't have a
21   chance to brief Connick prior to the Court's decision.  I don't
22   think that's a valid basis.
23           We have newly discovered evidence.  We pointed out in
24   our papers this is not newly discovered, assuming it's true.
25           And the third is that the interest of justice compel
```

1216iboc ag                    MOTION

 1    this.  And if you really want to get into this, Judge, the

 2    interest of justice does not compel the Court to allow this

 3    case to go forward any further.  The plaintiff, as you said in

 4    your decision, and as they've told us on a couple of occasions,

 5    worked very hard to get the facts together prior to the first

 6    complaint.  It's obviously carefully crafted.  To put within

 7    that a terse, formulaic request for an opportunity to amend in

 8    case the Court decides that all of this effort that people put

 9    in to parse the complaint and to pull apart these many, many

10    allegations, and to point out that they're just not plausible,

11    your Honor, to allow that terse request to say, okay, you blew

12    it the first time, let's come back and we'll do it all over

13    again is not what our rules provide for.

14          We're not trying to be very technical, Judge.  There's

15    a reason for that.  Our local rule says you must set forth

16    matters of fact or controlling decision which the Court has

17    overlooked.  This Court did not overlook *Connick*.  None of us

18    did.  We were all watching that come up, Judge.  It was cited

19    in the briefs before you rendered the decision.  The minute

20    *Connick* was decided we knew.  We had ordered the arguments of

21    the attorneys in *Connick* prior to the decision.  So *Connick* was

22    not a mystery to anybody.  And the intervening decision of

23    *Connick* is not a basis we suggest to this Court to allow the

24    plaintiff to recraft an already faulty complaint.

25          And it's all reworking the same general themes, Judge,

1   that *Brady* -- I don't want to go into that.  I can if the Court

2   wants.  But I think that the papers of both parties adequately

3   address whatever issues the Court needs to decide.  I don't

4   mean to belabor the record any more and I appreciate the

5   opportunity to belabor it this much.  I'm happy to answer any

6   questions if you want.

7          THE COURT:  No, that's fine, Mr. Burke.

8          Mr. Eriksen, anything you want to add?

9          MR. ERIKSEN:  No, I agree with Mr. Burke.  And I will

10  leave it at that, your Honor.

11         THE COURT:  Okay.  The motion is to reconsider that

12  portion of my original decision which is dated September 29th

13  of last year which denied leave to amend.  Motions to

14  reconsider are not second bites of the apple, they're a chance

15  for me to correct my own mistakes, for the parties to bring to

16  my attention something that I overlooked or something that I

17  misconstrued.  At least that's the primary function of a motion

18  for reconsideration.  Everything that the plaintiff raises on

19  this motion for reconsideration is outside that category.

20  They're not things that I overlooked, they're things that were

21  not before me.  For whatever reason the plaintiff didn't raise

22  them the first go round.

23         Another function of a motion to reconsider is new

24  evidence, and there is certainly new information that's being

25  brought to my attention on this motion.  But much if not all of

1   it could have been obtained before the motion and certainly

2   before my decision.  For example, the pending motion refers to

3   admissions by ADAs about a policy under *Brady* in which their

4   understanding was that only truly exculpatory rather than

5   simply favorable evidence was to be disclosed.  And those

6   statements, which date back to the 80s, were certainly out

7   there and could have been presented.  The officer who described

8   the policy of destroying police notebooks could have been and

9   apparently was interviewed before the motion was made.  There

10  is a newly discovered piece of paper which is a memorandum from

11  District Attorney Grady to the Chief of the City of

12  Poughkeepsie Police Department, acknowledging the fact that

13  officers had been destroying their notebooks after the

14  information was incorporated into typewritten reports and

15  asking for a stop to that policy.  That memorandum is described

16  in the plaintiff's papers and various places as evidencing that

17  the DA requested that policy.  There's nothing in the

18  memorandum supporting that notion.  The memorandum supports the

19  notion that the DA was aware of it but the memorandum itself

20  doesn't say anything indicating that:  At my request the police

21  were destroying notebooks.

22          The plaintiff advances other evidence to that effect.

23  Likewise that could have been turned up before the motion was

24  made, particularly because the plaintiff knew of the policy and

25  even without the piece of paper could have gotten the

1216iboc ag                    MOTION

1   equivalent corroboration of what Lieutenant Doherty had said.

2   The examples that plaintiffs provide of various *Brady* failures

3   in other cases were certainly available long ago.  And the

4   evidence that not in this case but in the murder case officers

5   had destroyed notebooks, that was certainly available

6   beforehand.

7        The only thing that's really new is I think an

8   interrogatory admission by the City and County that they didn't

9   have formal *Brady* training, and that is somewhat shocking.

10  While the acknowledgment wasn't available earlier, the

11  equivalent of the acknowledgment was available earlier.  The

12  plaintiff certainly could have dug up witnesses who could have

13  provided the same information.  And indeed, the lack of *Brady*

14  training was alleged in the original complaint.  So the

15  interrogatory response is new but the allegation is not new.  I

16  don't think it's a situation involving new evidence either.

17       The next basis on which I can reconsider is an

18  intervening change in the law.  I don't see that *Connick* worked

19  any kind of sea change.  As I said in I think it was footnote

20  21 of the original decision, the Second Circuit has always

21  required a pattern for *Monell* violations.  *Walker*, which the

22  plaintiff cited originally and continues to cite for the

23  proposition that a pattern is not required, does not say a

24  pattern is not required.  As I explained in footnote 21, *Walker*

25  was decided under the no longer applicable *Connelly* standard

1216iboc ag                    MOTION

1   and *Walker* said, you haven't pleaded a pattern, there needs to

2   be a pattern, but discovery might reveal a pattern, and because

3   under *Connelly* we can't dismiss unless it's inconceivable that

4   there was a pattern, we can't dismiss.  But *Walker* was quite

5   clear that there has to be a pattern.  Nowadays under *Iqbal* and

6   *Twombly* you have to allege enough facts making your claim

7   plausible.  So it seems to me it was quite clear that a pattern

8   needed to be plausibly alleged.

9        Plaintiff didn't address footnote 21.  When *Connick*

10  came along, *Connick* just said *Brady* violations by prosecutors

11  were not an exception to that rule.  The *City of Canton* case

12  had a hypothetical exception to the rule requiring a pattern.

13  I don't know that any case other than *City of Canton* has found

14  such an exception.  But there's a ton of law in our Circuit.

15  To name just a few.  *Dunk v. Brower*, 2009 Westlaw 605352 at

16  page 10, citing the well-settled principle that municipal

17  liability based on a policy of inadequate training cannot be

18  derived from a single incident of misconduct by a

19  nonpolicy-making municipal employee.  *Ferreira v Westchester*

20  *County,* 917 F.Supp. 209.  In cases where there's training or

21  where the wrongfulness of the official conduct at issue is

22  blatant -- I think I'm messing up the first part of that

23  quote -- the plaintiff can survive summary judgment only by

24  producing some evidence that the policy-makers were aware of a

25  pattern of unconstitutional conduct and failed to respond.  And

1216iboc ag                    MOTION

1    that's been applied specifically to *Brady* training in, for

2    example, *Jackson v. County of Nassau*, 2010 Westlaw 1849262, an

3    Eastern District case.  The court said:  A single incident

4    alleged in a complaint, especially if it involved only actors

5    below the policy-making level, does not suffice to show a

6    municipal policy.  Here, plaintiff has not submitted evidence

7    regarding any other incidents of withheld exculpatory material.

8    *McCray v. City of New York*, 2007 Westlaw 4352738.  In this

9    Circuit, proof of a single incident of unconstitutional

10   activity is not sufficient to impose liability unless the

11   incident was caused by an existing unconstitutional municipal

12   policy which policy can be attributed to a municipal

13   policy-maker.

14        In addition, as I mentioned earlier, if *Connick* were a

15   sea change, either side could have asked to brief it.

16   Plaintiff could have asked to amend the complaint before my

17   decision.  And I would note parenthetically that the only claim

18   that *Connick* affects is the failure to train claim against the

19   County, which I'll address in a couple of minutes.

20        So this leaves as the only possible basis for

21   reconsideration manifest injustice, which I understand to mean

22   not whether generally speaking what happened to the plaintiff

23   in this case was manifestly unjust, but rather it would be a

24   manifest injustice not to let the plaintiff amend in the

25   circumstances.  Whether that standard of manifest injustice is

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1216iboc ag                    MOTION

1    met sort of merges with the 12(b)(6) analysis, because at the

2    very least, a claim that isn't going to survive 12(b)(6) is not

3    one where I have to allow amendment to avoid manifest

4    injustice.

5            Let me lead with the punch line.  The only new claim

6    that I'm going to allow is the *Monell* claim against the County

7    for the alleged unconstitutional policy of not disclosing *Brady*

8    material unless it's truly exculpatory.  I think that meets not

9    only the 12(b)(6) standard but arguably also the manifest

10   injustice standard because it goes to the core of what went

11   wrong in the prosecution of the plaintiff in the state court

12   and how plaintiff's rights were violated.  The remaining claims

13   don't survive my view of a Rule 12(b)(6) analysis for reasons

14   I'm about to describe, and in any event, even if they did, they

15   are really marginally related, if that, to the injustice

16   suffered by the plaintiff in the state case and so would not

17   meet the manifest injustice standard.

18           Let me start with the *Monell* claims against the City.

19   Specifically, the first, the alleged unconstitutional policy of

20   destroying notebooks after the information was recorded in a

21   typed police report.  My understanding of *Brady* is that *Brady*

22   is about turning over information.  It doesn't matter if it was

23   written down or not and it doesn't matter in what form it was

24   written down.  There's no *Brady* violation if the plaintiff,

25   then a criminal defendant, gets the information.  So even if it

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1216iboc ag                    MOTION

1    was never written down, if it's *Brady* the criminal defendant

2    has to be apprised of it one way or another.  Likewise, if the

3    criminal defendant is apprised of it one way or another, I

4    don't think it matters if the way they're apprised of it is

5    through a typewritten report as opposed to handwritten notes.

6    The defendant City cites at page 14 of its brief a Second

7    Circuit case to the effect that it's not a *Jencks Act* or *Brady*

8    violation if the rough notes disappear but the written report

9    incorporates the information.  And that's my understanding of

10   the law.

11              In addition to those cases, there's a case *U.S. v.*

12   *Vallee*, 304 F. App'x 916, 922.  I think that was a *Jencks* case,

13   but the principle, same principle applies.  The plaintiff cites

14   to *U.S. v. Harrison* from the D.C. Circuit, and that's obviously

15   from the D.C. Circuit.  There are courts that have followed the

16   *Harrison* holding, but even they do not have a bright line rule

17   that the destruction of notes automatically constitutes a *Brady*

18   violation.  For example, the Third Circuit in *U.S. v. Ramos*, 27

19   F.3d 65, acknowledged *Harrison* but stated that the mere

20   possibility that the destroyed notes might have included *Brady*

21   material without more is insufficient and would require too

22   broad a reading of *Brady*, so the defendant has to raise a

23   colorable claim that the investigators discarded rough notes

24   containing information favorable to him and material to his

25   claim of innocence or to the applicable punishment, and that

1   such exculpatory evidence has not been included in any report

2   provided to defendant.

3           Obviously, that's not the claim here.  As to the notes

4   that were destroyed, there's no allegation with any factual

5   basis that they contained any *Brady* material that was not

6   incorporated into a report which the officers turned over to

7   the DA.  *U.S. v. Sullivan*, 919 F.2d 1403, 1427 from the Tenth

8   Circuit says:  If destroyed information is material under

9   *Brady*, the government's failure to preserve it is a denial of

10  due process regardless of the good or bad faith of the

11  government.  But on the record, the trial court couldn't

12  determine whether the information was material and sent it

13  back.  But the point is the information is what needs to be

14  turned over.  *U.S. v. Harris* from the Ninth Circuit, 543 F.2d

15  1247, agrees that the notes particularly relating to the

16  agent's interview of the accused must be preserved, with a

17  finding that no substantial rights of the defendant were

18  affected and that any error was harmless.

19          So it doesn't seem to me that the policy of notebook

20  destruction is itself any sort of *Brady* violation and there's

21  no evidence that any such policy led to a constitutional

22  violation in plaintiff's case, because the information

23  ostensibly destroyed in the notebooks, Officer Regula's notes

24  of his interviews with the neighbors who said they didn't see

25  anything in front of the Crapser residence, was incorporated

1    into a report and given to the DA.  Those notes seem to me to

2    be *Brady*.  Don't get me wrong.  That information seems to me to

3    be *Brady*, but nothing that the City police did prevented that

4    information from getting turned over.  Regula incorporated his

5    notes into a report, he gave the report to the DA.  That

6    discharged the officer's *Brady* obligation.  It was the DA that

7    apparently either through negligence or choice didn't turn it

8    over.  But the DA didn't withhold it because the DA didn't have

9    it nor did the DA withhold it because the DA only had it in

10   report form and not note form.  So the policy of destroying

11   notes as far as I can tell from the complaint simply made no

12   difference in the plaintiff's case.  And to the extent the

13   plaintiff is suggesting that the notes may have contained other

14   *Brady* material, that is just sheer speculation.

15          So I don't find a plausible claim that the policy of

16   destroying the notebooks after information was recorded, was

17   transferred to a police report, led to any constitutional

18   violation in the plaintiff's case.  And so I don't think it

19   flies under 12(b)(6) and it's certainly not a manifest

20   injustice if the plaintiff can't advance that claim.

21          The other claim against the City is an alleged failure

22   to have *Brady* training for the officers.  As I said, that's

23   kind of appalling.  But again, the amended complaint doesn't

24   have any facts showing that the lack of training either led to

25   frequent deprivations of criminal defendants' rights or led to

1  any deprivation of the plaintiff's rights in this case.  There

2  are allegations about tapes that were destroyed.  But there are

3  no allegations that the exculpatory contents of those tapes

4  were not made available.  Again, it's the information.  So for

5  example, Lamar Smith, when he was first interviewed on tape,

6  said he didn't know anything about anything.  He later became

7  an important witness against the plaintiff.

8         If the existence of that tape, which totally

9  contradicts his trial testimony, was withhold, that would be a

10 *Brady* violation.  But the information apparently was not

11 withheld.  The information that Lamar Smith had previously made

12 a statement that completely contradicted his trial testimony

13 was available and, to my understanding, used at the trial.  So

14 again, I don't find a plausible showing of any violation that

15 affected the plaintiff's case on the part of the officers that

16 arose from the lack of *Brady* training.

17        Let me turn now to the claims against ADA O'Neill.

18 There are two claims against him.  One is the one that survived

19 the first motion to dismiss that he allegedly coerced a witness

20 named Madalyn Faust to recant her exculpatory testimony,

21 testimony that implicated somebody else as the murderer.  I

22 don't need to dwell on that at this stage.  It's an interesting

23 evidentiary question as to how it can be proved at this point,

24 given that she's no longer available, and some indication she's

25 getting her O'Neills mixed up, but that's for another day.

1          The second claim that the amended complaint advances

2     against ADA O'Neill is that he directed police officers to

3     destroy handwritten notes after they were incorporated into

4     written police reports.  The allegation is not that he directed

5     the destruction of any notes specifically in relation to

6     plaintiff's case, just that he generally, as part of training

7     that he provided to the police officers, generally recommended

8     such a policy.  And my analysis of that is basically the same

9     as it was with the City.  There's no *Brady* violation if the

10    information is incorporated into a report.  And what the

11    plaintiff would be harmed by, was harmed by in this case was

12    the DA's failure to turn over the information, not the

13    destruction of the notes.  So I don't think that second claim

14    meets the standard either.

15         The proposed amended complaint contains a claim

16    against the District Attorney William Grady in his capacity as

17    final policy-maker for alleged personal involvement in

18    suppressing *Brady* materials.  The argument goes from

19    plaintiff's side -- and let me back up to say that this relates

20    to the Holland tape in which Mr. Holland, in the course of

21    confessing to the King murder and implicating Donald Wise in

22    that matter, also said that he, Holland, had had a conversation

23    with Donald Wise before the King murder in which Donald Wise

24    said that he had done a murder that sounds very much like the

25    Crapser murder, and this information was not made available to

1216iboc ag                         MOTION

 1   the plaintiff.

 2          The plaintiff's argument now is that District Attorney

 3   Grady must have known about the *Brady* information in the

 4   Holland tape because Grady apparently, as an assistant district

 5   attorney, covered Donald Wise's arraignment or stood up at

 6   Donald Wise's arraignment for the King murder.  It does not

 7   strike me as plausible that as an ADA standing up at an

 8   arraignment -- and let me add the complaint doesn't allege that

 9   ADA Grady was the prosecutor in the Wise case or in the King

10   murder case, it just says that he stood up at the arraignment

11   of Mr. Wise -- it's just not plausible to me that as an ADA

12   covering an arraignment apparently for another ADA that Grady

13   must have known not only that the Holland tape existed and that

14   Holland implicated Wise in the King murder but also that in one

15   exchange on that tape Holland implicated Wise in the Crapser

16   murder.  It's just too much of a stretch.  I'm allowed to use

17   my common sense and experience and the notion that covering an

18   arraignment gives you that thorough knowledge of the underlying

19   evidence is just not plausible.

20          It's possible, it's conceivable, but as we know under

21   *Iqbal* and *Twombly*, things that are possible and conceivable or

22   consistent with liability are insufficient.  So the allegation

23   that Grady personally knew about the statement in the Holland

24   tape, that it sounds like it's about the Crapser murder, it's

25   conclusory, it's just not plausible.  Moreover, even if Grady

1    did know of the statement, there's no allegation that he

2    personally was aware of what was and was not turned over as

3    *Brady* material years later at plaintiff's trial.  If there were

4    an allegation that he was involved in trial decisions, he would

5    be immune.  But there is no such allegation, and so the claim

6    against him as the final policy-maker for alleged personal

7    involvement in suppressing *Brady* is not plausible.

8            So that leaves the claims against the County.  First

9    is the alleged unconstitutional policy of suppressing *Brady*

10   information unless it was "truly exculpatory."  In other words,

11   that the DA's Office and the ADAs interpreted *Brady* as not

12   requiring them to turn over information that was merely

13   favorable or could be used to impeach.  The proposed amended

14   complaint in paragraphs 179 to 90, which detail various ADAs

15   taking that position on the record, are sufficient to render

16   such a policy plausible.  And there are additional allegations

17   in paragraphs 218 to 228 which, although set forth in the

18   failure to train section of the complaint, also support

19   plausibly the existence of such a policy.  And further, the

20   complaint shows that suppression of just such information, in

21   other words information that was not directly exculpatory but

22   was favorable, led to the violation of plaintiff's rights in

23   the Crapser murder case.

24           For example, the Holland tape doesn't directly

25   exculpate the plaintiff but it implicates somebody else as

1    having done the crime.  The officer's report regarding the

2    neighbors could have been used to impeach Lamar Smith's

3    testimony that he was hanging out outside the residence all

4    evening because the neighbors say they didn't see anybody.  And

5    what we're calling the Dobler report, in which Donald Wise was

6    implicated as the perpetrator of a very similar crime against a

7    victim named Dobler who survived, were all favorable to

8    Mr. Bozella and should have been turned over and allegedly were

9    not.  So I'm going to allow that claim, even though I have to

10   say I do not understand why it was not included the first time

11   around when it could have been.  It does go to the heart of

12   what happened to Mr. Bozella in the state case and as I said,

13   it is plausibly alleged.  So I think it meets the manifest

14   injustice standard.

15         The next allegation against the County is that it had

16   an unconstitutional policy of directing police to destroy

17   notebooks.  I'm not going to repeat what I said above regarding

18   the similar claims against the City and O'Neill.  In connection

19   with the County in particular, the plaintiff argues that the

20   rule that rough notes don't have to be preserved if the

21   information is incorporated into a report does not apply to the

22   County because the amended complaint alleges that the County

23   had a policy of destruction of notes for the specific purpose

24   of violating *Brady*.  I am not at all convinced that a motive

25   like that, which is a bad motive, which is an inexcusable

1   motive, would absolve the plaintiff of his obligation to come

2   forward with some facts suggesting that the destroyed material

3   was in fact *Brady* materials in his case.  There is the *Anzalone*

4   case which mentions that there was no showing that the

5   destroyed notes were *Brady* or that the purpose of the

6   destruction was to prevent the defense from having them.  But

7   we could not find any cases that said affirmatively that if

8   that were the purpose, it would be a *Brady* violation without

9   any showing of what was in the notes that would have mattered.

10  So I'm not convinced that a bad motive like is alleged here, a

11  motive to violate *Brady*, that a bad motive for a policy as

12  opposed to having such a motive for destruction in an

13  individual case would absolve the plaintiff of his obligation

14  to come forward with some facts plausibly showing that the

15  destroyed materials were in fact *Brady* in his case.

16         The argument here seems to be that there was a policy

17  and there was a bad motive for the policy, end of story.  Even

18  if I felt that the negative pregnant, I think it is, of

19  *Anzalone* was the law, it seems to me that it refers to a

20  showing that the notes were destroyed to prevent the particular

21  defendant from having them.  But in any event, aside from there

22  being no evidence that there was anything in those notes that

23  would have been *Brady* material, even assuming that the DA's

24  Office directed that policy, I have to say I also don't find

25  plausible the amended complaint's allegation that the

1   destruction of the notes was done for the express purpose of

2   violating *Brady* which is what the complaint says.

3         I'm ignoring the affidavit that the County has

4   submitted from Doherty because they're not properly submitted

5   on a motion to dismiss.  What the plaintiff attributes to

6   Doherty is on the one hand he had never heard of *Brady*, that's

7   in paragraph 262, and on the other, the DA's Office directed

8   the destruction of notes for the express purpose of violating

9   *Brady*.  It's hard to imagine that Doherty could have attributed

10  that motive to the DA's Office if he never heard of *Brady*.  As

11  reprehensible as that would have been, again there's no

12  evidence of any *Brady* violation involving destroying notes in

13  plaintiff's case so I don't find it a manifest injustice to not

14  allow amendment of the complaint to advance this claim, which I

15  note apparently plaintiff's counsel didn't find compelling

16  enough to include originally either, even though Lieutenant

17  Doherty spoke to them early on.

18        The third claim against the County is that *Brady* is

19  based on District Attorney Grady as a final policy-maker.  I

20  won't repeat what I said earlier on that.

21        And finally, the plaintiff alleges the failure to

22  train against the County regarding *Brady*.  Even with the new

23  allegations, they do not in my view show a pre1990 pattern of

24  violations that demonstrated an obvious need to train ADAs on

25  *Brady* as the *Connick* case requires.  The plaintiff alleges

1    facts about the *West* case from 1986 and if what is alleged to

2    have happened in that case is true, that certainly would be a

3    *Brady* violation.  But there was no ruling in that case that

4    would have constituted notice to the policy-makers, and the

5    policy-makers have to have been aware of the pattern of

6    constitutional misconduct.  There has to be some sort of

7    notice.

8            The proposed amended complaint discusses the *Speeding*

9    case.  The same is true with respect to that case.  Plus

10   there's no indication that that case occurred before the

11   plaintiff's case and would have put anybody on notice of

12   anything.

13           The *Taylor* decision, that's a decision that presumably

14   would be some notice to the DA, but it came out after the

15   plaintiff's trial.

16           The *Williams* case.  It's not clear to me that this

17   would have been notice to the DA.  It looks like in the

18   complaint it was a verbal comment in court rather than a

19   decision, but even if it would have been notice, there's no

20   allegation that it occurred before the plaintiff's case.

21           And the *Britton* case in 1989 was not a *Brady* case.  It

22   had to do with destruction of notes under the *Rosario* case, a

23   state case, which imposes on prosecutors a much broader

24   obligation than *Brady*.  And even there there was no judicial

25   finding of a violation.

1        So even with the new information, I don't find a

2  plausible pattern of violations that would have provided

3  sufficient notice to the policy-makers that their decision not

4  to train on *Brady* can be said to have been deliberate.  So I

5  don't think the 12(b)(6) standard post *Connick* is met on the

6  manifest injustice standard.

7        Those are my rulings.  I'm going to let plaintiff file

8  an amended complaint that conforms to my decision.  How long

9  would you like, Mr. Macdonald, to get that first amended

10 complaint filed?

11        MR. MACDONALD:  I would say if we could get it in 30

12 days from the transcript if that's acceptable to your Honor.

13        THE COURT:  Let's say February 6th.  I'll make it

14 February 13th to give you a week to get the transcript and then

15 the plaintiff gets 30 days.  You're proceeding with discovery

16 under the guiding hand of Judge Yanthis.  I don't remember what

17 the cutoff is or if he's adjusted it or anything.

18        MR. MACDONALD:  I think everything is a little bit up

19 in the air right now because the original plan was that there

20 be a period after the decision and amendment.  I think we have

21 to go back to Judge Yanthis reasonably soon and there are some

22 open issues I think that we would probably need to address

23 obviously in light of the rulings that your Honor has made and

24 in particular with respect to the surviving claim on the *Brady*

25 policy because that implicates obviously a number of cases.

1216iboc ag                     MOTION

1    And in some instances there's been some discovery jousting

2    about at least one of those cases, the *Wood* case, where at the

3    time Judge Yanthis did not believe that that was discoverable.

4    But I think in light of your Honor's ruling today it would be

5    since that's one of the cases from which the affidavit was

6    drawn.

7              THE COURT:  Once you have the transcript, provide a

8    copy of it to Judge Yanthis and let him know the ball is back

9    in his court.  And I'll get to you guys when discovery is

10   complete and I'm sure then I'll have another lovely round of

11   motions.

12             MR. MACDONALD:  I think there's a conference scheduled

13   before Judge Yanthis on Thursday of next week, so it's

14   fortuitous timing.

15             THE COURT:  You can go ahead with him.  Do I have a

16   date with you?  I guess what I'll do is, Mr. Macdonald, I'll

17   put it on you to let me know when Judge Yanthis is finished

18   with discovery and I need to have you back in on a conference.

19             MR. MACDONALD:  From this point forward, your Honor, I

20   will err on the side of contacting the Court in any situation.

21   Thank you.

22             MR. BURKE:  Your Honor, the telephone conference, and

23   this is in the same venue of where are we on conferences, is

24   scheduled for the 11th.  Whatever that is, we'll get that

25   straightened out and speak to Judge Yanthis going forward.

         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1216iboc ag                    MOTION

1              THE COURT:  You should all be here on the same day,

2      although I guess Mr. Eriksen is off the hook.

3              We are adjourned.  Thank you.

4              (Proceedings adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25