Pre-motion conference to be held on: 2/11/2013 @ 4:15 pm

Opposing counsel to state position (by letter not to exceed 3 pages) in writing one week in advance.

WILMERHALE

So ordered.

*[signature]* Cathy Seibel

Cathy Seibel, U.S.D.J.

1/7/13

Peter J. Macdonald

+1 212 937 7223(t)
+1 212 230 8888(f)
peter.macdonald@wilmerhale.com

January 4, 2013

*MEMO ENDORSED*

**VIA HAND DELIVERY**

Honorable Cathy Seibel
United States District Court for the Southern District of New York
The Honorable Charles L. Brieant Jr. Federal Building and United States Courthouse
Room 218
300 Quarropas Street
White Plains, NY 10601-4150

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED 1-8-2013

Re: *Bozella v. County of Dutchess, et al*, No. 10 Civ. 4917 (S.D.N.Y.)

Dear Judge Seibel:

On behalf of Plaintiff Dewey R. Bozella, I write pursuant to the Court's Individual Practices to request a pre-motion conference in connection with a motion for partial summary judgment against Defendant Dutchess County (the "County"). Collateral estoppel bars the County from re-litigating the issue of whether the County violated Mr. Bozella's constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*"). The County litigated—and lost—that issue in the prior state court proceedings. *See People v. Bozella*, 25 Misc.3d 1215(A), 2009 WL 3364575 (N.Y. Cnty. Ct. Oct. 14, 2009). No additional discovery is needed and, on the basis of the undisputed record, Mr. Bozella is entitled to partial summary judgment on the County's violation of his constitutional rights under *Brady*.

The facts relevant to this motion are narrow in scope. In 2009, Mr. Bozella filed a motion pursuant to New York Crim. Proc. Law § 440.10 to vacate his murder conviction (the "440 Motion"), asserting that the Dutchess County District Attorney violated Mr. Bozella's constitutional rights under *Brady*. District Attorney William Grady then assigned his most senior trial prosecutor, Edward Whitesell, to respond to the 440 Motion. *See, e.g.*, Tr. of Dep. of Mr. Grady ("Grady Tr.") (attached as Ex. A) at 202:17-203:6, 205:4-16 ("I told [Mr. Whitesell] that .... *[i]t was an important case, that it had to be handled appropriately*, and I wanted someone to handle it who I felt could handle it from the point of view of responding to the 440 motion, as well as being able to make a decision as to whether the case could be retried if we lost the 440 motion. *And because he was my most experienced trial attorney, I asked him to perform both responsibilities. . . . I told him to do a full and complete job*.") (emphasis added). Mr. Whitesell spent over three months investigating the claims in the 440 Motion, conferred with District Attorney Grady several times during that investigation, and opposed the motion. *See, e.g., id.* at 203:23-204:22, 214:15-215:15; Tr. of Dep. of Mr. Whitesell (attached as Ex. B) at 143:12-25. After allowing the District Attorney extended time to make all submissions he wished to make in opposition, the Dutchess County Court granted Mr. Bozella's motion in a detailed and comprehensive opinion. The Court concluded that the Dutchess County District Attorney violated Mr. Bozella's constitutional rights under *Brady* by not disclosing four categories of *Brady* material prior to his 1990 re-trial. *People v. Bozella*, 2009 WL 3364575, at *16 ("[U]pon

WILMERHALE

Honorable Cathy Seibel
January 4, 2013
Page 2

a thorough and careful review of the record, the court, without reservation, is firmly and soundly convinced of the meritorious nature of the defendant's application. The legal and factual arguments advanced in support of the motion are compelling, indeed overwhelming.").

After the state court decision, District Attorney Grady conferred with Mr. Whitesell and the Chief of the Dutchess County District Attorney's Appeals Bureau about whether to appeal. *See, e.g.*, Grady Tr. at 229:17-230:19. After evaluating the decision carefully, District Attorney Grady made the decision not to appeal because he agreed "that the record was totally deficient of information or facts, which would allow us to be successful on an appeal." *See id.*

Mr. Bozella then pursued a *Monell* claim against Dutchess County, requiring him to establish, among other things, that the County violated his constitutional rights under *Brady. See, e.g., Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Based on the undisputed facts summarized above, the County is collaterally estopped from re-litigating this element of the *Monell* claim because that precise issue was already fully litigated in the prior state court proceeding. Collateral estoppel prohibits re-litigation of an issue when (i) the identical issue was "necessarily decided in the prior action" and (ii) the party against whom collateral estoppel would apply had "a full and fair opportunity to contest the issue in the prior action." *See, e.g., Benjamin v. Coughlin*, 905 F.2d 571, 575 (2d Cir. 1990). Both elements are met here.

*First*, Mr. Bozella's principal argument in the 440 Motion (whether the Dutchess County District Attorney violated his constitutional rights under *Brady*) and the first element of his *Monell* claim (whether the Dutchess County District Attorney violated his constitutional rights under *Brady*) are identical. The Amended Complaint alleges that the Dutchess County District Attorney violated Mr. Bozella's rights under *Brady* by not disclosing the following four categories of evidence: (i) pages of a police report and related voluntary witness statements; (ii) a statement by Saul Holland to Defendant William J. O'Neill and two detectives on or about February 23, 1978; (iii) two police reports regarding the August 2, 1977 attack of Estelle Dobler; and (iv) an oral statement to detective Pete Murphy by Ms. Crapser's neighbor stating that she heard loud noises that sounded like one or more garbage cans were being moved in an alley adjacent to Ms. Crapser's home on the night of the murder. *E.g.*, Am. Compl. ¶¶ 18-20, 26-33, 42-47, 55-68. These are *exactly* the same *Brady* violations that Mr. Bozella raised, the Dutchess County District Attorney opposed, and the Dutchess County Court found, in connection with the 440 Motion. *See, e.g., Benjamin*, 905 F.2d at 576 (collateral estoppel applied to issue of whether Department of Correctional Services' policy violated § 1983 plaintiff's constitutional rights where state court previously determined that the policy was unconstitutional); *Patzner v. Burkett*, 779 F.2d 1363, 1369 n.7 (8th Cir. 1985) (collateral estoppel applied to issue of whether arrest of § 1983 plaintiff was unconstitutional where state court previously determined that the arrest was unconstitutional).

WILMERHALE

Honorable Cathy Seibel
January 4, 2013
Page 3

*Second,* Dutchess County cannot meet its burden of showing that it did not have a full and fair opportunity to litigate this issue in the state action.  The Dutchess County District Attorney spent more than three months investigating the issues raised in the 440 Motion, and asserted both factual and legal arguments opposing the motion.  District Attorney Grady—the Dutchess County policymaker with respect to *Brady* and the District Attorney at the time of Mr. Bozella's 1990 re-trial, the litigation of the 440 Motion, and today—oversaw that process.  He received the 440 Motion, read it, discussed it with two of his most senior assistants, assigned one of them to investigate its claims, approved the submission of the opposition to the motion, and elected not to appeal Judge Rooney's decision.  *See, e.g.,* Grady Tr. at 197:14-198:8, 199:2-6, 202:2-203:18, 214:15-215:15; Whitesell Tr. at 128:18-129:5.  Under controlling precedent, these facts establish that the County had a full and fair opportunity to litigate this issue in connection with the 440 Motion.  *See, e.g., People ex rel. Dowdy v Smith,* 48 N.Y.2d 477, 482 (N.Y. 1979) ("[a]s to the identity of parties we encounter no difficulty in concluding . . . that for present purposes the People as prosecutors in the criminal action stood in sufficient relationship with the Division of Parole in the parole proceeding to meet the requirements of the doctrine in this respect"); *Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 640 (2d Cir. 1987) ("[O]ne whose interests were adequately represented by another vested with the authority of representation is bound by the judgment") (citation omitted).

Entry of partial summary judgment will also further several goals of FRCP 56 and collateral estoppel.  It will streamline the issues to be resolved at trial by eliminating the need to re-litigate whether the *Brady* material was disclosed to Mr. Bozella prior to the 1990 re-trial and whether the non-disclosure was material to the 1990 verdict.  It will avoid jury confusion and unfair prejudice to Mr. Bozella by eliminating any possibility that the jury makes an improper assumption about the circumstances of Mr. Bozella's release from prison.  And it will avoid any possibility of inconsistent decisions on the very issue that was the basis for Mr. Bozella's release from prison.  *See, e.g., Liberty Media Corp. v. Vivendi Universal, S.A.,* 861 F. Supp. 2d 262, 273 (S.D.N.Y. 2012) (SAS) ("application of collateral estoppel . . . would prevent inconsistent decisions, thereby encouraging reliance on adjudication" and "should shorten the trial").

The County has fully litigated the issue of whether it violated Mr. Bozella's constitutional rights.  It is therefore barred from re-litigating the issue that it fought and lost in state court and this case should proceed to trial only on the remaining two elements of Mr. Bozella's *Monell* claim.

Respectfully submitted,

Peter J. Macdonald

cc:    Patrick T. Burke, Esq. (*via email*)

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------

DEWEY R. BOZELLA,


                        Plaintiff,


            vs.        No. 10 Civ. 4917


THE COUNTY OF DUTCHESS and

WILLIAM J. O'NEILL,


                        Defendants.

--------------------------------------------



     VIDEOTAPED DEPOSITION OF WILLIAM GRADY

         Thursday, August 23, 2012

                10:30 a.m.




Reported by:

Joan Ferrara

[Page 197]

```
 1                    Grady

 2      Q     And I just want to make sure

 3  that we define it.  There was a memorandum

 4  of law in connection with the 440 motion.

 5  Do you have that understanding?

 6      A     Oh, yeah.  I did not read that.

 7      Q     Okay.

 8            I mean, the motion was probably

 9  a one-page notice of motion.  We can go

10  through the documents, but --

11      A     The notice of motion.  No, I

12  familiarized myself with the essence of the

13  440 motion.

14      Q     Okay.

15            Why don't we mark the memorandum

16  of law.  I just want to make sure that we

17  have a clear record of what it is that you

18  reviewed.

19            (Whereupon, Exhibit 1 was marked

20      for Identification.)

21  BY MR. FIRSENBAUM:

22      Q     Mr. Grady, I'm showing you

23  what's been marked as Grady 1.

24            Do you recognize this document?

25      A     Yes, I do.
```

[Page 198]

1                          Grady

2          Q      Is this what you were referring

3    to as the 440 motion?

4          A      Yes.

5          Q      Okay.

6                 And you read this when you

7    received it?

8          A      Yes, I did.

9          Q      Okay.

10                Do you recall that there were

11   certain declarations or affidavits or

12   affirmations, whatever you want to call

13   them, that were submitted with this

14   document?

15         A      I read the document.  I do not

16   recall whether they were or not.  If they

17   were, they were.  They were part of it.

18         Q      Okay.

19         A      I acknowledge receipt of the

20   entire document.

21                MR. FIRSENBAUM:  Why don't we

22         mark the other documents as well.

23                You know what, I take it back.

24         I don't think we need to mark it.

25   BY MR. FIRSENBAUM:

[Page 199]

1                          Grady

2        Q      After you read the 440 motion,

3   did you discuss it with someone?

4        A      Yes, I did.

5        Q      Who did you discuss it with?

6        A      Bridget Steller.

7        Q      And where did that conversation

8   take place?

9        A      I'm not sure whether it was my

10  office or her office.  She's right next to

11  mine.

12       Q      Okay.

13              And what did you say to her and

14  what did she say to you?

15       A      Well, we just received this very

16  extensive 440 motion.  I'd like you to take

17  a look at it and tell me whether you can

18  handle it.

19       Q      That's what you said to her?

20       A      Yeah, I -- in words or

21  substance.

22       Q      Okay.

23              And what did she say?

24       A      To the best of my recollection,

25  she said that when looking at it, she's

[Page 202]

1                           Grady

2       Q      What was the next conversation

3   you had about the 440 motion?

4       A      It was with Ed Whitesell.

5       Q      And where did that meeting take

6   place?

7       A      I don't recall.  Probably in my

8   office, but I don't recall.

9       Q      And how long would you say that

10  meeting took?

11      A      I have no recollection of that.

12      Q      Did Mr. Whitesell read the 440

13  motion before you met with him?

14      A      I don't know.

15      Q      What did you say to

16  Mr. Whitesell during that meeting?

17      A      I told him that we had, this

18  case involved a case that Bill O'Neill had

19  prosecuted.  Bill is no longer in the

20  office.  It was an important case, that it

21  had to be handled appropriately, and I

22  wanted someone to handle it who I felt

23  could handle it from the point of view of

24  responding to the 440 motion, as well as

25  being able to make a decision as to whether

[Page 203]

1                    Grady

2    the case could be retried if we lost the

3    440 motion.

4            And because he was my most

5    experienced trial attorney, I asked him to

6    perform both responsibilities.

7        Q    And I take it you didn't just

8    tell him that you felt that he could handle

9    it, you actually believed that he could

10   handle it?

11       A    I believed that he could handle

12   it, right.  I didn't say to him I believe

13   you can handle it.

14       Q    But that was your belief?

15       A    That was my belief, yes.

16       Q    Did Mr. Whitesell during that

17   meeting accept the assignment?

18       A    I believe he did.

19       Q    Did he convey to you how long it

20   might take him to get to a place where he

21   could respond to the 440 motion?

22       A    No, he did not.

23       Q    Did you discuss -- did you ask

24   him to provide you with a report or any

25   updates as his investigation went along?

[Page 204]

```
 1                        Grady

 2        A     No.

 3        Q     Did you have an expectation that

 4    he would at any point?

 5        A     Well, I had an expectation and

 6    he knew that I would be asking him from

 7    time to time how things were going, because

 8    although I don't intimately involve myself

 9    in the particular facts of any specific

10    case when somebody else is handling, I do

11    involve myself with regard to them getting

12    it done and getting it done as quickly as

13    possible.

14        Q     And did you get yourself

15    involved in the 440 process to that extent?

16        A     To the extent of asking Ed from

17    time to time what's the status of the 440,

18    I did.

19        Q     Okay.

20              And did Mr. Whitesell respond to

21    your questions?

22        A     Oh, he did, sure.

23        Q     And did you set up formal

24    meetings, or were they sort of just

25    conversations on an ad hoc basis?
```

[Page 205]

1                           Grady

2        A        They were conversations on an ad

3    hoc basis.

4        Q        Did you discuss with

5    Mr. Whitesell, did you suggest that he

6    speak to Mr. O'Neill?

7        A        Specifically tell him to speak

8    to anybody, no.  I gave him a general

9    overview of what I expected him to do, and

10   that is to confirm with as many people as

11   you could not only -- and obtain not only

12   information that would enable us to respond

13   to this 440, but that would enable us to

14   make a decision on whether we could retry

15   it if we had to.  So to that extent, I told

16   him to do a full and complete job.

17               Now, whether I said specifically

18   Mr. O'Neill or not, I don't know.

19       Q        You had an expectation that he

20   would do a full and complete job?

21       A        Yes, I did.

22       Q        During that meeting did

23   Mr. Whitesell express to you any

24   familiarity that he had with the case?

25       A        I don't think he was familiar

1                     Grady

2    document, but did you have this document in

3    your possession at any point in time before

4    the opposition was filed?

5         A    I really, I really cannot

6    recall.  I don't know.  I've seen it,

7    obviously.

8              Now I -- since I've read it a

9    few times, I can't recall whether I am

10   saying I saw it before because I just read

11   it, not today, but before today, or whether

12   in fact I read it before.  So I really have

13   no recollection of whether I did

14   specifically or not.

15        Q    Okay.

16             Putting aside whether you read

17   it or not, you said that you had an

18   understanding as to the arguments made in

19   it, is that right?

20        A    I believe I did.

21        Q    Okay.

22             And did you get that

23   understanding from meetings with

24   Mr. Whitesell?

25        A    Well, from time to time, when I

1                        Grady

2      asked him how the case was going, I believe

3      he would give me an update which may have

4      included different aspects of his response

5      to the 440.  It's very difficult for me to

6      recall exactly what he said to me.

7                 Because when I gave him the

8      responsibility of responding to this 440

9      motion, I did so not with the understanding

10     that I was giving it to an Assistant DA who

11     had limited experience on these matters, I

12     was giving it to one of my most senior

13     people, and he had full authority to

14     research and file the 440, which is done

15     normally all the time.

16                 Bridget Steller, when she files

17     her 440 motions on important cases

18     involving murders or anything else, never

19     gives me her 440 to review.  She just does

20     it.  I have the confidence in her that

21     she'll do the right thing.  And I had the

22     confidence in Whitesell that he would do

23     the right thing.

24                 So I really don't recall whether

25     I read this or not.

[Page 229]

1                          Grady

2       Q     And he, in fact, made a decision

3   as to what the best course of action would

4   be for the District Attorney's Office,

5   correct?

6       A     He did.

7       Q     And you didn't articulate any

8   opposition to that decision?

9       A     No.

10      Q     No, meaning correct?

11      A     Yes.

12      Q     Okay.

13            How did you learn about Judge

14  Rooney's decision on the 440 motion?

15      A     I really don't recall.  Someone

16  told me.  I'm not sure who.

17      Q     Do you recall having any

18  discussions with Mr. Whitesell, or anyone

19  else in the District Attorney's Office,

20  about what the next step would be in light

21  of Judge Rooney's decision?

22      A     Yes.

23      Q     What was the first discussion

24  that you had?

25      A     Well, I don't know how many

```
 1                        Grady

 2    discussions there were.  I believe that

 3    there had to be a review with regard to the

 4    issues that we could raise if we were going

 5    to try to effect an appeal of that

 6    decision.

 7               Bridget Steller was involved in

 8    that discussion.  The key on a 440 appeal

 9    is whether the prosecution can establish

10    that the judge abused his discretion when

11    making a decision -- and Bridget, upon

12    reviewing the record, and Ed agreed that

13    the record was totally deficient of

14    information or facts, which would allow us

15    to be successful on an appeal -- so her

16    recommendation was not to appeal.

17         Q     And you agreed with that

18    recommendation?

19         A     Yes, I did.

20         Q     Did you or anyone in the

21    District Attorney's Office consult with

22    Bill O'Neill during the time period between

23    Judge Rooney's decision and the October

24    28th hearing in the Bozella matter?

25         A     What was the hearing on October
```

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------

DEWEY R. BOZELLA,

                              Plaintiff,


          vs.          No. 10 Civ. 4917


THE COUNTY OF DUTCHESS and

WILLIAM J. O'NEILL,

                              Defendants.

---------------------------------------------



VIDEOTAPED DEPOSITION OF EDWARD F. WHITESELL

          Wednesday, July 18, 2012

               10:22 a.m.




Reported by:

Joan Ferrara

[Page 128]

1                    Whitesell

2    decision not to create any documents in

3    connection with your investigation?

4           A     No.

5           Q     Okay.

6                 I mean this is a matter of some

7    public interest, correct?

8           A     Yes.

9           Q     District Attorney Grady had been

10   at least quoted in the local press as

11   saying that there would be a complete

12   investigation and a report, correct?

13          A     Yes.

14          Q     Did you discuss with District

15   Attorney Grady that you will not be making

16   a written report?

17          A     No.

18          Q     Did you make an oral report to

19   District Attorney Grady at some point in

20   time?

21          A     We spoke about what I was doing

22   on a few occasions during that time period,

23   and then prior to the answer -- or no --

24   prior to the answer being submitted, or at

25   about the time the answer was being

[Page 129]

1                           Whitesell

2       submitted, we spoke more elaborately about

3       what was out there and what was being

4       submitted and what was in what I had

5       learned.

6            Q      Okay.

7                   Was there any factual

8       information that you had learned that you

9       provided to Mr. Grady, but which was not in

10      the opposition paper that you submitted

11      marked as Exhibit 5?

12           A      Yes.

13           Q      What was that?

14           A      The most significant one was my

15      conversation with Wayne Mosely, which was a

16      telephone conversation I had prior to the

17      submission of the answer.

18           Q      And what did Mr. Mosely say to

19      you and what did you say to Mr. Mosely?

20           A      I had been looking for

21      Mr. Mosely for some time.  The police had

22      indicated to me that they had contacted

23      him, but were not sure whether or not he

24      would reach out to me.

25                  At some point prior to the

[Page 143]

1                    Whitesell

2        Q      And then the three other pieces

3    of evidence as to which you did not assert

4    that they had been produced to the defense,

5    but you had some legal arguments about

6    whether they should have been produced?

7        A      Partially legal, but mostly

8    factual as to whether or not they

9    constituted Brady.

10       Q      Okay.

11              Since it was -- strike it.

12              To be clear, on July 2nd, 2009

13   when the opposition was filed, it was your

14   position that Mr. Bozella should not be

15   released and the results of the trial

16   should not be changed?

17       A      Yes.

18       Q      And it's correct to say that to

19   the best of your ability you presented to

20   the Court all of the facts and all of the

21   arguments you felt supported that

22   conclusion?

23              MR. BURKE:  Objection to the

24       form.

25       A      Yes.