1

20135gbozeccf

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    --------------------------------x
      DEWEY R. BOZELLA,
 3
                   Plaintiff,
 4

 5           v.                        10 Civ. 4917(CS)(GAY)

 6                                     CONFERENCE

 7    THE COUNTY OF DUTCHESS,
      THE CITY OF POUGHKEEPSIE,
 8    WILLIAM J. O'NEILL,
      ROBERT J. DeMATTIO,
 9
                   Defendants.
10    --------------------------------x

11
                                       United States Courthouse
12                                     White Plains, N.Y.
                                       May 16, 2013
13

14

15    Before:  THE HONORABLE GEORGE A. YANTHIS,

16                                     Magistrate Judge

17
                             APPEARANCES
18
      WILMER HALE, LLP
19         Attorneys for Plaintiff
      ROSS ERIC FIRSENBAUM
20    SOMIL BHARAT TRIVEDI
      JESSICA WHEELER
21
```

22   BURKE, MIELE & GOLDEN, LLP
         Attorneys for Defendants County of Dutchess and O'Neill
23   PHYLLIS A. INGRAM
     PATRICK THOMAS BURKE
24

25   *Proceeding recorded via digital recording device.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

2

20135gbozeccf

1           THE DEPUTY CLERK:   In the matter of Dewey R.

2    Bozella v. the County of Dutchess, et al.

3           Counsel, please state your names for the record.

4           MR. FIRSENBAUM:   Good morning, your Honor.  Ross

5    Firsenbaum from Wilmer Hale for plaintiff Dewey Bozella.  With

6    me are my colleagues Somil Trivedi and Jessica Wheeler.

7           THE COURT:   Good morning.

8           MS. INGRAM:   Good morning, your Honor.  Phyllis Ingram

9    from Burke, Miele & Golden for the defendants the County of

10   Dutchess and William O'Neill.  And with me is Patrick Burke.

11          THE COURT:   Good morning.

12          MR. BURKE:   Good morning, your Honor.

13          THE COURT:   All right, counsel, we're here to talk

14   about some issues that you raised in the letters.  Of course,

15   I've reviewed all the letters that have been submitted.  And

16    there are a couple of issues, one about subpoenas that

17    plaintiff is objecting to and also about some documents.   Why

18    don't we talk about the subpoenas first.

19            You make an objection, Mr. Firsenbaum, so you can

20    start it off.

21            MR. FIRSENBAUM:   Sure, your Honor.   Would you prefer

22    that I sit?   I think we did that last time.

23            THE COURT:   Both sides can remain seated.

24            MR. FIRSENBAUM:   Okay.   Thank you, your Honor.

25            The first issue before the Court is, on the very last

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

3

20135gbozeccf

1    day of discovery, a discovery period that was more than two and

2    a half years, 31 months from September 2010 to April 2013, the

3    defendants submitted a letter to your Honor asking your Honor

4    to so order six subpoenas.   These subpoenas are untimely, and,

5    therefore, Mr. Bozella requests that the Court reject the

6    defendants' request.   Why are they untimely?   Discovery

7    requests are not timely if they're served on the last day of

8    discovery.   Discovery requests are timely if they're served

9    such that the responding party has adequate time to respond to

10    that request within the discovery period.

11          Here, under Rule 45, the responding party to the six
12    subpoenas is entitled to 14 days to respond. By submitting the
13    subpoenas to your Honor -- they're not even served. We're
14    sitting here today, on May 16th, more than two weeks after
15    discovery has closed, and the subpoenas still aren't served.
16    The responding party doesn't have sufficient time to respond.
17    They're untimely. We've cited cases in our premotion letter
18    saying so. The defendants haven't cited any cases to the
19    contrary.

20          So what is the justification that the defendants have
21    offered for the delay? I submit they really haven't offered
22    any. They have had 31 months to attempt to serve most of these
23    subpoenas. And certainly, since August 2012, they acknowledged
24    in their correspondence that they could have subpoenaed these
25    six entities. Instead, they chose to waste our resources

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20135gbozeccf

4

1    through letter writing back and forth about authorizations.

2    We've been before your Honor twice on this issue.

3          THE COURT: Yes, we have talked about this issue in

4      the sense of they're seeking authorizations, and I had said

5      they could do subpoenas.

6            MR. FIRSENBAUM:  Yes, your Honor.  At the March 22nd

7      hearing, your Honor rejected their request to compel

8      Mr. Bozella to obtain these documents.  That was after about

9      eight months of bickering about whether these authorizations

10     were proper.  Your Honor said during that hearing that you

11     would so order the subpoenas to the city or state agencies,

12     which are two of the six entities that we're talking about

13     here, but your Honor didn't say that you would extend the

14     discovery schedule to allow that to happen.  That was on March

15     22nd, more than a month before discovery ended.  In the next 38

16     days, the defendants haven't offered any explanation whatsoever

17     as to why they waited until the last day of discovery to first

18     serve these subpoenas so now we have to deal potentially with

19     more documents during the summary judgment period.

20            THE COURT:  Okay.  Now, these subpoenas are seeking

21     financial information, so this is information that would go to

22     mitigation of damages, arguably?  Is that your understanding?

23            MR. FIRSENBAUM:  For four of the six entities, they

24     say they're seeking financial information.  The financial

25     information is how much money did Mr. Bozella receive from

5

20135gbozeccf

1    these four entities.  Mr. Bozella has already produced that
2    information.  During the March 22nd hearing, we informed the
3    Court that we intend to continue to supplement that production
4    with future income, and, in fact, that's exactly what we did.

5            The defendants complain that we produced a 1099 last
6    month showing additional money received from GTN and Three
7    Arts, which are two of the subpoenaed recipients, but that's
8    exactly what we told your Honor that we would do and what, in
9    fact, we are doing.  They say that that somehow entitles them
10   to serve subpoenas after the fact, but they knew well before
11   that that Mr. Bozella was receiving income from Three Arts and
12   from GTN.  In fact, Mr. Bozella produced documents back in
13   October 2012 showing that he was receiving income from those
14   entities.  That was before Mr. Bozella's deposition.  They
15   asked Mr. Bozella about GTN.  They could have asked Mr. Bozella
16   all they wanted about Three Arts.  It was disclosed in the
17   documents that we had produced before the deposition.  They
18   chose not to.  And they waited.

19           The Second Circuit just issued a decision this week, a
20   per curiam decision, saying rules matter.  You don't get to
21   extend the discovery deadline simply by submitting a request

22    the day before the deadline is over.  And we had a

23    teleconference with your Honor on April 22nd, about a week

24    before the discovery deadline, and, yes, your Honor said -- Ms.

25    Ingram told your Honor that she intended to submit subpoenas.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

6

20135gbozeccf

1    Your Honor didn't say anything about whether you would so order

2    them or not so order.  Your Honor didn't say a lot of things on

3    that teleconference.  But the one thing your Honor said was the

4    discovery deadline remains firm on April 29th.  So they're

5    looking for discovery to continue now, after April 29th, after

6    May 16th, because they haven't even served these discovery

7    requests.

8         And your Honor, there is prejudice here.  This is not

9    simply asking your Honor to enforce the rules.  For two of

10   these requests, for Fishkill and the Division of Youth records,

11   as we've explained in prior conferences, we've submitted the

12   requests to Fishkill.  We've produced over 700 pages of

13   documents from Fishkill, every single page that we received

14   from them.  They complain about damp documents that Fishkill

15   has informed them about.  We produced a letter that we received

16    from Fishkill informing us that they were damp documents that

17    couldn't be copied.  We produced that to them in October 2012,

18    and they waited until April 2013 to raise this.  Somehow it's a

19    new issue.  They've been aware of it for months.

20         Why is there prejudice, your Honor?  Because if there

21    are new documents, and I don't know that there are, but if

22    there are new documents from Fishkill, the Division of Youth,

23    those are documents that go to the subject matter of both

24    sides' psychology experts, that go to the psychological damages

25    in this case.  Now, taking this issue, and as a preview for the

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

7

20135gbozeccf

1    next argument that we're going to have, these two requests,

2    what we're talking about is reopening every subject on two and

3    a half years of discovery.  We're talking about new documents

4    that would lead to reopening the psychology expert reports,

5    psychology expert depositions.  And the other argument we're

6    talking about, we're talking about reopening document

7    discovery, fact depositions, and then ultimately Professor

8    Gershman's expert report and expert deposition.

9         There is no justification for why they waited until

10    the very last day of discovery to serve these subpoenas.  I'll

11    cover the other issue in the next argument.  And there's

12    substantial prejudice by continuing discovery that they could

13    have had two and a half years ago.

14         THE COURT:  Okay.  Now, on the financial information,

15    you've already provided all the income of the plaintiff that

16    you're aware of?  You have a continuing obligation to do that.

17         MR. FIRSENBAUM:  Yes, your Honor, we have, and we will

18    continue to do so through trial.

19         THE COURT:  Does that include these entities that they

20    want the subpoenas for?

21         MR. FIRSENBAUM:  Yes, your Honor.

22         THE COURT:  Okay.  Those are four.  Then there's two

23    dealing with -- what is it?  DOCS.  And what's the other one?

24         MR. FIRSENBAUM:  One is Fishkill and one is the

25    Division of Youth, yes, yes, or -- yes.


              CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                         (914)390-4103


                                                              8

     20135gbozeccf

1          THE COURT:  Okay.

2          All right, Ms. Ingram, why did you wait this long?

3          MS. INGRAM:  Why did I wait this long?

4          THE COURT:  Yes.

5          MS. INGRAM:  Well, contrary to Mr. Firsenbaum's
6     remarks that I waited so long, we didn't wait so long.  As you
7     know, are well aware, we have been going back and forth and
8     back and forth on this issue.  We initially had requested
9     authorizations that would have enabled us -- which would have
10     given us the control over obtaining the records.  We were
11     denied that opportunity.

12          It's not just financial records.  It's employment
13     records.  It's records of what he did and what he was doing on
14     behalf of those entities.  He has a claim for loss of income
15     and for loss of income opportunity and for loss of employment
16     in his $25 million dollar.  Certainly records that would show
17     that he was employed, employable, and what he was capable of
18     doing will go to the claims that are in his complaint, and they
19     are in addition to what he has "earned" during the course of
20     the time that he was -- since his release from prison.

21          We didn't have the opportunity to control gaining
22     access to those records because plaintiff arduously opposed
23     that, and your Honor agreed with him and, as of March 22nd, did
24     tell us that we could come out and subpoena those records on
25     our own returnable, by the way, not to our office, but to

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR

(914)390-4103

9

20135gbozeccf

1    Wilmer Hale's office because there's some claim of privilege,
2    which I'm not sure how that comes into play, but fair enough.
3    They go to Wilmer Hale.

4           So from March 22nd until the date that we served the
5    subpoenas, we were responding to a request for admission that
6    required -- that was, I think, numbered in the eighties of
7    specific requests that we had.  That was due April 10th.  There
8    were three expert depositions that took place.  We were
9    supplementing our disclosures because, in the course of
10   reviewing, which is the subject of the next argument that will
11   come up, we discovered that there were additional documents
12   that needed to be disclosed.

13          And most importantly, on April 26th -- plaintiff is
14   taking a huge, you know, opportunity here to place all the
15   blame on defendants.  However, on April 26th, after our April
16   23rd conference, a week before, so even if we had subpoenaed --
17   served the subpoenas that day, 14 days would have gone beyond
18   the close of discovery, plaintiff's attorney serves us with
19   documentation showing $192,000 worth of income.  We're not
20   talking about $25,000 worth of income.  We're talking about

21    $192,000 worth of income for the year 2012 alone.  That

22    document was in their possession since January 2013, and they

23    didn't disclose it until three days before.  And then there's

24    another document that they disclosed showing $37,500 worth of

25    income.  So I think it's a little bit disingenuous to come in

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

10

20135gbozeccf

1    here and place all the blame at our feet when, in fact,

2    plaintiff's counsel shares somewhat in that as well.

3         So the fact of the matter is discovery wasn't closed

4    until April 29th.  These issues go to damages and with regard

5    to the employment, and I don't think that there's any kind of

6    prejudice that will result to the plaintiff in allowing the

7    subpoenas to be issued.  I asked the Court to so order them so

8    that they had more weight.  And I gave 30 days because I

9    thought -- I did it as a courtesy to the recipients, so that

10   they weren't under time constraints.  If you want to make it a

11   14-day rule, I don't really have a problem with that, but I do

12   think that, given the history, we're more than entitled to get

13   those records.

14        With regard to the Fishkill records, the Fishkill

15    records that were disclosed were with regard to one of

16    Mr. Bozella's numbers, prison records.  The records that we're

17    seeking to obtain go to another one of his prison number

18    records.  They predate his incarceration for the claims in this

19    case.  And my understanding is that the communication that was

20    forwarded was that these records were illegible.

21          We have been in contact with Fishkill, and I spoke

22    with the -- I personally spoke with the records person.  She

23    didn't tell me that they were illegible.  She said that they

24    were damp and that it wasn't her job to go through mold-covered

25    records; however, she would make them available to us provided

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

11

20135gbozeccf

1    we had an authorization.  Well, we don't have an authorization.

2    Even if your Honor so orders the subpoenas, they go to Wilmer

3    Hale.  We would be happy to conduct the review with Wilmer

4    Hale.  I don't know how any kind of privilege can attach to

5    those records when those records pertain to Mr. Bozella's time

6    well before any of the claims in this action.

7          And with regard to the Division of Youth records,

8    again, we have been trying to get those records.  They asked

9      us -- back when we first asked for the records, we were told

10     they're not going to create an authorization, we have to create

11     the authorization. We created the authorization. They do

12     nothing until I start, in December, to get on them. What have

13     you done? What have you done? And they leave a voice mail

14     message. Then they say, you know, we didn't give them the

15     right address. So the burden has always come back.

16           These are claims they brought.

17           THE COURT: Okay, now, I'm just trying to understand

18     Fishkill. This is where the damp records are?

19           MS. INGRAM: Right. They're records that would show

20     his time of incarceration (INAUDIBLE) Warwick Training. They

21     predate -- they're during his -- immediately preceding the time

22     of the Crapser murder. So we believe --

23           THE COURT: What would these records arguably show?

24     I'm just trying to understand what the import of these records

25     are.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

12

20135gbozeccf

1            MS. INGRAM: Well, he claims that he was -- there have

2      been multiple claims with regard to what was occurring in his

3    lifetime during the time immediately preceding his

4    incarceration for this murder, and we're trying to determine

5    where exactly he was during that period of time, what he was

6    incarcerated for, what those records show, what kind of

7    discipline he might have been undergoing.  And essentially that

8    would be it.

9         THE COURT:  Okay.  And as far as the delay goes in

10   this, this is something that you knew about back in October?

11        MS. INGRAM:  We had been going back and forth and back

12   and forth because we didn't have the opportunity to get these

13   records ourselves.  Wilmer Hale was required to get the

14   records.  And even though we tried to explain to them that

15   they're two different numbers, if you look at the request that

16   they provide -- that they asked for, it was just with the one

17   number.

18        THE COURT:  Okay.

19        Mr. Firsenbaum, financial records.  I'm trying to

20   understand what the prejudice would be on financial records.

21   These are things that you have an obligation to provide anyway

22   as far as the financial data.  What would be the prejudice as

23   to the financial records?

24        MR. FIRSENBAUM:  Your Honor, I think the issue here,

25   certainly we're not arguing that there's prejudice in

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

13

20135gbozeccf

 1    continuing to produce evidence of what financial information
 2    Mr. Bozella has received.  In fact, we've already promised to
 3    continue to update that production from Mr. Bozella.  Now, I
 4    think there are two issues.  One is why are we burdening third
 5    parties to produce the same information that Mr. Bozella can
 6    produce?  That, I concede, comes more powerfully out of the
 7    third-party's mouth than Mr. Bozella's, but the second is
 8    what's the scope of the subpoena?

 9            Let's just look at Golden Boy.  All documents
10    "maintained in your files, including, but not limited to,
11    contracts, payments, a description of work performed,
12    presentations made, copies of speeches, videos of all other
13    electronic video or audio recording presentations and
14    appearances and all documents of employment or work performed
15    by Dewey Bozella from 2000 to the present."  That goes way
16    beyond the scope of how much money did Mr. Bozella receive from
17    this entity.  And it's the same language for the other entities
18    that we're talking about, financial information.

19            This is a fishing expedition, your Honor.  This is not
20    solely about seeking mitigation of damages information.  And I

21    think the gist of the prior conferences was that your Honor

22    concluded that the evidence about the mitigation of damages is

23    relevant and Mr. Bozella has to produce that, but these

24    subpoenas go well beyond that.

25            And Ms. Ingram says employment. Again, when they

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

14

20135gbozeccf

1    deposed Mr. Bozella, they knew about these entities, and they

2    asked him about some of them, if not all of them. They could

3    have asked them about all of them. Mr. Bozella is not employed

4    by any of these entities. We've produced an ESPN DVD. They

5    know that Mr. Bozella boxed in a boxing match for Golden Boy.

6    It's not some secret. Harper Collins. I think they know that

7    it has something to do with a book because we produced the book

8    contract between Mr. Bozella and Harper Collins and Three Arts.

9    They know exactly what the services are. They know exactly

10   what the damages are, what the mitigation of damages are, from

11   the financial information that Mr. Bozella has produced and

12   will continue to produce through trial.

13           So I haven't heard an explanation for the delay, and I

14   still haven't heard an explanation as to what new documents

15    they need from these third parties.

16           THE COURT:  Okay.

17           MS. INGRAM:  Your Honor.

18           THE COURT:  Yes.

19           MS. INGRAM:  If I may, in paragraph 203 of the

20    complaint, the amended complaint, they have a claim for loss of

21    professional opportunity.  Each one of the items that we've

22    noted in the subpoenas go to the kind of work that Mr. Bozella

23    has been performing on behalf of the various entities.  And

24    contrary to what Mr. Firsenbaum says, the third parties are the

25    best source, because if he's going to claim that he's got a

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

15

20135gbozeccf

1    loss of professional opportunity, unless they want to take that

2    claim away, if he's going out there -- and clearly he's made

3    $192,000 worth of income from this professional opportunity

4    that he's been given through Golden Boy, through Three Arts,

5    through Greater Talent and through Harper Collins.

6           THE COURT:  Okay, now, just looking at Golden Boy,

7    you're asking for contracts, payments, description of work

8    performed, presentations, copies of speeches, videos, videos of

9    audio recordings.  Do you really need all that?

10         Starting with the financial information, if I'm going

11   to allow it, financial information, it might be duplicative,

12   but you're getting it right from the source.  I understand

13   that.  What else do you really need here?

14         MS. INGRAM:  I don't know specifically what it was he

15   did for them.  Okay?  And so that's why I'm trying to

16   understand and obtain the contents of the presentations that

17   he's made.  If he's gone out there -- if they've been an agent

18   for him and he's gone out there and made presentations or

19   whatever other work that he's done on their behalf, we should

20   be entitled to get those records.  It's the same thing with the

21   Greater Talent Network and Harper Collins.  This is a

22   different -- it's a slightly different situation than if, you

23   know, Mr. Bozella was employed by ABC Corporation.  If

24   Mr. Bozella was employed directly by ABC Corporation, I don't

25   think we would be having this argument.  I think it's very

16

20135gbozeccf

1    clear that we would be entitled to get those records.  The only

2    difference is that he wasn't "employed," but these are records

3    of his employment. They're records of work he performed on

4    behalf of these entities, and we should be -- just like we

5    should be entitled to find out what the records are from an ABC

6    Corporation with regard to the types of work he did, what his

7    employment records show, his personnel files, all those

8    records, that's what we're trying to obtain here.

9           THE COURT: Okay.

10          Yes.

11          MR. FIRSENBAUM: Your Honor, they had Mr. Bozella

12    under oath for seven hours. They asked him what he does for

13    GTN. He answered the question. They had access. There's a

14    website. GTN has a website. They have access to it. They've

15    seen it. They monitor it. They asked Mr. Bozella about the

16    content of presentations that he's given. That's on the GTN

17    website. They know exactly what he does. He does speaking

18    engagements. They know that. There's nothing to discover.

19    They've seen content of what it is. He talks about his life.

20    So they know.

21          We filed our complaint more than two and a half years

22    ago. Doesn't matter whether it's the original complaint or the

23    amended complaint. It's the same claims for damages. They

24    took over a year to serve a document request about this stuff.

25    They waited until all fact discovery was over and all expert

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20135gbozeccf

1    discovery was over to do a very simple thing that they didn't

2    even need your Honor to so order, a subpoena.  A lawyer can do

3    that.

4            The notion that we are now talking about what

5    documents haven't been produced, that nobody's seen because

6    they're in third parties' possessions, that -- we don't control

7    these third parties.  I don't know what discovery comes out of

8    it.  I know that their psychology expert has focused on

9    Mr. Bozella's life before he went into prison.  And they're

10   looking for these records.  And we've spent a ton of time on

11   psychology expert reports and psychology expert depositions.

12   And, yes, that stuff doesn't to go summary judgment.  I

13   understand that, your Honor.  But we shouldn't have to work on

14   that while we're working on summary judgment, and we shouldn't

15   have to reopen expert discovery any time before trial.

16           THE COURT:  Okay.  I think I've heard what I needed to

17   hear on the financial ones.

18           Now, on the ones from Fishkill and Division for Youth,

19   the Office of Children and Family Services, what prejudice can

20      you identify, Mr. Firsenbaum, if these subpoenas were allowed

21      and documents were produced?

22              MR. FIRSENBAUM:  My prior comments about reopening

23      expert discovery, on the psychology experts, that is

24      specifically tied to the Fishkill and the Division of Youth

25      records, assuming there are records and assuming they're about

18

20135gbozeccf

1       the time period that Ms. Ingram say they are, which they

2       presumably would be.  It's also a question of reviewing the

3       documents now, of having to -- I mean, we're reviewing them for

4       privilege.  Ms. Ingram says how could there possibly be a claim

5       of privilege.  It's because this law firm got involved.  The

6       attorney/client privilege extends well beyond this case.  And

7       in fact, we're talking about prison records, so, actually,

8       there's a very great likelihood that, if Mr. Bozella had

9       counsel at the time, that there might be privileged documents.

10      And frankly, we would have to figure out perhaps who his lawyer

11      was.  I don't know.

12              But anyway, to answer your question, the real

13      prejudice is I don't want to have to reopen psychology experts.

14    And there should not be an incentive, your Honor, for parties

15    to wait two and a half years in discovery to serve subpoenas

16    that they acknowledge they could have served years ago, that we

17    told them they could serve years ago, and they just chose not

18    to do.

19         THE COURT:  Okay.  I'm going to reserve on this one

20    for the time being.  Let's go on to the next issue.  That's on

21    the documents.

22         MR. FIRSENBAUM:  Okay, your Honor.  This issue

23    concerns disclosures made by the defendants three business days

24    before the close of discovery, the night before Professor

25    Gershman's deposition.  I think it's telling that, about three

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

19

20135gbozeccf

1    days before Professor Gershman's deposition, during the

2    telephone conference, Ms. Ingram said that there were some new

3    documents that they intended to produce and use with Professor

4    Gershman at his deposition, and then they waited and waited and

5    produced them the night before.  They then said, well, you know

6    what?  We're not going to use them with him.  So, to them,

7    that's the end of the story, but let me focus, your Honor, on

8       exactly what we're talking about here.

9              We're talking about 591 pages of documents from 25

10      case files from the Dutchess County District Attorney's Office,

11      none of which are the Crapser case file.  We're talking about

12      other cases over a decades period.  We're talking about one

13      audiotape from one of those 25 case files of an interrogation.

14      And we're talking about disclosure of a trial witness, former

15      City of Poughkeepsie Police Detective Teddy Alston.

16             Now, again, these disclosures came three days before

17      the end of discovery, 28 months after we served document

18      requests asking for them, more than 15 months after we served

19      another round of document requests and interrogatories asking

20      for them, more than 14 months after the amended complaint was

21      filed, more than four months after fact depositions ended, more

22      than three months after Professor Gershman put in his expert

23      report and, again, the night before Professor Gershman's

24      deposition.

25             THE COURT:  Okay.  Let me just ask -- I mean, I see

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20

20135gbozeccf

1       the letter from defendants.  They're saying that 24 or 25 of

2      these files you already have.

3              MR. FIRSENBAUM:  Flat wrong, your Honor.  What we had,
4      your Honor, was certain other documents from 24 of those 25
5      case files, which did not have any of the documents that they
6      produced three days before the close of discovery.  And this
7      goes to exactly why this is misconduct, why there's prejudice,
8      and why the documents should be struck.

9              In November 2012, they produced documents from these
10     case files.  Now, for many of these case files, we didn't even
11     ask for documents from these specific case files.  They
12     produced them because they went back -- despite all of the
13     prior hearings we've had where they talked about how burdensome
14     it was for them to go, what did they do?  They went through
15     other case files of theirs and they cherry picked documents
16     that they think help their case, and they produced some of
17     them.  They produced a couple of documents.  Some documents
18     didn't even have complete pages, didn't have all the pages to
19     them.  They produced certain documents from certain case files
20     that they think support their claim, but they only produced
21     some of them.  So they produced some of them in November 2012.
22     They let fact depositions end.  They let Professor Gershman
23     submit his report on what we thought was a complete record from
24     those case files.  They took his deposition, and then
25     afterward, they decide to produce more documents from those

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

21

20135gbozeccf

1    case files.

2         Now, for two of the 25 case files, Wood and Williams,
3    we had access to those case files because your Honor granted us
4    the right to inspect those case files over a year ago.  And we
5    had the right to inspect and copy.  We copied documents.  We
6    didn't copy the documents that they just produced a couple
7    weeks ago.  But again, they had access to those boxes when we
8    had access to them, and they waited until fact discovery ended,
9    until expert discovery ended, to then produce them to us.

10   That's for two of the 25.

11        For the other 23, we did not have access to the files
12   at all.  All we received were the documents that they cherry
13   picked from their own files back in November and decided to add
14   to after the rest of discovery ended.

15        Now, they say we produced some documents from some of
16   these case files.  There are some documents from these cases
17   that we produced.  Those are from the County Clerk's Office.
18   The County Clerk's Office has a very, very small amount of
19   documents compared to the documents that are going to be in the

20    DA's file from these cases, and that's where they were getting

21    their documents from.  That's where they were producing from.

22          And let me give you an example, your Honor.  In one of

23    the cases, Andros, what they've done is they've produced

24    correspondence from the District Attorney's Office to defense

25    counsel showing disclosure of documents, and inevitably they're

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

22

20135gbozeccf

1    going to say this shows evidence that we complied with Brady,

2    we gave fulsome disclosure in the case.  We haven't had access

3    to the entire case file.  And we have no idea whether there is

4    correspondence coming back from defense counsel saying, excuse

5    me, you haven't given me X, you haven't given me Y, you haven't

6    given me Z.  We have no idea.

7          Now, discovery ended when they produced these

8    documents to us, so there's no remedy here.  I mean, the only

9    remedy here, your Honor, would be to do the two and a half

10   years that we've gone through all over again, because we need

11   to start with document discovery, we need to get access to the

12   23 files that we've never had access to and perhaps the two

13   again, because, again, now they're relying on different

14    documents.  It changes the calculus.

15          THE COURT:  Okay, now, when you say you haven't had

16    access to them, you've had some access to all of these files,

17    but not access to all of them?

18          MR. FIRSENBAUM:  We had pages of documents -- we had

19    certain documents from these files, again, the ones that they

20    cherry picked to produce to us in November 2012.  They had the

21    files in front of them, and they decided we're going to produce

22    some, we're going to let Professor Gershman put in his report,

23    we're going to depose Professor Gershman and get his opinion on

24    what these documents mean, and then we're going to produce more

25    documents that perhaps change the calculus or change the

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

23

20135gbozeccf

1    analysis that we could then use to impeach Professor Gershman

2    at trial.  It's not fair.

3          These documents -- I mean, one example, these

4    documents were -- some of them were authored by District

5    Attorney Grady himself, by other ADAs that we deposed where we

6    would have asked questions about these case files.  Now, yes,

7    we knew about the existence of these witnesses, but we didn't

8      know the context of the documents, the arguments that they were

9      going to make based on documents that weren't in the record

10     until three business days before the close of fact discovery.

11             And there are other witnesses that we might want to

12     depose now.   I mean, for example, let's talk about Mr. Alston,

13     for example.   Yes, we knew he existed, but the case law is

14     clear from the Pell case it's not the fact that we know a

15     witness exists, it's the fact that the other side intends to

16     rely on him at trial that's what's relevant to the analysis.

17     And they knew from the allegations in the amended complaint and

18     from Mr. Garrity's deposition -- Mr. Garrity is the former

19     Dutchess County public defender -- that Mr. Garrity testified

20     that Mr. Alston gave him information that evidenced a Brady

21     violation.   And Mr. Garrity's deposition was back in December

22     and, yet, they waited until April, three business days before

23     the end of discovery, to say, oh, by the way, we're going to

24     use Mr. Alston at trial.   That's sandbagging.   We can't depose

25     Mr. Alston.   So that's Mr. Alston.

                       CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                                  (914)390-4103

                                                                        24
20135gbozeccf

1              Going back to the documents, another example.   They've

2       produced a lot of documents from the Kirkpatrick case.  The

3       Kirkpatrick case was a case that we had alleged as a speeding

4       case where we alleged a Brady violation.  Mr. Garrity testified

5       about this case, but couldn't remember the name of the

6       defendant.  We served an interrogatory on the defendants asking

7       for cases that Mr. Grady and other ADAs tried, and they

8       objected, objected, objected.  You might remember, your Honor,

9       we were in court seeking to compel an answer, and they said

10      this is burdensome.  They said, you know, you're asking for

11      information for decades; you know, you're asking for more than

12      names; how are we supposed to give you indictment numbers?

13      Your Honor, they had the file in front of them, and after your

14      Honor ordered them to respond with as much as they could,

15      limited to names, based on their argument, they gave us only

16      the name, but not the indictment number.  But now, after

17      discovery, at the end of discovery, they've produced documents

18      that show the indictment number that would have enabled us to

19      go to the County Clerk's Office and find documents from that

20      case file.  But they didn't let us do that.  They waited until

21      the end of discovery to do all of this.

22              And your Honor, this is prejudicial.  We can't start

23      from scratch, and that's really what we would have to do.

24      Professor Gershman is an expert.  To provide an opinion, he

25      needs to rely on facts.  There's a lot of fact discovery that

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

25

20135gbozeccf

1       would come out of these documents, 25 different case files with

2       numerous individuals; some new, some old.  And Judge Seibel has

3       issued a scheduling order for summary judgment motions.  We're

4       three years into this case.  I understand that our partial

5       summary judgment motion doesn't touch on these issues.  That's

6       due in 30 days.  But the County's motion is due in 90 days.

7       And surely, if we get to reopen discovery, they're going to say

8       we can't file our summary judgment motions until all that

9       discovery is over.  And how long is that going to take?  Well,

10      I submit, your Honor, it took at least 14 months from the date

11      of the amended complaint to get to where we are now, and if

12      we're talking about inspecting 25 or 23 case files from the

13      Dutchess County District Attorney's Office, copying them,

14      reviewing them, figuring out who to depose, getting those

15      depositions scheduled and taken, supplemental report from

16      Professor Gershman, they're going to want to take his

17      deposition again, we're talking about another 14 months or more

18      to continue.

19          THE COURT:  Okay.  So these are case files of criminal

20    cases from the District Attorney's Office.

21          MR. FIRSENBAUM:  Yes, your Honor.  They're cherry

22    picked documents from those case files.

23          THE COURT:  Okay.  Now, how many case files have been

24    actually reviewed, as far as you know, so far in the discovery

25    of this matter?  Are we talking about another 24 or 25?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

26

20135gbozeccf

1          I'm just trying to get just an idea of the scope of

2    discovery that has already been done.

3          MR. FIRSENBAUM:  I don't have an exact number for you,

4    your Honor.  I can say that we've inspected the Bozella file --

5    the Crapser file, the King file, which is the related murder,

6    and I would -- this is just an estimate, but I would estimate

7    we've reviewed approximately eight other case files at the

8    District Attorney's Office.  So what we're talking about now --

9    and two of the 25 are in that eight.  So what we're talking

10    about now is 23 new Dutchess County District Attorney files

11    that we haven't had access to.

12          THE COURT:  You haven't had access to the files.  You

13     do have some documents from some of those files through the

14     County Clerk's Office?

15          MR. FIRSENBAUM:   We have some documents from some of

16     those files from the County Clerk's Office.

17          Now, the County Clerk's Office is only the public

18     documents filed with the Court, so, you know, to the extent

19     that there's omnibus motion practice in there, which are

20     relevant documents in this case for sure, we have them.  We

21     have had access to them.  Now, I can't say -- I think it would

22     be a big leap to say that the County Clerk's files are complete

23     and have all of the omnibus motion papers.  The District

24     Attorney's files may very well have more.  But we're not only

25     talking about their production of omnibus motion files.  Again,

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

27

20135gbozeccf

1      we're talking about one-way correspondence that shows only the

2      disclosure of information.  We're not talking about full

3      disclosure of all correspondence back and forth between the

4      prosecutor and defense counsel.

5           And I'll give you an example, your Honor, from the

6      Crapser case.   There's correspondence of disclosure and there's

7    correspondence from defense counsel saying where's the rest.

8    They didn't produce the where's-the-rest part.  I don't know if

9    there's where's the rest in every one of the 23 case files, but

10   they didn't produce the entire file for us to look at.  They

11   just produced the documents that show the disclosure.  Now, I'm

12   not saying that there isn't a single page in the 591 that might

13   be a correspondence from defense counsel to the prosecutor.

14   There might be.  But surely there isn't a complete record of

15   what the correspondence was, what the disclosure was.

16          And let me give you another example.  They didn't

17   produce the trial transcripts from the 23 cases.  Now, why

18   would those be relevant?  Well, one of the eight case files

19   that we looked at, the Taylor case, in the trial transcript is

20   evidence that information that was favorable to the defendant

21   wasn't disclosed until just before trial, opening statements.

22   So that's an important source for us to look at in these other

23   case files.

24          And another case that we had access to, it came out

25   during cross-examination of a witness that there was favorable

```
 1    information about that witness that hadn't been disclosed.  And
 2    I understand that defendants say, well, those aren't Brady
 3    violations because there was a curative instruction or the
 4    judge said, you know, there was no prejudice.  I get that.
 5    We're going to fight about that at a later point in time on the
 6    merits, I'm sure.  But the point is that the trial transcripts
 7    are relevant sources of information.  And they produced, you
 8    know, ten pages of the trial transcript from the Kirkpatrick
 9    case, for example, because that's what they say is the relevant
10    witness' testimony.  I get that.  But they didn't produce the
11    trial transcripts from the other 24 cases.  We would want to
12    look at that.
13              There are a lot of other documents we would want to
14    look at to understand the complete picture, and it's not fair
15    when these documents are solely in their possession, custody
16    and control, they've known -- they had these boxes in front of
17    them at least in November 2012.  Possibly earlier.  I don't
18    know.  Only they can tell you.  But they had them in front of
19    them November 2012.  They produced some documents from them,
20    and then they waited for fact discovery to end, they waited for
21    expert discovery to end.
22              And it's not a coincidence, your Honor.  The day
23    before John Garrity's deposition, they produced hundreds of
24    pages of documents.  Ms. Ingram says the schedule has never
```

25     been extended.  It's been extended twice.  And before the first

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

29

20135gbozeccf

1     schedule was extended, they dumped documents on us, within a

2     week before, hundreds of pages.  So this is a pattern, your

3     Honor.  This isn't just one time.

4              THE COURT:  Okay.

5              Ms. Ingram, you may respond.

6              MS. INGRAM:  In January of this year, plaintiff's

7     expert attached to his expert's report an appendix, which I've

8     attached for the Court, that has 51 cases attached to it,

9     identifying 51 cases that he relied upon, he reviewed documents

10    from and he relied upon.  The substantial number of cases -- of

11    documents in that appendix bear Wilmer Hale Bates stamp

12    numbers.  Of the 24 cases that supplemental disclosures were

13    made from on April 25th -- 24th, 18 of them were cases that had

14    been identified in the defendants' -- in the plaintiff's

15    request for admission.  Twenty-four of the case files -- every

16    single case file that contained documents disclosed, the

17    plaintiffs knew about, they were on notice of.  They, in fact,

18    went to the County Clerk's Office and obtained records.  They

19      never asked us can we review your documents, can we review your

20      case files.  We never denied them access.  So this whole claim

21      for the last 15 minutes about they've never had any access is a

22      presumption that they ever asked for access.  There was never,

23      ever any seeking of access of the documents.

24             With regard to disclosures that were made in November,

25      I don't have the discovery demand in front of me, but I believe

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

30

20135gbozeccf

1       that there was a response made because they asked for certain

2       template language that came out of depositions, and then we

3       gave them, in addition to the template -- what isn't template

4       language, but what they've identified as template language, we

5       gave them then copies of case documents -- portions of

6       documents because we were in a rush to get it done, portions of

7       documents from other case files that showed other language,

8       other than the standard response that was made, the versions of

9       the standard responses that were made.  So they had notice of

10      those files.  In fact, they then went and -- I believe they

11      went and they got some of those files from the County's Clerk's

12      Office.  Again, they could have easily done it, gone and

13    reviewed it.

14          So the combination of getting the second request for

15    admission and their plaintiff's expert report, which identified

16    these 50 files -- and just so that you know, your Honor, we had

17    previously asked, back in 2011, for all documents relied upon

18    by Mr. Bozella in the captioned action.  The response that we

19    were given was that it was -- you know, they objected to it and

20    they would produce nonprivileged documents and up until a

21    pretrial order, the time of their pretrial order.  So they're

22    even saying that, back in 2011, you know what?  We're going to

23    continue to produce documents way past the disclosure deadline.

24          We did not submit documents after the disclosure

25    deadline.  The documents that were produced on April 24th, yes,

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

31

20135gbozeccf

1    were from the District Attorney's files that, if they had

2    wanted to review it, they were on notice of every single one of

3    them.  They cannot deny the fact that they were not on notice

4    of every single one of them, including the Kirkpatrick file.

5    Back in August of 2012, Mr. Grady identified the Kirkpatrick

6    file for them as a case that he had tried.  It was again

    7      identified in the interrogatories that were served in February

    8      of this year.  So they had opportunities to say we want to

    9      review the Kirkpatrick file with or without the knowledge of

   10      the indictment number.  They never undertook to do that.

   11              THE COURT:  What you have attached to your letter,

   12      these are all materials and documents that --

   13              MS. INGRAM:  I'll give you an example.

   14              THE COURT:  -- the expert had reviewed?  The expert

   15      had reviewed all of these?

   16              MS. INGRAM:  Yes.

   17              If you compare this list -- if you compare them, the

   18      expert had -- it starts with Ali.  So if you look at Professor

   19      Gershman's expert disclosure, case file documents,

   20      People v. Ali, there are -- that file has Wilmer Hale Bates

   21      stamp numbers.  So we then looked at People v. Ali, and one of

   22      the things that we noticed that was missing was the notice of

   23      motion that should have been attached to the affirmation.  So

   24      they had access.  Now, that would be a document that would have

   25      been in the County Clerk's file.

1        Now, if you look at the notice of omnibus motion, on
2   the second page of it, it contains language that says what
3   they're asking for is for an order directing the District
4   Attorney to furnish the defendant, within the time period to be
5   specified by the court, all evidence or information of every
6   form and nature which may tend to exculpate the defendant
7   within the purview of Brady and Rosario.  And this is by the
8   Public Defenders' Office.  This is the same language that they
9   don't like that the District Attorney's Office uses in their
10  form responses, what they consider to be their form responses.
11  So we thought that, in the spirit of disclosing fulsome
12  documents, that maybe the notice of motion should go along with
13  that because it wasn't something that was provided to their
14  expert, who now they're claiming needed to be able to see the
15  whole file in order to render his opinion.

16        So they had access to documents.  And that's the kind
17  of documents -- and, yes, the Andros file has letters because
18  it was done in letter form in that particular case.  We
19  wouldn't -- no one is ever saying that they would have been
20  denied access to the Andros file.  The Andros file is another
21  file that, if you look on page two of their expert appendix,
22  that also contains Wilmer Hale Bates stamp numbers.  So,
23  clearly, they were aware of the Andros file, and if they

24    thought this was a file that they were going to rely on and

25    that, you know, maybe we would then look through the file and

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

33

20135gbozeccf

1    see, well, is there something that we think we should be able

2    to rely on, they could have asked any time during this whole

3    time period that they're complaining of that discovery was

4    going on to look at any of these files.

5          THE COURT:  Okay, now, we're talking about 591 pages

6    that you produced on April 24.  What prompted the production of

7    those documents at that time?

8          MS. INGRAM:  What I'm trying to tell your Honor is

9    what prompted the production of the documents was the receipt

10   of the 50 pages we've been asking for them to identify.  We

11   again asked for them to identify what documents they intended

12   to rely on in December of 2012.  We asked them to identify what

13   documents they intended to rely on to support the claim that

14   the County of Dutchess violates its Brady obligations and that

15   it had an unconstitutional and narrow policy.  Their response

16   was they objected to it and that they had previously produced

17   responsive documents, without identifying.  We then had

18    communications back and forth with them about could you

19    identify for them the documents. They refused to identify. So

20    the first time that we get the identity of the documents that

21    we believe they're going to rely on is when we get this in

22    January and also when we get the second requests for admission,

23    which was served I think also in January.

24          THE COURT: Okay.

25          Mr. Firsenbaum.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

34

20135gbozeccf

1          MR. FIRSENBAUM: Okay. Thank you, your Honor.

2          A couple of points. Rule 26(a)(1)(A) could not be

3    clearer. A party "without awaiting a discovery request" must

4    produce "a copy of all documents that disclosing party has in

5    its possession, custody or control and may use to support its

6    claims or defenses." That's 26(a)(1)(A). So we didn't need to

7    serve a discovery request if these were the documents they were

8    planning to use.

9          Now, we put in our premotion letter the requests that

10    did cover the 28 months before April. They didn't object to

11    that. Their premotion letter does not contest that we asked

12      for these documents in discovery requests, so this is a new
13      argument that's coming up in the hearing. And in fact, the
14      document requests do cover it. They don't ask for it by case
15      file, indictment number and name, but they covered the
16      documents.

17              Now, they talk about us being aware of case files.
18      Again, it's not the fact that these case files were out there,
19      it's what documents did we see. Yes, we produced documents
20      from them, not from our custody and control, from the County
21      Clerk's Office. We produced documents in a timely fashion;
22      during fact discovery, during depositions, before expert
23      discovery. And they produced documents -- your Honor asked
24      what prompted the disclosure in April, and Ms. Ingram responded
25      because of Professor Gershman's report in January. That was

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20135gbozeccf

1       months before Professor Gershman's deposition. So, again, what
2       prompted producing them after Professor Gershman has already
3       been deposed? There's no answer to that question.
4               Now, RFAs. She points to our RFAs, again, also served
5       in January. The RFAs, first of all, they're not burdensome.

6      Every single one was an authenticity RFA from a document that

7      came from the District Attorney's -- the County's files, either

8      the District Attorney's Office or the County.  And those

9      weren't new documents.  Those are all documents that were in

10     Professor Gershman's report.

11           Now, before Professor Gershman's report, in November

12     2012, they produced documents from these case files, so, of

13     course, Professor Gershman looked at them and discussed them in

14     the report because he was looking at the documents that were

15     produced in the record.  So it's disingenuous to say, oh, well,

16     we first learned of them in January because they were the ones

17     that were produced for most of these case files back in

18     November.

19           Now, we could have asked for them.  Yes, we did ask

20     for them.  Now, could we have served new document requests

21     asking for the entire case file?  I suppose we could have.  I

22     didn't think it was necessary because we already had document

23     requests pending asking for documents that they were going to

24     rely on to show that they complied with Brady.  But if -- they

25     say, oh, we would have produced them.  Well, your Honor might

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

36

20135gbozeccf

1   recall that, last time we asked for specific case files other
2   than -- including Crapser and King, they objected and refused,
3   and we were before your Honor on a motion to compel. Your
4   Honor granted, and they appealed to Judge Seibel. So the
5   notion that, oh, yeah, we would have given them access to all
6   of them, history in this case suggests that that's not quite
7   right.

8           And finally, your Honor, when they talk about our
9   objection to producing documents that we're going to rely on in
10  the case, that's from October 2011. That's before a single
11  fact deposition occurred in the case, before expert discovery.
12  Since then, we've produced hundreds, if not -- hundreds of
13  pages. And we're talking about apples and oranges when we're
14  talking about documents that are in the defendants' own files,
15  that they were aware of, that they looked through and cherry
16  picked from previously and what we're talking about, the fact
17  that we're free to conduct an independent investigation. There
18  might be information out there in this world that's not in
19  Mr. Bozella's custody or control. We can't say that it hasn't
20  been -- that, you know, we've produced information we're not
21  aware of. But what we can say is everything in our possession,
22  custody or control that we intend to rely on was produced
23  before expert discovery and during fact discovery, as it was

24    supposed to be.

25          What we're talking about here is sandbagging.   You

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

37

20135gbozeccf

1    didn't get an answer as to why they waited until after

2    Professor Gershman testified, and there's no remedy here other

3    than striking that allows this case to proceed in a fair way.

4          THE COURT:   Okay.

5          MS. INGRAM:   Your Honor, I was in a bit of a dammed if

6    I did and dammed if I didn't situation.   On April 23rd, I told

7    the Court and Mr. Firsenbaum that we were going to submit

8    additional documents.   I did not tell him that they were going

9    to be documents -- say that they were going to be documents

10   that were going to be used at Professor Gershman's deposition.

11   And in fact, not a single one of the documents that was

12   produced was used at Professor Gershman's deposition.

13         Some of the documents that were produced are complete

14   copies of documents Mr. Gershman previously reviewed in the

15   course of his rendering his opinion, and the completion of

16   those documents don't affect the substance of which he was

17   discussing.   They just, instead of giving a two-page -- you

18    know, being a two-page partial of a response to a demand or an

19    affirmation, they were -- it was the complete affirmation.

20         But aside from all of that, the fact of the matter is,

21    had I produced the documents on April 23rd, they would have

22    made the same sandbagging argument.  And I produced the

23    documents.  Initially the number of documents numbered 700, and

24    they were all set to go, and when I realized there were 700, I

25    personally went through and culled out to make sure there

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

38

20135gbozeccf

1    weren't any duplicates.  I believe there are still duplicates

2    that went through the documents.  So, from a physical manpower

3    standpoint, the best I could do was get them when I did.  I was

4    trying to avoid having there be any kind of argument that we

5    were going to use these documents.  There's no way we could use

6    those documents during Professor Gershman's deposition.  And

7    the nature of the documents is -- and the case files that they

8    come from are documents that are case files that plaintiff knew

9    about.  He cannot deny that he knew about them.  They had

10    access to them all along.

11         And while they don't think that getting the response

12    from plaintiff's expert in January and getting the requests for

13    admission was a big deal, when we got that, we reviewed 50

14    files.  Do you know how long it takes to review 50 files?  The

15    fact that we got them at the end of January until April was

16    pretty darn good.

17          THE COURT:  Okay, well, let me ask.  There's an issue

18    about a new witness, also?

19          MS. INGRAM:  Can I address that, your Honor?

20          THE COURT:  Yes.

21          MS. INGRAM:  Ted Alston is not a new witness.  Ted

22    Alston appears in paragraphs 188 through 194 in the plaintiff's

23    complaint.  He's not a new witness.  Mr. Garrity testified

24    about Mr. Alston.  We included Mr. Alston in a supplemental

25    26(a) disclosure when we really didn't have to because you know

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20135gbozeccf

1    what?  If we didn't and we included him in our pretrial order,

2    we would have an argument at that time that we never disclosed

3    him and they're prejudiced because we never disclosed him.  So

4    we disclosed him because he's going to be used for impeachment

5    purposes, but the rules don't require us to do that.

6           So, again, you know, this is an argument that really

7    has no merit because they're fully aware of Mr. Alston.  They

8    could have deposed Mr. Alston any time during the course of

9    their depositions.  They may have, in fact, had investigation

10   and contact with Mr. Alston before that.  So that's a

11   nonargument.

12          With regard to the Kirkpatrick case, I believe we've

13   already addressed it.  They had access.  They could have had

14   access to that file during the course of discovery.

15          THE COURT:  Okay.  Last word.

16          MR. FIRSENBAUM:  Your Honor, Ms. Ingram sits before

17   the Court and says we're disclosing Mr. Alston for impeachment.

18   The disclosure says, "The subject matter of the knowledge of

19   this individual relates to his knowledge of the investigation

20   of the death of Missy Storms and the prosecution of her murder

21   by the Dutchess County District Attorney's Office."  Sounds

22   like a lot more than impeachment, your Honor.

23          THE COURT:  Okay, counsel, I want to take about a

24   ten-minute break, and then I'll be back.

25          (Recess)

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

40

20135gbozeccf

1          THE COURT:  The Court's reviewed all the papers in the
2    matter, listened carefully to the arguments of both sides.
3          Concerning the subpoenas first, I have six proposed
4    subpoenas that were submitted to me on the last day of
5    discovery, April 29th.  That's an issue that we had talked
6    about before.  Compliance with the subpoena would have to be
7    after the close of discovery.  The Court sees no reason why
8    there was a delay until the last day of discovery to request
9    the Court to so order subpoenas.  So, accordingly, the Court is
10   going to deny the proposed subpoenas.
11         Additionally, as concerns the financial information,
12   plaintiffs have a continuing obligation to provide any type of
13   financial information that would go to mitigation damages.
14   They recognize that and have been doing so.  Plaintiff has been
15   deposed as to what kind of work that he's been doing.  But
16   given the late presentation to the Court of these subpoenas,
17   the Court does deny them.
18         Now, concerning the 591 pages of documents that were
19   produced I believe April 24th to the plaintiffs, under Rule 26,
20   defendants did have an obligation to provide these documents on
21   a timely basis, anything that they were going to be relying on,
22   under the Federal Rules.  They waited until a few days before

23    the close of discovery to produce these documents.  Plaintiffs

24    would be prejudiced.  They would have to review I don't know if

25    it's 24 or 25 files.  There might be additional depositions,

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

41

20135gbozeccf

1    supplementation of expert reports.  The Court just finds that,

2    at this late stage of discovery, which was ending April 29th --

3    that was made clear -- to allow this to occur and to expand

4    discovery in this case, which has already gone through two and

5    a half years of discovery, for another X amount of months or

6    year would not be the thing to do.  So, accordingly, the Court

7    is going to strike the 591 pages of documents.  They can't be

8    used by either side.

9         Now, according to the witness Alston, the Court does

10    not see any reason why that witness cannot be called.  I will

11    allow the calling of that individual as a witness.  He's named

12    in the amended complaint.  Both sides had the right to depose

13    him if they wanted.  No surprise there.  I am not striking him

14    as a potential witness in the case.

15         Counsel, that's the ruling of the Court.

16         MR. FIRSENBAUM:  Your Honor, could I just ask one

17    question?

18            THE COURT:  Go ahead.

19            MR. FIRSENBAUM:  Just so there's a clear record, the

20    591 documents do not include the cassette tape that came from

21    the files, and that was the subject of the --

22            THE COURT:  Well, it's all the disclosure.

23            MR. FIRSENBAUM:  Yes, okay.  Thank you, your Honor.

24            THE COURT:  Okay.  Matter adjourned.  Thank you.

25                        - - - -

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103