149NBOZms

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| 3 | DEWEY R. BOZELLA, |
| 4 | Plaintiff, |
| 5 | v. |
| 6 | THE COUNTY OF DUTCHESS, |
| | THE CITY OF POUGHKEEPSIE, |
| 7 | and WILLIAM J. O'NEILL, |
| 8 | Defendants. |
| 9 | ------------------------------x |

10 Civ. 4917(CS)
Decision on Motions

White Plains, N.Y.
September 23, 2014
10:00 a.m.

Before:

THE HONORABLE CATHY SEIBEL,

District Judge

APPEARANCES

WILMER CUTLER PICKERING HALE & DORR, LLP (NYC)
        Attorneys for Plaintiff
PETER J. MacDONALD
ROSS ERIC FIRSENBAUM

BURKE, MIELE & GOLDEN, LLP
        Attorneys for Defendants
PATRICK T. BURKE
MICHAEL K. BURKE
PHYLLIS A. INGRAM

1           THE DEPUTY CLERK:  Bozella against County of Dutchess,

2    et al.

3           THE COURT:  All right.  Good morning, everyone.

4           I'm prepared to rule on the motions for summary

5    judgment, but if there's anything anybody wants to add that

6    wasn't covered in the papers, now is your chance.

7           You have nothing?

8           MR. P.T. BURKE:  Nothing.

9           MR. MacDONALD:  Nothing to add to the papers, your

10   Honor.

11          THE COURT:  All right.  Here we go, then.

12          I've got plaintiff's motion for partial summary

13   judgment in his favor on a portion of his Monell claim against

14   Defendant Dutchess County, and I have Defendant Dutchess County

15   and O'Neill's motions for summary judgment dismissing the

16   plaintiff's claims.

17          The parties are familiar with the details, so I'm just

18   going to summarize the facts, which are undisputed, except

19   where noted, and which come from the 56.1 statements and

20   supporting documents.

21          The plaintiff was twice convicted in the 1977 murder

22   of 92-year-old Emma Crapser in Poughkeepsie.  The first

23   conviction in 1983 was overturned on Batson grounds, and the

24   plaintiff was retried and convicted again in 1991.

25          On October 14th, 2009, the Dutchess County Court

1   granted plaintiff's motion under New York Criminal Procedure

2   Law, Section 440, to vacate the 1991 judgment of conviction,

3   and he was released after more than 26 years in prison.  The

4   Dutchess County District Attorney or D.A. opposed the

5   plaintiff's motion.  At that time and at the time of

6   plaintiff's 1991 conviction, the D. A. in Dutchess County was

7   William Grady.

8           Over the D.A.'s objections, the County Court found

9   four violations of plaintiff's constitutional rights under

10  Brady, which are the same four violations underlying

11  plaintiff's Monell claim against the County in this case.  The

12  Court found that the D.A. had failed to disclose four kinds of

13  Brady evidence.

14          First are what I'll be calling the "neighbors'

15  statements," voluntary statements of Cecil Carpenter, Curtis

16  Carpenter, Shirley Ellerby and Linda Miller, who were in and

17  out of the upstairs apartment all night, and claimed they did

18  not hear or see anything unusual in front of the victim's

19  building on the night of the murder.  Those statements

20  contradicted testimony offered by the State that placed

21  plaintiff and prosecution witness Lamar Smith in front of the

22  building.  I'm also including in this category the statement of

23  Cynthia Murphy who sat on a park bench near the front of the

24  building all evening, and said that she did not see plaintiff

25  or the prosecution witness, Lamar Smith, who she knew and who

1   said he was there.  There was also a statement of someone named

2   Diedra Walker who was visiting the upstairs apartment.  The

3   Dutchess County Court did not discuss this statement, but it

4   was mentioned in the police report which is referred to as the

5   "Shelly Report," which I'll discuss more in a few minutes.

6          The second undisclosed Brady material was what I'll

7   call the "alleyway neighbor's statement."  This was a statement

8   from a neighbor reporting that she heard loud noises in the

9   alley next to the victim's apartment on the night of the

10  murder.  The statement was made to a Detective Murphy who did

11  not write it down, but mentioned it to Officer Arthur Regula,

12  who did write a report, but which did not include the alleyway

13  neighbor's statement.  The statement supported plaintiff's

14  theory that Donald Wise, not the plaintiff, was the killer, and

15  that Donald Wise gained access to the home through the alley

16  window, a theory that was bolstered by Mr. Wise's fingerprint

17  on the inside of that window and information from a witness to

18  whom Mr. Wise had spoken.  But there was also contrary evidence

19  that access was not through the window, given that a lot of

20  dust and debris around the window was undisturbed.

21         But that was the second species of Brady evidence that

22  the County Court found should have been turned over.

23         The third was what we're calling the "Holland Tape."

24  It was a recording of an interrogation on February 23rd, 1978,

25  of a man named Saul Holland in connection with what we're

1   calling the "King murder," which was a break-in at an apartment

2   of some elderly sisters, one of whom died in the manner similar

3   to Ms. Crapser.  In the Holland Tape, Holland says that, first

4   of all, he and Donald Wise, among others, were responsible for

5   the King murders, and Holland said that Donald Wise told

6   Holland that he had done one of these jobs before;

7   specifically, a burglary where, quote, "the lady came home,"

8   unquote, which supported plaintiff's theory that Wise did the

9   Crapser murder, because that was a murder which started as a

10   burglary and where Ms. Crapser came home during the burglary.

11   The interrogating detective seems to prompt Mr. Holland to

12   mention this story on the tape, but then somewhat abruptly

13   tells Holland that he doesn't want to get into it, "because

14   we're liable to get confused."  And the County Court found that

15   that statement by Mr. Holland that Mr. Wise had done a burglary

16   before where the lady came home supported plaintiff's theory

17   that Wise was the killer.

18         And finally, the fourth item was what we're calling

19   the "Dobler Report."  It was a report describing the 1977

20   assault of an elderly woman named Estelle Dobler which shared

21   similarities with the Crapser and King murders, and in which

22   Ms. Dobler's description of her attacker was consistent with

23   Donald Wise.  And that report, the Court also held, should have

24   been turned over.

25         The District Attorney did not appeal the County

1   Court's 440 decision, and Mr. Bozella was released.

2         On June 24th, 2010, plaintiff commenced this action by

3   filing a complaint against Dutchess County, the City of

4   Poughkeepsie, Assistant D.A. or A.D.A. William O'Neill and

5   Officer DeMattio.  DeMattio, O'Neill and the County moved to

6   dismiss, and the City moved for judgment on the pleadings.

7         On September 29th, 2011, I granted in part and denied

8   in part O'Neill's motions, and I granted the motions of the

9   County, City and DeMattio.  I also denied plaintiff leave to

10   amend.

11         At that point, the only claim that remained was the

12   claim against O'Neill for the alleged coercion of a witness

13   named Madelyn Dixon South who had implicated Wise, then

14   recanted that testimony in front of the grand jury, and then

15   implicated Wise again at plaintiff's 1983 trial.  And her

16   testimony was read to the jury at the 1991 trial.

17         Plaintiff alleged that O'Neill had coerced South into

18   falsely recanting in front of the grand jury previous

19   statements she had made implicating Wise in the murder, and

20   that O'Neill had done so in order to secure plaintiff's

21   indictment.

22         Plaintiff sought reconsideration of my decision

23   denying leave to amend, and on January 6th, 2012, I granted

24   reconsideration, and, on reconsideration, granted plaintiff

25   leave to amend a Monell claim against the County for its

1    alleged policy of not disclosing Brady evidence unless it was,

2    quote, "truly exculpatory," unquote.  The amended complaint was

3    filed on January 31st, 2012, and answered on April 9th.

4    Discovery took place.  We had a pre-motion conference on

5    March 5th, 2013, and set a briefing schedule for the instant

6    motions which I am now about to decide.

7         They are motions for summary judgment.  I won't take

8    the time to recite the legal standards.  We're all familiar

9    with them.

10        Before I get to the Monell claim, let me first turn to

11    plaintiff's claim against A.D.A. O'Neill, who is now retired.

12        The defendants argue that O'Neill is entitled to

13    summary judgment because he acted in a prosecutorial role when

14    soliciting grand jury testimony from South, and thus, he is

15    entitled to absolute and qualified immunity.  Defendants add

16    that South was clearly confused about which Assistant District

17    Attorney had coerced her, so that there is insufficient

18    evidence to maintain a claim against Defendant O'Neill.

19        There are two A.D.A. O'Neills.  There is William

20    O'Neill, with two "L"s, and Jim O'Neil with one "L," who, I was

21    sorry to learn, had passed away.  And they were both involved

22    in the Crapser case.  But it was Jim O'Neil who actually

23    questioned South before the grand jury.  The allegation here is

24    that William O'Neill spoke to South before her grand jury

25    testimony, and somehow coerced her into recanting the statement

**1**  she had previously made implicating Wise.  Plaintiff responds

**2**  that O'Neill is not entitled to immunity, or at least that

**3**  there is a question of fact on the subject.

**4**  There is sort of a preliminary matter floating around,

**5**  which is whether South's testimony to the effect that she was

**6**  coerced into changing her story in front of the grand jury

**7**  would be admissible at a trial of this case.  South died after

**8**  plaintiff's first trial, and the transcript of her testimony

**9**  was admitted at plaintiff's second trial.  But it doesn't

**10**  follow from that that it's necessarily admissible now in a 1983

**11**  claim against O'Neill personally.

**12**  The burden is on plaintiff as proponent to establish

**13**  by a preponderance of the evidence that the testimony is

**14**  admissible.  See O'Brien v. City of Yonkers, 2013 Westlaw

**15**  1234966, at Page 7 (S.D.N.Y. May 28th, 2008).  Testimony of a

**16**  nonparty witness that was given at a prior hearing is hearsay

**17**  when offered for its truth.  See generally evidence

**18**  Rule 801(c).  Evidence Rule 804(b)(1) exempts prior testimony

**19**  given by an unavailable witness from the hearsay rule if the

**20**  party against whom the testimony is now offered had an

**21**  opportunity and similar motive to develop the testimony by

**22**  direct, cross- or redirect examination.  That's Evidence

**23**  Rule (b)(1)(B).  See Paterson v. County of Oneida, 375 F.3d

**24**  206, at 219 to 20.  It is undoubtedly under the state analogue

**25**  of this rule that the testimony was admitted at the second

1   trial.  But again, it doesn't necessarily mean it should be

2   admitted in the civil case.

3          In discussing the "similar motive" requirement, the

4   Second Circuit has explained that the test must turn not only

5   on whether the questioner is on the same side of the same issue

6   at both proceedings, but also on whether the questioner had a

7   substantially similar interest in asserting that side of the

8   issue.  U.S. v. DiNapoli, 8 F.3d 909, at 912.  See U.S. v.

9   Whitman, 555 Fed. Appendix 98, at 103.

10          I'm not at all sure that O'Neill had the same motive

11   to cross-examine South in the 1983 trial as he has now when the

12   testimony is being offered against him personally.  Arguably,

13   O'Neill's interest is greater now because he is subject to

14   personal attack and personal liability.  As the DiNapoli Court

15   at Page 915 said, the, quote, "nature of . . . what is at

16   stake," unquote, is relevant in determining similarity of

17   motive.  It's possible O'Neill didn't feel it was necessary to

18   vigorously cross-examine South on the claim that he had coerced

19   her into changing her story.  Maybe he thought the fact that

20   she had changed her story was enough to convince a jury she was

21   not to be believed, whatever her testimony.  And she certainly

22   had other credibility issues, and he may have concluded that

23   her testimony did not pose a danger to the case.  See Hannah v.

24   City of Overland, 795 F.2d 1385, at 1390 to 91 (8th Cir. 1986).

25   See also O'Brien at Page 8, where the Court collects cases on

1    why a prosecutor may have a different motive as a defendant in

2    a civil case than he did as a prosecutor in a criminal case.

3         On the other hand, O'Neill did cross-examine South on

4    her claim that he had coerced her into changing her story.  He

5    asked whether it was him or Jim O'Neil who had coerced her, and

6    through his questioning, it became apparent that South was

7    confused about the identity of the two men.  So even though

8    O'Neill wasn't personally targeted at the trial, he did take

9    the time to attack South's testimony.  But I still don't know

10   that plaintiff has met his burden of showing that O'Neill had

11   the same motive to cross-examine South.

12        But ultimately, I need not resolve this question,

13   because the plaintiff's claim against O'Neill fails for a far

14   simpler reason.  The undisputed facts reveal that it was

15   impossible for O'Neill's alleged coercion of South to have

16   secured plaintiff's indictment.  Plaintiff was indicted before

17   O'Neill allegedly coerced South into changing her grand jury

18   testimony.  So any coercion could not have had an effect on

19   plaintiff's indictment.

20        It's undisputed that plaintiff was indicted on

21   March 31st, 1983.  It's also undisputed that South testified

22   before the grand jury on April 14th, 1983, 14 days later.  It

23   was at this grand jury, which apparently was looking into

24   charges against Mr. Pitman, that South recanted her testimony,

25   allegedly based on O'Neill's coercion.  It's chronologically

1    impossible for O'Neill's coercion of South to have had any

2    effect on securing plaintiff's indictment.

3           The alleged coercion may have had an effect on

4    plaintiff's conviction, but plaintiff has not pursued this

5    argument.  The inconsistency in South's statements, between her

6    grand jury testimony when she recanted her previous statement

7    that Wise had confessed to the murder, and her testimony at

8    plaintiff's trial that Wise had confessed to the murder,

9    arguably casts doubt on the truthfulness of her testimony, and

10   so diluted the power of defendant's defense.  In other words,

11   the jury may have been less likely to believe South that Wise

12   had confessed to the murder when it learned that she had

13   previously testified otherwise.  But plaintiff has not alleged

14   that the coercion of South led to plaintiff's conviction.  The

15   claim is that O'Neill coerced South's testimony to, quote,

16   "secure . . . the indictment" -- that's Paragraph 215 of the

17   amended complaint and Paragraph 99 -- which is chronologically

18   impossible.

19          Likewise, on the issue of immunity, that plaintiff was

20   already indicted and therefore, by definition, there was

21   probable cause to charge him before the alleged coercion took

22   place, is a significant factor suggesting that O'Neill is

23   entitled to absolute immunity.  Cousin v. Small, 325 F.3d 627,

24   at 633 (5th Cir. 2003).  See Descovic v. City of Peekskill,

25   2009 Westlaw 2475001, at Page 13 (S.D.N.Y. August 13th, 2009).

1    Given the time line, it seems that O'Neill pressuring

2    South to recant her testimony implicating Wise, if it happened,

3    was not to secure probable cause, but to bolster an already

4    assembled case.  Under Hill v. City of New York, 45 F.3d 653,

5    at 662, quote, "Out-of-court efforts to control a witness's

6    grand jury testimony that are made subsequent to the decision

7    to indict," unquote, are protected by absolute immunity.

8    Here, contrary to what I thought at the time of the

9    motion to dismiss, not only had the decision to indict already

10   been made, but the indictment had, in fact, already been voted.

11   I said in my decision on the motion to dismiss, based on the

12   allegations in the complaint, that it was plausible that

13   O'Neill coerced South's testimony to establish probable cause,

14   rather than to bolster evidence against an already indicted

15   individual.  As the evidence has played out, the opposite is

16   true.

17   In sum, whether on grounds of absolute immunity or

18   absence of causation, O'Neill is entitled to summary judgment

19   dismissing plaintiff's claims against him.

20   Let me now quickly mention the claim for punitive

21   damages before sinking my teeth into the Monell claim.

22   Punitive damages are not recoverable against the

23   County.  That's well settled.  City of Newport v. Fact

24   Concerts, 453 U.S. 247, at 271, and Parkash v. Town of

25   Southeast, 2011 Westlaw 5142669, at Page 10 (S.D.N.Y.

1    September 30th, 2011). So the claim for punitive damages goes

2    away along with the claim against O'Neill. Obviously, the

3    plaintiff can seek compensatory damages against the County, and

4    I imagine they would be substantial.

5              So now, let me address whether the Monell claim

6    survives.

7              And first, let me address the plaintiff's motion.

8              The plaintiff seeks partial summary judgment on the

9    first element of the Monell claim asserting two theories: One,

10   that the County is collaterally estopped from relitigating the

11   County Court's finding that the Brady evidence was favorable,

12   material and undisclosed; and second, even if collateral

13   estoppel does not apply, plaintiff is entitled to partial

14   summary judgment, because's the County does not dispute that

15   three of the four pieces of Brady evidence were undisclosed,

16   and the undisputed record establishes the favorability and

17   materiality of that evidence.

18             The County opposes the motion, and seeks summary

19   judgment dismissing plaintiff's claim.

20             First, let me talk about collateral estoppel or issue

21   preclusion which prevents parties or their privies from

22   relitigating in a subsequent action an issue of fact or law

23   that was fully and fairly litigated in the prior proceeding.

24   Marvel Characters v. Simon, 310 F.3d 280, at 288. The same

25   case tells us that under New York law, collateral estoppel

1    applies when the identical issue was raised in a previous

2    proceeding, the issue was actually litigated and decided in the

3    previous proceeding, the party had a full and fair opportunity

4    to litigate the issue, and the resolution of the issue was

5    necessary to support a valid and final judgment on the merits.

6         I'll talk first about the identity of issues.

7         The burden of showing that an issue raised in the

8    subsequent proceeding is identical to one that was raised and

9    necessarily decided in the prior action rests squarely on the

10   party moving for preclusion.  Sullivan v. Gagnier, 225 F.3d

11   161, at 166.  See Peterson v. City of New York, 2012 Westlaw

12   2148181, at Page 1 (S.D.N.Y. June 13th, 2012).  So the burden

13   is on the plaintiff on the "identical issue" issue.

14        Plaintiff argues that the issue decided by the Court

15   was that plaintiff's rights under Brady were violated by the

16   failure to disclose the Brady evidence, and that the same issue

17   exists in this case.  The County responds that the issues are

18   different.  It argues that while the County Court determined

19   that four categories of evidence were Brady material that

20   should have been turned over but were not, the issue in this

21   case is whether the County had an unconstitutional policy of

22   suppressing Brady evidence unless it was truly exculpatory.

23        The County overlooks that plaintiff is not seeking

24   summary judgment on his entire Monell claim.  Plaintiff seeks

25   only partial summary judgment on the existence of a

constitutional violation, which is only one part of the

three-part Monell inquiry.  See Wray v. City of New York, 490

F.3d 189, at 195, where the Court said, "To hold the City

liable under Section 1983 for the unconstitutional actions of

its employees, a plaintiff is required to plead and prove three

elements:  An official policy or custom that causes the

plaintiff to be subjected to a denial of a constitutional

right."

Actually, the way it's worded is that "A plaintiff is

required to plead and prove three elements:  (1) an official

policy or custom that (2) causes the plaintiff to be subjected

to (3) a denial of a constitutional right."

Plaintiff seeks summary judgment on the third element

only, not on the first two.

But I also need to address the standard of proof.

Courts and commentators alike have recognized that a

shift or change in the burden of proof can render the issues in

two different proceedings nonidentical, and thereby make

collateral estoppel inappropriate.  Cobb v. Pozzi, 363 F.3d 89,

at 113, collecting cases.  "To apply issue preclusion when the

burden of proof is heavier in the second litigation would be to

hold, in effect, that the losing party in the first action

would also have lost had a significantly different burden been

imposed."  That's Comment F to Section 28 of the restatement

second of judgments.  The same principle applies within the

1     context of civil actions.  See Cobb, at 114, where the Court

2     said, "The differences in gradations of civil standards of

3     proof are more subtle than the shift from the 'reasonable

4     doubt' standard to the preponderance standard, but the same

5     basic principle continues to apply."

6          The County Court applied a lower standard of proof for

7     its Brady analysis than I must apply here.  Under Brady, the

8     government must disclose material evidence favorable to a

9     criminal defendant.  U.S. v. Mahaffy, 693 F.3d 113, at 127.

10     Undisclosed evidence is material if there is a reasonable

11     probability that had the evidence been disclosed to the

12     defense, the result of the proceeding would have been

13     different.  Youngblood v. West Virginia, 547 U.S. 867, at 870.

14          New York State courts, however, utilize a two-tier

15     standard when assessing the materiality of nondisclosed

16     favorable evidence.  Where a defendant makes a specific request

17     for a document, the materiality element is established,

18     provided there exists a reasonable possibility that it would

19     have changed the result of the proceedings.  Absent a specific

20     request, materiality can only be demonstrated by showing that

21     there is a reasonable probability that it would have changed

22     the outcome of the case.  People v. Fuentes, 12 N.Y.3d 259, at

23     263.

24          The County Court decided plaintiff's 440 motion under

25     the "reasonable possibility" standard.  This seems to have been

1    a mistake, although not one that prompted the D.A. to appeal.

2    Plaintiff had made a general demand for Brady evidence.  So it

3    looks to me that the County Court should have applied the

4    higher standard of reasonable probability, but instead applied

5    the lower standard of reasonable possibility.  The higher

6    "reasonable probability" standard applies to plaintiff's claim

7    in this case.  Because the standard of proof is higher now,

8    defendants are not collaterally estopped from challenging the

9    finding that plaintiff's Brady rights were violated.

10             I note parenthetically that the County argues that the

11   County Court's error means that I should disregard the whole of

12   the County Court decision, but I disagree.  The decision to use

13   the lower standard only prevents me from finding that the

14   identical issue was previously decided with respect to

15   materiality.

16             Plaintiff argues that even though the Court applied

17   the lower "reasonable possibility" standard, it unquestionably

18   determined that the evidence was material under the higher

19   "reasonable probability" standard.  Plaintiff cites language

20   from the County Court decision that the Court was, quote,

21   "firmly and soundly convinced of the meritorious nature of the

22   defendant's application," unquote, and that the, quote, "legal

23   and factual arguments advanced in support of the motion are

24   compelling; indeed, overwhelming."  Unquote.

25             But this argument does not follow.  Just because the

1   Court used strong language in deciding that Brady had clearly

2   been violated under the standard the Court found applicable

3   does not mean the Court would have found that the higher

4   standard was met on these facts.

5           Plaintiff next argues that in the event I agree with

6   the County that collateral estoppel should not apply because

7   the materiality standard in this case differs from the standard

8   the Court applied, such a decision would only preclude

9   collateral estoppel on materiality, but would not preclude

10  collateral estoppel on the issues of nondisclosure or

11  favorability.  This is probably so presuming that the County

12  had a full and fair opportunity to litigate the Brady issue.

13          The burden is on the County to demonstrate that it

14  lacked a full and fair opportunity to litigate.  See Colon v.

15  Coughlin, 58 F.3d 865, at 869.  As an initial matter, I reject

16  the County's seeming suggestion that collateral estoppel does

17  not apply because the County Court never determined that the

18  County had a full and fair opportunity to litigate.  There

19  would have been no occasion for the County to address that

20  issue.  It's a question for me to decide.  See, for example,

21  Colon at 869.

22          The parties agree that the County was not a party to

23  the plaintiff's 440 motion, but disagree regarding whether the

24  County was in privity with the opposing party to the 440

25  motion.

1    Plaintiff argues that the County was in privity,

2    because even though the State is the party, the People of the

3    State of New York are the party, in the criminal case, the

4    D.A.'s Office was representing the State, and the County was in

5    privity with the D.A.'s office which handled the 440 motion,

6    and thus, the County should be bound by that decision.

7    Plaintiff adds that District Attorney Grady, the policy-maker

8    for the County, oversaw opposition to the motion, and that

9    Grady had every incentive to defeat the motion.

10    The County disagrees, arguing that numerous cases have

11    held that the D.A. is not in privity with the County, that the

12    D.A.'s Office represented the state, not the County, as it does

13    in every criminal prosecution, including the 440 motion, and

14    thus, that the County lacked a full and fair opportunity to

15    litigate the issue.  The County cites numerous cases which

16    suggest that the D.A. is not in privity with the County.  Those

17    cases include Jenkins v. City of New York, 478 F.3d 76, where

18    the circuit held there was no privity between the municipality

19    and the District Attorney in the false arrest case; Brown v.

20    City of New York, 60 N.Y.2d 987, where the New York Court of

21    Appeals held the same; and Wiltshire v. Williams, 2013 Westlaw

22    3192137, at Page 3 (S.D.N.Y. June 24th, 2013), which cited

23    Jenkins and Brown, and explained that there was no privity in

24    that case, because the defendant officer and the City were not

25    parties to the underlying criminal action, and therefore did

1    not have an opportunity to argue the legal issue in the case.

2    The County cites other cases which are similar:  DeGennaro v.

3    Town of Riverhead, 836 F.Supp. 109, at 112 (E.D.N.Y. 1993);

4    Taveras v. City of New York, 635 N.Y.S.2d 608 (App. Div. 1995);

5    and Saccoccio v. Lange, 599 N.Y.S.2d 306 (App. Div. 1993).

6        These cases involve situations that are admittedly

7    different from this case, in that there, individuals were

8    arrested for a crime, and the Criminal Court determined that

9    probable cause was lacking.  The individuals then sued the

10   police for false arrest, and the Court concluded that the

11   previous determination that the arrest was unlawful did not bar

12   the municipality or the police from contesting the issue of

13   probable cause, because the officer and, in turn, the

14   municipality had no involvement in, or control over, the

15   prosecution; the officer in the criminal case was merely a

16   witness to the underlying events.

17       Here, as plaintiff argues, District Attorney Grady was

18   involved in opposing the plaintiff's motion.  Plaintiff has

19   introduced evidence that Grady reviewed the motion, assigned it

20   to A.D.A. Ed Whitesell, one of his top prosecutors; made sure

21   that his office conducted a full investigation; and frequently

22   conferred with Whitesell.  Plaintiff adds that not only did

23   Grady have the opportunity to litigate the motion, but he had

24   every incentive to win, because plaintiff was arguing that the

25   D.A. had violated his constitutional rights, and Grady was the

1    D.A. at the time of plaintiff's 1991 conviction.  So Grady was,

2    in effect, defending his own conduct and reputation.

3           The County disputes some of plaintiff's assertions

4    regarding Grady's involvement.  Without getting into those

5    disputes, which are largely irrelevant for present purposes,

6    it's undisputed that Grady was significantly more involved in

7    this case than the officers were in the cases cited by

8    defendants.  So those cases -- Brown, Jenkins, et cetera -- do

9    not compel my decision.

10          But nor do I think that the cases that plaintiff cites

11   on Page 6 of his memo drive the decision, either.  Those cases

12   found privity existing between separate governmental entities,

13   but involved governmental entities at the same level of

14   government; for example, the D.A.'s Offices of Queens and

15   Manhattan, or the D.A.'s Office and the Parole Office.  None

16   involved a situation like this one where a Court is being asked

17   to find that a county is in privity with the District Attorney.

18   Indeed, New York courts have largely refused to find two

19   functionally independent governmental entities in privity with

20   each other for purposes of preclusion.  City of New York v.

21   Beretta U.S.A., 315 F.Supp.2d 256, at 267 (E.D.N.Y. 2004).

22          The County of Dutchess and the District Attorney's

23   Office are, if nothing else, functionally independent.  Their

24   functions and responsibilities are sufficiently distinct that

25   preclusion would interfere with the proper allocation of

1    authority between them -- Beretta at 267 -- even if Grady is

2    legally regarded as a County policy-maker for certain purposes

3    under Section 1983.

4            I recognize some logic to plaintiff's argument that

5    the County is collaterally estopped from challenging the Brady

6    findings, at least where the underlying conduct at issue in the

7    criminal proceeding was that of the same policy-maker whose

8    acts are attributable to the County, and that person controlled

9    the criminal litigation, and thus had a full and fair

10   opportunity to litigate.

11           But the law, as I read it, doesn't suggest that the

12   County is in privity with the D.A. for purposes of challenging

13   findings from the criminal case.  At a minimum, I am unable to

14   find another court to have reached such a conclusion, and I

15   hesitate to be the first to go out on a limb on this important

16   issue.  And the precedent is clear that the D.A. represents the

17   State, not the County, during criminal proceedings.  See

18   Jackson v. County of Nassau, 2009 Westlaw 393640, at Page 4

19   (E.D.N.Y. February 13th, 2009).

20           So even if, as plaintiff argues, Grady had the same

21   interest in defending against the 440 motion as the County has

22   in this case, I don't think that's sufficient to take away the

23   County's right to challenge the finding that Brady was

24   violated.

25           I also take some issue with plaintiff's

1    characterization of Grady as a policy-maker.  Grady may have

2    been a County policy-maker when acting as manager of the D.A.'s

3    Office.  See Walker v. City of New York, 974 F.2d 293, at 301,

4    where the circuit said where a D.A. acts as the manager of the

5    District Attorney's Office, the District Attorney acts as a

6    county policy-maker.  But the D.A. is not a policy-maker when

7    acting in a prosecutorial capacity, which he was doing when he

8    defended against the 440 motion.  See Jackson at Page 4.  In

9    other words, in litigating the 440 motion, Grady was exercising

10   his role as prosecutor for the State of New York in an

11   individual criminal case.

12           The conduct challenged in the instant case involves

13   his managerial role in allegedly implementing an

14   unconstitutional policy.  So he wears different hats:  One a

15   State hat in the 440 litigation, and one a County hat here.

16   And thus, the County should not be said to have had control

17   over the 440 litigation.

18           In Doe v. City of Mount Vernon, 548 N.Y.S.2d, 282

19   (App. Div. 1989), the County of Westchester was sued for

20   negligence in allowing child abuse victims to be victimized.

21   Even though the Westchester D.A. in convicting the abusers had

22   taken the position, and apparently proven beyond a reasonable

23   doubt, that the abuse occurred, when plaintiffs in the civil

24   case moved for partial summary judgment, apparently on the

25   issue of whether the abuse had occurred, the Court said the

1  County was not barred by the previous criminal litigation

2  handled by the D.A.  In other words, the County could argue

3  there had been no abuse, even where the D.A. had argued and

4  proven that there had been abuse.

5  So it seems here that the County should be able to

6  argue that there was no Brady violation where the D.A. had

7  argued the same.  Doe held that the County did not have the

8  opportunity to participate in the criminal case, and the D.A.

9  and the County did not have a sufficient relationship to

10  warrant collateral estoppel.  There is no reason to think the

11  rule should be different just because the issue here was the

12  conduct of the D.A.

13  Reasonable minds can differ on this one, but that's

14  where I come out.

15  The County raised other reasons why I should not

16  follow the County Court decision that there was no hearing as

17  required under the C.P.L., and that the County Court didn't

18  have the complete record of what was and was not disclosed,

19  because neither side provided it to the County Court Judge.

20  But because I find the County is not collaterally estopped, I

21  need not reach these issues, although I don't find either

22  argument particularly persuasive.

23  Even if collateral estoppel does not apply, plaintiff

24  argues he is still entitled to summary judgment on the issues

25  of nondisclosure, favorability and materiality of the Brady

1  evidence, because the facts with respect to those issues are

2  undisputed.  The County opposes the motion and cross-moves for

3  summary judgment.

4         As an initial matter, the County argues that plaintiff

5  can't, as a matter of law, obtain summary judgment on a single

6  element of his Monell claim, because Rule 56 does not authorize

7  a piecemeal adjudication of nondeterminative issues.  See

8  Member Services v. Securities Mutual Life, 2010 Westlaw

9  3907489, at Pages 16 to 17 (N.D.N.Y. September 30th, 2010).

10  While some courts have disfavored motions for partial summary

11  judgment -- see, for example, Melini v. 71st Lexington Corp.,

12  2009 Westlaw 413608, at Page 3 (S.D.N.Y. February 13th,

13  2009) -- those same courts recognize that a court may, under

14  Rule 56(d), narrow the issues for trial by determining that

15  certain facts are undisputed when it would be practicable to

16  save time and expense and to simplify the trial.  That is

17  Melini at Page 3.

18         That seems to me to be precisely what plaintiff is

19  doing with his motion for partial summary judgment.  Partial

20  summary judgment motions are contemplated by the federal rules.

21  The Rule 56 Advisory Committee notes state that "Partial

22  summary judgment is merely a pretrial adjudication . . . that

23  likewise serves the purpose of speeding up litigation by

24  eliminating before trial matters wherein there is no genuine

25  issue of fact."  So I find it appropriate to consider the

1  motion for partial summary judgment.

2          The first issue is nondisclosure.  Plaintiff argues

3  there is no genuine issue of fact regarding that the Holland

4  Tape, the Dobler Report and the alleyway statement were not

5  disclosed.  The County concedes that the Holland Tape and the

6  Dobler Report were not disclosed, but argues that neither

7  should have been turned over because they were not Brady

8  material.

9          Putting aside the merits of that argument, it's

10  irrelevant to the present inquiry.  Whether or not it was Brady

11  doesn't affect whether or not it was disclosed.  Plaintiff is

12  entitled to summary judgment on this narrow issue of disclosure

13  with respect to the Holland Tape and the Dobler Report.

14          The County raises a similar argument with respect to

15  the "alleyway witness" statement.  It argues that I previously

16  found that the statement was not Brady material.  But that

17  misrepresents my decision.  I questioned whether the statement

18  was Brady material.  And what I said was, it is by no means

19  obvious that a reasonable police officer hearing, as Regula

20  did, four days after the neighbor's interview, that Smith

21  placed plaintiff on the front porch entry to the victim's

22  apartment, would recognize as helpful to the defense the

23  neighbor's statement about the noise in the alley.  Plaintiff

24  entering the victim's apartment via the porch at one point and

25  someone being in the alley at an unknown point are by no means

1  mutually exclusive.  But I also said that I reach no definitive

2  conclusion on the matter.

3          Further, and importantly, my comments were in the

4  context of the now-dismissed claim against the City of

5  Poughkeepsie regarding its alleged policy of failing to write

6  down all eyewitness statements, and related to whether Officer

7  Regula could reasonably have realized at the time that the

8  statements were helpful or material.  It was only in that

9  context that I made any distinction between eyewitnesses and

10  interviewees.  That distinction, which pops up in the County's

11  papers, is irrelevant for Brady purposes.  In any event, my

12  thoughts on whether or not the statement was Brady material do

13  not affect whether or not the statement was disclosed, and

14  there doesn't seem to be any dispute that it was not disclosed.

15          I could grant summary judgment in favor of plaintiff

16  on the narrow issue of disclosure.  I guess I am doing that,

17  but as I will explain shortly, I have a separate issue with the

18  alleyway statement.

19          Finally, the County asserts it's undisputed that the

20  neighbor statements --

21          Let me back up.

22          Finally, in cross-moving for summary judgment, the

23  County asserts that it's undisputed that the neighbor

24  statements, including the Murphy statement, were disclosed.

25  Plaintiff responds that disputed facts exist regarding whether

1    or not these statements were disclosed, and I agree.  The

2    County claims that the statements were disclosed in (1) the

3    Shelly Report, (2) the June 14th, 1983, letter from Jim O'Neil,

4    (3) William O'Neill's, quote, "Rosario notes," unquote, and in

5    response to a subpoena issued by plaintiff's attorney, Mickey

6    Steiman, in 1990.  But none of those documents establish that

7    the statements were, in fact, disclosed.  Rather, this question

8    remains very much in dispute.

9         For example, the County claims that Steiman received

10   the Shelly Report, and that the neighbors' statements were

11   attached to the report.  But Steiman denies having received the

12   purportedly attached statements, and the Bates numbering on the

13   documents, as produced by the County, suggests that they were

14   not together in the D.A.'s file.

15        Further, William O'Neill's Rosario notes is just a

16   list of items that O'Neill claims to have turned over, but

17   Steiman denies receiving any of these documents.  Further, I

18   note that the statement from Murphy, who was sitting outside on

19   the park bench and says Lamar Smith was not there, is only

20   mentioned in the Regula Report.  So if that document was not

21   turned over and there is a question of fact on that point, then

22   the Murphy statement would not have been disclosed.

23        In the cases on which the defendants rely, the Court

24   said the statements themselves did not have to be turned over

25   where defense counsel was aware of the witness's identity.  But

1    in those cases, defense counsel was also aware that the witness

2    had or might well have favorable information.  Indeed, in the

3    Grossman and Volpe cases cited by the County, the government

4    identified the witnesses as Brady witnesses, so the statements

5    themselves did not have to be turned over.  Here, in contrast,

6    the witnesses were not only not characterized as Brady

7    witnesses, but were arguably mischaracterized as irrelevant in

8    the Shelly Report.

9          So disputed questions of fact prevent me from granting

10   summary judgment to either party on the issue of disclosure.

11         I also reject the County's argument that it had no

12   obligation to disclose these statements because the plaintiff

13   should have discovered them independently.  Largely for the

14   reasons set forth in plaintiff's brief at Pages 16 to 17, I

15   cannot say, as a matter of law, that plaintiff should have

16   discovered this information.  I don't think the summary in the

17   Shelly Report was necessarily sufficient to give plaintiff's

18   counsel the essential facts permitting him to take advantage of

19   the exculpatory evidence, because the summary basically said

20   these witnesses were irrelevant.  Plaintiff's counsel would not

21   have known from that statement that the witnesses, in fact,

22   contradicted prosecution witnesses.  And plaintiff's counsel,

23   indeed, was arguably affirmatively misled in that regard.

24         Now, discussing favorability, plaintiff argues that

25   the County can't demonstrate any genuine dispute of fact

1    regarding the favorability of the Brady evidence.  Evidence is

2    favorable under Brady if it's exculpatory or impeaching.  U.S.

3    v. Rivas, 377 F.3d 195, at 199.  See U.S. v. Certified

4    Environmental Services, 753 F.3d 72, at 91.

5         Plaintiff argues that the Holland Tape and the Dobler

6    Report suggest that Donald Wise, not plaintiff, committed the

7    Crapser murder.  It's very hard to accept the County's argument

8    that this evidence is unfavorable to plaintiff or that I can

9    decide, as a matter of law, that it is unfavorable, when the

10   evidence suggests another individual was responsible for the

11   murder.  The cases are legion that the existence of an

12   alternative suspect is favorable to defendant and has to be

13   disclosed.  See Mendez v. Artuz, 2000 Westlaw 722613, at

14   Page 13 (S.D.N.Y. June 6th, 2000) which collects many cases.

15   That's a report and recommendation that was adopted at 2000

16   Westlaw 1154320 (S.D.N.Y. August 14th, 2000), which was

17   affirmed at 303 F.3d 411.

18        To the contrary, not only do I not find that the

19   evidence is unfavorable, I can go a step further and find the

20   evidence is undisputedly favorable to plaintiff.

21        First, as to the Holland Tape, the County suggests it

22   can't be favorable because it doesn't specifically refer to the

23   Crapser murder, but that is not required.  It refers to a crime

24   with sufficient similarities to the Crapser murder, one where a

25   lady came home as the burglary was in progress.  Although the

1  City states that there were many unsolved burglaries in the

2  City of Poughkeepsie in the relevant year, there is no evidence

3  that there was any unsolved burglary in the City of

4  Poughkeepsie that fit that description where the lady came home

5  with the burglary in progress.

6       In the King murder, which involved breaking into the

7  apartment of elderly women, tying them up and stuffing

8  something down at least one woman's throat itself was

9  sufficiently similar to the Crapser murder in which Ms. Crapser

10  was tied up and something was stuffed down her throat, that

11  Wise's participation in the former suggested his participation

12  in the latter.  Indeed, that the police and the press at the

13  time saw a possible connection between the two murders based on

14  modus operandi illustrates that evidence of Wise's

15  participation in the King murder, coupled with his boast that

16  he'd done one like it before, would have been favorable to

17  plaintiff.

18       William O'Neill's testimony perfectly illustrates the

19  problem.  O'Neill testified that he did not regard the Holland

20  Tape as favorable, because Holland could not have been talking

21  about the Crapser murder because the authorities knew that

22  plaintiff had done the Crapser murder.  As I said, this

23  perfectly illustrates the problem.  Even if A.D.A. O'Neill,

24  upon hearing that Mr. Holland was attributing to Mr. Wise a

25  previous murder much like the Crapser murder, didn't decide

1    that the right thing to do for his own purposes was to revisit

2    or reconsider the Crapser murder in light of that information,

3    he still has an obligation to give the defendant that

4    opportunity.  Even if in the District Attorney's view the

5    Holland Tape was not conclusive or not reliable, it is still

6    favorable.  Even if it did not undermine A.D.A. O'Neill's

7    certainty that plaintiff was guilty, that is not his call to

8    make.  Evidence that might undermine a jury's certainty is

9    favorable.  "Favorable" does not mean that which the D.A.

10   believes.  It means that which could help the defendant.  Even

11   if the D.A. believes it's a lie, it can still be Brady

12   material.

13        As the Mendez Court said, it is for the jury, not the

14   prosecutor, to decide whether favorable information in the

15   police record is credible.  Otherwise, prosecutors might, on a

16   claim that they thought it unreliable, refuse to produce any

17   matter whatever helpful to the defense, thus setting Brady at

18   nought.  That's Mendez at Page 14.  And the Court went on to

19   collect cases to the effect that if evidence suggests someone

20   else might have done the crime, it's favorable and has to be

21   disclosed, even if the prosecution reasonably or not does not

22   believe it's reliable.

23        Further, the evidence suggesting an alternative

24   suspect could also have been used to impeach the credibility

25   and reliability of the police investigation.  See Kyles v.

1    Whitney, 514 U.S. 419 at 445.  See also Alvarez v. Ercole, 2014

2    Westlaw 4056324, at Page 6, where the second circuit last month

3    noted that it is a legitimate defense strategy to suggest that

4    the police prematurely concluded the defendant was guilty and

5    did an incomplete investigation.  So I can hardly grant

6    defendant summary judgment on favorability, and frankly don't

7    see how anyone could rationally find the Holland Tape not to be

8    favorable.

9          The same is true for the Dobler report.  Someone

10   fitting Wise's description fairly closely committed a rather

11   similar offense right down to the cloth in the elderly lady's

12   throat.  Luckily, Ms. Dobler survived, but that's a fairly

13   distinctive detail.  Indeed, defense counsel's argument that

14   evidence implicating Wise -- excuse me.  County counsel's

15   argument that evidence implicating Wise in the Dobler murder is

16   not Brady material because the prosecution witness fingered

17   plaintiff and not Wise -- that's in the brief at Page 24 --

18   again illustrates the problem.  If that evidence undermined the

19   prosecution's case in a significant way, it was Brady.  That it

20   contradicts the prosecution witnesses doesn't make it not

21   Brady.  That's why it is Brady.

22         The Holland Tapes and the Dobler report may not be

23   conclusive of anything, but I do not see how a rational jury

24   could fail to find them favorable.

25         I am unpersuaded by a case the County cites, Bohanan

v. United States, 821 F.Supp. 902 (S.D.N.Y. 1993), affirmed 19
F.3d 8.  The Court there found that it was not Brady material
that another group in a different state had a similar MO to the
bank robbers who had been convicted.  It reasoned that the
existence of another group of bank robbers with a similar MO
was irrelevant, because the prosecution had not relied on MO to
establish the defendant's identity.

With all due respect to my counterpart in that case,
that argument does not seem logical to me.  Regardless of what
evidence the prosecution offered to establish the defendant's
participation, that someone else had the same MO would tend to
suggest that the perpetrator may have been someone else.  In
other words, it would have undermined, maybe not conclusively,
but it would have undermined the evidence that the prosecution
had offered that it was the defendant.  The Second Circuit's
one-word affirmance sheds no light on its thinking, and more
recently, it has acknowledged that evidence pointing to another
possible suspect is favorable.  See Mendez, 303 F.3d, at 411,
and Alvarez at 6.

Even if I were to agree with Bohanan, the facts in
that case are distinguishable from the instant case.  The group
of bank robbers with a similar MO in Bohanan were located in a
different state than the defendant, but here, the evidence was
that Wise had committed a similar crime in the same city.

In short, the suggestion that someone else who lived

1   in the area and who had committed similar crimes was

2   responsible for the Crapser murder is indisputably favorable to

3   plaintiff.  The same is true for the "upstairs neighbor"

4   statements.  The County insists that the witnesses seeing

5   nothing is neutral.  But in this case, the witnesses seeing

6   nothing is favorable because it contradicts the prosecution

7   witnesses who described activity occurring where and when the

8   neighbors saw nothing.

9           For example, Lamar Smith testified about all sorts of

10  things he saw and heard outside the victim's building that

11  night.  Witness Murphy said she knew Lamar Smith, was in the

12  vicinity all evening, and did not see him or the activity he

13  described.  This plainly impeaches the prosecution's witness.

14  Statements that contradict the testimony of the People's

15  witnesses are favorable to the plaintiff.

16          But I cannot say, as a matter of law, that the

17  alleyway statement is favorable.  Although the County Court

18  found that it was, I continue to question whether the statement

19  was Brady material for the reasons stated in connection with

20  the motion to dismiss, and a jury could reach a different

21  conclusion.

22          There is a separate problem with the alleyway

23  statement, however.  It's undisputed that this statement was

24  never memorialized by the City of Poughkeepsie Police

25  Department or shared with the District Attorney.  Thus, its not

1    being handed over to plaintiff could not have been the result

2    of the D.A.'s unduly restrictive definition of Brady.  Assuming

3    that the statement is favorable and material, the reason

4    plaintiff never got it was because of an ad hoc decision by

5    city police officers, not because the D.A. possessed it but

6    withheld it pursuant to its overly narrow reading of Brady.

7            I previously held that there was nothing nefarious

8    about the officer's decision not to write the statement down.

9    But even if there were, the injury to plaintiff from not having

10   the statement was not caused by any policy of the D.A.

11           So partial summary judgment should be entered for

12   defendants as to that statement.  Even though it was not

13   disclosed, and even though there is a dispute of fact with

14   respect to its favorability and materiality, I don't see how

15   there can be any dispute that the injury to plaintiff, if any,

16   was not caused by the D.A.'s custom or policy.

17           Causation is an element of plaintiff's 1983 claim --

18   see Wray, 490 F.3d at 195 -- and a reasonable jury could not

19   find that element to be met.  So summary judgment is

20   appropriate for the County with respect to that statement only.

21   I recognize that this wasn't really argued, and so when we're

22   done here, I'll give the plaintiff the opportunity to persuade

23   me otherwise, but it seems pretty clear.

24           Now, turning to materiality, plaintiff relies on the

25   County Court decision to argue that the evidence was

1    undisputedly material.  But for the same reasons the County is

2    not collaterally estopped from challenging the Court's finding

3    of a Brady violation, I cannot grant partial summary judgment

4    on the issue of materiality.  The decision involved the

5    "reasonable possibility" standard, not the "reasonable

6    probability" standard which applies here.  So the jury should

7    decide if the withheld information probably would have made a

8    difference.

9        Now, turning to the County's cross-motion for summary

10   judgment seeking dismissal of the Monell claim, the County

11   argues that the claim is barred by the Eleventh Amendment, that

12   the D.A. is not a policy-maker for the County, and that even if

13   the County could be liable under Monell, plaintiff has not

14   submitted evidence to suggest that the D.A. had an

15   unconstitutional Brady policy.  The County also argues that the

16   plaintiff did not sustain a deprivation of his constitutional

17   rights, but much of that argument responds to plaintiff's

18   assertion that he is entitled to summary judgment on the

19   individual Brady issues of nondisclosure, favorability and

20   materiality which I just addressed.

21       The only additional argument the County raises is that

22   plaintiff's Brady rights were not violated, because plaintiff

23   received other exculpatory and impeachment evidence from the

24   D.A.  But just because plaintiff receives some exculpatory and

25   impeachment evidence does not mean that the D.A.'s failure to

1    provide the evidence at issue in this case does not constitute

2    a Brady violation.

3            So let me now turn to the Eleventh Amendment argument.

4            The County argues that prosecutors, when deciding

5    whether evidence should be disclosed pursuant to Brady, are

6    acting on behalf of the State, and thus entitled to the State's

7    Eleventh Amendment immunity.

8            While it's true that individual prosecutors are

9    entitled to immunity for their decisions related to Brady

10   disclosures -- see Van deKamp, 555 U.S. 335, at 344 -- this

11   immunity does not extend to municipalities; here, the County.

12   See Owen v. City of Independence, 445 U.S. 622, 657, where the

13   Supreme Court said that municipalities have no immunity from

14   damages for liability flowing from their constitutional

15   violations.  See Askins v. Doe, 727 F.3d 248, at 255, where the

16   municipality was not immune, even though the officer was.

17           So I reject the argument for Eleventh Amendment

18   immunity.

19           The County next argues that it's entitled to summary

20   judgment because the D.A. is not its policy-maker.  This

21   argument opens up an inquiry into a series of cases from the

22   circuit that have tried to flesh out when and in what

23   circumstances the County is liable for the actions of a State

24   prosecutor.

25           In Myers v. County of Orange, 157 F.3d 66, at 77, the

1  Court held that a D.A. policy that directed the police and

2  County A.D.A.s to engage in investigative procedures that

3  violated plaintiff's "equal protection" rights by refusing to

4  accept criminal cross-complaints gave rise to municipal

5  liability against the County.  The Court held that the County

6  was liable for the D.A.'s managerial decision to implement a

7  cross-complaint policy, because it reflected the D.A.'s long

8  practice of ignoring evidence of police misconduct and

9  sanctioning and covering up wrongdoing, and a D.A.'s decision

10  not to supervise or train A.D.A.s on Brady and perjury issues,

11  all of which would result in County liability.  That's Myers at

12  77.

13       The Court in that case outlined the law in the

14  circuit.  It explained that an inquiry into whether

15  governmental officials are final policy-makers for the local

16  government in a particular area involves an inquiry into the

17  definition of the official's functions under relevant state

18  law.  Under New York law, D.A.s and A.D.A.s are presumed to be

19  local county officers, not state officers.  That's Myers at 76.

20  The Court went on to note at the same page, however, that New

21  York courts recognize a narrow exception to this general rule

22  when a prosecutor makes individual determinations about whether

23  to prosecute violations of the state Penal Law.  The Court

24  continued at Page 76, "Although a county cannot be held liable

25  for an A.D.A.'s improper filing of an indictment" -- see Myers

1    v. Hennessy, 853 F.2d 73, at 77 (2d Cir. 1988) -- a county can

2    be liable based upon its, quote, "long history of negligent

3    disciplinary practices regarding law enforcement personnel

4    which gave rise to the individual defendant's conduct in

5    promoting the malicious prosecution of plaintiffs."  Unquote.

6    Gentile v. County of Suffolk, 926 F.2d 142, at 152, Note 5 (2d

7    Cir. 1991).

8         In Walker v. City of New York, 974 F.2d 293 (2d Cir.

9    1992), where the, quote, "prosecutors covered up exculpatory

10   evidence and committed perjury in order to ensure the

11   defendant's conviction," unquote, id. at 294, the circuit held

12   that a county could be liable for the, quote, "District

13   Attorney's management of the office; in particular, the

14   decision not to supervise or train A.D.A.s on Brady and perjury

15   issues."  Unquote.  Id. at 301.  The Court in Walker noted that

16   Baez was, quote, "confined . . . to challenges to specific

17   decisions of the District Attorney to prosecute," unquote, and

18   held, quote, "Where a District Attorney acts as the manager of

19   the District Attorney's Office, the District Attorney acts as a

20   county policy-maker."  Id. at 301.  Again, that's all from

21   Myers at Page 76.

22        The County argues that under Walker, plaintiff must

23   advance a "failure to train" theory to bring a Monell claim,

24   and because I previously dismissed that claim, plaintiff's

25   remaining claim must be dismissed.  Plaintiff disagrees with

1    the County's narrow reading of Walker.

2            I find plaintiff's claim that the D.A. managed his

3    office with an unconstitutional Brady policy that failed to

4    require disclosure of evidence unless it was truly exculpatory,

5    constitutes an allegation that fits within the realm of Walker

6    and Myers.  I see no reason why a policy of not training on

7    Brady should subject a county to liability, but a policy to

8    apply Brady too narrowly would not.  Indeed, Myers found county

9    liability for a long-standing practice of covering up police

10   misconduct.  A long-standing practice of construing Brady too

11   narrowly seems like the same sort of thing.

12           Accordingly, I find the County may be liable for the

13   D.A.'s actions.  See Ramos v. City of New York, 285 A.D.2d 274,

14   at 303 (App. Div. 2001), where the Court held that when

15   prosecutors conceal Brady material pursuant to policy or

16   custom, liability rests with the county, not the state.

17           The County cites a series of district court cases in

18   support of its position that the D.A. is not the County

19   policy-maker, but those cases are distinguishable.  Almost all

20   of them involve complaints against individual prosecutorial

21   decisions of the D.A. which, as previously explained, are not

22   at issue here.  See Doe v. Green, 593 F.Supp.2d 532, at 534

23   (W.D.N.Y. 2009), where the county was not liable for the

24   prosecutorial acts of the state which there involved conduct

25   before the grand jury; Michels v. Greenwood Lake Police

1    Department, 387 F.Supp.2d 361, at 367 (S.D.N.Y. 2005), where

2    the case was regarding the defendant's handling of plaintiff's

3    individual case and no policy or custom was identified.  The

4    Court there did suggest the D.A. policies can never be county

5    policies, but it didn't grapple with Walker or Myers.  See

6    McLaurin v. New Rochelle Police Officers, 368 F.Supp.2d 289

7    (S.D.N.Y. 2005), where there was no "malicious prosecution"

8    claim against the county because the county was not liable for

9    individual prosecutorial decisions by the D.A.  Another case

10   cited by the County, Miller v. County of Nassau, 467 F.Supp.2d

11   308 (E.D.N.Y. 2006), is arguably a closer case, because there,

12   plaintiff had challenged an alleged policy of the D.A.'s Office

13   regarding executing plea bargains, not just an individual

14   prosecutorial decision.

15          But as I read the Miller decision, the Court based its

16   holding on the observation that, quote, "plea bargaining is

17   intertwined with prosecutorial decisions regarding prosecution

18   and trial," unquote, and that plea bargaining is, quote, "not

19   related to the District Attorney's management of the office,

20   and has no relation to the training of Assistant District

21   Attorneys or police investigative policies."  Unquote.  That's

22   Miller at 316.

23          By contrast, plaintiff in this case alleges that the

24   D.A. managed the office with an unconstitutional Brady

25   disclosure policy.  For what it's worth, a policy regarding

1    Brady disclosure seems slightly more attenuated from the actual

2    prosecution of an individual than a policy regarding plea

3    agreements.

4           So I do not feel compelled to follow the Miller

5    decision.  And in any event, I simply disagree with Miller

6    because I don't see why a policy that affects all plea

7    bargaining should be treated like an individual decision

8    whether to prosecute or not.  The former sounds like management

9    or administration to me.  So again, with all due respect to my

10   counterpart in the Miller case, I would have come out the other

11   way in that case.

12          The County then argues that even if the County could

13   be liable for the D.A.'s action, as I have just found,

14   plaintiff has not introduced evidence to suggest there was a

15   policy or custom of the District Attorney of interpreting Brady

16   in an unconstitutional manner.  I disagree and find that

17   plaintiff has submitted evidence to suggest that the D.A. had a

18   policy that subjected Brady; at least there is a factual

19   dispute on the subject.

20          The County first argues that the, quote, "standard

21   response form" unquote or template language is not enough to

22   establish a policy or custom.  But plaintiff has introduced

23   testimony from Grady and from William O'Neill that that

24   language was, in fact, the D.A.'s Office's response to Brady

25   requests, and this evidence seems to at least raise a question

1    of fact as to whether or not the office had an unconstitutional

2    Brady policy.  In addition, plaintiff has introduced evidence

3    that this language was used in other cases, and that Brady

4    material was not disclosed in other cases, which gives rise to

5    a plausible policy.

6            Further, plaintiff has introduced evidence that

7    several A.D.A.s articulated in court the D.A.'s view of its

8    Brady obligations as not extending to merely favorable

9    evidence.  There are other examples of Brady requirements being

10   properly articulated, but (a) the question isn't so much the

11   articulation as the practice, so proper articulation could

12   still exist with an improper practice, and, of course, vice

13   versa, (b) the articulation is only evidence of the practice,

14   it's not the practice itself, and (c) the existence of proper

15   and improper articulations demonstrate a fact question.  There

16   is some evidence of an unduly narrow reading of Brady and some

17   evidence suggesting the contrary.  It's a classic factual

18   dispute.

19           I also reject the County's arguments that because

20   others, such as public defenders and judges used template

21   language with respect to Brady means that the D.A.'s policy did

22   not violate Brady.  This argument seems irrelevant to whether

23   or not the D.A. had an unconstitutional policy, especially

24   where the policy is not limited to the specific language in the

25   template, but where plaintiff's argument is that those forms

1    reflect the existence of a policy.  Further, the public

2    defender and the courts that used the language, quote, "tend to

3    exculpate," unquote, also added, quote, "or is otherwise

4    favorable," unquote, language the D.A.'s Office usually did not

5    use, at least on occasion argued against, and still may think

6    is wrong.  At least an argument could be made based on the

7    Grady and O'Neill depositions.

8         Let me finally address the supplemental authority that

9    the parties briefed for me, which, on the whole, does not alter

10   my analysis.  They brought to my attention Matusick v. Erie

11   County Water Authority, 759 F.3d 51, amended and superseded by

12   757 F.3d 31, and Jones v. City of New York, 988 F.Supp.2d 305

13   (E.D.N.Y. 2013).

14        Matusick involved a "workplace discrimination" claim.

15   The circuit held that collateral estoppel applied, and that the

16   jury was precluded from finding that Matusick had not actually

17   engaged in misconduct that had been charged against him in a

18   Section 75 hearing.  That's Matusick at 49.  It also upheld

19   plaintiff's Monell claim, finding that plaintiff had alleged

20   that defendant's actions were sufficiently widespread and

21   persistent to support a finding that they constituted a custom,

22   policy or usage of which supervisors must have been aware.

23   That's Matusick at 62.

24        With respect to collateral estoppel, the case doesn't

25   set forth any new law, or at least any new law that affects my

**1**  decisions.  It focuses on whether the issues are identical, but

**2**  doesn't identify what effect different burdens of proof have on

**3**  this inquiry, nor does it address the "full and fair

**4**  opportunity to litigate" issue.

**5**  As for Monell, Matusick re-affirmed that isolated acts

**6**  can give rise to Monell liability if done pursuant to municipal

**7**  policy or sufficiently widespread and persistent to support a

**8**  finding that they constitute a custom, policy or usage of which

**9**  supervisors must have been aware.  The decision arguably helps

**10**  plaintiff, because it re-affirms that isolated acts can be the

**11**  basis for Monell liability if certain conditions are met.  And

**12**  plaintiff seems to be arguing that the D.A.'s policy regarding

**13**  Brady resulted in isolated acts that violated his rights.

**14**  The County attempts to distinguish Matusick on the

**15**  ground that there is no evidence in the record to establish the

**16**  presence of frequent and severe Brady violations, but I find

**17**  the record shows issues of fact with respect to whether the

**18**  D.A. had a widespread policy or practice of only disclosing

**19**  Brady material when exculpatory as opposed to just favorable,

**20**  such that municipal liability could attach.

**21**  Turning to the Jones decision, in that case, the Court

**22**  granted a motion to dismiss because plaintiff had failed to

**23**  plead facts plausibly alleging that the D.A. was on notice of

**24**  the need to train A.D.A.s regarding Brady, essentially applying

**25**  the Supreme Court's decision in Connick v. Thompson, 131 S.Ct.

1    1350.   Plaintiff cites this case for specific language from

2    Judge Weinstein, which plaintiff concedes is dicta, to the

3    effect that in Judge Weinstein's opinion, sovereign immunity

4    should shield the city from liability for the D.A.'s actions,

5    but Judge Weinstein acknowledged that his view was contrary to

6    circuit precedent.   In other words, plaintiff argues that Judge

7    Weinstein reads circuit precedent to suggest that the County

8    can be liable for the D.A.'s actions.

9            Of course, Judge Weinstein, although a well respected

10   judge, is not on the Second Circuit, and his reading of circuit

11   precedent is not precedential, but I consider it, nonetheless.

12   And even he recognized that under Second Circuit and Supreme

13   Court precedent, the county or, in his case, the city, is the

14   proper municipal party in interest in a Monell claim, based on

15   the policies or customs of the D.A.   That's Jones at 316.

16           More persuasive is a case from the Ninth Circuit,

17   Goldstein v. City of Long Beach, 715 F.3d 750, at 751 to 53,

18   which Judge Weinstein cites in Jones at Page 317, where the

19   Court found that "The D.A. represents the county when

20   establishing administrative policies and training related to

21   the general operation of the District Attorney's Office,

22   including the establishment of an index containing information

23   regarding the use of jailhouse informants."   The Court in

24   Goldstein explains that it's clear that the District Attorney

25   acts on behalf of the state when conducting prosecutions, and

1   local administrative policies are distinct from the

2   prosecutorial act.  That's Goldstein at 759.

3          Plaintiff's claim here is similar to the allegations

4   in Goldstein that the D.A. had a policy regarding its

5   obligations under Brady, and that this policy was

6   unconstitutional.  Just because the policy was allegedly an

7   affirmative one which --

8          I'll try again.

9          Just because the policy was allegedly an affirmative

10  one with which the D.A. himself agreed or at least which the

11  D.A. himself ratified, rather than one inferred from the

12  failure to train or supervise or discipline, should not, it

13  seems to me, make a difference.  One key fact in Goldstein,

14  moreover, was that California categorized District Attorneys as

15  county officials.  That's Goldstein at 759.  Likewise, as the

16  Second Circuit observed in Myers, D.A.s and A.D.A.s are

17  generally presumed to be local county officers, not state

18  officers under New York law.  That's Myers, 157 F.3d at 76,

19  quoting New York Public Officers Law Section 2 and New York

20  County Law Section 53.1.

21         So Goldstein, although not binding on this Court,

22  suggests that the plaintiff's Monell claim should survive

23  summary judgment.  Of course, whether the plaintiff can prove

24  that the County's policy led to the alleged violation of

25  plaintiff's Brady rights is a separate question, as is whether

1    the disclosure of the information would probably have made a

2    difference.  But at present, I find that fact issues exist as

3    to whether the County is liable for the D.A.'s policy of

4    failing to disclose Brady material unless the material was

5    exculpatory rather than simply favorable.

6         So does plaintiff want to make any argument as to why

7    the County should not be entitled to summary judgment with

8    respect to the "alleyway witness" statement on my theory that

9    the nondisclosure of the statement couldn't be the result of

10   the unconstitutional Brady policy?

11        MR. MacDONALD:  No, your Honor.

12        THE COURT:  All right.  Then here's where we are.

13        The plaintiff's motion is granted in part and denied

14   in part.  It's granted on the issue that the Dobler Report and

15   Holland Tapes were not disclosed.  And it's granted on the

16   issue that the Dobler Report, Holland Tapes and neighbor

17   statements were favorable to plaintiff.  It's otherwise denied.

18        And the defendants' cross-motion for summary judgment

19   is granted in part and denied in part.  It's granted dismissing

20   plaintiff's claim against O'Neill and the claims for punitive

21   damages.  And it's granted dismissing claims arising from

22   failure to disclose the "alleyway witness" statement.  And it's

23   otherwise denied.

24        The Clerk of Court should terminate Mr. O'Neill as a

25   defendant, and close Motions 146 and 156.

1                   Now, we should discuss trial date or settlement.

2                   Can I see you folks at the sidebar off the record?

3                   (Discussion off the record at the sidebar)

4                   THE COURT:  All right.  We've had a discussion off the

5     record.

6                   I think it would be in everyone's interest to set a

7     schedule for trial that built in some time to see if there is

8     any possibility of resolving the case, which, since it involves

9     a governmental entity, is going to be a cumbersome process.

10                  So let me first ask the parties how long they think

11    the case would take to try, soup to nuts.

12                  MR. MacDONALD:  I think the case would take about

13    seven or eight trial days, so a week and a half or so.

14                  THE COURT:  Does that sound right to you Mr. Burke?

15                  MR. P.T. BURKE:  It does, Judge, depending upon

16    evidentiary rulings.

17                  THE COURT:  So I'll put aside two weeks.  The question

18    is when.

19                  MR. P.T. BURKE:  Before you go digging too far, can

20    I -- my personal schedule -- and I have never brought these

21    kinds of things up to the Court until I reached a certain age.

22                  THE COURT:  You know me.  I don't like to ruin

23    people's personal lives or their work lives.

24                  MR. P.T. BURKE:  My wife and I had planned to take off

25    from about the last week in January to the first week in March;

1    in other words, the entire month of February.

2              THE COURT:  Nice.

3              MR. P.T. BURKE:  Well, when you get to be my age,

4    Judge, you can do these kinds of things, I hope.

5              THE COURT:  God bless you.

6              I hope.

7              MR. P.T. BURKE:  Well, I'm sure --

8              THE COURT:  Somehow, I never have figured out how --

9    you know, like Judge Brieant used to take the whole month of

10   August off, and I was really looking forward to that when I

11   became a judge, and I haven't been able to do it once.

12   I'm happy if I get two weeks.  But he was much faster than I

13   am.  Maybe I'll catch up.

14             All right.  So you're gone in February.  Right now, I

15   have trials in January.  However, one is the week of 5th and

16   one is the week of the 26th.  So we could squeeze this in the

17   weeks of January 12th and the 19th.

18             MR. MacDONALD:  Actually, I was just speaking to one

19   of my colleagues, and we were going to propose January 12th or

20   the 13th, knowing that the 19th is a holiday, so there would be

21   a break there.

22             THE COURT:  Right.

23             MR. MacDONALD:  I have one issue with a witness, one

24   witness's availability.  That would have to be in that second

25   week.  But I think we would go into that second week, and I may

1    not need to call that witness.

2              THE COURT:  Well, I'm always flexible about taking

3    witnesses out of order --

4              MR. MacDONALD:  Thank you.

5              THE COURT:  -- if, you know, people have vacations or

6    whatever planned.

7              Does that work for defense counsel?

8              MR. P.T. BURKE:  We'll have to make it work if the

9    Court orders it.

10             MR. M.K. BURKE:  The only concern, your Honor, is that

11   as we approach towards trial; obviously, the pretrial motions

12   and everything else will push us into Christmas.

13             THE COURT:  Well, I think we would have to take care

14   of those in December.  But that would still give you a good two

15   months to try to resolve the case.

16             MR. P.T. BURKE:  We should be able to get that done.

17             THE COURT:  All right.  So let's work back from

18   January 12th.  And if I'm lucky, one of my other two cases will

19   go away so I don't have three back to back.  But if I do, so be

20   it.

21             Jury selection and trial will be January 12th.

22             Alice, can we find a date for final pretrial

23   conference the week of the 5th, maybe the Thursday?  Because I

24   think the trial we have that week is just going to be three

25   days.

1       THE DEPUTY CLERK:  January 8th, 2:30.

2       THE COURT:  January 8th, 2:30, will be the final

3   pretrial conference.  Then working backwards from there and not

4   destroying your holidays, how about motions in limine

5   December 10th, and opposition December 17th.  I'll have the

6   joint pretrial order December 3rd, proposed jury instructions

7   and voir dire questions also December 10th, let's say.

8       MR. MacDONALD:  I'm sorry.  December 10th for?

9       THE COURT:  Proposed jury instructions and voir dire

10  questions December 10th, motions in limine December 10th,

11  opposition to motions in limine December 17th, joint pretrial

12  order December 23rd, final pretrial conference January 8th at

13  2:30, jury selection and trial January 12th.

14       And that leaves you a good two and a half months to

15  try to resolve it.

16       MR. P.T. BURKE:  Judge, what weeks did you pick for

17  the trial?

18       THE COURT:  The weeks of January 12th and 19th.

19       MR. P.T. BURKE:  Okay.

20       THE COURT:  You can go on your vacation free of cares.

21       MR. P.T. BURKE:  Well, please God, the 20th, I think

22  we're planning on leaving.

23       THE COURT:  I'm sorry.  What's the day you're leaving?

24       MR. P.T. BURKE:  The 20th.

25       THE COURT:  Oh, you're leaving that early in January.

1    MR. P.T. BURKE:  Yes.

2    THE COURT:  Aha.  Well, I don't think we'll be

3    finished by the 20th, especially because the 19th is a holiday.

4    MR. P.T. BURKE:  No.  I beg your pardon, your Honor.

5    We're not leaving until the 27th.  I'm sorry.

6    THE COURT:  Okay.  Then we're good.

7    MR. P.T. BURKE:  Yes.

8    THE COURT:  We've got to be done by the 27th or at

9    least the jury had better have it.

10   MR. P.T. BURKE:  Right.

11   THE COURT:  All right.  Good.  Why don't you folks

12   send me a joint letter a week from today with respect to

13   whether you think Magistrate Judge, private mediator or court

14   mediator is the best idea, or if you don't like any of those

15   ideas.  But I think, as somebody said at the sidebar, there is

16   nothing like a trial date to focus the mind.  So now is the

17   time to work this out if it can be worked out.

18   MR. P.T. BURKE:  Right.

19   THE COURT:  All right.  Anything else we should do

20   now?

21   MR. M.K. BURKE:  Your Honor, do we want to set for

22   now -- we do, I believe, intend to move to re-argue -- a

23   schedule as to that or do you want me to send it in a letter a

24   week from now?

25   THE COURT:  Well, why don't you talk to Mr. MacDonald

1  and Mr. Firsenbaum and see if you can agree on a schedule.  I'd

2  like it to be pretty tight.

3          Do you want to tell me, without committing yourself,

4  what are the issues that you think I blew.  Or let me withdraw

5  that.  What are the ones that you think I blew and that you're

6  going to move to reconsider on, because maybe you think I blew

7  more than one.

8          MR. M.K. BURKE:  The first issue, your Honor, is that

9  nowhere in the complaint, the amended complaint, does it have

10  an allegation as to managerial role of the D.A.'s Office.

11  There are different theories of liability under Monell, as we

12  all know.  There is the management and supervision.  There is

13  the failure to train.  They initially brought a "failure to

14  train claim."  There was language in the initial complaint that

15  had touched on a managerial role.  That was taken out of the

16  amended complaint.  So there is no complaint -- there is

17  nothing in the allegations as to managerial role.  It was

18  custom and policy, the third Monell theory of liability, not

19  the failure on the part of Grady who was no longer a defendant,

20  in his managerial role.

21          THE COURT:  I don't know.  He's the one who sets the

22  policies.  I mean, my discussion --

23          Make your motion.  I'm not suggesting you shouldn't.

24  If I screwed up, I want to fix it.

25          But when I was discussing the distinction between

1    managerial -- when I was discussing managerial role, I was

2    discussing it in the context of the distinction between

3    managerial and prosecutorial, the former meaning overall

4    policies of the office, the latter meaning individual case

5    decisions.

6         So whether you call it "setting policy" or

7    "implementing a policy or practice" or "managing the office

8    according to a policy or practice," I still think it meets

9    Monell.  But as I say, you'll get the transcript, you'll decide

10   whether what I said was right or wrong.  Okay?

11        Was there another issue?

12        MR. M.K. BURKE:  I need to --

13        THE COURT:  When you get the transcript, you'll find

14   out.

15        MR. M.K. BURKE:  I'll find out.  That's correct.

16        THE COURT:  All right.  So I hope you'll have the

17   transcript in time to put that in the letter next week, as

18   well.  Hopefully, you can agree upon a scheduling order, but

19   I'm not going to want 25 pages.  Let's keep the briefs to 15.

20   And actually, the sooner I get them the better, because the

21   more time that goes by, in my old age, I start to lose the

22   details.  But they're really in the front of my mind now.  So

23   try to put that in the letter, as well.  But I hope you'll

24   still be talking settlement while that's pending.

25        All right.  Anything else?

1           MR. BOZELLA:  Your Honor --

2           THE COURT:  Better talk to your lawyer.  Don't talk to

3    me.

4           (Pause)

5           MR. MacDONALD:  My client simply wanted to express his

6    gratitude to the Court for the time and the willingness to

7    present the decision today in person.  He appreciates that, as

8    I'm sure I speak for all counsel, for the Court's energy and

9    time on this.

10          THE COURT:  That's why they're paying me the big

11   bucks.

12          ALL COUNSEL:  Thank you, your Honor.

13                              -   -   -

14

15

16

17

18

19

20

21

22

23

24

25